# EXHIBIT G

Allianz Meeting - March 1, 2022

USAO: Damian Williams, Margaret Garnett, Dan Gitner, Andrea Griswold, Scott Hartman, Margaret Graham, Nicholas Folly, Richard Cooper, and Gina Castellano

S&C: Bob Giuffra; William Torchiana (S&C) (Paris); Stephanie Wheeler; Jamie McDonald; Shane Yeargan (

Immersion (Graphics for S&C): Harper Smith

AGI:  Hans-Konrad Ress (Group General Counsel, Allianz SE) (Munich); Norbert Schlund (Head of Corporate Law & Governance, Allianz SE) (Munich); Tobias Pross (CEO, Allianz Global Investors) (Munich); Thomas Schindler (General Counsel, Allianz Global Investors) (Munich)

USAO:  Thank you for being here.  Meaningful that you are all here, that you travelled to be here, that you have been here in the past.

AGI: Potential guilty plea will not allow us to advise mutual funds.  It will have an impact on 1000 employees – will have to unwind portfolios

The $72 billion abroad is both advisory and sub-advisory.

If lose license, no other regulators abroad will allow these funds to continue – will need to unwind. The moment AGI US loses license, other regulator says cannot delegate to other entities, cant just transfer to other asset managers; if not legally allowed to manage, have to return funds to the client

The principal is the same:  once you lose license not allowed to manage.  Never been instance when investment advisor lost license so unchartered territory as to what is supposed to happen

Once guilty plea is announced the portfolio managers will move. No growth opportunity and if they unwind portfolios, they will be the teams trying to find a new home.  Moving clients to another asset manager is not going to work

Really ask you to allow us to continue to work – take into account amount already paid and willing to pay and think of innocent employees.

If you give us the chance, will continue to improve and do better

USAO: Will you commit to making investors whole, regardless of how this plays out?

RG: Regardless of how this plays out, plan is to make investors whole.  Whole is in the eye of the beholder, we think we have done that with respect to plaintiffs settled with.  Sign of good faith, we went forward with settlements and that money is out.  That amount of money is top 5 of securities settlements.  No evidence that anyone from AllianzSE knew anything about this.  Cannot think of another case where parent who is not culpable funded settlements

OB:  We accept and take responsibility for the harm to our clients

Turning to presentation:

RG: Thank you to your team. Begin by saying cooperative relationship. Today we have four topics:

First, why for an investment advisor a guilty plea is a death penalty. A car company or pharmaceutical company doesn't have the collateral consequences that I/A does. Here, it actually is a death penalty.

Your prosecutorial interests can be satisfied by DPA, fine and monitor

In every other case that involves advisor, resolved by DPA

SAC is only case where IA pled guilty – did not advise mutual funds

Serious precedent here by having this strict liability rule. Regime where basically, regardless of mgmt. involvement, pervasiveness, whether cooperating, there is going to be a guilty plea that puts them out of business. Blackrock example.

Slide 4: Allianz is biggest insurance company in the world

Slide 6: Important in that SA was a different kind of product than the rest of Allianz – the rest is standard.

Slide 7: $78 B in Asia and Europe.

In 1940 when 40 Act enacted, IAs small operations not part of financial conglomerates. One thing to put Tournant and SA out of business, another thing to put a big business out of business.

9c- disqualified from managing $111 bilion of its $120 billion.

Told by IM wont get waiver, but seems clear PIMCO would.

Looked at whether another entity could take plea to avoid corporate death penalty and cant – same with sale

JM:

As to precedent, think were the office to pursue a DPA here that would actually be a step toward prosecuting companies

SAC: didn't advise mutual funds; widespread; institutional and rose to the top of the company

Key point in connection with SAC case – company was shut down but that was intended consequence not a collateral consequence. Not aware of case where Office required guilty plea where company shut down as collateral consequence

In Morgan Stanley case, finding of direct harm to investors. But yes, precedent as to DPA or guilty plea is only SAC

RG: No question that in private fund business SEC looking at this closely about funds understating the risk. Not disputing that happened here. This can happen at Blackrock, JP Morgan, and the issue of adopting a strict liability regime – if wrongdoing in an investment adviser, shut down the business.

USAO: Where would strict liability rule emanate from? The flip side is functional immunity.

RG:  There needs to be a nuanced version of enforcement,  Here, 3 wrongdoers.  No evidence that no one else outside of SA team knew of wrongdoing; fair to say cooperated, and made substantial efforts to make investors whole.  So in continuum of responsibility could have senior mgmt. involved, pervasiveness, no cooperation and no compensation.   No question that conduct wrong – but limited to three people, people further up didn't know about it, cooperated, and paid $3.5B and prepared to put up more.  To treat AGI US the same as directed from top, pervasive, not cooperating, losing ability to have more nuanced prosecution.

Prepared to have discussion of financial penalties; prepared to have monitor; and parent is prepared to fund a substantial fine.

USAO:  Resist the premise that strict liability or functional immunity.  There is nuanced balancing that is going on.  When strategy adopted by AGI US? Concerned about mismatch between strategy and compliance structure?  True symmetry between risk that investors are exposed to and compliance

OB:  Part is that you let us continue the work.  If we have guilty plea, unwind, no monitor

RG:  The street will pay attention to this resolution no matter DPA or guilty plea,  Sheer amount of $.  The strategy itself was developed while at Oppenheimer and then comes up to Allianz in 2008.  SA performed well from 2008-2020.  Compliance:  fund different from everything else and too sophisticated for compliance function in place and three managers who conducted brazen fraud.  COVID was hard  - couldn't meet with people face to face.  Took a lot of work to uncover the fraud.  The three managers clearly violated all of the policies

Slide 30:  Examples

- UBS and Barclays did not have types of collateral consequences we are talking about it here
- JP Morgan:  In course of one decade, JPM had 5 criminal resolutions and one guilty plea

USAO:  Is DPA effective general deterrence?

RG:  Putting companies out of business – Arthur Anderson was one example, Drexel Burn is another.  In all of those examples, the wrongdoing was at the very top of the firm – Milton was the mastermind.  No history

We are only a $120BN asset manager non-US.  Have to be prepared to apply that same principal to big NY employers.  Cant be that too big too fail or put out of business means cannot apply that rule.  Blackrock is in same position as AGI US, because it is an I/A.

If evidence that people above GT in on it, not cooperated, not paying investors.

This is like GS Asset Mgmt – to extent 40 Act advisors within institution, everyone gets blown out.  Allianz SE and Allianz GmbH not comparison to Blackrock or GS because not I/As.

AGI US clearly didn't have money to compensate investors

In terms of what is left to pay investors – 26% -  looking to resolve and mediating.  As a sign of good faith and as something we hoped you would take into account, we paid this money already.  We could have litigated – we didn't, client wanted to do the right thing.  Didn't litigate against Jamey Sharpe – could have gone after him in litigation, didn't.

Slide 42: Made settlement offers to all of them.

Slide 43:

If you shut the business down, the value of $120B book is $2.5-3B.  If paid north of $4B to settle civil, and then lose 2.5-3BN in economic value.  In terms of deterrence, $6.5-$7b.  That is a huge amount of enterprise liability.

Allianz SE has supervisory board and management board – each has separate counsel.  Very mindful of German corporate law principals.  Issues are real – Allianz SE cannot just pay money it doesn't have a basis to pay.  Looking at situation where may have to place AGI US into bankruptcy

Slide 43:  Under German corporate law regime, enterprise is blown up, no legal obligation to fund subsidiary, that as a matter of german corporate law would not be justified.  With a DPA, could explain it.  Have to prove to investors that did not overpay.  If we pay up to $4BN and then AGI US is out of business – will likely face civil law suit.

Candidly, if you do a guilty plea, plan at this point is to settle with investors – in terms of paying fines, that would raise serious questions under German law.  Here, based on statement of facts, no claim against parents.

Parent of AGI US has done everything by the book – fully cooperating, funding settlements, being prepared to pay fines, and will resolve these cases with rest of investors because we want to stand by investors.  In case of guilty plea don't think parent can pay fines to DOJ or the SEC fair fund where there is no business purpose.

Slide 45:

- Cooperation – above and beyond what justice manual requires; shared privilege information and work produce of our experts; given lots of information include wrt to the obstruction case
- Forensic review results are reflected in the statement of facts
- Holdings data – this is one that don't think anyone would have found on their own; experts and S&C stumbled upon it

RG:

- Sitting here where I am would like to see you prosecute GT – would like to help you do that but may not have anyone at AGI US to help you do that if guilty plea

Slide 55:

Guilty plea of a registered advisor with mutual funds – no one really knows because never been done and no one knows what consequences will be

The way these funds are set up – operated through intermediaries and institutional clients.  Investors are retail investors around the world.  Having ability to set up a transition – very concerned about chaotic wind down.  End up with orphaned funds with no one to manage.  Who is going to handle risk?  Who is going to handle redemption request?  If investors rush to exits, would have to halt withdrawals and investors could suffer losses which would result in additional losses.

Ukraine situation is disrupting markets.  Trying to wind down in middle of Ukraine crisis is scary concept.

USAO:  Are you saying can never guilty plea because would always be this situation?

RG:  No, on these facts, can say in DPA that you thought very hard about plea agreement, can negotiate how to protect investors,

On employees, people will lose their jobs.  The PMs will find a new job but people who have worked at AGI – some of them for years – innocent people who never laid eyes on GT will lose their jobs.  Job losses outside of US.

Allianz SE is the largest German financial institution.  Taking the ultimate weapon that you have in arsenal at time of global turmoil.  Ukraine is hundreds of miles from Germany.

Innocent affiliates of AGI US – PIMCO is one of largest financial advisers in US, Allianz Life is one of biggest insurers in US –

DPAs carry big impact –

Slide 64:

Do not dispute that control environment around AGI us was not the best.  Lots of flaws.  No control environment is perfect.  This cannot be the line where you draw the guilty plea line.  This is a standard that would be hard to apply fairly.

Compliance: We recognize that compliance should have been better.  The second flaw was ability of PMs to do one-off client communications with investors.  That was a flaw in the system.

There is no evidence that people in the compliance function or audit or legal knew about the wrongdoing and looked the other way.  If there was evidence of control function looking the other way, different position.

USAO:  Why no self report here?

RG:  S&C got involved in July 2020 – this case was really affected by COVID.  No one was going to the office – in retrospect, think in initial review done by Ropes, too much acceptance of what they were being told by PMs, not enough kicking of the tires, NERA hired in Aprl/May 2020 (didn't find it; main person working is former SEC expert).  Hard to find.  Were there issues raised in the complaints?  Yes, hedging.  Understood this case to be in the gray zone until the SBN interview.  Possible mistakes early on by Ropes, COVID impacted, and willingness of portfolio managers to lie – COVID had a lot to do with it.  GT would only talk without a camera.

Slide 66:

USAO:  Do you dispute that compliance did not have anyone checking that what investors were told about hedges were accurate, or that what BCBS was told about how it ran the fund was accurate?

RG:  For purposes of this convo, not disputing compliance function was subpar but think it was better than you think it was.  Should have been better.

GT was a charismatic successful person who ran this fund and grew it.  Even through market dislocation

Compliance was well-funded.  There was an independent compliance function.  Not a sham function.

If this was done for a criminal purpose (that AGI US did not have compliance targeted to SA) then would be in a difference situation.

P71-72

ERS – think it was independent.  Paid separately, didn't report to PMs,

ERM – did have access to legal and compliance

Slide 74:

Slide 75:  Control failures – even in instances with significant control failures, office charged individuals.  Have not heard from SEC that intend to bring control failure charges – these are cases where SEC did identify significant control failures and charged them, the Office still didn't require a guilty plea.

Not all of these involve 10b.  Madoff was AML – but they all involve some substantive charge.  Herbalife wasn't 10b it was FCPA.

Still discussing with SEC what charge will be in this case.

Have not seen any evidence that anyone in control function was aware and no evidence that designed with wilful blindness.

Slide 76-81

<u>Deterrence:</u>

Can satisfy with a DPA coupled with fine and prosecuting PMs.

Can be structured in a way that has significant impact.  Talking about spending 10X what made in performance fees.

$500M-$1B on slide 87: based on discussions to date; will settle with investors either way, but if guilty plea may not be the way you would want me to settle with them.  Different ways to go about this.

Even if you look at 3.5B paid already, to make everyone whole on out of pocket is 90M or more.  Investors don't look at it as out of pocket loss.

We are going to resolve cases with investors.  In DPA you would have a big say in how we did that; in non-DPA would get best settlement we can get.

If do DPA, would work with you to come up with a model to compensate investors

If guilty plea, understand would be with AGI US and AGI US does not have money.

Direction received from client was make this right with everyone and that is what we have been working fastidiously to do

JM:  Intention is not to plead open.  Want to reach a resolution here.  Obviously standards are different but wouldn't overread the $500 M there.

Slide 94:

- 3 year monitor
- This is not functional immunity.  One way to think about this is case specific but also programmatic.  Is there a program, the office can apply across cases.  DPA here allows the Office to build out the program – can explain why its doing this, how looks at cases, host of options in middle that allows for calibrated approach.  If you are thinking about that, think you want one further step.

DPA is right way forward.  Allianz SE is prepared to fund settlements.  By any rough calculation talking about over $5B – no one will think this is a slap on the wrist.  Guilty plea will shut business down.

Slide 106:

- For guilty plea would need more time – we really haven't figures out how we will do that, layered on top of uncertainty in Ukraine
- No business left
- Computer Associates – DPA.  RG worked on it.  Cooperated with the Government – we were basically the back office of the USAO.
- This will disincentivize cooperation:  we can have done nothing, been slow to cooperate.  Here, we did everything and getting no benefit.  If you do a guilty plea here, the business is shut down, the ability to fund settlement is in jeopardy
- Two worlds:
    - Tournant may file disciplinary claim against us because we gave you info even though he was represented by Cannellos
    - Funded settlements
    - Unwind business –
- Cooperation incentives:
    - Have not been asked for attorney client communications; our view is what we gave you is not privileged
    - We have been doing everything we can to cooperate fully, quickly, NERA work product
- Treat like cases alike.  Recognize Allianz SE not based in US but still need to treat like cases alike.


If you come to resolution of a guilty plea, there are a number of things that have to happen:

- Seek review by DAG's office.  Do think this case raises important policy consideration
- No discussion about financial resolution yet – need that
- Want to discuss whether some other entity can take the plea – don't think this will work, but a thought
- German organizations are very structure oriented – would need to have two board meetings, inform them of terms of resolution, authorization to enter into a resolution, and each board represented by separate counsel which will take time;
- we still have to negotiate statement of facts
- review plea agreement
- Only party you have before you is AGI UA
- Need to inform primary regulator of AllianzSE

- Discussions with IM about transition
    - Have to replace AGI US
    - Unwind some funds to avoid chaos in financial markets
- Need to meet with relevant investment advisers – boards, counsel – to effectuate transition
- Presumably have to prepare disclosures to investors in the funds
- Supplements to prospectuses
- PIMCO – need to make sure get 9c waiver before guilty plea could be done
    - Not sure how long to put waivers in place
- SEC – Fair Fund – need to consider this
- Settling rest of investors
- Further up the food chain – we would fight that, don't think SDNY would do that
    - Plaintiffs dropped it and threatened to add AllianzSE back in
    - Factually nothing in SOF that would support piercing corporate veil.
    - USAO:  Understanding is that pre-discovery some plaintiffs agreed to drop claims against AllianzSE with no prejudice and others have tolling agreement.  RG:  Correct