# EXHIBIT J

Speech

# The SEC's Cooperation Program: Reflections on Five Years of Experience

## Andrew Ceresney, Director, Division of Enforcement

**Remarks at University of Texas School of Law's Government Enforcement Institute in Dallas, Texas**

**May 13, 2015**

Thank you for that very kind introduction.  Before I start, I must give our standard disclaimer that the views I express today are my own and do not necessarily reflect the views of the Commission or its staff.[1]

I am very happy to be here to kick off this Government Enforcement Institute.  Today I plan to discuss the SEC's cooperation program, which recently celebrated its five-year anniversary.  That makes it a very good time to reflect on our experience and explain how we in the Enforcement Division have used cooperation agreements and other cooperation tools.  I'll also highlight the significant benefits that have accrued, particularly to individuals, through cooperation in our investigations and litigations.  My bottom line is twofold:  first, the cooperation program has succeeded in making the Commission's enforcement program more effective by obtaining significant results which protect investors and deter misconduct; and second, those who are willing and able to help us can thereby help themselves in significant ways.

## Overview of Corporate Cooperation

As many of you know, the Commission has been formally granting credit for cooperation by entities for more than five years.  In 2001, the Commission issued what came to be known as the Seaboard report.[2]  In it, the Commission identified four broad factors to be considered in evaluating a company's cooperation when determining appropriate charges and remedies: ***self-policing***, ***self-reporting***, ***remediation***, and ***cooperation***.  Under those broad categories, the Commission spelled out a number of different questions to ask in evaluating misconduct and the entity's response to it.[3]

In laying out the range of options for considering and rewarding self-reporting and cooperation, the Commission noted that such credit could range from the "extraordinary" step of declining an enforcement action, to narrowing charges, limiting sanctions, or including mitigating or similar language in charging documents.  The Commission has used each of these approaches in its cases over the years.[4]

To take one example of how this plays out in practice, look at our recent announcement of settled Foreign Corrupt Practices Act (FCPA) charges against FLIR Systems Inc.  As the order in that case noted, the company self-reported, cooperated, and undertook significant remedial efforts.  The settlement required the company to pay around $7.5 million in disgorgement, plus prejudgment interest, but a penalty of only $1 million,[5] whereas penalties in FCPA settlements often are set at an amount equal to the disgorgement amount.

Similarly, the Commission filed an FCPA action against Goodyear Tire & Rubber Company earlier this year.[6]  The order in that case notes the company's prompt self-reporting, remedial acts, cooperation, and disciplinary actions against employees.  The settlement ordered disgorgement and prejudgment interest of over $16 million, but no

penalty at all.  As you can see from those two examples, Seaboard continues to provide a framework under which entities can receive cooperation credit in settlements.

Let me focus briefly on two of the four Seaboard factors, self-reporting and cooperation.  The discussion of whether and when to self-report is, I think, a bit more developed in the context of FCPA cases than in other types of cases.  As I have previously said,[7] companies are gambling if they fail to self-report FCPA misconduct to us.  After all, given the success of the SEC's whistleblower program, we may well hear about that conduct from another source.  But self-reporting is advisable not just in the FCPA context.  Firms need to be giving additional consideration to it in other contexts as well.  This includes self-reporting by registered firms of misconduct by associated persons, for example, and misconduct by issuer employees.  Where Enforcement staff uncovers such misconduct ourselves, a natural question for us to ask is why the firm didn't tell us about it.  Was it because the firm didn't know of the misconduct?  If so, what does that say about the firm's supervisory systems, compliance program, and other controls?  On the other hand, if the firm did know about it, and the misconduct was significant, why didn't the firm report it to us?  There will be significant consequences in that scenario from the failure to self-report.

As for the nature of cooperation, I think that the bar has been raised for what counts as good corporate citizenship in the last 15 years or so.  For example, internal investigations have now become common, a clear best practice for any company that discovers significant potential misconduct.  And sharing the results of those internal investigations with the government has become commonplace, as companies recognize the immense benefits that can accrue to them from doing so.  Some government officials have reemphasized recently the need for companies to share information on individual wrongdoers in order to receive credit for their cooperation.[8]  I wholeheartedly agree, and this has long been a central tenet of cooperation with the SEC.[9]  When a company commits to cooperation and expects credit for that assistance, the Enforcement staff expects them to provide us with all relevant facts, including facts implicating senior officials and other individuals.  In short, when something goes wrong, we want to know who is responsible so that we can hold them accountable.  If a company helps us do that, they will benefit.

## Creation of the Formal Cooperation Program

Now around five years ago, the Division recognized that there was more that it could – and should – be doing to encourage cooperation by individuals.  This idea made all the sense in the world.  In the criminal law enforcement realm, where I grew up, cooperation is critical to building cases.  Cooperators provide a bird's-eye view of the misconduct, often informed by their own participation in the scheme.  Cooperators not only accept responsibility for their actions through pleas or other consequences, they also serve as a narrator for the story that the criminal authorities are presenting to a jury.  In contrast, all too often, we at the SEC were left without such a narrator in our cases, facing nothing but hostile witnesses who have no incentive to tell the truth and no desire to assist us.

So five years ago, the Division of Enforcement launched a cooperation program providing for the use of formal cooperation agreements, among other new tools.  At the same time, the Commission issued a policy statement articulating a framework for evaluating cooperation by individuals in the Commission's investigations and actions. [10]  That statement identified four general considerations for assessing cooperation.  The factors in that statement are:

1. **Assistance provided by the cooperator**.  This factor includes things such as the value and nature of the cooperation provided by an individual;
2. **Importance of the underlying matter**.  This factor includes things such as the type of misconduct and the danger it posed to investors;
3. **Interest in holding the individual accountable**.  This factor considers, among other things, the cooperator's culpability, including culpability relative to that of other violators, and the cooperator's other efforts to remediate the harm caused by the violations; and

4. **Profile of the individual**.  This factor includes things such as the individual's history of compliance, opportunity for future misconduct, and whether the individual accepts responsibility for his or her misconduct.

The Division of Enforcement also announced that we would begin using deferred prosecution and non-prosecution agreements, or DPAs and NPAs for short.  We might use a DPA or NPA where an entity or person has engaged in misconduct and where the cooperation is extraordinary, but the circumstances call for a measure of accountability.  These agreements also allow the Commission to secure specified remedial measures and other undertakings, to provide additional assurance of forward-looking compliance with the law.

Since the start of the cooperation program, the Commission has announced just five DPAs and five NPAs.  While these types of agreements are a good option in some extraordinary cases, they have been a relatively limited part of our practice.  I think this is appropriate and should continue to be the case.

## Use of Cooperation Agreements

In contrast to the limited number of DPAs and NPAs, the Division of Enforcement has signed over 80 cooperation agreements over the last five years.  These cooperation agreements, and the benefits they have provided, are really at the heart of our cooperation program.

As I mentioned, cooperation agreements have long been a staple of criminal prosecutions.  The reason for this is simple:  to break open a case, you often need assistance from someone who participated in or knew of the misconduct.  These people can answer your questions, and they can lead you to ask the questions you hadn't yet thought of.  They can also be strong witnesses in outlining the misconduct for a jury.  This is no less true in our civil cases than in criminal cases.  Given the complexity of so many cases in our docket, we have much to gain by enlisting those who can guide us during our investigation and who can then tell a factfinder what happened from an insider's perspective or otherwise explain the contours of the misconduct with specificity.

Over the last five years, we have signed up cooperators in all manner of cases.  Let me give you a flavor of how we have used them.  One area where we have been active in using our cooperation program is in our insider trading cases.  We have successfully used our cooperation tools to develop cases even when criminal authorities were not involved.

For example, in 2012, the Commission charged three people with insider trading in a case that was significantly advanced by early cooperation from one of the traders.[11]  That assistance helped us develop a case against the tipper, who sat on the board of directors of an insurance company and who tipped a friend with confidential information about an upcoming merger.  With the assistance from our cooperator, the Commission obtained a settlement from the board member that included disgorgement of trading profits and a penalty equal to the amount of those profits, plus a bar from serving as officer or director of a public company.  In recognition of his assistance, our cooperator paid a penalty that reflected an approximately 75-percent discount from what the board member paid.

Similarly, last year the Commission filed a case against six individuals who traded in advance of eBay's acquisition of another e-commerce company.[12]  The corporate insider in that case pleaded guilty and received a 15-month sentence.  But apart from our parallel case against that executive, we also filed charges against five tippees and entered into an NPA with another trader.  None of those six additional people were indicted, and we were able to unravel these tipping chains, in part, due to extensive cooperation from some of those tippees.  I'll discuss this case a bit more later on.

The two cases I have just discussed were filed as fully settled actions.  This is no accident, because one of the important benefits we get from cooperators is to develop such strong evidence against potential defendants that we can demand strong settlement terms.  After all, a defendant who learns that one of his co-conspirators is prepared to testify against him will often decide it is better to settle.  But of course, not all of our actions settle, and cooperating witnesses can be especially helpful in actions that are litigated.  So one thing I think you are seeing as

our cooperation program is maturing is that we are increasingly developing witnesses who will testify for us in litigated actions.

Let me give a concrete example.  Last year we tried a case involving prearranged trades or parking transactions, which are essentially transactions between parties that are not done as bona fide transfers of ownership and risk.  The participants worked for broker-dealers and knew that their emails and Bloomberg instant messages were available for review by supervisors and by compliance.  So they used intentionally vague phrasing that got the point across to the recipient while allowing for some wiggle room if they were ever asked about the communications.  In that case we signed up one of the parties to the trades as a cooperator, and he testified that he and the respondent with whom we litigated used "coded" language in their written communications.  In short, he took the stand and decoded his communications for the administrative law judge, who issued an initial decision finding the litigating party liable for fraud.[13]  I should note that the decision is currently on appeal to the Commission.  This was our first litigated action that featured testimony from someone we signed up as a cooperator.  But it was not our last.  We have litigated two other recent matters where cooperators testified on our behalf.[14]  These were both tough cases, and they would have been even tougher without cooperators to help tell our story.

## Use of Admissions

We also have been thinking about how our cooperation agreements should interact with our admissions policy.  As many of you probably know, almost two years ago, the Commission changed its long-standing no-admit, no-deny settlement practices.  In certain cases, the Commission now requires admissions of fact and wrongdoing where heightened accountability and acceptance of responsibility are in the public interest.  In some cases, admissions are beneficial in part because Enforcement staff does not want to sign a defendant up to a cooperation agreement.  This might be because we have questions about his credibility on certain issues or because his testimony would not be of great assistance.  Still, if a party is settling before trial, it can be useful to us to obtain admissions to make it less likely that party will change his testimony at trial or otherwise testify falsely.

We used this approach in our Wyly case, where we had alleged that Samuel and Charles Wyly had developed offshore trusts which they controlled to conceal their interest and trading in certain of their holdings.  It was clear that a lawyer who had helped them set up these offshore trusts, and who was also a defendant in our case, would be an important witness at trial and likely the centerpiece of their defense.  Prior to trial, we reached a settlement with him and obtained admissions from him as part of his settlement to provide clarity on what he would testify to at trial.[15]

The Wyly case is not the only instance where we have obtained admissions while litigation is pending.[16]  I consider this use of admissions to be a supplement to the Division's cooperation program – even without a cooperation agreement, this approach provides a way to lock in a witness's version of events before trial to ensure predictable testimony.

## Use of Reverse Proffers

I want to add a final point about some of the methods the Division is using to try to enhance our ability to obtain cooperation from witnesses.  One thing we are doing more of is using reverse proffers at key points in our investigations.  When appropriate, we will invite counsel in for a meeting in which we share key documents and expected testimony that will implicate the defendant.  This is another practice that is well established among criminal prosecutors and FBI agents but historically has been used less frequently at the SEC.

Sometimes we might do a reverse proffer at a more advanced stage of an investigation in order to attempt to bring the investigation swiftly to a close on settlement terms that we deem favorable and appropriate.  But we also might do it much earlier in an investigation, in order to demonstrate to a witness why cooperation is worthwhile.  Doing this early, and in some cases, even in advance of testimony, may pay dividends in the right cases.  The staff can explain our working theory, show key documents, and share other evidence that we have developed.  And we can

then use the meeting to impress upon the individual that, even though it may be early in our investigation, there is strong evidence that will eventually support an enforcement action against them, and that there are others against whom they can provide evidence in order to lessen their plight.

Now, this is not appropriate for every case or every defendant.  But we have seen this approach get results.  It can help us get where we need to be much quicker.

## Benefits for Cooperators

So far I hope I've given you a better sense of what the Enforcement staff can seek to accomplish through cooperation agreements.  But let me turn to a question that I suspect is on the minds of many of you:  Is cooperation worth it?  Does it provide significant enough benefits to make it worthwhile?  Particularly given some of the downsides, including the need to potentially testify against others, can it pay sufficient dividends to justify the sacrifice?  Of course, in the criminal realm, a reduction in sentence is a very significant benefit of cooperation and serves to incentivize cooperation.  Have we been able to offer benefits sufficient to incentivize cooperation on the civil side?

My answer to that is a simple yes.  Let me start by talking about the cooperation calculus for individuals.  Say that you represent someone who fits this profile:  they are caught up in an investigation where charges are likely, but there are others who are more culpable or are in a more senior role.  True, they can hunker down during the investigation and hope for the best.  But if they come forward and assist the investigative staff, they can be affirmatively helping themselves as well.  Our history over the last five years demonstrates that the benefits are real in terms of charging decisions, monetary relief, and bars.  Let me go through each of those categories of benefits.

First, charging decisions.  Usually if a defendant is at a certain level of seniority, has engaged in serious misconduct, and we have significant evidence, the staff is not going to be in a position to recommend against charges entirely.  But there are situations where an individual is on the bubble.  The person might be a somewhat peripheral or lower-level player, where charges are possible but where exercising prosecutorial discretion against bringing charges is also a valid option.  Or there may be situations where the evidence is less clear, and without cooperation we would have a hard time making a case against that individual or against others.  The staff may also consider whether the conduct is sufficient to justify an injunction or a cease-and-desist order – after all, if an individual's conduct suggests they are not likely to break the law again, and if the individual accepts responsibility through cooperation, it weighs against that sort of relief.

The bottom line is that it is possible to convince the staff that forward-looking relief is not necessary based on your client's conduct and risk profile, and this can happen when your client quickly and fully owns up to their conduct and tries to make it right by helping us in our investigation.  Or, if we believe a charge is necessary, in the right case we may reflect your client's cooperation in making a recommendation about which violations to charge – for example, a cooperator might avoid scienter-based charges.

For obvious reasons, the Commission does not normally announce instances where, in the exercise of discretion, it determines that no charges are appropriate.  And unless that individual testifies, that exercise of discretion likely will not become public.  But I can tell you, based on an analysis of our cooperation agreements, that a significant percentage involved instances where the Division declined to recommend charges.

This does not mean the staff considered all of those cooperators to be blameless.  In one case we were able to explain publicly,[17] the individual was a former senior executive at a money manager whose computer code error resulted in over $200 million in client losses.  Among other considerations, the individual approached us early with an offer to cooperate, and his assistance enabled us to conduct an efficient investigation that led to charges against the firm and its co-founder.  Although the cooperator had played a limited role in concealment of the error, taking everything into account the Commission decided that it was appropriate not to charge him.

The Commission made a similar decision in a case where our cooperator was a fund administrator for a hedge fund.[18]  This individual was instructed by the fund's manager to transfer fund assets to the manager's personal account, and he also provided monthly statements to investors that were inaccurate because of those transfers, among other things.  But this individual became uncomfortable with what he was being asked to do, so he resigned and brought his concerns to us along with documentary evidence to back them up.  On the strength of his cooperation, we quickly filed an emergency action that allowed us to freeze $6 million to use to compensate investors.  In that case, a DPA with the cooperator – our first with an individual – was appropriate because he came forward voluntarily and provided the cooperation that allowed the Commission to move swiftly to protect investor funds.

Second, a significant reduction in monetary relief is another potential benefit of cooperation.  In most cooperation cases, the Commission enters into bifurcated settlements.  This postpones the determination of any civil penalty until after the cooperation is complete, much like a deferred sentencing in the criminal realm.  What this means is that, if there is a trial or a hearing in which the cooperator takes the stand and testifies, that cooperation can be taken into account when setting any monetary penalty.  Again, the numbers bear out that cooperators receive significant benefits.  In cases where a cooperator has been charged and we have resolved the penalty question, two-thirds of the time the cooperator has paid no penalty at all.  For example, our bifurcated proceeding with our first testifying cooperator resulted in a termination with no civil penalty.[19]

For other examples of monetary benefits, let me return to one of the insider trading cases I mentioned before.  This is the one where an executive was imprisoned after pleading guilty to trading in advance of eBay's acquisition of his employer.  Besides that executive, the Commission filed settled charges against five downstream traders.  On the strength of the evidence we developed through our cooperators, we obtained a settlement with one trader who paid disgorgement of his own profits, as well as a penalty reflecting a three-times multiple of his own profits and all of the profits of his own tippees.  Another settling party paid a penalty reflecting a two-times multiple.  Contrast that to our settlement with one of the traders who cooperated with our investigation, who paid a penalty equal to one-half of his profits – not to mention another trader who provided early, extraordinary, and unconditional cooperation, with whom we entered into an NPA and who paid no penalty.

There are other examples of significant monetary benefits for those cooperators who end up being charged.  For example, the Commission brought a case against two former brokers alleging that they overcharged tens of millions of dollars of hidden fees on structured note transactions.[20]  One settled at the outset and paid disgorgement and prejudgment interest of approximately $1.2 million, but with the penalty left open pending our litigation against his co-defendant.  The Commission ultimately obtained a $4.5 million settlement with that co-defendant, and dismissed the bifurcated claim for a civil penalty against the cooperating defendant.  In another case, the Commission obtained settlements totaling over $2 million from a husband and wife who were charged with defrauding seniors through a purported charitable organization, but decided against seeking any monetary relief from their in-house counsel due to his cooperation.[21]

To be clear, this flexibility ordinarily does not extend to disgorgement, for reasons that I think should be obvious.  Where someone is in possession of what clearly are the proceeds of wrongdoing, the Commission typically seeks to disgorge it.  That said, in some cases there is flexibility as to how to calculate disgorgement, and the Enforcement staff might take a narrower view of what should be disgorged in recognition of cooperation.

Third, another potential benefit of cooperation is its impact on the need for remedial relief such as industry suspensions or bars.  An individual who is associated with a regulated entity, and who has been integrally involved in misconduct, typically will be faced with an industry bar or suspension.  But true cooperation bears directly on some of the factors that the Commission and courts have long found probative on the questions of whether, and what type, of remedial relief is necessary – such as recognition of the wrongful nature of the conduct, and sincerity of assurances against future violations.[22]  An individual's sanction also may be influenced by other factors bearing on that person's conduct and risk profile, but cooperation can greatly influence how one assesses the degree of future risk to investors and the markets that is posed by the individual.

Let me point out that the cooperation program also may have important implications not only for potential cooperators, but also for their attorneys.  The defense bar would benefit from heightened attention to the fact that our use of our cooperation tools has changed the calculus for individuals whose conduct is under investigation.  Among other things, counsel need to take seriously the challenges posed by representing multiple clients when one client is in a position to obtain significant benefits by cooperating.  This is especially true when one client's cooperation might threaten another of a lawyer's clients.  Additionally, counsel should keep in mind that, just as corporate cooperation credit is greatly enhanced by early self-reporting, the same is true with individuals.  The earlier that someone comes in to start a conversation about cooperation, the better it will be for the client, because early action allows us to achieve the efficiency, speed, and effectiveness that result in the highest amount of cooperation credit being given.  So, just as we have seen the bar raised in terms of corporate cooperation, I think we are seeing a similar evolution when it comes to individuals.

## Conclusion

I hope this has given you a better sense of how the Division is thinking about cooperation agreements and other cooperation tools, and the tremendous progress that we have made over the last five years in the use of these tools.  And I hope I have also shown that cooperation has tangible benefits for individuals and entities in our investigations.  When faced with the prospect of a potential enforcement action, I hope that individuals will consider seriously cooperation, which carries with it significant benefits and which can be a viable way to avoid a terrible result.  I look forward to the 10th anniversary of the program, when we hopefully can look back on even further progress.

Thank you for your attention, and enjoy the rest of the conference.

---

[1] The Securities and Exchange Commission, as a matter of policy, disclaims responsibility for any private publication or statement by any of its employees. The views expressed herein are those of the author and do not necessarily reflect the views of the Commission or of the author's colleagues on the staff of the Commission.

[2] See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions, Release No. 34-44969 (Oct. 23, 2001) ("Seaboard Report"), available at http://www.sec.gov/litigation/investreport/34-44969.htm.

[3] Id.

[4] See, e.g., Press Rel. No. 2013-174, SEC Charges Former Vice President of Investor Relations With Violating Fair Disclosure Rules (Sept. 6, 2013) (noting declination as to a public issuer due to its cultivation of an environment of compliance as well as its self-reporting, remediation, and cooperation), available at http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370539799034;

compare Complaint, SEC v. Raffle et al., Case No. 11-Civ.-540 (W.D. Tex. June 27, 2011) (charging certain former executives with aiding and abetting violations by an issuer of the antifraud provisions), available at http://www.sec.gov/litigation/complaints/2011/comp22027.pdf, with Order Instituting Cease-and-Desist Proceedings, In re Arthrocare Corp., Sec. Exch. Act. Rel. No. 63833 (Feb. 9, 2011) (ordering the issuer to cease and desist from violations of books and records and other provisions, and noting that the issuer's remedial acts and cooperation were taken into account in determining to accept its offer to settle to such charges), available at https://www.sec.gov/litigation/admin/2011/34-63883.pdf.

[5] See Press Rel. No. 2015-62, SEC Charges Oregon-Based Defense Contractor With FCPA Violations (April 8, 2015), available at http://www.sec.gov/news/pressrelease/2015-62.html.

[6] *See* Press Rel. No. 2015-38, *SEC Charges Goodyear With FCPA Violations* (Feb. 24, 2015), available at http://www.sec.gov/news/pressrelease/2015-38.html.

[7] *See FCPA, Disclosure, and Internal Controls Issues Arising in the Pharmaceutical Industry* (March 3, 2015), available at http://www.sec.gov/news/speech/2015-spch030315ajc.html.

[8] *E.g.*, Leslie R. Caldwell, *Remarks at New York University Law School's Program on Corporate Compliance and Enforcement* (April 17, 2015) ("Perhaps most critically, we expect cooperating companies to identify culpable individuals – including senior executives if they were involved – and provide the facts about their wrongdoing."), available at http://www.justice.gov/opa/speech/assistant-attorney-general-leslie-r-caldwell-delivers-remarks-new-york-university-law.

[9] *See* Seaboard Report ("Did the company identify possible violative conduct and evidence with sufficient precision to facilitate prompt enforcement actions against those who violated the law?").

[10] *See* Policy Statement of the Securities and Exchange Commission Concerning Cooperation by Individuals in its Investigations and Related Enforcement Actions, SEC Rel. No. 34-61340 (Jan. 13, 2010), available at https://www.sec.gov/rules/policy/2010/34-61340.pdf.

[11] *See* Press Release No. 2012-193, *SEC Charges Three in North Carolina With Insider Trading; Early Cooperator Receives Lesser Penalty* (Sept. 20, 2012), available at http://www.sec.gov/News/PressRelease/Detail/PressRelease/1365171484866.

[12] *See* Press Release No. 2014-85, *SEC Charges Six Individuals With Insider Trading in Stock of E-Commerce Company Prior to Acquisition by eBay* (April 25, 2014), available at http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370541642140.

[13] *See In re Thomas C. Gonnella*, Initial Decision Rel. No. 706 (Nov. 13, 2014), available at http://www.sec.gov/alj/aljdec/2014/id706jeg.pdf.

[14] *See In re Thomas R. Delaney II and Charles W. Yancey*, Initial Decision Rel. No. 755 (March 18, 2015), available at http://www.sec.gov/alj/aljdec/2015/id755jsp.pdf; *In re James E. Cohen and Joseph A. Corazzi*, Admin Proc. File No. 3-15974.

[15] *See SEC v. Samuel E. Wyly, et al.*, No. 10-Civ.-5760 (SAS) (March 20, 2014) (final consent judgment as to defendant Michael C. French).

[16] *See SEC v. CKB168 Holdings Ltd., et al.*, Case No. 13-Civ.-5584 (E.D.N.Y.), Dkt. Nos. 217 and 218 (notices of filing of consents and proposed judgments as to certain defendants).

[17] *See* Litigation Release No. 22298, *SEC Credits Former AXA Rosenberg Executive for Substantial Cooperation during Investigation* (March 19, 2012), available at https://www.sec.gov/litigation/litreleases/2012/lr22298.htm.

[18] *See* Press Rel. No. 2013-241, *SEC Announces First Deferred Prosecution Agreement With Individual* (Nov. 12, 2013), available at http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370540345373.

[19] *In re Ryan C. King*, Sec. Act Rel. No. 9715 (Jan. 28, 2015), available at https://www.sec.gov/litigation/admin/2015/33-9715.pdf.

[20] *See* Litigation Release No. 22462, *SEC Charges Brokers for Defrauding Brazilian Public Pension Funds in Markup Scheme* (Aug. 29, 2012), available at http://www.sec.gov/litigation/litreleases/2012/lr22462.htm.

[21] *See* Litigation Release No. 23009, *Husband and Wife Agree to $2 Million Settlement in Florida-Based Charity Fraud Case* (May 29, 2014), available at http://www.sec.gov/litigation/litreleases/2014/lr23009.htm.

[22] *See Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981); *In re Diane M. Keefe*, Initial Decision Rel. No. 410 (Dec. 8, 2010), at 14 ("In light of [the cease-and-desist order and

censure], the financial penalty imposed on her by her employer, and Keefe's sincere awareness, although belated, of the wrongful nature of her conduct as shown by her self-reporting, neither a suspension or bar nor a civil money penalty is necessary to protect the public interest."), available at

https://www.sec.gov/litigation/aljdec/2010/id410cff.pdf; *In re Diane M. Keefe*, Sec. Act Rel. No. 63686 (Jan. 10, 2011) (notice that Initial Decision became final), available at https://www.sec.gov/alj/aljdec/2011/34-63686.pdf.

*Modified: May 13, 2015*