# EXHIBIT V

**Deputy Attorney General Rod J. Rosenstein Delivers Remarks at the American Conference Institute's 35th International Conference on the Foreign Corrupt Practices Act**

Oxon Hill, MD ~ Thursday, November 29, 2018

*Remarks as prepared for delivery*

Thank you, Sandra [Moser]. I appreciate your exceptional work for the Department of Justice. As the chief of the Criminal Division's Fraud Section, Sandra leads our efforts to enforce the Foreign Corrupt Practices Act. And she has helped to develop and implement many policy improvements.

It is nice to be in a room with so many friendly lawyers. As you know, the legal profession prizes collegiality. Once upon a time, there was a small town with just one lawyer who suffered from a lack of business. Then another lawyer moved to town, and they both prospered. So you see, lawyers benefit from collegiality.

I know that many of you have served in the Department of Justice, so you understand our work. In some respects, you serve a law enforcement function even today: you counsel clients about how to comply with the law so that they will not wind up on the wrong side of Sandra and her colleagues.

Prosecuting crime is our tool, but our goal is deterring crime. We want less business. Our Department's 115,000 employees work every day to uphold the rule of law, fulfilling the mission articulated in our name: Justice.

A few months after the creation of our federal government in 1789, President George Washington started the tradition of issuing a Thanksgiving Proclamation. He expressed thanks "for the peaceable and rational manner, in which we have been enabled to establish constitutions of government for our safety and happiness."  President Washington prayed that the national government would be "a blessing to all the people, by constantly being a Government of wise, just, and constitutional laws, discreetly and faithfully executed and obeyed."

Almost a century later, in 1863, President Abraham Lincoln issued a Thanksgiving proclamation. In the midst of the Civil War, Lincoln expressed gratitude that the rule of law continued to be observed in most of the country. Outside of the battlefields, "order ha[d] been maintained, the laws ha[d] been respected and obeyed, and harmony ha[d] prevailed." Not even a civil war could extinguish America's commitment to the rule of law.

Another hundred years later, in 1987, President Ronald Reagan celebrated the bicentennial of the Constitution. His Thanksgiving Proclamation declared that "[t]he cause for which we give thanks, for which so many of our citizens through the years have given their lives, has endured 200 years – a blessing to us and a light to all mankind."

The cause continues. Earlier this year, President Donald Trump issued a proclamation explaining that "we govern ourselves in accordance with the rule of law rather [than] … the whims of an elite few or the dictates of collective will. Through law, we have ensured liberty."

As President Trump recognized, law provides the framework for free people to conduct their lives.  At its best, law reflects moral choices; principled decisions that promote the best interests of society, and protect the fundamental rights of citizens.

The term "rule of law" describes the government's obligation to follow neutral principles and fair processes.  The ideal dates at least to the time of Greek philosopher Aristotle, who wrote, "It is more proper that law should govern than any

one of the citizens: upon the same principle, if it is advantageous to place the supreme power in some particular persons, they should be appointed to be only guardians, and the servants of the law."

The rule of law is indispensable to a thriving and vibrant society.  It shields citizens from government overreach.  It allows businesses to invest with confidence.  It gives innovators protection for their discoveries.  It keeps people safe from dangerous criminals.  And it allows us to resolve differences peacefully through reason and logic.

When we follow the rule of law, it does not always yield the outcome we prefer.  In fact, one indicator that we are following the law is when we respect a result that we do not agree with.  We respect it because it is required by an objective analysis of the facts and a rational application of the rules.

The rule of law is not simply about words written on paper.  The culture of a society and the character of the people who enforce the law determine whether the rule of law endures.

One of the ways that we uphold the rule of law is to fight bribery and corruption. Until a few decades ago, paying bribes was viewed as a necessary part of doing business abroad.  Some American companies were unapologetic about corrupt payments.

In 1976, the U.S. Senate Banking Committee revealed that hundreds of U.S. companies had bribed foreign officials, with payments that totaled hundreds of millions of dollars.  The Committee concluded that there was a need for anti-bribery legislation. It reasoned that "[c]orporate bribery is bad business" and "fundamentally destructive" in a free market society.  That was the basis for the Foreign Corrupt Practices Act.

I visited the nation of Armenia in 1994, just as it was emerging from seven decades of Soviet domination. I gave a talk about public corruption at the University of Yerevan. After I finished, a student raised his hand. He asked me, "If you cannot pay bribes in America, how do you get electricity?"

It was a pragmatic question that illustrated how that young man had learned to think about his society.  Corruption may start small, but it tends to spread like an infection.  It stifles innovation, fuels inefficiency, and inculcates distrust of government.

We aim to prevent corruption. Your agenda includes a presentation by Sandra Moser and FCPA Unit Chief Dan Kahn.  They will describe our prosecutors' efforts to enforce the FCPA, fight bribery around the world, and protect markets and governments from the debilitating effects of corruption.

Over the past year, our FCPA Unit reached eight corporate resolutions, four of which were coordinated with foreign authorities.  The cases involved a total of almost one billion dollars in corporate criminal fines, penalties, and forfeitures.

Many of our cases require extensive coordination with domestic and foreign law enforcement partners.  Three recent corporate resolutions involved collaboration with the Securities and Exchange Commission.

Those settlements resulted from coordinated dispositions consistent with the policy against "piling on" that we announced in May.  Under that new policy, Department components work jointly with other enforcement agencies with overlapping jurisdiction.  Our goal is to enhance relationships with law enforcement partners in the United States and abroad, and avoid duplicative penalties.

It is important to punish wrongdoers.  But we should discourage the sort of disproportionate and inefficient enforcement that can result if multiple authorities repeatedly pursue the same violator for the same misconduct.

We recently announced our first coordinated FCPA resolution with French authorities.  We also worked with authorities in the United Kingdom, Singapore, and Brazil.  Anyone who considers committing fraud with the hope of hiding their misconduct in foreign jurisdictions, should know that the arm of American law enforcement is long.  We work every day with partners around the globe to root out and punish misconduct that distorts markets and corrupts political systems.

The success of our FCPA program is part of a broader effort to combat corporate and white-collar crime.  The Department announced last month that white collar prosecutions increased in 2018, to more than 6,500 defendants.

Fighting white collar crime is a top priority for the Department, and we increased prosecutions in every priority area last year. Thanks to a series of initiatives and policy enhancements, we are making white collar enforcement more effective and more efficient.

President Trump issued an executive order instructing us to strengthen our efforts to investigate and prosecute fraud, and we are following through on that mandate. Leaders of the Securities and Exchange Commission, the Federal Trade Commission, and the Bureau of Consumer Financial Protection joined the Department of Justice in July to announce a new Task Force on Market Integrity and Consumer Fraud.

The Task Force established working groups to focus on financial fraud, health care fraud, consumer fraud, and fraud against the government.  Department officials and leaders of other relevant agencies co-chair the working groups.

The Task Force created a new web site to explain its goals and track its accomplishments. You can find it at www.justice.gov/fraudtaskforce.  The site contains links to useful resources on fraud detection and prevention.

The Task Force will promote inter-agency cooperation, consider policy changes, and implement enforcement initiatives.

We welcome your input about how best to deter fraud and foster increased cooperation so our investigations will be both expeditious and effective. If you have any suggestions, I encourage you to contact the task force executive director, Associate Deputy Attorney General Matt Baughman.

Focusing on individual wrongdoers is an important aspect of the Department's FCPA program.  Over the past year, we announced charges against more than 30 individual defendants, and convictions of 19 individuals.

Last year, we initiated a review of our Department's policy concerning individual accountability in corporate cases, to consider suggestions by our own employees and outside stakeholders about opportunities for improvements that will promote efficient enforcement and reduce fraud.

Today, we are announcing changes that reflect valuable input from the Department's criminal and civil lawyers, law enforcement agents, and private sector stakeholders.

Under our revised policy, pursuing individuals responsible for wrongdoing will be a top priority in every corporate investigation.

It is important to impose penalties on corporations that engage in misconduct. Cases against corporate entities allow us to recover fraudulent proceeds, reimburse victims, and deter future wrongdoing. Corporate-level resolutions also allow us to reward effective compliance programs and penalize companies that condone or ignore wrongdoing.

But the deterrent impact on the individual people responsible for wrongdoing is sometimes attenuated in corporate prosecutions. Corporate cases often penalize innocent employees and shareholders without effectively punishing the human beings responsible for making corrupt decisions.

The most effective deterrent to corporate criminal misconduct is identifying and punishing the people who committed the crimes.  So we revised our policy to make clear that absent extraordinary circumstances, a corporate resolution should not protect individuals from criminal liability.

Our revised policy also makes clear that any company seeking cooperation credit in criminal cases must identify every individual who was substantially involved in or responsible for the criminal conduct.

In response to concerns raised about the inefficiency of requiring companies to identify every employee involved regardless of relative culpability, however, we now make clear that investigations should not be delayed merely to collect information about individuals whose involvement was not substantial, and who are not likely to be prosecuted.

We want to focus on the individuals who play significant roles in setting a company on a course of criminal conduct. We want to know who authorized the misconduct, and what they knew about it.

The notion that companies should be required to locate and report to the government every person involved in alleged misconduct in any way, regardless of their role, may sound reasonable. In fact, my own initial reaction was that it

seemed like a great idea. But consider cases in which the government alleges that routine activities of many employees of a large corporation were part of an illegal scheme.

When the government alleges violations that involved activities throughout the company over a long period of time, it is not practical to require the company to identify every employee who played any role in the conduct. That is particularly challenging when the company and the government want to resolve the matter even though they disagree about the scope of the misconduct. In fact, we learned that the policy was not strictly enforced in some cases because it would have impeded resolutions and wasted resources. Our policies need to work in the real world of limited investigative resources.

Companies that want to cooperate in exchange for credit are encouraged to have full and frank discussions with prosecutors about how to gather the relevant facts.  If we find that a company is not operating in good faith to identify individuals who were substantially involved in or responsible for wrongdoing, we will not award any cooperation credit.

Civil cases are different. The primary goal of affirmative civil enforcement cases is to recover money, and we have a responsibility to use the resources entrusted to us efficiently.  Based on the experience of our civil lawyers over the past three years, the "all or nothing" approach to cooperation introduced a few years ago was counterproductive in civil cases. When criminal liability is not at issue, our attorneys need flexibility to accept settlements that remedy the harm and deter future violations, so they can move on to other important cases.

The idea that a company that engaged in a pattern of wrongdoing should always be required to admit the civil liability of every individual employee as well as the company is attractive in theory, but it proved to be inefficient and pointless in practice. Our civil litigators simply cannot take the time to pursue civil cases against every individual employee who may be liable for misconduct, and we cannot afford to delay corporate resolutions because a bureaucratic rule suggests that companies need to continue investigating until they identify all involved employees and reach an agreement with the government about their roles.

Therefore, we are revising the policy to restore some of the discretion that civil attorneys traditionally exercised – with supervisory review.

The most important aspect of our policy is that a company must identify all wrongdoing by senior officials, including members of senior management or the board of directors, if it wants to earn any credit for cooperating in a civil case.

If a corporation wants to earn maximum credit, it must identify every individual person who was substantially involved in or responsible for the misconduct.

When a company honestly did meaningfully assist the government's investigation, our civil attorneys now have discretion to offer some credit even if the company does not qualify for maximum credit. When we allow only a binary choice –full credit or no credit – experience demonstrates that it delays the resolution of some cases while providing little or no benefit.

In a civil False Claims Act case, for example, a company might make a voluntary disclosure and provide valuable assistance that justifies some credit even if the company is either unwilling to stipulate about which non-managerial employees are culpable, or eager to resolve the case without conducting a costly investigation to identify every individual who might face civil liability in theory, but in reality would not be sued personally.

So our attorneys may reward cooperation that meaningfully assisted the government's civil investigation, without the need to agree about every employee with potential individual liability.

As with the "all or nothing" criminal policy, we understand that the civil policy was not strictly enforced in many cases. I prefer realistic internal guidance that allows our employees to reach just results while following the policy in good faith.

I want to emphasize that our policy does not allow corporations to conceal wrongdoing by senior officials. To the contrary, it prohibits our attorneys from awarding any credit whatsoever to any corporation that conceals misconduct by members of senior management or the board of directors, or otherwise demonstrates a lack of good faith in its representations.  Companies caught hiding misconduct by senior leaders or failing to act in good faith will not be eligible for any credit.

Other policy changes return discretion to our civil lawyers to resolve each case consistent with relevant facts and circumstances.  Department attorneys are permitted to negotiate civil releases for individuals who do not warrant additional investigation in corporate civil settlement agreements, again with appropriate supervisory approval.

And our attorneys once again are permitted to consider an individual's ability to pay in deciding whether to pursue a civil judgment.  We generally do not want attorneys to spend time pursuing civil litigation that is unlikely to yield any benefit; not while other worthy cases are competing for our attention.

These commonsense reforms restore to our attorneys some of the discretion they previously exercised in civil cases; the same discretion routinely exercised by private lawyers and clients and by government agencies responsible for using their resources most efficiently to achieve their enforcement mission.

Returning discretion to Department attorneys is consistent with our commitment to hold individuals accountable in every appropriate case, using both our civil and criminal enforcement authorities. The Department will vigorously and diligently pursue enforcement actions against individuals in every case where it is justified by the facts. If it is not justified, we will move on.

Let me conclude by acknowledging that most companies want to do the right thing.  Companies that self-report, cooperate, and remediate the harm they caused will be rewarded. Companies that condone or ignore misconduct will pay the price.

  These policy changes reflect a lot of deliberation and analysis by experienced government and private sector lawyers who understand the practical implications of our policies and how they sometimes help – but sometimes inhibit – efforts to achieve our goals.

In summary, our corporate enforcement policies should encourage companies to implement improved compliance programs, to cooperate in our investigations, to resolve cases expeditiously, and to assist in identifying culpable individuals so that they also can be held accountable when appropriate. It is not always possible to achieve all of those goals, but the new policies strike a reasonable balance.

We will monitor the results, and we will revisit policies if warranted. As someone once remarked, "In God we trust; all others must bring data."

Thank you very much.

**NOTE: The links to the aforementioned changes can be found below:**

https://www.justice.gov/jm/jm-1-12000-coordination-parallel-criminal-civil-regulatory-and-administrative-proceedings#1-12.000

https://www.justice.gov/jm/jm-4-3000-compromising-and-closing#4-3.100

https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.210

https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.300

https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.700

---

**Speaker:**
Deputy Attorney General Rod J. Rosenstein

**Topic(s):**
Foreign Corruption

**Component(s):**
Office of the Deputy Attorney General