UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                        :
UNITED STATES                                           :
                                                        :
              -v-                                       :
                                                        :
GREGOIRE TOURNANT,                                      :        22 Cr. 276 (LTS)
                                                        :
                        *Defendant.*                    :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


## THE GOVERNMENT'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT AND TO COMPEL


                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York
                              *Attorney for the United States of America*


Nicholas Folly
Margaret Graham
Allison Nichols
Assistant United States Attorneys
        *- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND .................................................................................................... 2

   I.    The Offense Conduct ................................................................................. 3

   II.   The Government's Investigation.............................................................. 4

   III.  The Government's Investigation into Obstruction ................................ 7

   IV.  AGI Pleads Guilty to Securities Fraud.................................................. 10

   V.   The Government Learns of the Joint Representation ........................... 11

ARGUMENT ...................................................................................................... 16

   I.    The Motion to Dismiss the Indictment Should Be Denied Without a Hearing ........... 16

    A. Applicable Law ...................................................................................... 17

      1.   Attorney-Client Privilege and Waiver ....................................... 17

      2.   Interference with the Sixth Amendment Right to Counsel ................... 18

    B. Discussion .............................................................................................. 21

      1.   The Information Provided to the Government Was Not Privileged ....................... 21

      2.   Even If Privileged Information Were Shared with the Government, There Would Be No Basis for Relief ........... 25

         a.   The Government Did Not Intrude on any Privilege ............................ 25

         b.   There Is No Basis to Claim that Any Action Was "Manifestly and Avowedly Corrupt" ........... 28

         c.   Tournant Has Not Been Prejudiced ................................................ 32

         d.   Even Assuming *Arguendo* That the Material Identified by the Defendant is Privileged, He is Not Entitled to the *Kastigar*-like Hearing He Seeks ........... 32

   II.   The Motion to Compel Must Be Denied. ............................................. 35

    A. Applicable Law ...................................................................................... 35

    B. Discussion .............................................................................................. 40

      1.   The Government Did Not Conduct a Joint Investigation ....................... 40

      2.   Tournant Fails to Cite Facts Showing a Joint Investigation ................... 41

      3.   The Government Did Not Violate the Court's 5(f) Order ...................... 46

      4.   Tournant's Request is Unduly Burdensome ...................................... 46

CONCLUSION.................................................................................................... 49

## TABLE OF AUTHORITIES

### CASES

*Baird v. Koerner*, 279 F.2d 623 (9th Cir. 1960) ........................................................ 23

*Blum v. Yaretsky*, 457 U.S. 991 (1982)...................................................................... 20

*Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951) ............................................ 29

*Denney v. Jenkins & Gilchrist*, 362 F. Supp. 2d 407 (S.D.N.Y. 2004) ...................... 18

*Ferreira* v. *United States*, 350 F. Supp. 2d 550 (S.D.N.Y. 2004) ............................... 39

*Fisher v. United States*, 425 U.S. 391, (1976) ............................................................ 17

*Gilman v. Marsh & McLennan Cos.*, 826 F.3d 69 (2d Cir. 2016)................................... 20, 26, 27

*Hollis v. O'Driscoll*, No. 13 Civ. 01955 (AJN), 2013 WL 2896860 (S.D.N.Y. June 11, 2013)…
................................................................................................................................. 18

*In re Asia Global Crossing, Ltd.*, 322 B.R. 247 (S.D.N.Y. 2005)................................ 18

*In re Grand Jury Subpoena Duces Tecum* Dated Sept. 15, 1983, 731 F.2d 1032 (2d Cir. 1984)…
................................................................................................................................. 25

*In re Horowitz*, 482 F.2d 72 (2d Cir. 1973) ................................................................ 17

*In re John Doe, Inc.*, 13 F.3d 633 (2d Cir. 1994) ....................................................... 25

*In re Six Grand Jury Witnesses*, 979 F.2d 939 (2d Cir. 1992)................................ 17, 18

*Kyles* v. *Whitley*, 514 U.S. 419 (1995)..................................................................... 35, 46

*Massiah v. United States*, 377 U.S. 201 (1964) .......................................................... 19

*Nickel v. Hannigan*, 97 F.3d 403 (10th Cir. 1996) ..................................................... 34

*Pina v. Henderson*, 752 F.2d 47 (2d Cir.1985)........................................................... 38

*Schaeffler v. United States*, 806 F.3d 34 (2d Cir. 2015) ............................................ 17

*SEC* v. *Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir. 1980) .............................. 44

*SEC v. Shkreli*, No. 15 Civ. 7175 (KAM), 2016 WL 1122029 (E.D.N.Y. Mar. 22, 2016) ......... 42

*SEC* v. *Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007).... 38, 40, 43, 44

*United States v. Alexandre*, No. 22 CR. 326 (JPC), 2023 WL 416405 (S.D.N.Y. Jan. 26, 2023).
................................................................................................................................. 41

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998).................................... 35, 36, 47

*United States v. Barcelo*, 628 F. App'x 36 (2d Cir. 2015) ........................... 36, 37, 42, 44

*United States v. Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066 (S.D.N.Y. Aug. 15, 2014).. 37, 45

*United States v. Bein*, 728 F.2d 107 (2d Cir. 1984) .................................................... 34

*United States v. Blaszczak*, 308 F.Supp.3d 736, (S.D.N.Y. 2018).................... 39, 42, 44

*United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550 (S.D.N.Y. July 24, 2014)
................................................................................................................................. 36

*United States v. Buske*, No. 09 Cr. 65, 2011 WL 2912707 (E.D. Wis. July 18, 2011)................ 27

*United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69 (S.D.N.Y. Feb. 9, 2018) ......... 39, 44

*United States v. Colasurdo*, 453 F. 2d at 595 ............................................................ 33

*United States v. Collins*, 409 F. Supp. 3d 228 (S.D.N.Y. 2019).................... 39, 41, 42

*United States v. Connolly,* No. 1:16-CR-00370 (CM), 2017 WL 945934 (S.D.N.Y. 2017)........ 47

*United States v. Correia*, 468 F. Supp. 3d 618 (S.D.N.Y. 2020)................................ 18

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ........................................ 20

*United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979)................................................. 19

*United States* v. *Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006) ................................................ 39

*United States* v. *Fiore*, 381 F.3d 89 (2d Cir. 2004) .................................................................... 43

*United States* v. *Gartner*, 518 F.2d 633 (2d Cir. 1975) ................................................ 19, 20, 29

*United States* v. *Ginsberg*, 758 F.2d 823 (2d Cir. 1985) .................................................. 18, 19, 30

*United States* v. *Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) ........................................ 44

*United States* v. *Guerrerio*, 670 F. Supp. 1215 (S.D.N.Y. 1987) .................................................. 39

*United States* v. *Gupta,* 848F. Supp. 2d 491, 495 (S.D.N.Y 2012) (JSR) .................................. 47

*United States* v. *Hunter*, 32 F.4th 22 (2d Cir. 2022) ........................................................ 35, 36, 38

*United States* v. *Int'l Bhd. of Teamsters*, 119 F.3d 210 (2d Cir. 1997) ................................ 17, 22

*United States* v. *Kovel*, 296 F.2d 918 (2d Cir. 1961) .................................................................... 17

*United States* v. *Lefkowitz*, 618 F.2d 1313 (9th Cir. 1980) .......................................................... 34

*United States* v. *Locascio*, 6 F.3d 924 (2d Cir. 1993) .................................................................. 38

*United States* v. *Lusterino*, 450 F.2d 572 (2d Cir. 1971) ............................................................ 29

*United States* v. *Marashi*, 913 F.2d 724 (9th Cir. 1990) ............................................................. 34

*United States* v. *Martoma,* 990 F. Supp. 2d 458 (S.D.N.Y. 2014) (PGG) ................................... 47

*United States* v. *Mejia*, 655 F.3d 126 (2d Cir. 2011) ........................................................ 17, 18, 22

*United States* v. *Meregildo*, 920 F. Supp. 2d 434 (S.D.N.Y. 2013) ........................... 37, 38, 42, 45

*United States* v. *Merlino*, 349 F.3d 144 (3d Cir. 2003) ............................................................... 38

*United States* v. *Morgan*, 302 F.R.D. 300 (S.D.N.Y. 2014) ......................................................... 38

*United States* v. *Ozar,* 50 F.3d 1440 (8th Cir. 1995) ................................................................... 34

*United States* v. *Payne*, 63 F.3d 1200 (2d Cir. 1995) .................................................................. 35

*United States* v. *Pierce*, 785 F.3d 832 (2d Cir. 2015) .................................................................. 37

*United States* v. *Quinn*, 445 F.2d 940 (2d Cir. 1971) ............................................................ 36, 38

*United States* v. *Rhodes*, No. 18 Cr. 887 (JMF), 2019 WL 3162221 (S.D.N.Y. July 16, 2019)…
..................................................................................................................................................... 43

*United States* v. *Rispo*, 460 F.2d 965 (3d Cir. 1972) ................................................................... 29

*United States* v. *Sanin*, 113 F.3d 1230 (2d Cir. 1997) ................................................................ 19

*United States* v. *Schell*, 775 F.2d 559 (4th Cir. 1985) ................................................................ 30

*United States* v. *Schwimmer*, 892 F.2d 237 (2d Cir. 1989) .................................................... 17, 32

*United States* v. *Schwimmer*, 924 F.2d 443 (2d Cir. 1991) .............................................. 20, 28, 32

*United States* v. *Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019)..
............................................................................................................................................... 20, 31

*United States* v. *Squillacote*, 221 F.3d 542 (4th Cir. 2000) ........................................................ 34

*United States* v. *Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006) .................................................... 26

*United States* v. *Stein*, 541 F.3d 130 (2d Cir. 2008) .......................................................... 20, 26, 27

*United States* v. *Stewart*, 433 F.3d 273 (2d Cir. 2006) ...................................................... 36, 37, 42

*United States* v. *Tomasetta*, No. 10 Cr. 1205 (PAC), 2012 WL 896152 (S.D.N.Y. March 16, 2012) ...................................................................................................................................... 27

*United States* v. *Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994) ........................................................ 39

*United States* v. *Velissaris*, No. 22CR105 (DLC), 2022 WL 2392360 (S.D.N.Y. July 3, 2022) . 36

*United States* v. *Warshak*, 631 F.3d 266 (6th Cir. 2010) ............................................................ 34

*United States* v. *Weissman*, No. 94 C. 760 (CSH), 1996 WL 751386 (S.D.N.Y. Dec. 26, 1996)..
..................................................................................................................................................... 31

*VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16 Civ. 6392 (JPO), 2019 WL 2121690 (S.D.N.Y. May 15, 2019) .......................................................................................................... 18

## PRELIMINARY STATEMENT

For six years, the defendant lied to and defrauded investors in the funds that he managed, for his own personal gain.   The defendant lied to investors about the risks associated with their investments and the efforts that he and others were taking to minimize those risks.   When the risks that he had lied about materialized, investors lost billions of dollars: after the Covid-19 pandemic struck, the funds managed by the defendant lost about $7 billion in market value.

Following the collapse of the funds, both private and public actors began asking questions about the defendant's conduct.   During the course of those investigations, the defendant was represented by three prominent law firms, including attorneys with unusually deep experience in investigations of this kind.   One of those law firms represented the defendant alone; two of those firms, with the defendant's written consent, represented the defendant and his employer.   As the investigations unfolded, the defendant's employer, Allianz Global Investors U.S. LLC ("AGI"), learned about his conduct and its scope, and decided to cooperate with the Government's investigation.   As part of that cooperation, and as it was entitled to do under the defendant's explicit waiver, AGI conveyed to the Government information that was gathered at a time when the same law firm represented the defendant and his employer. AGI was eventually criminally charged and pleaded guilty in connection with the fraud scheme perpetrated by the defendant and his co-conspirators.

Skirting and ignoring those facts, the defendant now seeks to be relieved of his obligation to stand trial and answer for his crimes by claiming that his former employer should not have shared this information with the Government and by making inflammatory claims about his former attorneys and the Government that are legally and factually baseless.   What may be difficult to discern from the defendant's brief, however, is (1) that the disclosure of information to the

- 1 -

Government by the defendant's employer was authorized by the written waiver that the defendant signed at the beginning of the representation and while having the advice of three separate law firms; and (2) that the Government was not aware of any of the claimed joint representation issues when the information was conveyed.    The remainder of his brief is little more than salacious rhetoric unsupported by law or fact.    The entirety of the brief should be rejected.

In short, the defendant now seeks to evade responsibility for his years-long, billion dollar fraud by laying blame at the feet of everyone but himself.    His motions are meritless and should be denied.[1]

## BACKGROUND

On May 16, 2022, a grand jury sitting in this District returned Indictment 22 Cr. 276 (LTS) (the "Indictment"), which charges Tournant in five counts.    On May 17, 2022, the Indictment was unsealed, and Tournant was arrested and presented before a Magistrate Judge in the District of Colorado.    The SEC filed a complaint in *SEC v. Tournant, et al.*, 22 Civ. 4016 (LLS) (the "Civil Case"), the same day.    This Criminal Case and the parallel Civil Case arise out of separate but parallel investigations into the same underlying events.    Trial is scheduled to begin in the Criminal Case on February 5, 2024.

---

1 Tournant filed a motion to compel on December 23, 2022 (Dkt. 45, hereinafter "First Br."), which is addressed in Part II below.    The same day, Tournant filed under seal a motion to dismiss the Indictment, or, in the alternative, for a hearing.    This motion has been provided to a Government filter team but not shared with the undersigned prosecution team.    Tournant filed a redacted version of this motion on January 30, 2023 (Dkt. 54, hereinafter "Second Br.").    The Government is attaching here as Exhibit A the version of Tournant's Second Brief to which the prosecution team has access (the "Prosecution Team Version").    Because the Government believes that the defense filed the Prosecution Team Version under seal, it similarly is providing the Prosecution Team Version to the Court via email only and under seal.    Unless otherwise noted, page numbers in Tournant's briefs refer to the pagination in the ECF-generated headings for the filed versions.

## I.    The Offense Conduct

The Indictment charges Tournant with conspiracy to commit securities fraud, investment adviser fraud, and wire fraud; securities fraud; two counts of investment adviser fraud; and conspiracy to obstruct justice.

As alleged in the Indictment, from in or about 2014 through in or about March 2020, Tournant and others engaged in a scheme to defraud investors in a series of investment funds (the "Funds") managed by Allianz Global Investors U.S. LLC ("AGI"), which was an indirect, wholly-owned subsidiary of Allianz SE ("Allianz"), one of the world's largest financial services companies and one of the world's largest insurance companies.   Tournant acted as portfolio manager for the Funds.   At their height, the Funds managed over $11 billion in assets.

Tournant and his accomplices carried out the fraudulent scheme in three ways.   First, they overstated the level of independent oversight that AGI and Allianz were exercising over the Funds' investment strategy.   Second, they misrepresented the hedging and other risk-management strategies they were undertaking to protect investor funds.   Third, to hide the true risk associated with the Funds' investments, Tournant and his accomplices fraudulently altered documents that AGI provided to investors, including open position spreadsheets, risk reports, projected expected value data, historical performance data, holdings data, attribution data, and the "Greeks"—standard metrics in options trading concerning measures of risk.

In short, contrary to representations made to investors, Tournant deployed an investment strategy that prioritized returns over risk management.   After the market downturn following the onset of the pandemic in March 2020, the Funds lost more than $7 billion in market value, including more than $3.2 billion in lost principal, even as, during the time relevant to the fraud, Tournant earned compensation, including performance-based compensation, totaling more than

$60 million.   Beginning in July 2020, the Funds' investors filed multiple lawsuits against AGI, seeking to recover their lost investments.[2]

## II.   The Government's Investigation

Shortly after the Funds collapsed, the Government began its months-long, in-depth investigation of the fraud at AGI, reviewing thousands of documents, engaging subject-matter experts, and interviewing more than 20 individuals, including 10 AGI employees, many on multiple occasions.[3]   At or about the same time, the SEC, and Allianz itself also each initiated separate investigations into the circumstances of the Funds' collapse.   While the Government's criminal investigation remained covert for over a year, it appears that no later than August 2020, the SEC made Allianz aware of its civil inquiry.   On May 5, 2021, Allianz presented the preliminary findings of its own investigation to the SEC, arguing that the collapse had been caused by the unforeseeable market downturns of February and March 2020.   (Levine Decl. (Dkt. 55), Ex. C at 41-55).   Allianz's presentation noted that the Funds' investors were "highly sophisticated," and that the Funds' risks were disclosed in investor communications.   (*Id.* at 24-36).

On May 20 and 21, 2021, Stephen Bond-Nelson, one of AGI's two managing directors, gave pre-complaint testimony to the SEC under oath, in which he answered questions both about

---

2  *See, e.g.*, Teachers' Pension Lost $774M in Allianz Volatility Funds: Lawsuit, Institutional Investor, July 21, 2020, *available at* https://www.institutionalinvestor.com/article/b1mlj29jx9wjsy/Teachers-Pension-Lost-774M-in-Allianz-Volatility-Funds-Lawsuit.

3  The "Government" as used in this brief refers to the prosecution team in the instant case: that is, the United States Attorney's Office and the FBI.   The SEC opened its own investigation, which it conducted parallel to the U.S. Attorney's Office's investigation, as discussed further in Section II.   The defendant's statement that "the SEC opened an investigation, which was later joined by the USAO," is factually incorrect and misleading.   (Second Br. 5).

the Funds and suspicious alterations to documents sent to investors that the SEC had discovered. Bond-Nelson's individual counsel was present for his testimony, and Ropes & Gray and Sullivan & Cromwell also appeared on his behalf and on behalf of Allianz.   During his testimony, Bond-Nelson steadfastly maintained that any alterations had not been fraudulent but had instead been attempts to make investor documents more accurate.   During the middle of the second day of his testimony, however, Bond-Nelson abruptly refused to answer any further questions and adjourned his testimony.   Bond-Nelson's individual counsel then separately communicated to the SEC that Bond-Nelson wished to cooperate with the SEC's investigation.   Bond-Nelson's individual counsel also stated that if the SEC was aware of a parallel criminal investigation, Bond-Nelson wished to meet with the parallel civil and criminal investigators at the same time.

The SEC communicated this to the Government, and on May 26, 2021, the Government reached out to Bond-Nelson's lawyers.   Those lawyers reiterated Bond-Nelson's interest in cooperating with the Government's investigation.   Bond-Nelson's attorneys also expressed that Allianz might suspect that he was cooperating, given the adjourned testimony.   Although the Government did not direct Bond-Nelson's counsel how or whether to communicate with Allianz, it is the Government's understanding that Bond-Nelson's counsel did not tell Allianz that Bond-Nelson was cooperating.

The Government met with Bond-Nelson on June 3 and 4, 2021, with the SEC also present. To the Government's understanding, no one but the Government, Bond-Nelson, and the SEC was aware of the proffers.   During these two days, Bond-Nelson explained the basic contours of his participation in Tournant's years-long, audacious fraud that had caused billions of dollars of losses to dozens of investors. From the very first proffer, Bond-Nelson explained that Tournant had masterminded and directed the fraud and was the individual who benefited the most from it

financially.

On June 7, Bond-Nelson's counsel informed the Government that Allianz had placed Bond-Nelson on administrative leave and revoked his access to the building as well as his electronic records.    In the same call, as part of its ongoing criminal investigation, the Government asked Bond-Nelson to begin producing relevant records that were in his possession.

In the meantime, as the Government has since learned, Allianz continued its internal investigation into the collapse of the Funds.    The Government later learned that on June 3, Allianz interviewed Tournant (the "June Interview"), and on June 7, Allianz interviewed the Funds' lead product specialist.    The Government was not aware of these actions until later, and did not confer with Allianz or direct it to conduct those interviews.

On June 10, 2021, the Government contacted Allianz for the first time, as well as multiple Allianz employees, to inform them that it had an ongoing criminal investigation and request documents.    Prior to this date, June 10, the Government had not had any contact with Allianz or any subjects other than Bond-Nelson, as discussed above.

In the months that followed, the Government conducted an intensive investigation, reviewing thousands of documents and interviewing 23 witnesses.    While the Government's investigation proceeded, Allianz conducted its own internal investigation, analyzing the Funds' records and investor communications with the help of expert consultants.    At various times, Allianz made factual presentations to the Government about its findings.

Although the Government received factual presentations from Allianz, through its own efforts and those of the SEC working in parallel, the Government discovered multiple aspects of the fraud scheme that Allianz had not discovered.    Specifically, and among other things, after Allianz had begun making factual presentations to the Government about the fraudulent scheme,

the Government identified the following three additional methods through which the fraudulent scheme had been carried out:

- **Open Position Worksheets:** Tournant and Taylor altered open position worksheets, which showed each position in the portfolio, to hide portfolio risk.   (*See* Indictment ¶¶ 40-43).
- **Expected Value Sheets:** Tournant and Taylor changed expected value ("EV") sheets that were shown to certain investors during meetings, so that the potential losses on certain positions appeared smaller.   The alteration of EV Sheets understated the magnitude of the downside risk of the strategy.   (*Id.* ¶¶ 52-58).
- **Variable Alpha Target Funds:** Tournant failed to adhere to a bespoke risk mitigation strategy specifically promised to the Funds' largest investor ("Investor-1") and showed Investor-1 fraudulent reports that hid Tournant's divergence from the agreed upon strategy.   This exposed Investor-1 to greater financial risk than Investor-1 had agreed to assume.   (*Id.* ¶¶ 33-38).

The Government brought these additional aspects of the fraud scheme to Allianz's attention.   Ultimately, when AGI pleaded guilty, it acknowledged this additional misconduct in the Plea Agreement's Statement of Facts.

## III.   The Government's Investigation into Obstruction

As part of its investigation, the Government learned from Bond-Nelson that Tournant had engaged in obstructive conduct after learning of the SEC investigation, some of which is detailed in the Indictment.   In this connection, during an August 3, 2020 joint interview with AGI's internal and external counsel, Tournant and Bond-Nelson lied about the reasons for their fraudulent alterations to risk data for the Funds that was provided to investors.   After this interview, Tournant instructed Bond-Nelson to lie when responding to an email from AGI's in-house counsel seeking information to answer certain of the SEC's questions about alterations to investor documents.   Bond-Nelson followed Tournant's instructions and provided false information about these alterations to AGI counsel.

Bond-Nelson told the Government that this was not the only time that Tournant had instructed him to lie: on another occasion, Tournant coached Bond-Nelson on what to say if asked by counsel about AGI's hedging positions.   Tournant told Bond-Nelson to prepare for such a conversation by pretending that Tournant was a lawyer and practicing his answer.

Given Bond-Nelson's statements to the Government, the Government was concerned that in addition to committing the underlying fraud, Tournant had also sought to obstruct the SEC investigation.   The Government knew that during Allianz's internal investigation, it had interviewed different Allianz employees, including Tournant, although the Government had not yet learned the substance of those interviews.   Given Tournant's insistence that Bond-Nelson lie to Allianz and, by extension, the SEC, about the fraud, the Government suspected that Tournant himself also had lied to Allianz when questioned as part of the internal investigation, and in doing so had obstructed justice.

The Government therefore reached out to Allianz in October 2021 and explained that it was looking into efforts by Allianz employees to obstruct the SEC investigation.[4]   The Government asked Allianz to, among other things, provide the Government with any facts Allianz had learned during its internal interviews regarding the purported rationale for altering risk reports, as well as any explanation of what positions could or did qualify as a certain type of hedge promised to investors—the two topics about which Tournant had instructed Bond-Nelson to lie.

On or about November 4 and 5, 2021, Allianz provided to the Government for the first time partial summaries of certain internal investigation interviews, including portions of the June

---

4  The Government made a prior request in June 2021 that Allianz provide the Government with a list of who it had interviewed, on what date, and a high-level summary of the statements.   In response, Allianz produced a chart of dates and times of interviews, participants, and topics discussed, which Tournant's counsel has since received in discovery.

Interview of Tournant.   By the time these partial summaries were provided, the Government's investigation into the underlying fraud was well advanced.   The Government had already interviewed Bond-Nelson several times and fifteen other witnesses, some of them multiple times, and received attorney proffers as to what two other witnesses would likely say if interviewed.

Subsequently, on or about November 19, 2021, the Government informed Allianz that it believed certain communications between Tournant or Bond-Nelson, on the one hand, and counsel for Allianz, on the other, were made to conceal their fraudulent conduct and obstruct the SEC's investigation into that conduct.   The Government informed Allianz that there was reason to believe that those communications were not privileged because they were subject to the crime-fraud exception.   The Government requested that Allianz review documents that it had previously withheld or redacted based on attorney-client privilege and consider whether any would be subject to the crime-fraud exception.

On or about December 17, 2021, Allianz informed the Government that it intended to provide the Government with full summaries of Tournant's interview statements.   On or about January 6 and 7, 2022, Allianz provided the Government with oral summaries of the June Interview.[5]   In providing these summaries, counsel for Allianz did not disclose that the company had shared counsel with Tournant, a fact that remained unknown to the Government. Government counsel took notes of the oral summaries and those notes have been provided to defense counsel in discovery.[6]

---

5 Prior to Allianz's conveying this information, at Allianz's request, the Government agreed in writing that it would not use the fact that the information was being conveyed to argue that Allianz had effected a broader waiver over the subject matter of the communications.

6 As discussed below, after Tournant's current counsel first asserted that the summaries contained information protected by Tournant's personal attorney-client privilege, notes of these summaries

IV.    **AGI Pleads Guilty to Securities Fraud**

Soon after the Government made its investigation known to Allianz, the Government communicated to the company that given the scope and nature of the fraud, it was considering criminally charging AGI, in addition to any criminal charges it might bring against individual employees.   This led the company to make several presentations, during which it vigorously advocated for its preferred resolution: a deferred prosecution agreement.

The Government carefully considered the company's arguments but concluded that criminal charges were appropriate.   In May 2022, AGI pleaded guilty to securities fraud, in *United States v. AGI*, 22 Cr. 279 (CM).   Due to a statutory bar in the Advisors Act triggered by the felony conviction, AGI lost its ability to manage money within the United States, and Allianz was forced to sell AGI's components to a third party.

Before deciding to plead guilty, Allianz unsurprisingly argued for a resolution that would preserve AGI, which was the only US-based asset manager that bore Allianz's corporate name and which, as of December 2019, had $140.9 billion dollars under management.   Allianz argued to the Government that a criminal conviction of AGI and the resulting loss of its ability to manage money in the United States would be a "corporate death penalty."

During one presentation, Allianz stated that the shuttering of AGI would hurt the Government in any criminal prosecutions against the individual defendants, because AGI would not be able to cooperate by helping to locate documents and make employees available for testimony.   Allianz's lawyer stated that if AGI were allowed to remain in business, it could be in

---

were segregated from the investigative case file and made inaccessible to the prosecution team. A filter team produced them to Tournant in discovery.

the future what he termed a "back office" for the Government in a criminal trial.[7]   The Government did not find this advocacy persuasive for many reasons, including because the Government had already gathered the relevant documents and interviewed the relevant witnesses for any potential individual criminal prosecution.   The Government did not accept or in any way adopt this piece of advocacy by Allianz's lawyers and, indeed, rejected Allianz's offer that AGI could serve as a "back office" for trial in favor of a resolution that led to AGI's extinction.

## V.   The Government Learns of the Joint Representation

As the Government was discussing the corporate resolution with Allianz and giving Allianz opportunities to be heard, it was doing the same thing with respect to Tournant.   In the fall of 2021, the Government informed Tournant's counsel of its serious concerns about Tournant's conduct at AGI, including its concern that Tournant had lied to company counsel in the aftermath of the Funds' collapse.

Beginning in October 2021, defense counsel asked for multiple in-person meetings to present the Government with its view of the facts, citing the complex nature of AGI's investments.[8] Between October 2021 and May 2022, the Government met at length with Tournant's defense counsel three separate times; voluntarily provided key documents to defense counsel; explained its understanding of the fraud; and provided targeted feedback between meetings about the

---

7 The defense misreads the notes as Allianz's lawyer claiming that Allianz had been serving as a "back office" throughout the Government's investigation.   Allianz did not make such a claim, nor could they, including because, among other reasons, it was the Government and the SEC who continued to discovery new frauds and bring them to Allianz's attention during the course of their parallel investigations.

8 At the initial meeting, Tournant was represented by Millbank.   At the second meeting, Tournant was also represented by his current counsel.   By the third meeting, the Government's understanding is that Millbank, who did not participate in the meeting, was was no longer representing Tournant.

Government's reactions to counsel's arguments.   During the initial portion of Tournant's engagement with the Government, he was represented personally by a partner at Milbank LLP, a deeply experienced practitioner, who has held leadership positions at various times at both the United States Attorney's Office for the Southern District of New York and the SEC.   Current counsel replaced the Milbank partner in or about January 2022.

It was shortly after current counsel entered the case, during a conversation that the Government itself had initiated, that the Government first learned that during the Milbank partner's representation of Tournant, Tournant was also jointly represented by company counsel at Sullivan & Cromwell and Ropes & Gray.   Specifically, on January 28, 2022, the Government called defense counsel to note that in their upcoming meeting, the Government was interested in hearing defense counsel's thoughts on the truth of Tournant's statements in interviews with Allianz's in-house lawyers and outside counsel during the internal investigation.   The Government itself volunteered to defense counsel that it had learned of these statements from Allianz, that it had concerns about the truthfulness of Tournant's statements during these interviews, and that the Government believed that it was important for defense counsel to understand this going into the meeting.   Defense counsel then informed the Government that, during the June Interview, Tournant had been personally represented by company counsel at Sullivan & Cromwell and Ropes & Gray.   As noted above, this was the first time the Government had learned of the joint representation.[9]   In subsequent calls, defense counsel asserted that Allianz's disclosure to the

---

[9]  The defense claims that the Government should already have known this fact because the SEC at one point directed process for Tournant to Ropes & Gray.  But as noted in Section II, the Government conducted a parallel, not joint, investigation, and, even assuming that the SEC was aware of the facts of Tournant's representation, the SEC's knowledge cannot be imputed to the Government.

Government of Tournant's statements during the June Interview to the Government may have tainted the Government's investigation.

Having learned of the joint representation for the first time on the January 28, 2022 call, the Government promptly and carefully evaluated the issue.   It asked defense counsel for the engagement agreements, to better understand the relevant facts.   From the engagement agreements and conversations with defense counsel, the Government learned that in the fall of 2020, Tournant retained Milbank to represent him individually in the ongoing civil litigation and SEC investigation.   After retaining Milbank, Tournant also retained Sullivan & Cromwell and Ropes & Gray – which he knew also represented Allianz – to simultaneously represent him in these matters, on November 17, 2020.[10]   The Sullivan & Cromwell and Ropes & Gray engagement agreements were addressed to Tournant "c/o" his counsel at Milbank, and it therefore appears clear that Tournant was individually advised on the engagement agreements by the Milbank firm before signing any engagement with the other firms,   (Levine Decl., Ex. A, B.), and defense counsel has not claimed otherwise.   Moreover, the language of those agreements confirms that Tournant understood the implications of joint counsel.

Tournant's engagement agreement with Sullivan & Cromwell clearly stated that Sullivan & Cromwell was representing both Tournant and Allianz, and that by executing the agreement, Tournant "acknowledge[d] that you understand the implications of this Joint representation, including the benefits and the risks involved."   (Levine Decl., Ex A).   The agreement

---

10 Defense counsel does not provide the timeline in their brief, instead stating vaguely that Tournant "retained the Firms, as well as Milbank." (Second Br. 11). But Sullivan and Ropes' November 17 engagement letters are addressed to Mr. Tournant in care of the Milbank partner, leading to the conclusion that Tournant first retained the Milbank partner as individual counsel and then subsequently retained Sullivan and Ropes.

enumerated risks that included "the possibility that if a conflict of interest" arose, Sullivan might be required to terminate the relationship.    The agreement also warned Tournant that if Sullivan & Cromwell terminated their representation of him, he waived "any conflict of interest that might otherwise prevent Sullivan & Cromwell from continuing to represent the Allianz Entities," and that Tournant would not seek to disqualify Sullivan & Cromwell "on the ground that Sullivan & Cromwell previously represented you or that Sullivan & Cromwell is using confidential information that you provided to Sullivan & Cromwell." (*Id.*).    Tournant also agreed in no uncertain terms that any confidential information he shared with Sullivan & Cromwell could be shared with the Government "if management of the Allianz Entities deems it appropriate." (*Id.*). The agreement noted that this could include materials that would otherwise be "protected from disclosure to anyone else as a result of the attorney-client privilege, the work-product doctrine, or other applicable privileges," and that Tournant agreed that Allianz could "waive any applicable privileges to the disclosure" of such materials, and that "such disclosure may mean that the protections of the attorney-client privilege that you may have for such Material would no longer apply." (*Id.*).

Sullivan & Cromwell and Ropes & Gray represented Tournant alongside Milbank until June 5, 2021, when each firm informed Tournant's individual counsel at Milbank that it was terminating its representation of Tournant.    As noted above, this termination occurred two days after Sullivan & Cromwell and Ropes & Gray interviewed Tournant about the Funds, with his individual counsel at Milbank present.    Sullivan & Cromwell and Ropes & Gray both sent letters confirming this termination on June 7.    Sullivan & Cromwell's letter, addressed to Tournant's individual counsel, informed him that his "interests in the above-described matter have potentially diverged from those of the Allianz Entities and we have decided to withdraw from our

representation of you." (Levine Decl., Ex. L). The letter further stated that Sullivan & Cromwell would "continue to represent the Allianz Entities, as contemplated by the terms of your November 17, 2020 engagement letter." (*Id.*).

After reviewing the engagement agreements and their express warnings to Tournant that Sullivan & Cromwell was within its rights to provide information to the Government, as well as considering an applicable Formal Opinion issued by the New York City Bar Association's Professional Ethics Committee in 2004,[11] the Government believed that Tournant's privilege had not been breached by Sullivan & Cromwell's recounting of the June Interview to the Government. Nonetheless, in an abundance of caution, the Government elected to treat the materials at issue as potentially privileged until the case was before a judge and the issue could be resolved. The Government made best efforts to set aside the following materials: notes of Tournant's statements to Sullivan & Cromwell during the June Interview; references to those statements in Allianz's presentations to the Government; and documents that were (i) produced by Allianz pursuant to the non-waiver agreement, (ii) created during the period that Tournant was jointly represented, and (iii) included Tournant (collectively, the "Disputed Materials"). The Disputed Materials were segregated by a filter team and made unavailable to the case team.[12]

---

11 *See* New York City Bar Association's Professional Ethics Committee, *Formal Opinion 2004-02: Representing Corporations and Their Constituents in the Context of Governmental Investigations*, issued Feb. 2, 2004, *available at* https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/formal-opinion-2004-02-representing-corporations-and-their-constituents-in-the-context-of-governmental-investigations. This formal opinion explained that counsel could jointly represent corporations and corporate constituents pursuant to the New York Code of Professional Responsibility, so long as both clients gave knowledgeable and informed consent, after full disclosure of the potential conflicts that might arise, ideally while represented by individual counsel; and counsel concluded that the representation would serve the interests of both the corporation and the individual.

12 Four additional pages from a January 20, 2022 presentation by Allianz were clawed back by the Government's filter team after consulting with defense counsel in early January of this year.

On February 25, 2022, the Government informed defense counsel that without taking a position on whether the Disputed Materials were privileged, it would not rely on the Disputed Materials in bringing any case.[13]   The Government did not rely on the Disputed Materials, in its grand jury presentation or in the Indictment.   Indeed, as the Court can see from the Indictment, the Government, for the time being, has cabined its obstruction charges to the time frame *before* the joint representation began.

## ARGUMENT

### I.   The Motion to Dismiss the Indictment Should Be Denied Without a Hearing

Tournant claims that he is entitled to dismissal of the Indictment because the Government used a broadly applicable policy that provides leniency to entities cooperating with the Government to coerce his former attorneys to breach their ethical duties and violate his privileges by providing information that the Government used to indict him.   Each of the premises underlying Tournant's argument is incorrect and false, and he is not entitled to any relief, much less the "extraordinary remedy" of dismissal.   *First*, the information shared with the Government was not privileged: Tournant knowingly and intelligently agreed that, as a result of and in exchange for the benefit of his being jointly represented with Allianz, Allianz would control the privilege over information obtained during the course of that representation.   *Second*, whatever allegations Tournant may now make against Sullivan & Cromwell or Ropes & Gray, there is no basis in law or fact to attribute any action by Allianz or its law firms to the Government.   *Third*, Tournant has not demonstrated and cannot demonstrate either that the Government's conduct has been

---

The Government did not rely on the material contained in those recently clawed-back pages for its Indictment or grand jury presentation.

13 The Government reserved its right to use the material at a later stage of the proceedings if a judge determined that the material was admissible.

"manifestly and avowedly corrupt," or that he has been prejudiced.   Accordingly, Tournant's motion must be denied.

### A.      Applicable Law

#### 1.   Attorney-Client Privilege and Waiver

"The attorney-client privilege protects communications (1) between a client and his . . . attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice."   *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). Its purpose is to "encourage[] clients to confide in their attorney fully and frankly, free from the apprehension of disclosure."   *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943 (2d Cir. 1992). But "it may be invoked to hold secret *only* those communications made in confidence to a lawyer to obtain legal counsel that would not have been made without the existence of the privilege."   *Id.* (emphasis added) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976); *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)).   In other words, "[t]he relationship of attorney and client, a communication by the client relating to the subject matter upon which professional advice is sought, and the confidentiality of the expression for which the protection is claimed, all must be established in order for the privilege to attach."   *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) ("*Schwimmer I*").

The attorney-client privilege may be expressly or impliedly waived.   *See Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015); *Mejia*, 655 F.3d at 134. "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997); *see also In re Horowitz*, 482 F.2d 72, 81-82 (2d Cir. 1973) ("as with all privileges, the person claiming the attorney-client privilege has the burden of establishing all essential elements").   "Moreover, the person invoking

- 17 -

the privilege must have taken steps to ensure that it was not waived." *Mejia*, 655 F.3d at 134; *see also Hollis v. O'Driscoll*, No. 13 Civ. 01955 (AJN), 2013 WL 2896860, at *1 (S.D.N.Y. June 11, 2013) ("The party claiming privilege also carries the burden of showing that it has not been waived."); *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16 Civ. 6392 (JPO), 2019 WL 2121690, at *5 (S.D.N.Y. May 15, 2019); *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 255 (S.D.N.Y. 2005) ("The person asserting the privilege has the burden of proving . . . that the privilege was not waived."); *Denney v. Jenkins & Gilchrist*, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004) (the party seeking to avoid waiver must demonstrate "that its privilege was not waived through disclosure").

Critically, "because the attorney-client privilege stands in derogation of the search for truth so essential to the effective operation of any system of justice it must be narrowly construed." *United States v. Correia*, 468 F. Supp. 3d 618, 621 (S.D.N.Y. 2020) (internal quotation marks, alterations, and citation omitted); *see also Mejia*, 655 F.3d at 132 (courts are to "apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable"); *In re Six Grand Jury Witnesses*, 979 F.2d at 943 (the privilege stands as an "exception to the testimonial compulsion for every witness' evidence," and "[g]enerally, all relevant proof is essential [for a] complete trial record" and for "confidence in the fair administration of justice").

## 2.   Interference with the Sixth Amendment Right to Counsel

The Sixth Amendment provides the accused in all criminal prosecutions "the right . . . to have the assistance of counsel for his defense."   U.S. Const. amend. VI.   "[G]overnment interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel."   *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985)

- 18 -

(citing *Massiah v. United States*, 377 U.S. 201 (1964)).

To establish a Sixth Amendment violation based on a claim that the Government has violated the attorney-client privilege, a defendant must demonstrate either "'that privileged information [was] passed to the government or that the government . . . intentionally invaded the attorney client relationship, and resulting prejudice.'" *Ginsberg*, 758 F.2d at 833 (quoting *United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir. 1979)).   Further, where the alleged intrusion results from unintentional or justifiable government conduct, a defendant is entitled to a hearing to secure relief only if the defendant "allege[s] specific facts that indicate communication of privileged information to the prosecutor and prejudice resulting therefrom." *Id.*; *see also United States v. Sanin*, 113 F.3d 1230 (2d Cir. 1997) ("In order to make out a Sixth Amendment violation . . . , a defendant must show that he has suffered prejudice as a result of communications that allegedly impinged upon the attorney-client privilege."); *Ginsberg*, 758 F.2d at 833 ("there can be no violation of the Sixth Amendment without some communication of valuable information derived from the intrusion to the government"); *Gartner*, 518 F.2d 633, 637–38 (collecting cases in which courts have "attempt[ed] to measure the harm or prejudice, if any, to the defendant rather than punish the prosecutor by freeing the defendant"); *United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *6 (S.D.N.Y. Jan. 21, 2016) ("a defendant must ordinarily demonstrate prejudice stemming from the Government's conduct"); *United States v. Sattar*, No. 02 Cr. 395 (JGK), 2002 WL 1836755, at *6 (S.D.N.Y. Aug. 12, 2002) ("Where the intrusion upon an attorney-client communication is unintentional or justified there can be no violation of the Sixth Amendment without a showing that the intercepted communication was somehow used against the defendant to the defendant's prejudice.").

Even where the government intrusion is intentional, moreover, "unless 'the conduct of the Government has . . . been . . . manifestly and avowedly corrupt,' . . . a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege." *United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991) ("*Schwimmer IV*") (quoting *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975)).   And even in such cases of intentional intrusion into the attorney-client relationship, the "[Second] Circuit never has gone so far as to adopt a per se rule" requiring the dismissal of an indictment.   *Id.*   "'The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights.'"   *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *3 (S.D.N.Y. Aug. 13, 2019) (quoting *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)).   Short of dismissal, "courts have applied a different and a less rigid rule which attempts to measure the harm or prejudice, if any, to the defendant rather than punish the prosecutor by freeing the defendant."   *Gartner*, 518 F.2d at 637.

Actions of a private employer may be "fairly attributable to the government," *United States v. Stein*, 541 F.3d 130, 152 n.11 (2d Cir. 2008) (*"Stein II"*), when "there is a sufficiently close nexus between the [government] and the challenged action," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Stein II*, 541 F.3d at 146.   However, the Second Circuit has expressly refused to adopt a categorical rule that "acts taken by a private company in response to government action, and that have as one goal obtaining better treatment from the government, amount to state action."   *Gilman v. Marsh & McLennan Cos.*, 826 F.3d 69, 77 (2d Cir. 2016).   Rather, "a company is not prohibited from cooperating, and typically has supremely reasonable, independent interests for conducting an internal investigation, even when employees suspected of crime end up jettisoned.   A rule that deems all such companies to be government actors would be incompatible with corporate

- 20 -

governance and modern regulation." *Id.*

### B.  Discussion

#### 1.  The Information Provided to the Government Was Not Privileged

Tournant asserts that he holds the attorney-client privilege over his communications with Sullivan & Cromwell and Ropes & Gray made during the course of their representation of him. He further claims that, therefore, the Government received privileged communications without a valid waiver when Sullivan & Cromwell provided the Government readouts of Allianz's June Interview of Tournant.   (Second Br. 45).   Although Tournant makes various accusations against his former attorneys and vague references to invalid waivers, he fails to address a central fact: Tournant agreed, in writing, while advised by three exceedingly well-regarded law firms—one of which represented him individually and no one else in the matter—that Allianz would control the attorney-client privilege over information obtained during the joint representation in the event that a conflict arose.   Allianz waived that privilege when it provided the information at issue here to the Government, and therefore there is no factual basis to the allegation that Tournant's privilege was breached.

Indeed, Tournant expressly agreed in his engagement letter with Sullivan & Cromwell that Allianz—not he—could decide to "waive any applicable privileges," including by sharing information with the Government, "if management of the Allianz Entities deems it appropriate." (Levine Decl., Ex A).   The letter further noted that "such disclosure may mean that the protections of the attorney-client privilege that you may have for such Material would no longer apply." (*Id.*).   Tournant acknowledged that by executing the agreement he "understand[s] the implications of this Joint representation, including the benefits and the risks involved."   (*Id.*).

- 21 -

Moreover, it cannot be said that Tournant entered into this agreement lightly.   He was advised by his own independent criminal counsel at Milbank when he did so, and clearly had the benefit of that independent counsel's advice while considering the potential advantages and disadvantages of joint representation.

Indeed, Tournant received a massive benefit from the joint representation, namely, representation by law firms that, (unlike Milbank) had access to every Allianz document and employee; full knowledge of Allianz's history with the SEC and what Allianz had produced to the authorities; and an understanding of how Tournant's statements and documents related to nearly every other witness in the case.

That one of the potential risks of joint representation that Tournant expressly contemplated in advance came to pass did not void the knowing waiver he had executed in exchange for those benefits.   Rather, it is clear on the face of the engagement letters that Tournant, a highly educated and well-counseled professional, understood and agreed that it was possible that Allianz's management might decide that it would be appropriate to share information Tournant had provided to the law firms with the Government.   Tournant understood and expressly agreed that in such a case it would be Allianz, not Tournant, who would decide whether to waive any otherwise applicable privileges.   Tournant understood and expressly agreed that in such a case, any attorney-client privilege he otherwise would have had would no longer apply.   In light of all the foregoing, Tournant decided that he preferred to proceed with joint representation and obtain the benefits described above.

It is Tournant's burden to demonstrate the existence of a privilege over the disclosed information, *Int'l Bhd. of Teamsters*, 119 F.3d at 214, and that he "took steps to ensure that it was not waived," *Mejia*, 655 F.3d at 134.   But Tournant has utterly failed to establish that any privilege

over the information shared with the Government was not waived.   Tournant does not claim, for example, that he failed to understand the import of the waiver he undisputedly signed, that he was coerced into doing so, or that his own experienced counsel at Milbank gave him misleading or incorrect advice about the potential consequences of the joint representation.   Instead, Tournant asserts in a footnote that "an advanced waiver of confidentiality at the discretion of a lawyer's other client is void at the outset and not enforceable," citing to a Ninth Circuit case that is wholly inapposite.   (Second Br. 40 n.13).   In that case, the Ninth Circuit applied California state law on privilege and held that an attorney could not be held in contempt for refusing to provide privileged information that would tend to reveal the identities of his clients.   *Baird v. Koerner*, 279 F.2d 623, 635 (9th Cir. 1960).   This case has no bearing on Tournant's motion.[14]

Tournant also deflects from the fact that he affirmatively waived any privilege over the relevant information by making various accusations against Sullivan & Cromwell, including alleging that Sullivan & Cromwell breached its obligation to timely notify him and sever the relationship when a conflict arose.   (Second Br. 40-43).   As an initial matter, the facts—stripped of Tournant's shading—do not support any of these inferences.   It does not appear that Sullivan & Cromwell was aware of an actual conflict between Tournant and Allianz prior to June 5, 2021, the day that Sullivan notified Tournant and terminated the representation.   Rather, during Bond-Nelson's May 20 and 21 SEC testimony, which was attended by both Bond-Nelson's independent counsel as well as Allianz's counsel, Bond-Nelson repeatedly and steadfastly maintained that there had been no fraud at the Structured Alpha Funds.   Bond-Nelson then terminated his investigative

---

14 Tournant suggests that he may raise other facts and argument at a later time.   (Second Br. 40 n.13).   In the event that Tournant raises new arguments in his reply brief, the Government may seek leave of the Court to file a sur-reply solely to respond to any such new arguments.

testimony before the end of the second day, and *through his independent counsel*, communicated his desire to cooperate with the SEC's investigation and with the Government's parallel criminal investigation.   Counsel for Allianz was not party to these conversations, and the Government has no reason to believe that Sullivan & Cromwell was aware that the Government scheduled and held proffers with Bond-Nelson on June 3 and 4, 2021, which counsel for Allianz did not attend.   Prior to the termination of Tournant's joint representation with Allianz, the Government did not disclose to Sullivan & Cromwell, and has no reason to believe that anyone disclosed to Sullivan & Cromwell, what Bond-Nelson said in those proffers regarding Tournant's role in the fraud. Similarly, the Government was not aware during this time that Allianz was conducting its June 2021 interviews of Allianz employees, or that Sullivan & Cromwell terminated its representation of Tournant on June 5, 2021.   Indeed, the Government contacted Allianz for the first time on June 10, 2021—after Allianz had decided based on its internal investigation to terminate the joint representation.

In any case, Tournant's accusations against Sullivan & Cromwell only emphasize central truths: the plain language of the law firm's engagement letters with Tournant made clear that he had no right to control the information he had provided, and Allianz decided to waive its own privileges over the June Interview—not the Government.   Indeed, the Government had no awareness that Tournant and Allianz were jointly represented until after Allianz had disclosed the content of the June Interview.   Accordingly, as discussed further below, there is no basis for relief, even if Allianz provided privileged information to the Government.

### 2.   Even If Privileged Information Were Shared with the Government, There Would Be No Basis for Relief

Even if Allianz had transmitted to the Government material that was covered by a privilege held by Tournant, Tournant would still not be entitled to relief, as he has not demonstrated and cannot show (1) that the Government deliberately intruded into his attorney-client relationship, let alone that it did so in a manner that is "manifestly and avowedly corrupt," or (2) that the provision of the relevant information to the Government prejudiced Tournant, particularly as the Government removed the Disputed Materials from its files and did not use it when charging its case.[15]

### a.   The Government Did Not Intrude on any Privilege

In the absence of any facts that the Government deliberately sought Tournant's privileged information, Tournant turns to a tortured, wholly implausible theory based on generalities and divorced from this case: because the Government often rewards cooperation by companies (as it does for individuals), any action by any entity (or individual presumably) that might later assist in its cooperation with the Government—whether the Government is aware of the action or not, or indeed whether the entity and Government have had any communication at all—is forever attributable to the Government.   (Second Br. 28).   Indeed, the mere existence of the Principles of Federal Prosecution of Business Organization in the Justice Manual is sufficient, in Tournant's

---

[15] This brief focuses on the issue of waiver, because Tournant clearly waived any privilege over the Disputed Material.  But separate and apart from the waiver issue, portions of the Disputed Material may not be privileged because they are subject to the crime-fraud exception.  *See generally In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994) (noting that communications that otherwise might be privileged are not entitled to that protection if they "relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct") (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984)).  Should the litigation reach a stage where this becomes relevant, the Government is prepared to litigate this issue.

view, to render the Government responsible for any act taken by a company prior even to engagement with the Government such that if the company, without notice to the Government, relays information to the Government that turns out to have been subject to a claim of privilege by an individual, the Government has now intruded on the individual's privilege and the individual is entitled to dismissal of charges.   (*Id.*).   The claim is implausible on its face and even more so in light of the law of this Circuit.   In fact, the Second Circuit has addressed precisely this argument— that "acts taken by a private company in response to government action, and that have as one goal obtaining better treatment from the government, amount to state action"—and referred to the claim as "the legal equivalent of the 'Hail Mary pass' in football."  *Gilman*, 826 F.3d at 76-77.   Perhaps not surprisingly, that argument did not win the day, and is not the law of this Circuit.  *Id.*[16]

Tournant nonetheless argues that "there [was] a sufficiently close nexus between the [Government] and the challenged action of the [corporation] . . . so that the action of the latter may be fairly treated as that of the [the Government] itself."  *Stein II*, 541 F.3d at 146–47.   As the reasoning in *Gilman* makes clear, however, *Stein* is not applicable to this case.   In *Stein*, the Government had entered into a deferred prosecution agreement with the company, which required the company to comply with the Government's document demands.  *United States v. Stein*, 440 F. Supp. 2d 315, 354 (S.D.N.Y. 2006) ("*Stein I*").   Here, by contrast, there was no deferred prosecution agreement between the Government and Allianz or AGI, or agreement of any sort, let

---

[16] In *Gilman*, the Circuit rejected the argument that a company's decision to interview its employees as part of an internal investigation transformed the company into a state actor, even where the company was aware of a criminal investigation by the New York Attorney General's office.   826 F.3d at 77 (2d Cir. 2016) ("A rule that deems all such companies to be government actors would be incompatible with corporate governance and modern regulation.").   The facts of *Gilman* are particularly unhelpful for Tournant's argument as here, unlike the company at issue in *Gilman*, Allianz was not even aware of the Government's investigation until after Allianz interviewed Tournant in early June 2021.

alone one that required any action.  That alone should end the matter.  *See United States v. Tomasetta*, No. 10 Cr. 1205 (PAC), 2012 WL 896152, at *5 (S.D.N.Y. March 16, 2012) (distinguishing *Stein* because there was no deferred prosecution agreement); *United States v. Buske*, No. 09 Cr. 65, 2011 WL 2912707, at *9 (E.D. Wis. July 18, 2011) (distinguishing *Stein* because the third party in issue had "no similar [deferred prosecution agreement] or other legal requirement [to] cooperate with the government").   Nor is there any claim or basis to suggest the Government here had the kind of direct involvement with corporate decision-making at issue in *Stein*.  *See Stein II*, 541 F.3d at 148; *see also Gilman*, 826 F.3d at 76.

In the absence of case law supporting the relief he seeks, Tournant argues that Allianz's desire to obtain a deferred prosecution agreement or some result other than the "corporate death penalty" supplied the Government coercion.  (Second Br. 7).  But this is exactly what the Second Circuit has ruled does not transform private action into government action.  *Gilman*, 826 F.3d at 77.  Rather, "a company is not prohibited from cooperating, and typically has supremely reasonable, independent interests for conducting an internal investigation, even when employees suspected of crime end up jettisoned.  A rule that deems all such companies to be government actors would be incompatible with corporate governance and modern regulation."  *Id.*

Nor do the undisputed facts support Tournant's arguments.  Tournant argues that the Government's policies for evaluating corporate cooperation "effectively deputized corporate counsel in this case as government agents so that they could obtain the cooperation credit necessary to avoid indictment."  (Second Br. 33-34).  But this argument is demonstrably untrue in every respect: corporate counsel did not act as deputy Government agents, the Government conducted its own independent investigation, and the Government ultimately decided to criminally charge AGI rather than enter into a deferred prosecution agreement, despite Allianz's cooperation.

Perhaps because the facts do not support his premise, Tournant repeats six times in his brief that one of Allianz's attorneys promised, in the context of urging the Government to allow AGI to enter into a deferred prosecution agreement rather than face criminal charges, that AGI would serve as a "back office" for the Government if only it could remain a going concern.   Tournant quoted a similar sentiment in bold italic font at the opening of his preliminary statement.   (Second Br. 6). But Tournant's rhetorical flourishes cannot change the fact that the Government did not ask Allianz to serve as the "back office" for its investigation or prosecution, did not adopt that comment by counsel in any respect, and in fact rejected it by choosing to pursue a criminal conviction that had, as a consequence, the very corporate death penalty that company counsel sought to avoid.   Nor did the Government deputize corporate counsel to investigate for the Government.   Rather, the Government did the opposite; shortly after notifying Allianz of the existence of its criminal investigation, the Government asked Allianz to deconflict before interviewing additional witnesses, and within approximately seven weeks asked Allianz to stop interviewing witnesses as part of its internal investigation.   Moreover, Allianz was not a "back office" for the Government; the Government conducted an independent investigation, including by bringing new facts and new frauds to Allianz's attention that Allianz had not yet uncovered in its internal investigation.   And although buried in Tournant's brief, the Government charged AGI criminally, resulting in that entity going out of business after AGI pled guilty.

> **b.** **There Is No Basis to Claim that Any Action Was "Manifestly and Avowedly Corrupt"**

Tournant claims that the Government's actions relating to his privilege were "manifestly and avowedly corrupt."   *Schwimmer IV*, 924 F.2d at 447.   As discussed, the Government was unaware that Sullivan & Cromwell had jointly represented Allianz and Tournant individually at

the time Sullivan & Cromwell provided the Government readouts of its June 2021 interviews of Tournant, and, indeed, the Government remained unaware of that fact until a January 2022 call with defense counsel—a call the Government initiated in order to express concern about Tournant's truthfulness in the interviews and to invite defense advocacy on that topic. Nonetheless, Tournant insists that the existence of a policy of rewarding cooperation, as embodied in the Principles of Federal Prosecution of Business Organization, renders the Government "manifestly and avowedly corrupt." This astonishing claim is wrong.

In fact, Tournant makes no serious attempt to contend with the gravity or meaning of his accusations. The Second Circuit has invoked the notion of "manifestly and avowedly corrupt" conduct to describe actions that might invoke a "per se rule [that] represents a moral as well as a legal condemnation of such egregious and unequivocal conduct for which sanctions are imposed against the Government as punishment regardless of the defendant's guilt." *Gartner*, 518 F.2d at 637. Such a rule applies where the government's "conduct has been an offensive interference with the defendant's rights without any justification." *Id.* The Second Circuit has pointed, as examples of government conduct that might meet this standard (though still eschewing a per se rule), among others to cases where the government tried multiple defendants, including one who, unbeknownst to his co-defendants or even his attorney, was a government informant, *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972); where the government tried an informant along with a codefendant and the informant professed his own and his codefendant's guilt in front of the jury, *United States v. Lusterino*, 450 F.2d 572 (2d Cir. 1971); and where the government wiretapped conversations between a defendant and her counsel before and during trial, *Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951). *See Gartner*, 518 F.2d at 637.

- 29 -

Nothing of the sort happened here.   Tournant claims that the Government acted in a manner "manifestly and avowedly corrupt" "by encouraging and inducing [Tournant's] former counsel to switch sides and build the criminal case against him."   (Second Br. 24).   But Tournant's use of the phrase "switch sides" makes plain the shallowness of this argument. Tournant uses this flippant phrase no less than seven times in his brief.   But this is not a soccer match with two sides vying for points.   This matter concerns a Government investigation into an extensive and insidious fraud that exposed innocent people to risk and massive loss, all for the defendant's gain.   The Department of Justice's policy of encouraging corporate cooperation did not "induce" Allianz to "switch sides"; it sent a message to companies that it is in their interest to ferret out corruption and fraud in their ranks and to assist rather than obstruct the Government's efforts to combat such conduct.   There is nothing "manifestly or avowedly corrupt" about any Government conduct in this case or with the policy.   *Cf. Ginsburg*, 758 F.2d at 833 (discussing justified investigative actions).

The lone out-of-circuit case that Tournant relies in support of his argument is more than 35 years old—before the Principles of Federal Prosecution of Business Organization existed—(*see* Second Br. 25-26) and does not advance his claim; rather, it highlights its weakness.   In *United States v. Schell*, the Court of Appeals for the Fourth Circuit concluded that it was *per se* prejudicial for an attorney who represented two individuals to join a prosecutor's office and prosecute his former clients for the very conduct as to which he had previously represented them.   775 F.2d 559, 566 (4th Cir. 1985).   The Principles of Federal Prosecution of Business Organization do not resemble the circumstances at issue in *Schell*, and the fact that Allianz, having obtained evidence of unlawful conduct by its employees, chose to cooperate with the Government and waive its privilege does not render the Government's conduct and the corporation cooperation policy

"manifestly and avowedly corrupt."

Indeed, in an effort to traverse the hole at the center of his argument, that Tournant agreed that Allianz would hold the privilege, Tournant goes so far as to blame the Principles of Federal Prosecution of Business Organization for the fact that he chose—while counseled by three firms, including a highly experienced lawyer representing only him—to enter into a joint representation with Allianz pursuant to which Allianz could control the privilege.   (Second Br. 35).   But the fact is—and Tournant has not offered any basis to suggest otherwise—that he was not coerced into signing that agreement, nor was there anything particularly remarkable about it.   Tournant sought and obtained the benefits of being represented, not only by his own attorney, but also by two prominent firms jointly representing his employer, and he did so understanding that if his interests diverged with his employer's, the privilege over information gathered by the employer during interviews that were conducted by their joint counsel, would remain with the employer.

Finally, it is worth observing that, once the Government understood that Tournant believed and alleged – no matter how feebly – that the information from his interviews had been provided in violation of his privilege, the Government segregated the materials, notwithstanding the Government's own belief that Tournant's argument did not stand on any legal ground.   That action was obviously taken in an excess of caution, and Tournant does not wrestle with this fact at all.   Accordingly, given the total lack of Tournant's ability to establish that the Government's actions were "manifestly and avowedly corrupt," dismissal of the indictment is not an available remedy here.   *See United States v. Weissman*, No. 94 C. 760 (CSH), 1996 WL 751386, at *13–14 (S.D.N.Y. Dec. 26, 1996) (denying motion to dismiss the indictment because the Government's intrusion into the attorney-client privilege could not be characterized as intentional); *Sharma*, 2019 WL 3802223, at *4 (denying motion to dismiss the indictment where "Government took

reasonable precautions to avoid exposure to privileged materials" but a few potentially privileged documents slipped through the Government's review protocols).

**c.      Tournant Has Not Been Prejudiced**

*Schwimmer* and other cases make clear: even had the Government intentionally intruded into Tournant's attorney-client relationship, which it did not, to establish a Sixth Amendment violation the defendant must also "show prejudice to his case resulting from the intentional invasion of the attorney-client privilege."   *Schwimmer IV*, 924 F.2d at 447.   Tournant has shown no such prejudice here, nor could he.   By the time summaries of witness interviews were first provided to the Government by Allianz in November 2021, the Government's understanding of the fraud was well-advanced.   And once the defense identified the potential privilege issue in January 2022, the Government set aside the Disputed Materials and did not use them in its grand jury presentation or Indictment.   Tournant therefore has not shown any prejudice resulting from the Government's review of the Disputed Materials.

**d.      Even Assuming *Arguendo* That the Material Identified by the Defendant is Privileged, He is Not Entitled to the *Kastigar*-like Hearing He Seeks**

The defendant cites to the *Schwimmer* cases in support of his argument that he is entitled to a *Kastigar*-like hearing.   (Second Br. 29 (citing *United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991) ("*Schwimmer II*")).   However, even assuming *arguendo* that the material identified here by the defendant is privileged, *Schwimmer II* does not entitle Tournant to the *Kastigar*-like hearing he seeks.   Rather, the Second Circuit remanded the first *Schwimmer* case, without any direction as to the standard that should be applied or where the burden of proof rested, *United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989) (*Schwimmer I*), and those questions were never

- 32 -

squarely addressed nor resolved by the subsequent litigation.[17]   To the extent that dicta in those

cases suggests that *Kastigar* prescribes these standards, the *dicta* is inconsistent with all the

decisions outside this Circuit that have squarely addressed these questions and with other decisions

of the Second Circuit.

Numerous cases make clear that the Second Circuit does not contemplate that a hearing

under the standards triggered by compelled testimony is required every time the Government is

exposed to privileged material in the course of an investigation.   In *United States v. Colasurdo*,

for example, attorneys for the defendants were interviewed by the United States Attorney's office

and testified before the grand jury.   Claiming breach of the privilege in these communications,

---

17 In *Schwimmer I*, the defendant brought a post-conviction challenge on appeal of an alleged intentional violation of defense camp information. The Government had elicited information in grand jury proceedings that it later conceded – for the purposes of the defendant's appeal of his conviction – was privileged.   Although the Government asserted on appeal that all of this information was capable of being obtained from other sources, the Second Circuit found that "[t]here is reason to question that assertion based on the nature of the accountant work papers that were furnished to the Government."   *Schwimmer I*, 892 F.2d at 245.   Accordingly, the Second Circuit found that, "based on the documentation available to it, the district court should have conducted an evidentiary hearing to determine whether the government's case was in any respect derived from a violation of the attorney-client privilege."   *Id.*   (Significantly, the Second Circuit never even suggested in *Schwimmer I* that the Court should have held a pretrial hearing).

The Second Circuit remanded the case without any direction as to the standard that should applied or where the burden of proof rested.   On remand, the district court refrained from deciding these questions because it concluded that the Government had demonstrated a lack of taint even measured by the *Kastigar* standard. *United States v. Schwimmer*, 738 F. Supp. 654, 658 (E.D.N.Y. 1990) (McLaughlin, J.) ("Because I conclude that the government has satisfied the "heavy burden" described in *Kastigar*, I may assume, without deciding, that the defendant's contention is correct [as to the applicability of that standard]."), *aff'd*, 924 F.2d 443 (1991).

On appeal of the district court's ruling, the Second Circuit also had no need to decide these questions.   Like the district court, it assumed the applicability of the *Kastigar* standard and upheld the district court's finding that the Government had met that standard, noting that the finding was "amply supported by evidence produced at the hearing" and "not clearly erroneous."   *Schwimmer IV*, 924 F.2d at 446.   *Schwimmer IV*, therefore, did not have occasion to decide which party bears the burden of proving taint or lack of taint and what type of "derivative use" of privileged material is prohibited.

the defendants argued on appeal of their convictions that the district court should have dismissed

the charges based on disclosure of privileged information to the grand jury.   In rejecting this

claim, Judge Friendly stressed that, if defendants could claim a right to dismiss charges on this

basis, "before trial on the merits there would always be a kind of preliminary trial to determine the

competency and adequacy of the evidence before the grand jury, with resultant delay."   453 F.2d

at 595.   The Second Circuit reaffirmed this ruling in *United States v. Bein*, 728 F.2d 107, 113 (2d

Cir. 1984).   Under these authorities, the pretrial disclosure of privileged communications, without

more, does not trigger the right to a hearing.[18]

 The defendant's request for a hearing should accordingly be denied.

---

[18] Numerous cases in other circuits have addressed the question of what standard should apply when the Government comes into possession of information subject to the attorney-client privilege or other common-law evidentiary privileges.   All have rejected the *Kastigar* standard.   Indeed, all have rejected even the less stringent, "fruit of the poison tree" analysis.   For example, the issue was thoroughly addressed in *United States v. Warshak*, 631 F.3d 266, 293-95 (6th Cir. 2010).   In *Warshak*, the Government came into possession of "myriad documents" that were the subject of the attorney client privilege. *Id*. at 292.   The Sixth Circuit flatly rejected the defendant's claim that a *Kastigar* hearing was warranted.   *Id*.  *See also United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir. 2000) (holding no hearing was required and that the defendant was not entitled to suppress any of the derivative fruits of the privileged communication); *Nickel v. Hannigan*, 97 F.3d 403, 405-06 (10th Cir. 1996) (remedy for violation of privilege is suppression of direct evidence, not fruits).   Other cases are in accord.  *See United States v. Marashi*, 913 F.2d 724, 731 n. 11 (9th Cir. 1990) ("no court has ever applied [the 'fruits of the poisonous tree'] theory to any evidentiary privilege and . . . we have indicated we would not be the first to do so"); *United States v. Lefkowitz*, 618 F.2d 1313, 1318 n. 8 (9th Cir. 1980) ("Because we reject . . . Lefkowitz's argument that the marital privileges are somehow constitutionally grounded in, among other locations, the Fourth Amendment, we doubt that a secondary source of information obtained through information protected by the confidential marital communications privilege would in any way be tainted"); *see also United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir. 1995) ("Because there was no bad faith attempt to obtain [attorney-client] privileged conversations [through a wire tap], if privileged conversations were intercepted (and the government seems to concede that some inadvertently were), those conversations should be suppressed on an individual basis at or before trial.").

## II.     The Motion to Compel Must Be Denied

The SEC is a separate and independent agency that engaged in a parallel investigation into conduct at AGI.   As discussed below, the SEC is not a part of the prosecution team.   In urging the Court to find otherwise, Tournant relies heavily on statements made at a joint press conference and on the fact that the SEC participated in witness interviews with the Government—both routine occurrences in parallel investigations conducted by different government agencies.   Indeed, contrary to Tournant's argument, the fact that the Government and the SEC conducted joint witness interviews resulting in only one set of interview notes taken and maintained as part of the criminal investigation file makes it less likely, not more, that material arguably favorable to Tournant's defense would be found in the SEC's file.   In any event, the law is clear that because the SEC is not part of the prosecution team, Tournant's motion to require the Government to search the files of separate and independent actors should be denied.   Tournant's requests are contrary to the law and would improperly extend the law of this Circuit in ways that would result in perverse and undesirable incentives and undermine the efficient enforcement of the criminal and civil laws.

### A.  Applicable Law

"Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it."   *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). This duty extends to the prosecution team.   In other words, a prosecutor "is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'"   *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); *accord United States v. Hunter*, 32 F.4th 22, 36 (2d Cir. 2022).

The Government's duty to obtain and produce Rule 16 and *Brady* material is also limited to material in the possession of the prosecution team.  *Hunter*, 32 F.4th at 36 ("We have long rejected the notion that 'knowledge of any part of the government is equivalent to knowledge on the part of th[e] prosecutor.'" (quoting *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971))); *Avellino*, 136 F.3d. at 255 ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis."); *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016) (*Brady* is "not a discovery doctrine that c[an] be used to compel the Government to gather information for the defense.").

Although "[t]he Second Circuit has not yet articulated a test to decide when knowledge of *Brady* material may be imputed from one agency to another," *United States v. Velissaris*, No. 22CR105 (DLC), 2022 WL 2392360, at *2 (S.D.N.Y. July 3, 2022), the Circuit has provided guidance, and courts within this District have articulated a number of factors for determining the scope of the prosecution team and whether a joint investigation occurred.  The Circuit counsels that "the relevant inquiry [for determining whether a person is a member of the prosecution team] is what the person did, not who the person is."  *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006).  "Individuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (summary order).  "At bottom," the determination of who constitutes the prosecution team, "involves a question of agency law: should a prosecutor be held responsible for someone else's actions?"  *United States v. Meregildo*, 920 F.

- 36 -

Supp. 2d 434, 443-44 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d

Cir. 2015).   "Generally, a principal is responsible for the knowledge of an agent when that agent

has a duty to give the principal information or when the agent acts on his knowledge regarding a

matter that is within his power to bind the principal.   An agent's duty to disclose is thus linked to

his power to bind the principal."   *Id.*   In the context of a criminal investigation and prosecution,

the individuals empowered to bind the prosecutor consist generally of those who "actively

investigate[] the case, act[] under the direction of the prosecutor, or aid[] the prosecution in crafting

trial strategy."   *Meregildo*, 920 F. Supp. 2d at 442; *see also United States v. Barcelo*, No. 13 Cr.

38 (RJS), 2014 WL 4058066, at *9 (S.D.N.Y. Aug. 15, 2014) ("To determine whether someone is

a member of the prosecution team—in other words, whether the prosecution can be deemed to

have constructive knowledge of information held by that individual—the Court considers the

totality of the circumstances, including whether the individual actively investigates the case, acts

under the direction of the prosecutor, or aids the prosecution in crafting trial strategy."), *aff'd*, 628

F. App'x 36 (2d Cir. 2015).

Applying these principles, the Second Circuit and courts in this District have consistently

rejected efforts to impose discovery obligations on the Government related to information held by

entities that do not act as agents of the prosecution, including cooperating witnesses, expert

witnesses for the Government, other government agencies, and even separate components of the

Justice Department.   *See, e.g.*, *Barcelo*, 628 F. App'x at 38 (holding that a cooperating witness

was not a part of the prosecution team where he "played no role in the investigation or in

determining investigation or trial strategy," and "did no more than provide information to the

government and testify at trial"); *Stewart*, 433 F.3d at 299 (holding that a civilian employee of the

Secret Service who testified as an expert witness for the Government was not a member of the

"prosecution team" for *Giglio* purposes); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (holding that for *Giglio* and Jencks Act purposes, the Government had no discovery obligation related to information filed in an unrelated bankruptcy proceeding); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (holding that the reports made by FBI agents in the course of investigations unrelated to the defendants' prosecutions were not possessed by the prosecution team); *Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir.1985) (holding that a prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting "completely untenable position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'"); *United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("[T]he prosecution team does not include federal agents, prosecutors, or parole officers who are not involved in the investigation."); *Meregildo*, 920 F. Supp. 2d at 444 ("[I]n most cases, cooperating witnesses should not be considered part of the prosecution team."); *United States v. Merlino*, 349 F.3d 144, 154-55 (3d Cir. 2003) (holding that Government not required to obtain prison calls of cooperating witness to satisfy disclosure obligations).

Courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession, custody or control of another agency for *Brady* evidence only where the Government conducts a "joint investigation" with another state or federal agency. *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (finding that facts similar to those here "make clear that the investigations, while they may have overlapped, were not conducted jointly" in denying the

defendant's request for the Court to require the SEC to access and review FBI interview notes that were not in the SEC's possession, custody or control); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE); *Ferreira v. United States*, 350 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (holding that cooperation between the Government and NYPD was "not sufficient to make the Government and the state prosecutor members of the same prosecutorial team"); *United States v. Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994) (holding that the Government and FAA did not conduct a "joint investigation" even though the FAA provided two inspectors to assist the criminal investigation); *United States v. Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the Government and the Government had no control over the material).

To determine whether the criminal prosecution conducted a "joint investigation" with another agency, such that the other agency should be considered part of the prosecution team, courts consider a number of factors, including whether the other agency "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F.Supp.3d 736, 741-42 (S.D.N.Y. 2018)); *see also United States v. Collins*, 409 F. Supp. 3d 228, 241 (S.D.N.Y. 2019) (finding no joint investigation where SEC and Government participated in some joint interviews); *United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9, 2018) (finding no joint

investigation where agencies shared information but made their own determinations regarding what documents to obtain and what facts to ask a witness); *accord Stanard*, 2007 WL 1834709, at *3 (FBI and SEC did not conduct a joint investigation despite participating in joint interviews during which only FBI took notes); *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008) (finding that parallel civil and criminal investigations were not "joint").

    **B.**    **Discussion**

        **1. The Government Did Not Conduct a Joint Investigation**

The SEC is not part of the Government's prosecution team. Although the Government and the SEC conducted joint interviews for the convenience of witnesses, most aspects of the Government's investigation were conducted without any involvement of the SEC:

- the Government and the SEC each initiated their separate investigations independently;

- the SEC played no role in the Government's charging decisions or the development of the Government's prosecutorial strategy;

- likewise, the Government played no role in the SEC's charging decisions or the development of the SEC's litigation strategy;

- no one from the SEC was designated a special Assistant U.S. Attorney to work on the criminal investigation;

- at jointly conducted interviews, the SEC did not take notes during the interviews and does not have any notes from joint interviews;

- at jointly conducted interviews, witnesses were told that the agencies' investigations were separate, that the interviews were conducted together only as a

matter of convenience, and that, if there were to be a proffer agreement, the witness

would enter into a separate agreement with each agency;

- the SEC was not involved in presenting this case to the grand jury and did not

  receive grand jury transcripts;

- the SEC did not participate in the execution of search warrants or the

  responsiveness reviews of materials obtained pursuant to search warrants;

- the SEC did not obtain materials produced to the Government pursuant to grand

  jury subpoenas;

- the SEC has not accompanied the Government to Court.

*See Collins*, 409 F. Supp. 3d at 242 (citing many of these factors in support of a finding that the

SEC and the Government did not conduct a joint investigation); *United States v. Alexandre*, No.

22 CR. 326 (JPC), 2023 WL 416405, at *6-8 (S.D.N.Y. Jan. 26, 2023) (same).   These factors,

considered together, weigh heavily in support of a finding that the Government and the SEC

engaged in separate investigations, notwithstanding their focus on overlapping subject material.

Notwithstanding that the SEC is not part of the prosecution team, the Government has

voluntarily requested from the SEC all documents that the SEC obtained from third parties, and

has already turned over these documents to the defense.   In the event the SEC produces additional

documents to the Government that it received from third parties, the Government will promptly

produce those documents to defense counsel.

### 2.   Tournant Fails to Cite Facts Showing a Joint Investigation

None of the facts cited by Tournant establish the existence of a joint investigation in this

case.   Rather, Tournant repeatedly seeks to paint as unusual or suspect facts that are routine in

the parallel investigation context, such as the Government and the SEC bringing charges on the

same date (First Br. 8-9), s*ee SEC v. Shkreli*, No. 15 Civ. 7175 (KAM), 2016 WL 1122029, at *7

n.6 (E.D.N.Y. Mar. 22, 2016) ("The court finds no fault in the SEC's commencement of the civil

action at or around the time the criminal indictment was unsealed, given the SEC's independent

mandate to enforce the securities laws and the need to commence an action before expiration of

the statute of limitations."), and the fact that witness interviews were conducted jointly (First Br.

6-7), *see, e.g.*, *Collins*, 409 F. Supp. 3d at 242 (finding no joint investigation when the Government

and the SEC participated jointly in some interviews "and the SEC did not take notes during the

interviews and does not have any notes from the interviews"); *Blaszczak*, 308 F. Supp. 3d at 738

(finding no joint investigation despite the Government and the SEC conducting thirty-nine joint

witness interviews).

Tournant also points to the fact that the Government obtained documents and information

from the SEC (First Br. 7), but that is entirely normal and appropriate.    The Government routinely

obtains documents and information from any number of individuals and entities in its

investigations, and the Government is aware of no authority for the proposition that that bare fact

transforms those sources of information into members of the prosecution team.    To the contrary,

courts have specifically rejected that proposition.    *See, e.g.*, *Meregildo*, 920 F. Supp. 2d at 445-

46 (holding that cooperating witness was not a member of the prosecution team); *United States v.

Barcelo*, 628 F. App'x 36, 38–39 (2d Cir. 2015) (same); *Stewart*, 433 F.3d at 298–99 (holding that

an expert witness who analyzed evidence, assisted the prosecution in preparing cross-examination

questions, participated in a mock examination, and testified at trial was not a member of the

prosecution team).    Indeed, it would be highly unusual if the SEC refused to provide information

to the Government in connection with an ongoing criminal inquiry into a massive fraud, such as

the one perpetrated by Tournant.    "Moreover, 'there is no general rule" prohibiting a civil

enforcement agency such as the SEC from "sharing . . .  evidence acquired through civil discovery with criminal prosecutors.'"   *United States v. Rhodes*, No. 18 Cr. 887 (JMF), 2019 WL 3162221, at *3 (S.D.N.Y. July 16, 2019) (quoting *United States v. Fiore*, 381 F.3d 89, 94 (2d Cir. 2004)).   "Indeed, because '[s]ecurities fraud is a proper subject of both administrative and criminal investigations . . . SEC enforcement officials and prosecutors all expect coordination at some investigative level and perceive the various proceedings as integral to each other." *Rhodes*, 2019 WL 3162221, at *3 (quoting *Fiore*, 381 F.3d at 94).   Tournant fails to cite any authority for the proposition that an independent agency becomes part of the prosecution team simply by complying with a voluntary information request.

Likewise, the fact that the Government and the SEC—both tasked with enforcing anti-fraud laws and protecting victims, and both investigating the same conduct perpetrated by the same individual against the same victims—may have shared certain evidence and informed each other of anticipated investigative or enforcement steps is wholly unremarkable and routine.   Such "coordination and sharing between the lawyers and agents on the criminal prosecution team, on the one hand, and [a civil enforcement authority], on the other, is, in itself, unexceptional and unproblematic."   *Rhodes*, 2019 WL 3162221, at *3

The typical overlap between investigations that existed here to promote efficiency and reduce costs has been deemed by many judges in this District as indicative of parallel, not joint, investigations.   In *Stanard*, for example, then-District Judge Lynch addressed a defendant's discovery request to the SEC to obtain and produce notes and memoranda that were in the possession, custody and control of the U.S. Attorney's Office but which the SEC had reviewed. *Stanard*, 2007 WL 1834709, *2.   Acknowledging that the SEC could be considered to have "effective control" over the documents if it conducted a joint investigation with the Government,

Judge Lynch instead determined that the facts of the case "ma[d]e clear that the investigations, while they may have overlapped, were not conducted jointly," and rejected the defendant's argument.   *Id.*; *see also United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *3; *Middendorf*, 2018 WL 3956494, at *4-5; *Blaszczak*, 308 F.Supp.3d at 741-42; *Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87.

The simultaneous nature of the Government and SEC's actions is a reflection of the normal and appropriate sharing of information that occurs in separate, parallel criminal and civil investigations.   In part for these reasons, parallel investigations between the SEC and the Government have been endorsed in support of the "[e]ffective enforcement of the securities laws." *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1377 (D.C. Cir. 1980) (*en banc*) ("If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary.   Similarly, Justice must act quickly if it suspects that the laws have been broken.   Grand jury investigations take time, as do criminal prosecutions.").

Tournant's argument that *Barcelo* suggests that the Second Circuit may be inclined to reject the *Blaszczak* and *Middendorf* factors for determining the scope of the prosecution team is a misreading of that case.   (First Br. 15).   Tournant emphasizes the disjunctive in the following quote: "Individuals who perform investigative duties *or* make strategic decisions about the prosecution of the case" (First Br. 15 (quoting *Barcelo*, 628 F. App'x at 38)), presumably to suggest that the Circuit might be inclined to find that performance of investigative duties, without more, might be enough to bring an individual within the scope of the prosecution team.   Neither *Barcelo* nor other Circuit cases suggest that Tournant's proposal is reasonable.   Rather, the

*Barcelo* court went on to cite *Meregildo*'s collection of cases on the scope of the prosecution team, which, broadly, all discuss whether the agents have been involved in a prosecution to the extent that they act "at the prosecutors' request," "submit to the direction of the prosecutor," or are "integral to the prosecution team." *See* 920 F. Supp. 2d at 441. These cases do not support Tournant's assertion that the SEC attorneys, who participated in joint interviews in furtherance of a separate, parallel investigation but did not submit to the Government's direction, did not undertake investigative duties in response to Government requests, and were not at all part of, much less integral to, the Government's strategic or prosecutorial decision-making, should be nonetheless considered embroiled in a joint investigation with the Government. Moreover, *Barcelo* affirmed the district court, which had noted below that that factors to be considered in the totality of circumstances should include "whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy." *Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066, at *9 (S.D.N.Y. Aug. 15, 2014). In other words, the case law counsels that it is not the mere fact of investigative steps taken, such as participation in joint interviews, but that the steps are undertaken at the direction of the Government such that the investigators at the other agency can properly be considered agents of the Government. Tournant cites no facts, nor could he, that would support a finding that the SEC attorneys here submitted to the Government's direction.

The balance of the *Blaszczak* and *Middendorf* factors also weigh against Tournant's argument. The Government did not disclose documents obtained from grand jury subpoenas to the SEC, and the SEC was not involved in the Government's grand jury presentation. The Government and the SEC each made independent decisions about what charges or claims they intended to bring. Nor did the Government or the SEC direct one another to take any particular

investigative actions.   Instead, each agency took the appropriate respective prosecutorial and regulatory enforcement action it deemed necessary.

In sum, under these facts and circumstances, the SEC was not part of the Government's prosecution team, and the defendant's request to compel Government to obtain and review the SEC's full investigative file is without merit.

### 3.   The Government Did Not Violate the Court's 5(f) Order

The Government has not violated the Court's 5(f) Order or its *Brady* and *Kyles* obligations more generally by reviewing and producing only the files within its custody and control. Tournant's argument is the tail wagging the dog: he asserts that because the Court should find that there was a joint, not parallel, investigation, the Court should also find that the Government violated its obligations by not undertaking a complete file review of the SEC's case file.   But for all the reasons previously discussed, Tournant is incorrect that there was a joint investigation with the SEC or that the SEC acted, in whole or in any part, on the Government's behalf during the Government's criminal investigation.   Accordingly, the Government does not have either actual or constructive possession of the SEC's case file and has not violated its disclosure obligations by not searching what it does not have.   *See Avellino*, 136 F.3d at 255 (the Government "has a duty to learn of any favorable evidence known to *the others acting on the government's behalf* in the case" (quoting *Kyles*, 514 U.S. at 437)).

### 4.   Tournant's Request is Unduly Burdensome

Asking the Government to review the SEC case file—which could entail searching databases, reviewing terabytes of documents, and parsing through attorney work product—simply because the Government and the SEC sought to maximize the efficiencies of investigation at limited and discrete junctures in the investigation would "inappropriately require [the court] to

adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." *Avellino*, 136 F.3d at 255. Reviewing the entire investigative file of another independent agency would be inordinately time consuming and burdensome for attorneys for the Government, which does not have custody of the files, is not familiar with the files, and knows of no effective way to search the files.

Even the cases Tournant cites, in which courts that have determined that a joint investigation took place on the basis of joint fact-gathering, do not support the expansive, uncabined relief that he seeks. For example, in *United States v. Gupta*, in which Judge Rakoff found that there was a joint investigation with respect to 44 joint witness interviews and ordered the SEC to turn over to the U.S. Attorney's Office the SEC's memoranda related to those interviews, the court also explicitly noted, "[t]his does not mean that all of the documents the SEC prepared and accumulated in its investigation of Gupta are part of the joint investigation." 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012) (JSR). Similarly, in *United States v. Connolly*, which largely adopted Judge Rakoff's reasoning in *Gupta* with respect to joint interviews, Judge McMahon found that the U.S. Attorney's Office "was involved in joint fact-gathering with" the Commodity Futures Trading Commission "[t]o the extent of" thirteen jointly-conducted interviews but that the agencies were "otherwise engaged in parallel investigations." No. 1:16-CR-00370 (CM), 2017 WL 945934, at *7 (S.D.N.Y. 2017). That court thus found the Government's obligation would be satisfied by its collecting and reviewing for *Brady* and *Giglio* material "any notes taken by representatives from other agencies [here, the CFTC] that were present during DOJ interviews, if such notes exist." *Id.* (internal citation omitted). Likewise, in *United States v. Martoma*, Judge Gardephe ordered the U.S. Attorney's Office to produce non-cumulative *Giglio* and *Brady* materials in the form of correspondence between counsel for two cooperating witnesses and the

SEC that was in the sole possession of the SEC, but did not order an amorphous, full-file review of the SEC case file.   990 F. Supp. 2d 458, 462 (S.D.N.Y. 2014) (PGG).

Accordingly, for all the reasons set forth above, the Court should deny Tournant's motion for a finding that the Government engaged in a joint investigation with the SEC or that the Government violated its disclosure obligations by not searching the SEC's files.   The Court should also reject Tournant's request for an evidentiary hearing exploring "the extent of cooperation" between the Government and the SEC and "the Government's ability to access the SEC's files."   This Court needs no hearing to determine that the Government has no ability nor obligation to access the files of an entirely separate government agency.   Nor would a hearing be helpful here, as there is no meaningful factual dispute about the two obligations, but rather a dispute concerning the legal conclusions that should be drawn from the facts.   As with Tournant's other arguments, to the extent the Court believes further factual development is necessary, the Government respectfully submits that the next step, rather than an evidentiary hearing, would be submission of affidavits.

**CONCLUSION**

For the reasons set forth above, the Government respectfully submits that Tournant's pretrial motions are wholly without merit and should be denied.

Dated: New York, New York
       February 17, 2023

                                           Respectfully submitted,

                                           DAMIAN WILLIAMS
                                         United States Attorney

By:      /s/
                                         Nicholas Folly
                                         Margaret Graham
                                         Allison Nichols
                                         Assistant United States Attorneys
                                         United States Attorney's Office
                                         One Saint Andrew's Plaza
                                         New York, New York 10007
                                         (212) 637-1060 / 2923 / 2366