**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

GREGOIRE TOURNANT,

Defendant.

22 Cr. 276 (LTS)

ORAL ARGUMENT REQUESTED

**OMNIBUS REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**GREGOIRE TOURNANT'S MOTIONS**

**LEVINE LEE LLP**
Seth L. Levine
Alison M. Bonelli
1500 Broadway, Suite 2501
New York, New York 10036

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Daniel R. Alonso
Olivia Rauh
1133 Avenue of the Americas, Suite 3100
New York, New York 10036

*Attorneys for Defendant Gregoire Tournant*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

I.   THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT
     INDUCED MR. TOURNANT'S FORMER LAWYERS TO SWITCH SIDES AND
     JOIN IN HIS CRIMINAL PROSECUTION ...................................................................... 5

     A.   The Government Collaborated with S&C in the Prosecution of Mr. Tournant........... 6

     B.   S&C's Conduct Is Attributable to the Government .................................................... 10

          1.   The Principles and the Government's Statements Induced S&C to Switch
               Sides and Betray Mr. Tournant ........................................................................... 10

          2.   The Government Continued to Collaborate With and Make Use of the
               Information Provided by S&C Even After It Learned of S&C's Personal
               Representation of Mr. Tournant ........................................................................... 16

II.  ALTERNATIVELY, THE COURT SHOULD HOLD A HEARING TO
     DETERMINE WHETHER THE INDICTMENT SHOULD BE DISMISSED ..................... 18

     A.   Absent Dismissal, a Hearing Is Necessary to Determine the Extent of the
          Government's Responsibility for S&C's Conduct ..................................................... 19

     B.   Absent Dismissal, a Hearing Is Necessary to Determine the Extent to Which
          the Government's Access to Mr. Tournant's Privileged Statements Tainted the
          Indictment and Prosecution Team .............................................................................. 21

          1.   *Kastigar* Applies Given the Government's Access to Mr. Tournant's
               Privileged Communications ................................................................................. 21

          2.   The Government Accessed Mr. Tournant's Privileged Communications ........... 24

               a.   The Advance Waiver Is Inapplicable Because S&C Breached Its
                    Obligations Under the Engagement Letter ................................................. 24

               b.   The Advance Waiver Provision Does Not Apply Because S&C Failed
                    to Adhere to its Ethical Duties to Mr. Tournant ......................................... 29

          3.   The Government Has Not Met Its Heavy Burden to Show That
               Mr. Tournant Has Not Been Prejudiced and the Court Should Order
               Discovery ............................................................................................................. 31

III. IF THE CASE IS NOT DISMISSED, THE COURT SHOULD COMPEL THE
     GOVERNMENT TO PRODUCE *BRADY* MATERIAL IN THE SEC'S FILES ................. 32

     A.   The Government Violated the Court's Rule 5(f) Order in Refusing to Search
          the SEC's Files for *Brady* Material.......................................................................... 33

     B.   The USAO Violated *Brady* in Refusing to Search the SEC's Files .......................... 35

     C.   Alternatively, the Court Should Order an Evidentiary Hearing ................................. 38

CONCLUSION ........................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Best Western Int'l, Inc. v. CSI Int'l Corp.*, 1995 WL 505565 (S.D.N.Y. Aug. 25, 1995) .............. 6

*Brentwood Acad. v. Tennessee Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ................................... 13

*Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973) .................................................. 6

*Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69 (2d Cir. 2016) ........................... 14, 15, 20

*Gov't of the V.I. v. Martinez*, 780 F.2d 302 (3d Cir. 1986) ........................................................ 38

*Horvath v. Westport Library Ass'n*, 362 F.3d 147 (2d Cir. 2004) ............................................... 13

*Kastigar v. United States*, 406 U.S. 441 (1972) ................................................................... passim

*Nadeau v. Equity Residential Props. Mgmt. Corp.*, 251 F. Supp. 3d 637 (S.D.N.Y. 2017) ......... 26

*Rella v. N. Atl. Marine, Ltd.*, 2004 WL 2480409 (S.D.N.Y. Nov. 3, 2004) ................................... 8

*SEC v. Stanard*, 2007 WL 1834709 (S.D.N.Y. June 26, 2007) .................................................... 37

*United States ex rel. Sanney v. Montanye*, 500 F.2d 411 (2d Cir. 1974) ..................................... 14

*United States v. Ahuja*, No. 18 Cr. 328 (KPF) (S.D.N.Y. Jan. 13, 2021) ................................. 4, 39

*United States v. Alex*, 788 F. Supp. 359 (N.D. Ill. 1992) ............................................................. 6

*United States v. Alexander*, 748 F.2d 185 (4th Cir. 1984) ......................................................... 38

*United States v. Barcelo*, 2014 WL 4058066 (S.D.N.Y. Aug. 15, 2014) ..................................... 36

*United States v. Barcelo*, 628 F. App'x 36 (2d Cir. 2015) ......................................................... 35

*United States v. Bein*, 728 F.2d 107 (2d Cir. 1984) ................................................................... 23

*United States v. Colasurdo*, 453 F.2d 585 (2d Cir. 1971) ......................................................... 23

*United States v. Connolly*, 2018 WL 2411216 (S.D.N.Y. May 15, 2018) .................................... 22

*United States v. Connolly*, 2019 WL 2120523 (S.D.N.Y. May 2, 2019) ............................... 14, 15

*United States v. Danielson*, 325 F.3d 1054 (9th Cir. 2003) ……………………………………...23

*United States v. Gartner*, 518 F.2d 633 (2d Cir. 1975) .............................................................. 5

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ................................................... 32

*United States v. Hoey*, 2016 WL 270871 (S.D.N.Y. Jan. 21, 2016) ................................. 23, 24, 26

*United States v. Landji*, 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ........................... 22, 23, 24

*United States v. Landji*, No. 18 Cr. 601 (S.D.N.Y. Aug. 20, 2021) ......................................... 3, 22

*United States v. Meregildo*, 920 F. Supp. 2d 434 (S.D.N.Y. 2013) ....................................... 36, 37

*United States v. Nejad*, 487 F. Supp. 3d 206 (S.D.N.Y. 2020) ................................................ 4, 39

ii

*United States v. Nejad*, 521 F. Supp. 3d 438 (S.D.N.Y. 2021)...................................... 4, 39

*United States v. Prevezon Holdings Ltd.*, 839 F.3d 227 (2d Cir. 2016) ............................. 6, 7, 8

*United States v. Rhodes*, 2019 WL 3162221 (S.D.N.Y. July 16, 2019) ........................... 37

*United States v. Sabri*, 973 F. Supp. 134 (W.D.N.Y. 1996) ........................................... 5

*United States v. Schell*, 775 F.2d 559 (4th Cir. 1985) ..................................... 5, 7, 11, 17

*United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989)..................................... 21, 22

*United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991)..................................... 21, 22

*United States v. Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006) ..................................... 13

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ............................................. passim

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ........................................... 32

*United States v. Weissman*, 1996 WL 751386 (S.D.N.Y. Dec. 26, 1996)................................... 25

*Yaretsky v. Blum*, 525 F. Supp. 24 (S.D.N.Y. 1981).................................................. 7

Defendant Gregoire Tournant respectfully submits this reply memorandum of law in further support of his motions:  (1) to dismiss the Indictment or, in the alternative, for a hearing (ECF No. 53, the "Dismissal Motion"); and (2) to compel the Government to produce *Brady* material in the SEC's files or, in the alternative, for a hearing (ECF No. 45, the "Discovery Motion" and, collectively with the Dismissal Motion, the "Motions").[1]

## PRELIMINARY STATEMENT

The Court should reject the Government's dismissive response to the substantial evidence and authorities submitted in support of the Motions, which show that it has repeatedly violated Mr. Tournant's constitutional and other rights.  The evidence demonstrates that the Government: (1) induced Mr. Tournant's former counsel to switch sides, build the Government's case against Mr. Tournant, and advocate for his prosecution; (2) improperly accessed his privileged information, tainting both the Indictment and the prosecutors; and (3) failed to search for exculpatory information in the possession of its "partner[s]" at the SEC, with whom it publicly claimed to have worked "shoulder to shoulder" in building the case against Mr. Tournant, in violation of its *Brady* obligations.  The Government's failure to submit a single declaration or other piece of evidence in connection with its Response in Opposition to the Motions (ECF No. 61, the "Opposition" or "Opp.") reflects a lack of seriousness in confronting the issues raised in the Motions, as well as the Government's apparent position that it should not be required to account for its interactions with Mr. Tournant's former counsel or the SEC.  The Court should not permit the Government to violate Mr. Tournant's rights with impunity or avoid scrutiny of what Mr. Tournant submits is extremely troubling conduct.  The Court should therefore grant the

---

[1] Unless otherwise defined, capitalized terms used herein shall have the same meaning ascribed to them in Mr. Tournant's opening briefs in support of the Motions.  (ECF Nos. 46 ("Discovery Br."), 54 ("Dismissal Br.").)

Motions on the current record, or hold a hearing after discovery, to rule on the Motions on a complete record.

***The Court Should Grant the Dismissal Motion.***  The Court should dismiss the Indictment because the Government engaged in what the Second Circuit has termed "manifestly and avowedly corrupt" conduct, or, alternatively, should hold a hearing: (1) to determine the extent of the Government's responsibility for S&C's conduct; and (2) to address the taint from disclosure of Mr. Tournant's privileged information to the Government.

The Government's use of Mr. Tournant's former counsel to actively assist in his prosecution satisfies the "manifestly and avowedly corrupt" standard because it constitutes an unjustified and offensive interference with Mr. Tournant's rights that threatens the integrity of our justice system.  The Government does not dispute the evidence showing that S&C switched sides and betrayed Mr. Tournant.   This evidence demonstrates that, notwithstanding its former representation of Mr. Tournant, S&C effectively served as the Government's "back office," engaging in a more than sixteen thousand hours-long forensic review to collect and organize the evidence underlying the Indictment.  In addition, S&C disclosed its confidential communications with Mr. Tournant made during the time it served as his counsel and affirmatively advocated for his prosecution.  Pursuant to *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ("*Stein II*"), the Government bears responsibility for S&C's conduct because its corporate cooperation policies, which the Opposition fails to address, employed the threat of indictment to induce S&C to turn on its former client to save Allianz from incurring the "corporate death penalty."  S&C's conduct is also attributable to the Government because, while the Government was aware of S&C's representation of Mr. Tournant before the date it acknowledges (January 2022), there is no dispute

that even after learning that S&C previously represented Mr. Tournant in this case, the Government continued to meet with S&C regarding Mr. Tournant.

Alternatively, the Court should hold a hearing to determine the full extent of the Government's interactions with the SEC, S&C, and Allianz, and to determine the extent to which the Government's improper access to Mr. Tournant's privileged communications tainted the Indictment and the prosecutors. Contrary to the position the Government takes here, the Second Circuit "appl[ies] [the] *Kastigar* standard to breaches of a defendant's attorney-client privilege," as the Government itself acknowledged just two years ago in the most recent case to address this issue in this district. *See* Letter Response in Opposition, *United States v. Landji*, No. 18 Cr. 601 (S.D.N.Y. Aug. 20, 2021), ECF No. 518. The Government has submitted no evidence to the Court, and it therefore has not met its "heavy burden" under *Kastigar*.

The Court should also reject the Government's argument that Mr. Tournant waived privilege under the advance waiver provision in the S&C engagement letter. First, the advance waiver provision did not apply to Mr. Tournant's statements at the June 3, 2021 Meeting because S&C committed a prior breach of the agreement when it failed to raise its obvious conflict. Second, the advance waiver provision was invalid and unenforceable under the New York Rules of Professional Conduct because S&C was required, at a minimum, to re-obtain Mr. Tournant's informed consent in light of a clear change in circumstances following Stephen Bond-Nelson's SEC testimony prior to the meeting.

***The Court Should Grant the Discovery Motion.*** To the extent the Court does not dismiss the Indictment, the Court should compel the Government to search the SEC's files for *Brady* material. At the press conference announcing the charges, the United States Attorney credited the "combination" of the Government and SEC with "run[ning]" "this investigation" (singular not

plural), and the SEC Enforcement Director described the SEC's working relationship with the Government as a "partnership."  The Government tries to dismiss these statements, as well as the unrebutted, substantial evidence corroborating them, as "routine occurrences in parallel investigations conducted by different government agencies."  (Opp. at 35.)  But the only "routine" aspect of the Discovery Motion is the Government, while avoiding discussion of the actual facts and evidence, again attempting to distance itself from its prior statements and presenting to this Court the fiction that the Government and SEC conducted independent, parallel (*i.e.*, non-intersecting) investigations.  Based on the Government's own admissions and the undisputed evidence, the Court should conclude that the SEC is part of the prosecution team and grant the Discovery Motion.

Alternatively, the Court should hold a hearing on the Discovery Motion.  The Government's *Brady* failures in this case are part of a pattern of conduct, both in this Court and others, of the Government making excuses for not providing criminal defendants with the discovery to which they are constitutionally entitled.  *See, e.g., United States v. Nejad*, 521 F. Supp. 3d 438, 442 (S.D.N.Y. 2021); *United States v. Nejad*, 487 F. Supp. 3d 206, 207 (S.D.N.Y. 2020); *see also United States v. Ahuja*, No. 18 Cr. 328 (KPF) (S.D.N.Y. Jan. 13, 2021), ECF No. 424.  While Congress adopted Federal Rule of Criminal Procedure 5(f)—and the Court issued an order requiring compliance with it (ECF No. 13)—these measures have clearly not cured the problem.  Moreover, contrary to its cries of governmental "paralysis" if the Court requires it to comply with its *Brady* obligations and produce exculpatory evidence from the SEC's files (Opp. at 47), several Judges of this Court have adopted Individual Rules of Practice that expressly require the Government to produce *Brady* and *Giglio* material from "regulatory agencies that are or have been involved . . . in parallel proceedings or investigations involving the defendant"—and yet the

sky has not fallen.  (*See* Individual Rules of Practice of Hon. Richard M. Berman, § 5.C.2.d; Individual Rules of Practice – Hon. Jed S. Rakoff, § 13(4); Individual Rules and Procedures for Criminal Cases of Hon. Lorna G. Schofield, § H.1.d.)  The Discovery Motion therefore should be granted, or a hearing ordered.

## I.   THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT INDUCED MR. TOURNANT'S FORMER LAWYERS TO SWITCH SIDES AND JOIN IN HIS CRIMINAL PROSECUTION

The Court should dismiss the Indictment on the present record because the Government failed to rebut the showing that it engaged in "manifestly and avowedly corrupt" conduct.  As demonstrated in Mr. Tournant's opening brief, the Fourth Circuit in *United States v. Schell*, 775 F.2d 559 (4th Cir. 1985), held that the government violated due process when it induced a criminal defendant's former counsel to switch sides and participate in his prosecution.  *Id.* at 565–66. Although the Government dismisses *Schell* as an "out-of-circuit case" (Opp. at 30), it does not take issue with the court's decision or dispute that the Second Circuit's "manifestly and avowedly corrupt" standard is met in the situation at issue in *Schell*.  (*See id*.)  Nor does the Government cite any authority to the contrary.

As occurred in this case, the use of a defendant's former counsel to actively assist in his prosecution falls squarely within the type of conduct prohibited under the "manifestly and avowedly corrupt" standard, namely, as the Government acknowledges, "'conduct [that] has been an offensive interference with the defendant's rights without any justification.'"  (Opp. at 29 (quoting *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975)); *see also United States v. Sabri*, 973 F. Supp. 134, 147 (W.D.N.Y. 1996) (dismissing the indictment based on outrageous government misconduct where the government used the defendant's attorney as an informant).  It is hard to conceive of a more offensive and unjustifiable violation of an individual's due process rights than using his former counsel to build the case against him and encouraging that former

counsel to advocate for his prosecution.  In fact, in what this Court has referred to as "the Second Circuit's first important disqualification decision," which involved the disqualification of "an attorney who attempted to 'switch sides,'" *Best Western Int'l, Inc. v. CSI Int'l Corp.*, 1995 WL 505565 (S.D.N.Y. Aug. 25, 1995) (citing *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973)), the Second Circuit characterized the issue as "touching upon vital concerns of the legal profession and the public's interest in the scrupulous administration of justice." *Emle*, 478 F.2d at 564.  In *United States v. Prevezon Holdings Ltd.*, the Second Circuit, again addressing a motion to disqualify counsel who switched sides, included this quote from *Emle*, as well as a parenthetical that described the act of "switching sides" as "'challeng[ing] the very integrity of our adversary system.'"  839 F.3d 227, 238–39 (2d Cir. 2016) (quoting *United States v. Alex*, 788 F. Supp. 359, 365 (N.D. Ill. 1992)).

As shown in Mr. Tournant's opening brief and below, S&C switched sides, collaborated with the Government to build its case against Mr. Tournant, and advocated for his indictment.  The Government is responsible for S&C's actions because (a) they resulted from the coercive pressure that the Government applied to Allianz and its counsel to obtain cooperation credit in order to avoid the "corporate death penalty," and (b) knowing that S&C was Mr. Tournant's former counsel, the Government nevertheless readily accepted S&C's work on the Government's behalf, and willingly allowed S&C to advocate for his indictment.

### A.  The Government Collaborated with S&C in the Prosecution of Mr. Tournant

Rather than confront S&C's conduct, the Government engages in *ad hominem* attacks and mischaracterizations designed to avoid Court scrutiny of the substance.  For example, the Government accuses Mr. Tournant of being "flippant" in using the phrase "switch sides" to describe the egregious violation that occurred in this case.  (Opp. at 30.)  Given that his liberty is

at stake and the seriousness of the Government's intrusion into his attorney-client relationship, there is nothing "flippant" about the Dismissal Motion.

Indeed, Mr. Tournant cannot claim origination credit for the phrase about which the Government now complains, as the Second Circuit and this Court have repeatedly used it in situations, as here, where an attorney unethically represented or assisted an adversary against a former client in the same or a substantially related matter as the prior representation. *See, e.g.*, *Prevezon Holdings*, 839 F.3d at 242 (disqualifying counsel who "***switch[ed] sides***" from representing a crime victim to representing the perpetrator) (emphasis added)); *Rella v. N. Atl. Marine, Ltd.*, 2004 WL 2480409, at \*4 (S.D.N.Y. Nov. 3, 2004) ("[C]ourts are obligated both to enforce the ethical standards of the legal profession, and to protect parties from prejudice that may ensue when lawyers who formerly represented them ***switch sides*** to represent an adverse party against them." (emphasis added)); *Yaretsky v. Blum*, 525 F. Supp. 24, 30 (S.D.N.Y. 1981) (granting motion to disqualify counsel and stating "[t]his court would be hard pressed to explain to a lay person how it was in fact proper for a lawyer who was substantially involved with the prosecution of a lawsuit to ***switch sides*** in the middle of the action" (emphasis added)). *Schell* similarly referred to the conduct at issue in this case as switching sides. *Schell*, 775 F.2d at 565 ("Such ***switching of sides*** is fundamentally unfair and inherently prejudicial. Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances." (emphasis added)).

Contrary to the Government's vague assertion that Mr. Tournant "makes no serious attempt to contend with the gravity or meaning of his accusations" (Opp. at 29), Mr. Tournant supported each of his factual assertions with evidence submitted with the Dismissal Motion, despite being handicapped by receiving only limited discovery. The Government, notably, has not submitted

7

any evidence in response and does not dispute the facts relating to S&C's work in building the Government's case against Mr. Tournant or that S&C affirmatively encouraged the Government to indict its former client.  Among other things, the Government does not dispute that S&C performed a forensic review and investigation spanning "16,700 hours" that included creating "detailed spreadsheets identifying each altered report" and "modules showing the history of the alteration and every person involved."  (*See, e.g.*, Dismissal Br. at 17, 26–27.)  Nor does the Government dispute that S&C disclosed the results of this extensive review and addressed "follow up" requests from the Government.  (*See, e.g.*, Levine Decl. Ex. H at SDNY_01_000054552, 555.)  The Government similarly does not dispute that S&C provided it with multiple verbatim readings from its notes of privileged meetings with Mr. Tournant and its other clients, including the June 3, 2021 Meeting.  (*See, e.g.*, Dismissal Br. at 13–14, 27.)  The Government likewise does not dispute that, in an effort to stave off the "corporate death penalty" for Allianz, S&C pushed for Mr. Tournant's indictment and pledged its "help" to the Government in its prosecution.  (*See, e.g.*, *id.* at 22–23, 27–28; Levine Decl. Ex. G at SDNY_01_000054788 (S&C stating "would like to see you prosecute GT – would like to help you do that").)

    Notwithstanding that these undisputed facts demonstrate that S&C acted as the Government's "back office," the Government accuses Mr. Tournant of taking S&C's statements about serving as the Government's "back office" out-of-context—claiming that S&C pledged only to work as the Government's "back office" in the future at Mr. Tournant's criminal trial.  (*See* Opp. at 10–11 & n.7.)  Mr. Tournant submits that the notes themselves contradict the Government's characterization of S&C's statements.  In fact, the notes reflect that S&C made the "back office" comment at two separate meetings (Levine Decl. Ex. P at SDNY_01_000054510; Ex. G at SDNY_01_000057491), and, at the second meeting, almost immediately followed this

comment with the statement "[h]ere, ***we did everything***"—referring to the work that it did for the Government in the past tense (Levine Decl. Ex. G at SDNY_01_000057491 (emphasis added)).

But, in its zeal to convince the Court not to take S&C's statements at face value, the Government makes several telling admissions that strengthen the conclusion that S&C switched sides. Specifically, the Government acknowledges that it had a back-and-forth dialogue with S&C that guided S&C's forensic review and analyses. Among other things, the Government asserts that it brought "new facts and new frauds to Allianz's attention." (Opp. at 28; *see also id.* at 11 n.7 ("it was the Government and the SEC who continued to discovery [sic] new frauds and bring them to Allianz's attention. . . .").) Although the Government submitted no evidence relating to this dialogue and the Opposition is short on specifics, the Government purportedly identifies "three additional methods through which the fraudulent scheme had been carried out" that the Government "brought . . . to Allianz's attention": (1) open position worksheets; (2) expected value sheets; and (3) variable alpha target funds. (*Id.* at 7.) Notably, as to each of these methods, the evidence that Mr. Tournant submitted demonstrates that S&C took credit for gathering the underlying evidence for the Government. (*See, e.g.*, Levine Decl. Ex. H at SDNY_01_00054538, 52–53, 57 (Variable Alpha Fund Targets), SDNY_01_00054539–40, 53, 58 (Expected Value and Open Position Sheets); *see also* Levine Decl. Ex. G at SDNY_01_000054788 (noting that S&C's "[f]orensic review results are reflected in the statement of facts").) In fact, in touting the value of its assistance, S&C characterized these methods as "Difficult to Detect" and represented that they "took months to figure it out." (Levine Decl. Ex. H at SDNY_01_00054538–40; Ex. P at SDNY_01_00054500.)

The Government also admits that it specifically asked Allianz to collect the evidence underlying the obstruction count in the Indictment. (Opp. at 8 ("The Government asked Allianz

to, among other things, provide the Government with any facts Allianz had learned during its internal interviews regarding the purported rationale for altering risk reports, as well as any explanation of what positions could or did qualify as a certain type of hedge promised to investors. . . .").)  This is consistent with the evidence submitted in support of the Dismissal Motion showing, among other things, that S&C, on behalf of Allianz, took credit for "Provid[ing] Valuable Information For DOJ's Obstruction Investigation," including providing a "Chronology of Communications" and "Facts from Tournant and Bond-Nelson interviews related to obstruction," *i.e.*, privileged communications.  (Levine Decl. Ex. H at SDNY_01_000054560.)

The Government's admissions and the other evidence before the Court therefore reinforce S&C's statements that it served as the Government's "back office" and "did everything." Accordingly, the Court should conclude that S&C collaborated with the Government to build its case against Mr. Tournant.

### B.  S&C's Conduct Is Attributable to the Government

#### 1.  The Principles and the Government's Statements Induced S&C to Switch Sides and Betray Mr. Tournant

As in *Stein II*, the Principles placed coercive pressure on Allianz, which led S&C to conclude that betraying Mr. Tournant was the only safe course to avoid the "corporate death penalty" for Allianz.  *See Stein II*, 541 F.3d at 151 ("An adversarial relationship does not normally bespeak partnership.  But KPMG faced ruin by indictment and reasonably believed it must do everything in its power to avoid it.  The government's threat of indictment was easily sufficient to convert its adversary into its agent.  KPMG was not in a position to consider coolly the risk of indictment, weigh the potential significance of the other enumerated factors in the [Principles], and decide for itself how to proceed.").  In fact, the Government's conduct here is more egregious than that at issue in *Schell* because unlike the attorney in that case, S&C not only possessed

Mr. Tournant's confidential information, it shared the information with the Government, as shown in Mr. Tournant's opening brief and below.  *See Schell*, 775 F.2d at 565 (stating that the side-switching attorney "did not possess any confidential information with respect to his former clients").  The Government therefore bears responsibility for S&C's conduct under the close nexus test.  *See, e.g.*, *Stein II*, 541 F.3d at 147.

As shown in Mr. Tournant's opening brief, the Principles contain two specific policies that induced S&C's conduct.  Since 2015, the Principles have taken an all-or-nothing approach that conditioned eligibility for corporate cooperation credit on providing all relevant facts, regardless of how obtained, about all individuals involved in the alleged misconduct.  (*See* Dismissal Br. at 30–32.)  Further, the Principles directed companies to structure joint defense agreements, as S&C did here, so as not to disable the companies from meeting the all-or-nothing disclosure obligation.  (*See id*. at 32–35.)  The Opposition does not mention either of these policies, let alone dispute Mr. Tournant's interpretation of them.  It similarly does not dispute that there is a direct correlation between these policies and the provisions of S&C's engagement letter with Mr. Tournant that S&C used as cover for its betrayal of Mr. Tournant.  (*See* Opp. at 15 (asserting that "Sullivan & Cromwell was within its rights to provide information to the Government" pursuant to the engagement letter).)

Moreover, although the Government provides scant details concerning its interactions with S&C and has refused to provide Mr. Tournant with the relevant discovery, the few details provided reflect that it emphasized the policies that led S&C to betray Mr. Tournant.  As noted above, the Government guided S&C's forensic review and investigation by bringing to S&C's attention certain aspects of the alleged fraud that it wanted S&C to examine.  The Government further admits that, "shortly after notifying Allianz of the existence of its criminal investigation, the Government

asked Allianz to **deconflict** before interviewing additional witnesses. . . ."  (Opp. at 28 (emphasis added).)  This direction to deconflict not only undermines the Government's assertion (addressed below) that it lacked knowledge of the joint representation of Mr. Tournant prior to January 2022, it also underscores the Principles' all-or-nothing and joint defense policies.

The Government also advances a series of legal arguments that the Second Circuit has rejected.  In *Stein II*, the Second Circuit squarely rejected the Government's argument that it is "implausible" that the Principles render the Government responsible for the acts of a cooperating company (*see* Opp. at 25–26).  There, the court affirmed the district court's finding that the government was responsible for the actions of a cooperating entity in ceasing to advance attorney's fees based on the version of the Principles then-in-effect (known as the "Thompson Memorandum").  *Stein II*, 541 F.3d at 148–51.  As the court stated, based on the Principles and the prosecutors' reinforcement of these policies, the cooperating company "was never 'free to define' cooperation independently" and state action was established because these policies "forced" the company to cease paying legal fees.  *Id.*; *see also id.* at 142 ("KPMG was faced with the fatal prospect of indictment; it could be expected to do all it could, assisted by sophisticated counsel, to placate and appease the government.").

The Government also wrongly claims that *Stein II* does not apply here because the cooperating company in that case "entered into a deferred prosecution agreement . . . which required the company to comply with the Government's document demands."  (Opp. at 26; *see also id.* at 27 (arguing "[t]hat alone should end the matter.").)  However, most of the governmental action in *Stein II*—including, but not limited to, the adoption of the Principles and the company's coerced decision to cease paying fees to non-cooperating employees—occurred before the deferred prosecution agreement ("DPA") was executed in August 2005.  *See Stein II*, 541 F.3d at 136–139.

Indeed, counsel for KPMG in *Stein II* pledged full cooperation 18 months before the DPA.  *Id*. at 137.  Similarly, this Court held that the Government was responsible for the pre-DPA pressure that the company put on employees to proffer with the Government, based again on the Principles, and suppressed the statements that resulted from the company's coercive conduct.  *United States v. Stein*, 440 F. Supp. 2d 315, 330–38 (S.D.N.Y. 2006).  Moreover, to the extent that an after-the-fact agreement requiring compliance with governmental document requests has any relevance to the Government's responsibility for S&C's conduct, there is such an agreement in this case, namely, Allianz's plea agreement.  (Supplemental Declaration of Seth L. Levine, dated March 15, 2023 ("Levine Supp. Decl.") Ex. A at 8 (requiring Allianz to "cooperate fully" with the Government and "other United States law enforcement and regulatory authorities and agencies in any and all matters relating to the conduct described in this Agreement and the Statement of Facts.").)

Additionally, the Court should reject the Government's assertion that the close nexus test requires "direct involvement" of the Government in the corporate decision making at issue.  (Opp. at 27.)  "[T]he Supreme Court has cautioned that the concept of responsibility is not to be read narrowly in the context of the state action inquiry."  *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 154 (2d Cir. 2004) (citing *Brentwood Acad. v. Tennessee Sch. Athletic Ass'n*, 531 U.S. 288 (2001)).  The close nexus test is satisfied under a number of different circumstances not requiring express direction of constitutionally inappropriate conduct, including when a governmental actor: (1) exercises coercive power; (2) is entwined in the management or control of the private actor; (3) provides the private actor with significant encouragement, either overt or covert; (4) engages in joint activity in which the private actor is a willful participant; (5) delegates a public function to the private actor; or (6) entwines the private actor in governmental policies.  *Stein II*, 541 F.3d at

147.  As this Court stated in *United States v. Connolly*, "**the 'controlling factor' is not whether the state directed the constitutionally prohibited conduct**, but whether the state 'involved itself in the use of a substantial economic threat to coerce a person into [the conduct at issue].'"  2019 WL 2120523, at *11 (S.D.N.Y. May 2, 2019) (emphasis added) (quoting *United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974) ("The state's involvement is no less real for having been **indirect** and no less impermissible for having been concealed.  The state is prohibited in either event from compelling a statement through economically coercive means, **whether they are direct or indirect**.") (emphasis added)).

The Government also overstates *Gilman v. Marsh & McLennan Cos.*, *Inc.*, 826 F.3d 69 (2d Cir. 2016), arguing that it forecloses the legal arguments underlying the Dismissal Motion.  (*See* Opp. at 26–27 & n.16.)  But *Gilman* was not a criminal case; it involved the civil claims of two terminated employees of Marsh & McLennan ("Marsh") for lost employment benefits.  826 F.3d at 71–73.  After the New York Attorney General's Office (the "AG") filed a civil complaint against Marsh, Marsh asked the employees to sit for interviews and, when they refused, fired them.  *Id.* at 72.  The Principles were simply not at issue in *Gilman* as it did not involve a federal investigation, let alone a criminal one of the entity at issue.  *Gilman*, 826 F.3d at 71 (noting that the AG issued a press release announcing that a civil proceeding was sufficient to punish and reform Marsh).

To be sure, *Gilman* rejected a *per se* rule deeming all cooperating entities to be government agents (*see* Opp. at 26 n.16, 27 (quoting *Gilman*, 826 F.3d at 77)).  But Mr. Tournant has made no such argument and has never suggested that Allianz's or its agents' actions are attributable to the Government based merely on their awareness of the Government's investigation or Allianz's status as a cooperator.  Rather, as in *Stein II*, the close nexus test is met here based on the coercive influence of the Principles, which forced S&C to turn on its former client to save Allianz.  Not

14

only does *Gilman* not preclude this argument, it supports Mr. Tournant's position because the court indicated that the Government would have responsibility for a cooperating entity's actions where it "'forced'" the entity to engage in the action at issue, "'intervened' in [its] decisionmaking," or "'steered'" or "'supervised'" its conduct. *Gilman*, 826 F.3d at 76 (quoting *Stein II*, 541 F.3d at 148). Notably, the *Connolly* court distinguished *Gilman* for this very same reason. *See Connolly*, 2019 WL 2120523, at *14 (stating that "*Oilman* [sic] differs from this case in one critical aspect: In *Gilman*, the Second Circuit explicitly found, 'There [was] no evidence that [the New York Attorney General] forced Marsh to demand interviews, intervened in Marsh's decision-making, steered Marsh to request interviews, or supervised the interview requests.' This Court cannot reach the same conclusion on the record before it." (final two alterations in original) (citation and internal quotation marks omitted)).

As in *Connolly*, the evidence here, even on a limited record, establishes that the Government both directly and indirectly intervened in Allianz's internal investigation through the Principles, its statements to S&C, and its acceptance of the information S&C provided even after it was well aware that it was hearing from Mr. Tournant's former counsel. Allianz, by its own admission, faced the "corporate death penalty" and believed that it must do everything in its power to obtain lifesaving cooperation credit. The Government therefore forced Allianz and S&C, as Allianz's attorneys, to disregard an unwaivable conflict of interest, affirmatively advocate for the Government's indictment of its former client, and pledge its assistance in that endeavor.

Finally, the Government understates the substantial benefits that it conferred on Allianz to reward it for its cooperation. First, the Government did not charge the Allianz parent entity, Allianz SE, based on S&C's cooperation on behalf of Allianz. *See* U.S. Attorney's Office for the Southern District of New York, U.S. Attorney Announces Charges Against Three Portfolio

15

Managers and Allianz Global Investors US, YOUTUBE (May 17, 2022), https://www.youtube.com/watch?v=Q9ZiLt3sOxg (noting that Allianz's cooperation is "a substantial reason why this office will not charge Allianz and will not seek a deferred prosecution agreement or any other type of resolution with Allianz."). Second, while asserting that AGI US's guilty plea prevented it from managing money in the United States (Opp. at 28), the Government neglects to mention that, prior to this bar, the Government granted AGI US an exemption that gave it "adequate time" to strip its assets and transition those assets to other service providers. (*See* Levine Supp. Decl. Ex. B.) As a result, by the time it pleaded guilty, AGI US was effectively a corporate shell because it used this exemption to transfer its assets to another entity in exchange for Allianz receiving up to a 24% stake in that entity. (*See* Levine Supp. Decl. Ex. C.) Third, the Government permitted certain high-earning and significant affiliates to seek waivers so that they would not be barred from doing business by various agency rules. (Levine Decl. Ex. H at SDNY_01_000054565–66.)

Accordingly, the coercive pressure that the Government placed on Allianz induced S&C's conduct in switching sides and turning on its former client. The Court should therefore conclude that S&C's actions constitute governmental action and should dismiss the Indictment.

### 2. The Government Continued to Collaborate With and Make Use of the Information Provided by S&C Even After It Learned of S&C's Personal Representation of Mr. Tournant

Mr. Tournant disputes the Government's claim that it did not know of the joint representation until January 2022.[2] However, even taking the Government at its representation,

---

[2] As discussed below, the available evidence suggests that the Government knew of the joint representation prior to January 2022. For example, it is undisputed that the SEC knew of the joint representation at least as early as April 2021 when it sent Mr. Tournant's subpoena directly to Ropes. (Dismissal Br. at 36; Levine Decl. Ex. Q.) The limited record reflects that the USAO had substantial interactions with the SEC throughout the investigation, and the USAO provided no

the Government bears responsibility for S&C's conduct because it continued to collaborate with S&C even after it admittedly knew of S&C's attorney-client relationship with Mr. Tournant as of January 2022.  (*See* Opp. 12–13 (acknowledging that defense counsel advised the Government of S&C's personal representation of Mr. Tournant on January 28, 2022, and that defense counsel also advised the Government that disclosure of Mr. Tournant's privileged communications may have tainted the investigation).)  It is undisputed that the Government continued to meet with S&C concerning Mr. Tournant after learning about its representation of him, including, but not limited to, the March 1, 2022 meeting, where, with the United States Attorney in attendance, S&C touted its role in building the case against Mr. Tournant and advocated for his prosecution.  (*See, e.g.*, Levine Decl. Ex. G at SDNY_01_000054788.)

Additionally, although the Government insists that it instituted screening procedures after learning that S&C represented Mr. Tournant (*see* Opp. at 31), it is clear that such measures were ineffective, even accepting the Government's unsworn representations as true.  The Government should have replaced all prosecutors on the trial team and established a firewall.  Instead, the prosecutors who participated in the meetings with S&C were not screened, and currently remain on the trial team, including those in a supervisory role.  The Government also should have segregated all of S&C's work product, the materials it received from S&C's forensic review, and any other information received from S&C, to prevent S&C from having any involvement in the prosecution of its former client.  *See* Section II; *Schell*, 775 F.2d at 566 (finding the effectiveness of the Government's screening procedures to be "questionable" to screen the former counsel from "any direct involvement in the cases against his former clients").  By its own admission, the

---

evidence concerning these interactions, let alone evidence showing that no member of the USAO's team received this information from the SEC.  In addition, it is Mr. Tournant's position that the SEC's knowledge should be imputed to the USAO.

Government not only failed to institute these required measures, it did not even segregate all of the materials from S&C relating to the subject matter addressed in S&C's privileged communications with Mr. Tournant during the June 3, 2021 Meeting.  Rather, the Government represented that it segregated only the documentation of Mr. Tournant's statements to S&C at the June 3, 2021 Meeting itself, as well as certain unidentified documents produced by Allianz that were both created during the period in which S&C represented Mr. Tournant and include Mr. Tournant.  (Opp. at 15.)

The Government does not appear to have engaged in any inquiry to determine whether any portion of S&C's forensic review and investigation was derived, in whole or in part, from Mr. Tournant's privileged statements to S&C.  Nor does it dispute that it used the evidence obtained from S&C's forensic review and investigation that was not segregated in presenting the case to the grand jury.  (*See* Opp. at 15–16 (asserting only that it did not rely on the limited materials that it segregated in its grand jury presentation and Indictment).)  The Government's knowing use of information provided by Mr. Tournant's former lawyers therefore provides an additional basis for dismissal.

## II.   ALTERNATIVELY, THE COURT SHOULD HOLD A HEARING TO DETERMINE WHETHER THE INDICTMENT SHOULD BE DISMISSED

Insofar as the Court declines to dismiss the Indictment on the current record, the Court should hold an evidentiary hearing, after ordering hearing-related discovery, to determine:  (1) the extent of the Government's knowledge and encouragement of S&C's decision-making in switching sides and building a case against Mr. Tournant; and (2) the extent to which the Government's exposure to Mr. Tournant's privileged communications tainted the Government's trial team, its evidence, and the Indictment.  (*See* Dismissal Br. 36–44.)

### A. Absent Dismissal, a Hearing Is Necessary to Determine the Extent of the Government's Responsibility for S&C's Conduct

Absent dismissal on the present Motion, the Opposition raises factual issues that should be resolved at a hearing, after discovery.  (Dismissal Br. at 37.)  At a minimum, it is clear that the record is not fully developed regarding, among other things:  (1) the degree to which S&C assisted with the Government's investigation; (2) the Government's directions to S&C and Allianz as to the manner in which it should conduct its forensic review and investigation; (3) the Government's communications with S&C concerning the Principles and how they applied to Allianz's cooperation in this case; and (4) the extent of the interactions among and between the Government, SEC, S&C, and/or Allianz personnel, including with respect to when the Government first knew or should have known about S&C's personal representation of Mr. Tournant.

In fact, given the scant discussion of the Government's interactions with the other relevant parties, the Opposition raises more factual questions than it answers.  For example, as discussed above, while professing its independence from S&C's investigation, the Government's papers contain numerous references to directions and other guidance that the Government provided to S&C and Allianz concerning the forensic review and investigation, both in terms of the factual areas to be covered and the manner in which S&C should gather the facts.  (*See, e.g.*, Opp. at 7 (admitting bringing certain aspects of the alleged fraud to S&C's attention), 8 (requesting that S&C make disclosures from witness interviews and to present on other issues), 28 (directing Allianz to "deconflict" and later to "stop interviewing witnesses").)  The Government, however, provides few details and no evidence regarding these interactions.  As another example, the Government references a communication between Mr. Bond-Nelson's counsel and the SEC in May 2021 in which Mr. Bond-Nelson's counsel appeared to be aware of the USAO's investigation, but provides little detail.  (Opp. at 5.)

There are also a number of unanswered factual questions regarding the Government's interactions with the SEC.  The Government has refused to produce its communications with the SEC, which now take on an added significance in light of the SEC's undisputed awareness of the joint representation of Mr. Tournant at least as early as April 2021 when it sent Mr. Tournant's subpoena directly to Ropes.  (*See* Levine Decl. Ex. Q.)  The limited record demonstrates that the Government had substantial interactions with the SEC throughout the course of the investigation. As shown in the Discovery Motion, the Government and the SEC jointly interviewed all the witnesses for whom the Government has produced interview reports; the SEC shared materials with the Government, including its work product; and the Government relied on the shared materials in applications filed with the Court in the criminal case.  (*See* Discovery Br. at 3, 8.)  In the Opposition, the Government acknowledges that it began its investigation "[a]t or about the same time" as the SEC—sometime in the Spring of 2020—and that the SEC knew about its "covert" investigation.  (Opp. at 4–5 (asserting that the SEC communicated a request from Mr. Bond-Nelson's counsel to the Government).)  In addition, in order to remain "covert for over a year" (Opp. at 4), the Government necessarily was reliant on another Government agency— likely the SEC—to provide it with materials and information about the investigation that it could not obtain for itself without communicating with Allianz or its employees.  The present record is bereft of factual detail concerning any of these interactions.

Moreover, the cases on which the Government relies (*see* Opp. 26 (citing *Gilman* and *Stein II*)), support Mr. Tournant's request for an evidentiary hearing.  In *Gilman*, the Second Circuit affirmed the district court's dismissal of the plaintiffs' claims after full discovery on summary judgment.  826 F.3d at 71.  Likewise, as reflected in *Stein II*, the district court "ordered discovery and held a three-day evidentiary hearing . . . to ascertain whether the government had contributed

to KPMG's adoption of the Fees Policy." 541 F.3d at 140. The court similarly determined that an evidentiary hearing was required in *United States v. Connolly*, 2018 WL 2411216, at *11 (S.D.N.Y. May 15, 2018). As a result, there is no support for any assertion that the Court should rule against Mr. Tournant on anything less than a full record.

### B. Absent Dismissal, a Hearing Is Necessary to Determine the Extent to Which the Government's Access to Mr. Tournant's Privileged Statements Tainted the Indictment and Prosecution Team

The Court should hold a *Kastigar* hearing to determine the extent to which exposure to Mr. Tournant's privileged communications tainted the Government's trial team and the Indictment. Under binding Second Circuit precedent, the *Kastigar* standards apply when the Government accesses a criminal defendant's privileged information. In addition, Mr. Tournant made the threshold showing necessary to obtain discovery and a hearing because the advance waiver provision is inapplicable under the terms of the S&C engagement letter, and the ethics rules do not permit Allianz to waive Mr. Tournant's privilege over his communications with S&C at the June 3, 2021 Meeting that the Government accessed.

### 1. *Kastigar* Applies Given the Government's Access to Mr. Tournant's Privileged Communications

The Government invites this Court into error in arguing that the Second Circuit's decisions in *United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989) ("*Schwimmer I*") and *United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991) ("*Schwimmer II*") do not require a hearing and do not require the Government to meet the standards set forth in *Kastigar* at such a hearing. (Opp. at 32–34.) In fact, the Second Circuit in *Schwimmer I* reversed and remanded specifically based on the district court's failure to hold a hearing when presented with evidence that the Government may have accessed the defendant's privileged information. 892 F.2d at 238–39 ("We think that the record is insufficient to support the perfunctory findings of the district court with respect to the

privilege issue, and we remand for a hearing and detailed findings on that issue. . . .").  And, approximately two years ago, the Government represented to this Court that *Schwimmer II* "appl[ied] [the] *Kastigar* standard to breaches of a defendant's attorney-client privilege" in a letter brief in *Landji*.  *See* Letter Response in Opposition at 4, *United States v. Landji*, 18-CR-601 (S.D.N.Y. Aug. 20, 2021), ECF No. 518.  In fact, in *Landji*, this Court held a two-day *Kastigar* hearing in 2021 to address the same issues raised here.  *See United States v. Landji*, 2021 WL 5402288, at *17 (S.D.N.Y. Nov. 18, 2021).

Consistent with the Government's previous position, both of the Second Circuit's decisions in *Schwimmer* make clear that a hearing is required and that the Court should apply the *Kastigar* standard.  In remanding the case based on the district court's failure to hold a hearing, *Schwimmer I* held that "the district court should have conducted an evidentiary hearing to determine whether the government's case was in any respect derived from a violation of the attorney-client privilege . . . ."  892 F.2d at 245.  In other words, the court held that the district court erred in not applying the *Kastigar* standard to evaluate the privilege issue.  *See Kastigar v. United States*, 406 U.S. 441, 453 (1972) ("Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection.  It prohibits the prosecutorial authorities from using the compelled testimony in any respect . . . .").  *Schwimmer II* made this holding explicit by citing *Kastigar* and stating that "[t]he government must demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources."  *Schwimmer II*, 924 F.2d at 446.

Moreover, the Government ignores this Court's recent and on-point decisions, cited in Mr. Tournant's opening brief, holding that the *Kastigar* standards apply and a hearing is warranted when the Government accesses a criminal defendant's privileged information.  For example, in

*Landji*, this Court, citing *Schwimmer II*, held that "[t]he same protection [from *Kastigar*] against use and derivative use applies where the Government has obtained information protected by the attorney-client privilege." 2021 WL 5402288, at *28. Similarly, in *United States v. Hoey*, 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016), this Court, again citing *Schwimmer II*, stated that the defendant "is correct that the principles applicable to the fruits of immunized testimony under *Kastigar* . . . apply to the fruits of breaches of a defendant's attorney-client privilege." *Id.* at *4; *see also United States v. Weissman*, 1996 WL 751386, at *10 (S.D.N.Y. Dec. 26, 1996) (applying the *Kastigar* standard and observing that there is "no principled reason for distinguishing between" cases involving immunized testimony and cases involving attorney-client privilege). The Government does not even acknowledge, let alone address, these decisions.

Nor do the two Second Circuit cases that the Government cites—both of which pre-date *Schwimmer I* and *Schwimmer II*—support the Government's arguments that the Court is not required to hold a hearing and apply *Kastigar*. The Government principally relies on *United States v. Colasurdo*, 453 F.2d 585 (2d Cir. 1971). Notably, *Colasurdo* pre-dates *Kastigar* (which was decided in 1972) and therefore necessarily did not address whether the standards set forth in that seminal decision applied to the Government's improper access to privileged information. In the other Second Circuit case cited by the Government, *United States v. Bein*, 728 F.2d 107 (2d Cir. 1984), the court followed *Colasurdo* and did not address whether *Kastigar* applied, unlike the later *Schwimmer* cases. *Id.* at 113. Moreover, the Government wrongly claims that "[a]ll" out-of-circuit decisions addressing the issue rejected the *Kastigar* standard (*see* Opp. at 34 n.18),[3] and, in any

---

[3] *See, e.g.*, *United States v. Danielson*, 325 F.3d 1054, 1059, 1071–72 (9th Cir. 2003) (holding that, where the government affirmatively intrudes into the attorney-client relationship, the government must meet the *Kastigar* standard of the "heavy burden" of showing that all the evidence it proposes to use was derived from legitimate independent sources).

event, they are wrongly decided pursuant to *Schwimmer I* and *Schwimmer II*.  The Court should therefore reject the Government's assertion that this Court is not required to hold a hearing at which the *Kastigar* standards apply.

### 2.   The Government Accessed Mr. Tournant's Privileged Communications

Mr. Tournant has made the threshold showing necessary to obtain a hearing because he has demonstrated that the prosecution is factually related to privileged information accessed by the Government.  *See, e.g.*, *Landji*, 2021 WL 5402288, at *28; *Hoey*, 2016 WL 270871, at *4.  The Government does not appear to dispute that S&C represented Mr. Tournant personally, or that Mr. Tournant's confidential communications with S&C, including those disclosed to the Government, are covered by the attorney-client privilege.  (*See, e.g.*, Opp. at 12 (acknowledging S&C's joint representation of Mr. Tournant).)  Instead, relying on the advance waiver in S&C's engagement letter, the Government argues that Allianz had the right to waive the privilege over all of Mr. Tournant's communications with S&C.  (*See* Opp. at 21–24.)

The Government's argument, however, is refuted by the terms of the engagement letter, the law, and the applicable ethics rules.  S&C had an obligation under the engagement letter to raise and resolve with Mr. Tournant the conflict that arose prior to the June 3, 2021 Meeting.  S&C did not do this, breaching the engagement letter and vitiating any advance privilege waiver.  Additionally, under the New York Rules of Professional Conduct, S&C's conflict was unwaivable, and, in any event, it failed to obtain the informed consent required to make any waiver of either the conflict or the privilege valid.

### a.   The Advance Waiver Is Inapplicable Because S&C Breached Its Obligations Under the Engagement Letter

The Government ignores the language of the S&C engagement letter in arguing that Mr. Tournant had no right to control the confidential information that he provided to S&C,

regardless of a change in circumstances.  (*See* Opp. at 23–24.)  The S&C engagement letter premised S&C's joint representation on the absence of a conflict between Allianz and Mr. Tournant.  (Levine Decl. Ex. A at 2 (confirming that S&C and Allianz were not aware of any conflict at the time they executed the engagement agreement).)  It also imposed obligations on S&C, during the course of the representation, to raise, discuss, and resolve any conflicts that may make it "inadvisable or improper" for S&C to continue representing Mr. Tournant at the time they arose.  (*Id*. at 2–3.)  The S&C engagement letter required:

> ***In the event we [i.e., S&C] conclude . . . that the interests of the Allianz Entities . . . conflict with your interests*** (including, for example, because the Allianz entities are of the view that the joint representation imposes constraints on its ability to cooperate with any government investigation) such that it may become inadvisable or improper for us to continue to represent you, ***we will discuss the situation with you with a view to arriving at a mutually agreeable solution***.

(*Id.* at 2 (emphasis added).)[4]

The evidence submitted in support of the Dismissal Motion established that after Mr. Bond-Nelson's testimony—and before the June 3, 2021 Meeting—S&C received information that a conflict of interest existed between Allianz and Mr. Tournant, including, but not limited to, Mr. Bond-Nelson abruptly ending his testimony and disengaging from S&C and Ropes. (Dismissal Br. at 10–12, 41.)  Moreover, the undisputed evidence before the Court reflects that S&C's own actions confirm that it was operating under a conflict of interest because it, among other things, (1) concealed from Mr. Tournant, as it later acknowledged to the Government, that it and Allianz changed its strategy "[i]mmediately after Bond-Nelson's SEC testimony," starting its forensic review into Mr. Tournant in cooperation with the Government (*see* Levine Decl. Ex. H at

---

[4] The Government fails to address the fact that Ropes also participated in the June 3, 2021 Meeting, but Mr. Tournant's engagement letter with Ropes does not permit Ropes or Allianz to disclose Mr. Tournant's privileged information to the Government.  (*See* Levine Decl. Ex. B at 2.)

SDNY_01_000054551); (2) hid from Mr. Tournant and Milbank that, prior to the June 3, 2021 Meeting, it had developed evidence that ██████████████████████ (*see, e.g.*, Levine Decl. Ex. F at 45–47); and (3) used the information it had secretly gathered about Mr. Tournant to ambush and sandbag him and Milbank, under the guise of preparing him for his SEC testimony (*see id.*). S&C's actions are inimical to the duty of loyalty that it owed to Mr. Tournant as a current client, as S&C's lead counsel effectively confessed to the Government in stating that he could face "disciplinary" action based on providing Mr. Tournant's privileged communications to the Government (Levine Decl. Ex. G at SDNY_01_000054791).

Once S&C was on notice that it had a conflict, it had an obligation under its engagement letter "to discuss the situation with [Mr. Tournant] with a view to arriving at a mutually agreeable solution." (Levine Decl. Ex. A at 2.) S&C did nothing of the kind, choosing to ambush Mr. Tournant and Milbank instead. As a result, S&C committed a material breach of its agreement with its client and any right to enforce the advance waiver immediately became ineffective. *See, e.g.*, *Nadeau v. Equity Residential Props. Mgmt. Corp.*, 251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017) ("Under New York law, when a party to a contract materially breaches that contract, it cannot then enforce that contract against a non-breaching party.") Thus, absent the conflict being properly addressed—which it was not—Allianz had no right to waive Mr. Tournant's privilege over his communications without his consent.

While largely ignoring the evidence, the Opposition strengthens the conclusion that S&C recognized the conflict. Specifically, the Government acknowledges that Mr. Bond-Nelson cutoff contact with S&C and Allianz after refusing to return to his SEC testimony (Dismissal Br. 8–10; Opp. at 5), and that Mr. Bond-Nelson's attorneys told the Government in May 2021 that "Allianz might suspect that he was cooperating" (Opp. at 5). Both admissions undermine its conclusory

assertion that "[i]t does not appear that Sullivan & Cromwell was aware of an actual conflict." (Opp. at 23.)  In addition, the limited evidence before the Court suggests that the Government's professed unawareness of the conflict is the product of deliberate ignorance as opposed to any meaningful inquiry.  In fact, the Government's notes of its March 1, 2022 meeting with S&C reflect that it asked no follow-up questions when S&C's lead counsel stated that "Tournant may file disciplinary claim against us because we gave you info even though he was represented by [Milbank]."  (Levine Decl. Ex. G at SDNY_01_000054791.)

The Filter Team's February 17, 2023 letter further supports the conclusion that a conflict existed prior to the June 3, 2021 Meeting.[5]  The Filter Team highlights that (as noted in Mr. Tournant's opening brief) two days before the June 3, 2021 Meeting, ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ (Filter Team Letter ("Ltr.") at 3.)  In hindsight, ████████████ ████████████████████████████████████████ was not just a coincidence.  Rather, it evidences a consciousness of guilt on S&C's part and that ████████████ was a thinly-veiled attempt to obtain cover for its premeditated actions at the June 3, 2021 Meeting.

The Filter Team also wrongly characterizes Mr. Tournant's position as claiming to have been blindsided by ████████████████████.  (*See* Ltr. at 2, 4.)  Mr. Tournant, however, has never asserted that he was not aware that S&C was ████████████████.  Rather, his assertion is that S&C's ████████████ does not relieve it of its duty of loyalty to, and its concomitant obligation to be entirely candid with its client, Mr. Tournant, about all relevant facts—

---

[5] Instead of delegating the entirety of this motion to the Government's Filter Team, the Government has chosen to have the trial team and the Filter Team submit separate responses to Mr. Tournant's Dismissal Motion.  Mr. Tournant submits that the Government's chosen workflow is improper, unwieldy, and unworkable, particularly to the extent that the Court orders a hearing on these issues, and maintains his objection to the Government's approach.  (*See* ECF No. 50.)

especially conflicts of interest that may have developed.  Nor is S&C permitted to misuse the attorney-client relationship ██████████████████████, as it did here, for the purpose of ambushing Mr. Tournant during the June 3, 2021 Meeting and making Mr. Tournant the scapegoat through which Allianz planned to obtain cooperation credit under the onerous requirements of the Principles.  Contrary to the Government's assertions, the notes of the June 3, 2021 Meeting reflect that much of the meeting was ███████████████████████████████████. (Dismissal Br. 11–12.)

Moreover, while touting S&C's supposed "candor," the Filter Team does not dispute that, despite █████████████████████████████, S&C (1) failed to ████ ████████████████████████████████████████████████████████ ███████████████, and (2) similarly concealed from Mr. Tournant and Milbank that, as it later acknowledged to the Government, it and Allianz changed its strategy "[i]mmediately after Bond-Nelson's SEC testimony" (*see* Levine Decl. Ex. H at SDNY_01_000054551).[6]  It also provides no explanation or evidence as to S&C's motivation for engaging in this deceptive conduct.

By failing to raise and resolve its conflict prior to the June 3, 2021 Meeting, as it was required to do under the terms of the engagement letter, S&C breached its obligations to Mr. Tournant, and such breach vitiates any advance conflict or privilege waiver that could otherwise conceivably apply here.

---

[6] While Mr. Tournant submits that the current record is more than sufficient, Mr. Tournant is prepared to make an *ex parte* submission of privileged information to demonstrate that ████ ████████████████████████████████████████████████████████ ███████████████████.

### b. The Advance Waiver Provision Does Not Apply Because S&C Failed to Adhere to its Ethical Duties to Mr. Tournant

The limited record before the Court establishes that the conflict that arose before the June 3, 2021 Meeting was unwaivable. *See* R. Simon, Simon's N.Y. Rules of Professional Conduct Annotated (Dec. 2021 update), 1.7:65 ("A conflict is non-waivable or non-consentable if client consent would not remedy the conflict no matter how much the lawyer discloses or how much the client (or clients) want to consent."); NYSBA Comm. on Pro. Ethics Op. 952 (2012) ("[W]aiver is available only if the lawyer reasonably believes that he or she could competently and diligently represent both [clients] concurrently."). No lawyer could reasonably believe that he or she could "provide competent[] and diligent[]" representation to each affected client in light of the actual conflict that had arisen between Mr. Tournant and Allianz. *Id.* (citing New York Rule of Professional Conduct 1.7(b)(1)). But, even if the conflict had been waivable, the Government could not, under applicable ethics rules, rely on the advance waiver because, as with its obligations under the engagement letter, S&C failed to re-obtain Mr. Tournant's informed consent after a conflict arose.

Because S&C's engagement letter provides that "[t]he laws of the State of New York (including all rules or codes of ethics that apply to the provision of legal services in New York) will govern the interpretation of this agreement" (*see* Levine Decl. Ex. A at 4), the provision requiring S&C to raise and address conflicts with Mr. Tournant must be interpreted in accordance with the New York Rules of Professional Conduct. As evidenced in the Formal Opinion on which the Government relies (*see* Opp. at 15), counsel is required to obtain a new waiver, based on informed consent, when there is a change in circumstances that constitutes a conflict.

Specifically, the Formal Opinion provides that "the attorney must remain alert to changing circumstances that may render continuation of multiple representation **impermissible or**

29

*inadvisable*, and **the attorney must discuss any such circumstances with his clients**."  (Levine Supp. Decl. Ex. D at 13 (emphasis added)); *see also* New York Rule of Professional Conduct 1.7, cmt. 22A ("Even if a client has validly consented to waive future conflicts . . . the lawyer must reassess the propriety of the adverse concurrent representation under [Rule 1.7(b)] when an actual conflict arises."); N.Y.C. Bar Formal Op. 2016-2 (2016) (lawyers have "ongoing duty to monitor conflicts throughout the representation"); NYSBA Ethics Op. 823 (2008) ("[T]he former client must also be informed that she has the right to insist that all of her confidences and secrets or specific confidences and secrets be held inviolate." (quoting N.Y. Cnty. Lawyers Assoc. Ethics Op. 716 (1996))).

These authorities paint a stark picture:  at the time Mr. Tournant engaged S&C to be his personal counsel, his interests and those of Allianz appeared closely aligned, and there was no indication that anyone at Allianz had suggested wrongdoing on the part of the company or Mr. Tournant and his team.  But by the time of the June 3, 2021 Meeting, Mr. Bond-Nelson had shut down his SEC testimony in the presence of S&C and Ropes; Allianz had changed its strategy "[i]mmediately after Bond-Nelson's SEC testimony"; and S&C had begun a forensic review and investigation that ultimately built the case against Mr. Tournant.  For those reasons, S&C had clearly developed a conflict, which it should have recognized as unwaivable under Rule 1.7(b)(1) because it could no longer "provide competent and diligent representation" to each client.  At the very least, even if the conflict were somehow waivable, the Rules of Professional Conduct plainly required additional waivers "confirmed in writing" based on a candid disclosure of the facts and circumstances under Rule 1.7(b)(4), or a withdrawal from representation.  *See* Rule 1.0(j) (defining

"informed consent").  Mr. Tournant neither gave informed consent, nor confirmed it in writing, and any waiver was therefore invalid and unenforceable.[7]

### 3. The Government Has Not Met Its Heavy Burden to Show That Mr. Tournant Has Not Been Prejudiced and the Court Should Order Discovery

As shown in Mr. Tournant's opening brief, *Kastigar* involves a burden shifting framework. (Dismissal Br. at 38–39.)  Where, as here, Mr. Tournant has made a "threshold showing" that the prosecution is factually related to privileged information accessed by the Government, the heavy burden shifts to the Government.  (*Id*. at 39 ("[T]he Government has the '***heavy burden*** of proving that all of the evidence it proposes to use was derived from legitimate independent sources.'" (emphasis added) (quoting *Kastigar*, 406 U.S. at 461–62).)  The Government has not produced the grand jury testimony (despite Mr. Tournant's request, as noted below), addressed the content and sources of that testimony, or provided the line-by-line and item-by-item evidentiary showing necessary to meet its burden.  (*See* Dismissal Br. at 39.)

The Government not only has failed to meet its burden, it erroneously attempts to place the burden on Mr. Tournant.  (Opp. at 32 (arguing that "Tournant has shown no such prejudice").)  And the Government's showing in opposing the Motion is limited to repeated unsupported assertions that it did not rely on Mr. Tournant's privileged communications in presenting to the grand jury or preparing the Indictment.  (*E.g.,* Opp. at 16 ("The Government did not rely on the Disputed Materials, in its grand jury presentation or in the Indictment."); *id.* at 32 ("[T]he Government set aside the Disputed Materials and did not use them in its grand jury presentation

---

[7] As noted in the Dismissal Motion, beyond a breach of the engagement letter and failure to obtain informed consent, the one-sided structure of the agreement makes it unenforceable.  We reserve the right to offer expert testimony on this issue, if necessary, at any hearing.  Moreover, at any hearing on these issues, Mr. Tournant would be prepared to submit expert testimony concerning informed consent and the principles of the ethics rules.

or Indictment.").)  These unsupported representations are woefully insufficient to avoid a taint hearing.

The Government also does not respond to Mr. Tournant's request, in accordance with *Stein II*, that he be permitted to take hearing-related discovery.  (Dismissal Br. at 44.)  By letter dated February 23, 2023, Mr. Tournant requested that the Government produce the documents and materials underlying the factual assertions in its Opposition, including, among other things, all grand jury materials and all communications between the Government and S&C.  On February 28, 2023, the Government informed Mr. Tournant that it does not intend to produce the requested documents.  Thus, if the Court is not inclined to dismiss the case now and instead grants a hearing, Mr. Tournant respectfully requests that the Court order that the parties be permitted to take discovery on the issues relevant to the hearing.  *See Stein II*, 541 F.3d at 140 (noting that Judge Kaplan "ordered discovery and held a three-day evidentiary hearing" to resolve the issues raised in the defendants' motion).

## III.  IF THE CASE IS NOT DISMISSED, THE COURT SHOULD COMPEL THE GOVERNMENT TO PRODUCE *BRADY* MATERIAL IN THE SEC'S FILES

As Judge Rakoff stated more than a decade ago, "[t]hat separate government agencies having overlapping jurisdiction will cooperate in the factual investigation of the same alleged misconduct makes perfect sense; but that they can then disclaim such cooperation to avoid their respective discovery obligations makes no sense at all."  *United States v. Gupta*, 848 F. Supp. 2d 491, 492 (S.D.N.Y. 2012).  The evidence submitted in support of the Discovery Motion, including the statements of the United States Attorney and the SEC Enforcement Director, shows that the USAO and SEC conducted a joint investigation.  While acknowledging that "the relevant inquiry" requires a determination of "what the person did" (Opp. at 36 (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)), the Government foregoes a discussion of what the SEC actually

did in favor of a hollow and unsupported assertion, stated more than fifteen times, that the USAO and SEC conducted "parallel" (*i.e.*, non-intersecting) investigations.  (*See, e.g.*, Opp. at 2, 4, 5, 6, 11, 12, 24, 35, 43, 44, 45, 46.)

It is undisputed that what the SEC actually did included:  (1) conducting all witness proffers jointly with the USAO; (2) jointly attending with the USAO numerous Allianz presentations; (3) jointly participating in calls with the USAO and Allianz and its counsel to gather more information; (4) engaging in extensive document and information sharing, including sharing its work product with the USAO; and (5) coordinating charges and cross-referencing respective court filings with the USAO.   (*See* Discovery Br. at 2–6.)   This evidence thus reflects a close coordination between the USAO and SEC at all stages of the years-long investigation, and the Court should therefore find, based on the factual record, that the SEC was part of the prosecution team.

### A.  The Government Violated the Court's Rule 5(f) Order in Refusing to Search the SEC's Files for *Brady* Material

Referring to Mr. Tournant's assertion that the Government is actually required to comply with an order of the Court as "the tail wagging the dog," the Government argues that it did not violate the Court's Rule 5(f) Order (the "Order") because it produced "the files within its custody and control."  (Opp. at 46.)  In making this assertion, the Government ignores the language of the Order which defines the "Government," consistent with Justice Manual § 9-5.001, to "include[] all federal, state and local law enforcement officers and other officials who have participated in the investigation and prosecution of the offense or offenses with which the defendant is charged." (ECF No. 13 at 2; *see* Justice Manual § 9-5.001(B)(2) ("It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of

the prosecution team.  Members of the prosecution team include . . . other government officials participating in the investigation and prosecution of the criminal case against the defendant.").)

Even without the benefit of full discovery, it is clear that the SEC participated in the investigation of this case, and is thus encompassed in the definition of the "Government" under the Order.  Among other things, the USAO and the SEC jointly conducted all 22 witness proffers in this case; both the USAO and SEC were present together at numerous presentations and calls involving Allianz; the SEC shared work product with the USAO, which the USAO then used to obtain search warrants to establish probable cause; the SEC provided millions of pages of documents and materials to the USAO, comprising the vast majority of the Rule 16 discovery; and the SEC and USAO worked together in the filing and announcement of charges in this case, which were announced on the same day.  (Discovery Br. at 2–6.)

The Opposition provides further confirmation that the SEC participated in the investigation of this case.  For example, the Government concedes that: the SEC and USAO initiated their investigations at the same time, even though the USAO kept its investigation "covert" for over a year (Opp. at 4); the SEC and USAO "shared certain evidence and informed each other of investigative and enforcement steps" (*id*. at 43); only one set of notes was taken during the 22 witness proffers attended by the USAO and SEC jointly (*id*. at 42); and the SEC and USAO were in regular communication with each other throughout the years-long investigation (*see, e.g.*, *id*. at 5 (noting that the SEC and USAO had multiple discussions after Mr. Bond-Nelson's SEC testimony)).

Indeed, the Government acknowledges that the SEC contacted it immediately after Mr. Bond-Nelson's May 20–21, 2021 SEC testimony, and, on May 26, 2021, the USAO first reached out to Mr. Bond-Nelson's attorneys.  (Opp. at 5.)  ***The very next day***, on May 27, 2021, a

Magistrate Judge granted the Government's *first* warrant application related to its investigation into Mr. Tournant.  (*See* Levine Brady Decl. Ex. B at SDNY_01_000045336.)  Although Mr. Tournant does not have the USAO's communications with the SEC, this timeline set forth in the Opposition is telling:  it clearly establishes that the USAO and SEC were working together in close coordination during the investigative process.

The Government also does not meaningfully address, let alone convincingly explain, the United States Attorney's and SEC Enforcement Director's statements at the May 17, 2022 joint press conference, including the statements crediting the "combination" of the USAO, SEC and postal inspection service with "run[ning]" "this investigation" (referring to a singular, not plural, investigation); thanking the SEC for its "extraordinary work in this matter"; and describing the relationship between the USAO and SEC as "working shoulder to shoulder" and a "partnership." (Discovery Br. at 5.)

Accordingly, these facts demonstrate that the SEC "participated in the investigation . . . of the . . . offense with which [Mr. Tournant] is charged" under the Order.  (ECF No. 13 at 2.)  The Government has therefore violated that Order based on its refusal to search the SEC's files for *Brady* material.

### B.  The USAO Violated *Brady* in Refusing to Search the SEC's Files

Separate from the dictates of the Order, the Government is also obligated to search the SEC's files for *Brady* material under relevant case law. The Government asserts that the Court should disregard the plain language of the Second Circuit in its unpublished opinion, *United States v. Barcelo*, 628 F. App'x 36 (2d Cir. 2015), in which it used the disjunctive in setting forth the following test for determining members of the prosecution team: "[i]ndividuals who perform investigative duties *or* make strategic decisions about the prosecution of the case are considered members of the prosecution team . . . ."  *Id.* at 38 (emphasis added); (*see* Opp. at 44–45).  At

bottom, the Government asks this Court to assume that the *Barcelo* court's use of the disjunctive was not a purposeful choice—that a "reasonable" interpretation of the Second Circuit's guidance in *Barcelo* is to read this sentence in the conjunctive. (Opp. at 44–45.)

But the Government provides no credible basis for concluding that the Second Circuit did not mean what it said in articulating the relevant test. The Government argues that the Court should not apply the *Barcelo* test because *Barcelo* cites the collection of cases in *United States v. Meregildo*, 920 F. Supp. 2d 434 (S.D.N.Y. 2013). (Opp. at 44–45.) *Meregildo* did not involve materials in the possession of the SEC or another government agency; rather, the issue in that case was whether a cooperating witness should be considered a member of the prosecution team. *See Meregildo*, 920 F. Supp. 2d at 437, 442. Neither *Meregildo*, nor the cases that it relies on in the portion cited in *Barcelo*, support the Government's argument. *Barcelo*, 628 F. App'x at 38 (citing *Meregildo*, 920 F. Supp. 2d at 441). In fact, like *Barcelo*, *Meregildo* used the disjunctive in describing the circumstances in which another person should be deemed to be a member of the prosecution team. *Meregildo*, 920 F. Supp. 2d at 442 ("[T]hese circumstances include whether the individual actively investigates the case, acts under the direction of the prosecutor, *or* aids the prosecution in crafting trial strategy." (emphasis added)). As the Government acknowledges (*see* Opp. at 45), the district court in *Barcelo* similarly used the disjunctive in setting forth the applicable standard. *United States v. Barcelo*, 2014 WL 4058066, at * 9 (S.D.N.Y. Aug. 15, 2014) ("To determine whether someone is a member of the prosecution team—in other words, whether the prosecution can be deemed to have constructive knowledge of information held by that individual—the Court considers the totality of the circumstances, including 'whether the individual actively investigates the case, acts under the direction of the prosecutor, *or* aids the

prosecution in crafting trial strategy.'" (emphasis added) (quoting *Meregildo*, 920 F. Supp. at 441–42)).

Regardless of the standard applied, the Government's public admissions that the USAO and SEC acted as a "partnership" in this investigation, "worked shoulder to shoulder," and collectively "r[a]n" "this investigation"—when coupled with the evidence showing their joint fact-gathering and other collaboration—establish that the USAO and SEC were members of the same prosecution team for *Brady* purposes. Thus, the Court should order the Government to search the SEC's files for *Brady* material.

Moreover, the Government attempts to minimize the overwhelming indications that the USAO and SEC conducted a joint investigation by citing to two largely inapposite cases, *United States v. Rhodes*, 2019 WL 3162221, at *3 (S.D.N.Y. July 16, 2019) and *SEC v. Stanard*, 2007 WL 1834709, at *2 (S.D.N.Y. June 26, 2007), for the proposition that any overlap in the purportedly "parallel" investigations was "typical" and merely "to promote efficiency and reduce costs." (Opp. at 43.) The *Rhodes* court, however, examined the distinct question of whether the relationship between the DOJ and the SEC investigations violated due process where the SEC's civil action was brought solely to obtain evidence for its criminal prosecution. 2019 WL 3162221, at *2–3. The Court did not analyze whether the USAO and SEC conducted a joint investigation such that the SEC would be considered part of the prosecution team for purposes of *Brady*. Similarly, *Stanard* was a ***civil*** action in which the defendant sought to compel the SEC, under Fed. R. Civ. P. 26(b) and 34, to produce certain documents, including notes taken by the FBI and SEC. 2007 WL 1834709, at *1–3. The *Stanard* Court applied the standards set forth in the Federal Rules of Civil Procedure—not *Brady*.

37

## C.  Alternatively, the Court Should Order an Evidentiary Hearing

Should the Court find that the record is not sufficiently developed to conclude that the SEC is part of the prosecution team, Mr. Tournant respectfully requests that the Court hold an evidentiary hearing to determine:  (1) the extent of cooperation between the USAO and SEC in the investigation of this case; and (2) the USAO's ability to access the SEC's files.  *See Gov't of the V.I. v. Martinez*, 780 F.2d 302, 306 (3d Cir. 1986) ("Where a factual question is raised as to whether a *Brady* violation occurred, the defendant is 'entitled to have it determined by the district court in a hearing appropriate to the factual inquiry.'" (quoting *United States v. Alexander*, 748 F.2d 185, 193 (4th Cir. 1984))).

The Court should also swiftly reject the Government's hyperbolic assertions that asking it to review the SEC's files for *Brady* material would "condemn the prosecution of criminal cases to a state of paralysis" and would be "inordinately time consuming and burdensome[.]"  (Opp. at 46–47.)  The Government's claim of burden is not only irrelevant to its obligation to fulfill its duties under the Constitution and the Court's Order, but it is simply false.  Indeed, several Judges of this Court have adopted Individual Rules of Practice that expressly require the Government to produce *Brady* and *Giglio* material from "regulatory agencies that are or have been involved . . . in parallel proceedings or investigations involving the defendant."  (*See* Individual Rules of Practice of Hon. Richard M. Berman, § 5.C.2.d ("[T]he Government has a continuing, good faith obligation to seek Brady Material and Giglio Material from law enforcement and regulatory agencies that are or have been involved in the prosecution of the defendant or in parallel proceedings or investigations involving the defendant."); Individual Rules of Practice – Hon. Jed S. Rakoff, § 13(4) (same); Individual Rules and Procedures for Criminal Cases of Hon. Lorna G. Schofield, § H.1.d (same).) The Government has apparently been able to abide by the rules of those courts without issue.  The Government has also managed to comply with court orders requiring the Government to review

38

the files of its investigative partners in plenty of past cases, including *Gupta* and *Martoma*, without "condemn[ing]" Government prosecutions to a "state of paralysis."

It is troubling that the Government has no shortage of resources to hold press conferences to tout its "partnership" with the SEC in this case, but when it comes to ensuring Mr. Tournant's most fundamental due process right to obtain exculpatory material, the Government claims no collaboration with the SEC and to lack the resources necessary to do what it is duty-bound to do: search the SEC's files for *Brady* material. The contrast between the Government's public statements and its arguments to the Court is stark and unacceptable. The Government's position is nothing more than a blatant effort to continue its regrettable pattern of circumventing *Brady* and its other obligations, and should not be tolerated by the Court. *See, e.g., Nejad*, 521 F. Supp. 3d at 442; *Nejad*, 487 F. Supp. 3d at 207; *see also Ahuja*, No. 18 Cr. 328 (S.D.N.Y. Jan. 13, 2021), ECF No. 424.

## CONCLUSION

Mr. Tournant respectfully requests that the Court grant: (1) his motion for dismissal of the

Indictment or, in the alternative, for a hearing; (2) his motion to compel the Government to produce

*Brady* materials; and (3) such further and other relief as may be just and proper.


Dated:  New York, New York
        March 15, 2023

<div style="margin-left:40%">

By:     /s/ Seth L. Levine
        Seth L. Levine
        Alison M. Bonelli

**LEVINE LEE LLP**
1500 Broadway, Suite 2501
New York, New York 10036
Telephone: (212) 223-4400
slevine@levinelee.com
abonelli@levinelee.com

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Daniel R. Alonso
Olivia Rauh
1133 Avenue of the Americas, Suite 3100
New York, New York 10036
dalonso@orrick.com
orauh@orrick.com

</div>