N4J8TOUA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

             v.                          22 Cr. 276 (LTS)

GREGOIRE TOURNANT,

                 Defendant.

------------------------------x
                                       New York, N.Y.
                                       April 19, 2023
                                       2:30 p.m.

Before:

                    HON. LAURA T. SWAIN,

                                       Chief Judge

                          APPEARANCES

DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
BY:  MARGARET GRAHAM
      ALLISON NICHOLS
      Assistant United States Attorneys

LEVINE LEE LLP
      Attorneys for Defendant
BY:  SETH L. LEVINE
      ALISON M. BONELLI
          -and-
ORRICK HERRINGTON & SUTCLIFFE LLP
BY:  DANIEL R. ALONSO
      OLIVIA RAUH

N4J8TOUA

```
 1                    (In open court; case called)
 2                    THE COURT:  Good afternoon.
 3                    Counsel, would you introduce yourselves, please.
 4                    MS. NICHOLS:  Good afternoon, your Honor.  Allison
 5    Nichols and Margaret Graham for the government.
 6                    THE COURT:  Good afternoon, Ms. Nichols and Ms.
 7    Graham.
 8                    MR. LEVINE:  Good afternoon, your Honor.  Seth Levine
 9    and Alison Bonelli, from Levine Lee, for Mr. Tournant.
10                    THE COURT:  Good afternoon, Mr. Levine and Ms.
11    Bonelli.
12                    MR. ALONSO:  Good afternoon, your Honor.  Daniel
13    Alonso, from Orrick, Herrington & Sutcliffe, together with
14    Olivia Rauh, for Mr. Tournant.
15                    THE COURT:  Good afternoon, Mr. Alonso and Ms. Rauh.
16                    Good afternoon, Mr. Tournant.
17                    THE DEFENDANT:  Good afternoon, your Honor.
18                    THE COURT:  Please be seated.
19                    And good afternoon to everyone who is here in the
20    spectator section.
21                    My rule for these proceedings is that speakers can
22    take their masks off while they are speaking.  Since I will be
23    doing a fair amount of speaking and I am sitting by myself, I
24    will take my mask off now, and that might make it easier for
25    you to hear me as well.
```

N4J8TOUA

1          I remind everyone that as provided in the Court's

2     standing order, there is to be no recording or retransmission

3     of any part of this proceeding.

4          We are here today for oral argument on the two motions

5     of Mr. Tournant that are currently pending in the first wave,

6     which is the motion to dismiss the indictment, which I may

7     refer to from time to time as the privilege motion, and the

8     motion to compel certain searches and production, which I will

9     refer to as the *Brady* motion.

10         I have read carefully all of the submissions in

11    connection with each of the motions, and so, counsel, you can

12    be confident of that as you decide how to allocate your time.

13    And I have over all allocated each side a total of 45 minutes

14    for argument of the two motions, which would include any

15    rebuttal time.

16         So my first question for you all is whether you have

17    decided to argue the motions separately or to have overall

18    arguments that will encompass both motions, basically tell me

19    anything you need me to know about the timing allocations and

20    sequence.

21         So I will first ask Ms. Nichols.

22         MS. NICHOLS:  Thank you, your Honor.

23         For the government, Ms. Graham and I are dividing the

24    motions.  So I will be handling the privilege motion and she

25    will be handling the *Brady* motion.  And it was our anticipation

N4J8TOUA

1    that we would go second after the defense has had an

2    opportunity to speak first.

3           THE COURT:  Mr. Levine.

4           MR. LEVINE:  Yes, your Honor.

5           Your Honor, a preliminary question, if I might.  In

6    our view, as you know, we have expressed in our papers on the

7    privilege, as you call the privilege motion, there is a matter

8    in the paper that's under seal.  We continue to believe, and

9    consistent with previous practice in this court, that the

10   appropriate people to be arguing this is the filter team, not

11   the trial team.  And that's why we have competing papers from

12   them with different information.  So I renew that objection.

13   Given that the government has elected a filter team -- I think

14   that they have admitted they are tainted, if the other factors

15   are established, but nonetheless --

16          THE COURT:  I'm sorry.  You said, I think they have

17   admitted to something.

18          MR. LEVINE:  They suggested that they had access to

19   materials, that they were tainted.  It's undisputed that many

20   of the notes and materials were in possession of members of the

21   trial team.  But, nonetheless, I am pointing out, in my

22   previous experience with *Kastigar* issues, the Department of

23   Justice had a separate team.  I don't know how we are going to

24   deal with the fact that we have got sealed materials that I

25   certainly do intend to reference, at least for the Court.

N4J8TOUA

```
 1    That's one issue.
 2              The other issue --
 3              THE COURT:  I guess I had the naive hope that you all
 4    would have worked out some agreed way of dealing with that
 5    before we got here today.
 6              MR. LEVINE:  I apologize, your Honor.  We made that
 7    point in our papers.  Frankly, we didn't confer with the
 8    government.  I did speak with the taint team, who is here, and
 9    expressed that continued to be our view.  But I wanted to at
10    least -- we do not want to do anything to suggest that we are
11    waiving any privilege or have done anything that would allow
12    privileged materials to be further disseminated.
13              THE COURT:  Ms. Nichols, did you want to respond to
14    that?
15              MS. NICHOLS:  I do, your Honor.
16              Just to circle back, I don't think that's an accurate
17    representation either of what was said at the previous
18    conference or of the government's position with respect to
19    these motions.  It's our position, respectfully, that this is
20    not a Kastigar issue, and so we have not conceded that the
21    prosecution team is tainted, and we do not believe that that is
22    so.
23              We do think that the case team is appropriately the
24    people who would argue this motion.  That's our intention here
25    today.  Obviously, there are things under the redactions that
```

N4J8TOUA

1    we cannot see.  And so obviously we will not be addressing

2    those points.  But I think what we propose, and what we think

3    makes sense here today, is that the parties proceed with the

4    unredacted materials, and only in the event, if further inquiry

5    into the sealed matters is required --

6              THE COURT:  I'm sorry.  Just for clarification, do you

7    mean that the parties should proceed as to the redacted

8    materials as opposed to basing the arguments on the unredacted

9    materials?

10             MS. NICHOLS:  The latter.  I think the parties should

11   base their arguments on the materials that -- let me start

12   over.

13             THE COURT:  The materials that are public.

14             MS. NICHOLS:  The public materials, your Honor.  The

15   ones that the case team have been able to engage in with our

16   briefs.  We think that those are the appropriate set of

17   arguments and issues to engage with here today.

18             THE COURT:  You would not be planning to refer in your

19   arguments to any of the materials that have been restricted to

20   the filter team.  And I do understand the questions of whether

21   there is a privilege, the question of whether *Kastigar* is

22   appropriate under these circumstances are among the issues that

23   will be argued here today.  So I don't consider them to have

24   been resolved.

25             MS. NICHOLS:  Right.  Thank you, your Honor.

1          THE COURT:  So, Mr. Levine, do you think that

2     reference to the content of any of the materials that you

3     contend are privileged will be necessary in connection with

4     your argumentation today, reference to the content of any of

5     those materials?

6          MR. LEVINE:  Your Honor, the government has at times

7     taken factual positions that are 180 degrees from what those

8     materials show.  Frankly, I am a little bit at a loss, which is

9     not that common for me, because this is a hearing on a sealed

10    portion motion that is about a *Kastigar* issue.  So the

11    government's position, and we have raised this from the

12    beginning, this is about the privilege matter.  That's why we

13    filed all of this stuff under seal.  The government is taking,

14    I think in my experience, a relatively unique position.  That's

15    why you have a filter team, to avoid exactly this problem.

16    And, in fact, it's the refusal of the government to respect

17    privilege which brings us here today.

18          So, I can certainly try, your Honor, and I can come up

19    to sidebar, if you would like, on things that I know are

20    privileged, but I am certainly going to make argument today,

21    because the issues that they have challenged include what

22    people knew and the nature of, for example, the prep session

23    that happened.  Those representations the government has made

24    in both of their papers is just wrong.  But I tend to rebut

25    them, even though the government has not offered any factual

N4J8TOUA

1   basis for their positions.  So I will do the best I can, but

2   that's exactly why I raised this issue in our papers.

3          I would also like to bring to the Court's attention

4   page 25 of the transcript of October 27, 2022, where the

5   government said:  "We have been clear on this.  We are not here

6   silently saying -- we are not taking a position on what was

7   shared with the prosecution team.  We said it was accessible to

8   the prosecution team and accessible to the AUSAs' own case, and

9   it was accessible to all agents.  We are saying that defense

10   counsel can assume that for the purpose of bringing forth this

11   motion."

12          So, as I said, we have taken the position that they

13   don't deny that some of the folks' -- sitting in front of me --

14   own notes, which contain this material, hasn't tainted them, if

15   in fact the Court determines that those are privileged matters.

16   So when counsel stands up and says they haven't conceded that,

17   I don't quite know what they are talking about.  But I just

18   commend the Court to the transcript on page 25, which I think

19   is also noted in our briefs on this point.

20          On the *Kastigar* issue, I will say, your Honor, it is

21   our firm position under the law that the heavy burden is on the

22   government in this proceeding and in all others.  So I will be

23   guided however the Court wants to proceed.  I will reserve

24   substantial amount of my time for rebuttal, hopefully about 25

25   minutes.  If the Court wants to proceed in that manner, that's

N4J8TOUA

1    fine with me.

2            I intend to divide my initial argument between the

3    privilege issue and the *Brady* issue, although I will tell the

4    Court just to be clear, there is intersection, in the sense

5    that one of the main issues here is what the SEC and the

6    government talked about.  I can't answer those questions

7    because they won't give me the material.  But that's how they

8    in some way do intersect.  So they are not totally independent

9    issues.  I just wanted not to be confusing if I am referring in

10   the first argument to things with the SEC.  The reason is

11   because they are interrelated and not because I am talking

12   about the second argument.

13           THE COURT:  I appreciate that by way of clarification.

14   Let me just say a couple of things.

15           As to *Kastigar*, it seems to me that the question at

16   this stage -- well, there are two predicate questions, really.

17   One that is a through-line through all of the arguments, which

18   is, is this material privileged at this point in time?  And

19   that goes to waiver issues.  And the government has also

20   alluded to a potential crime fraud exception argument, and to

21   the extent the government wants or intends to press that, I

22   will be looking for them to identify for me in the record where

23   they have raised that now or when they would want to raise

24   that.

25           So, if we have material that isn't privileged, wasn't

N4J8TOUA

1    privileged at the time it was disclosed, that's one picture,

2    and I certainly expect counsel to engage with that issue of

3    whether the privilege has been preserved.  And then to the

4    extent that we -- we will be addressing *Kastigar* one way or

5    another because obviously the defense contends that there is a

6    privilege that was preserved and the defense contends that,

7    because of that, there is taint.

8         I don't expect the parties to be in a position today

9    to argue about whether a *Kastigar* burden, if *Kastigar* is

10   appropriate, has been carried because the *Kastigar* application

11   of the defense is for discovery and testimony and anticipates a

12   lot of things that aren't in the record now.  So my focus has

13   been on whether there is a predicate for a *Kastigar* hearing,

14   and if so, what that would look like.  So that might help you a

15   bit, Mr. Levine, in fashioning your boundaries in terms of

16   argumentation, and if you think my view of the structure is

17   wrong, if we need to run up to the sidebar, we will all go to

18   the sidebar.

19        So I think that's all that I can say about those

20   matters at this time, and I have read the papers.

21        So I think it is time for us to go to arguments.

22        So, as I understand the time division, Mr. Levine, you

23   will be doing the entire argument.  We will allot you 20

24   minutes to start.

25        Then we will allot the government its full 45 minutes.

N4J8TOUA

1    Would you like us to run the clock at -- I have an argument

2    clock with nice little lights, just like the Second Circuit,

3    and the yellow light will go on, I think it's three minutes

4    before time is out.  Would you like us to set you for 22 and a

5    half and 22 and a half or should we just set you for 45?

6              MS. NICHOLS:  That's fine, your Honor.  I don't think

7    we are going to need 45 minutes either way, but maybe a clock

8    will help ensure that we keep mindful of the time.

9              THE COURT:  If you're working from the podium, there

10   is actually a digital clock there that will tell you how much

11   time has elapsed.

12             MR. LEVINE:  I can use all the help that I can get.

13   So if you can sit the initial clock for 20 minutes, that will

14   be great.  Ms. Bonelli is also going to enforce the time

15   limits.

16             THE COURT:  We will do that.

17             Defense counsel will start with 20.  And when defense

18   counsel comes back, we will set you again for 25 for your

19   rebuttal.

20             MR. LEVINE:  The other thing is we are going to show

21   you a few slides.  I will tell you now, several of those

22   slides, including the slides that reflect the prep session Q

23   and A, are absolutely sealed and privileged.  We can try to not

24   display them on their screen, but those are things that I think

25   you need to see.  Several of these slides are in the sealed

N4J8TOUA

 1    record.

 2              THE COURT:  Did you bring paper?  Let's use paper for

 3    those.  Otherwise it will display for all counsel and me.  And

 4    if you put it up, it will also display for everybody in the

 5    gallery.

 6              Do you want to bring the collection of paper up now.

 7    And if you have a copy for the court reporter as well, that

 8    will help.

 9              MR. LEVINE:  I am just going to set up, if I can.

10              MS. BONELLI:  Can I approach, your Honor?

11              THE COURT:  Yes.

12              Do you have a third copy for my law clerk?

13              MS. BONELLI:  I do.

14              THE COURT:  Thank you.

15              Are you ready?

16              MR. LEVINE:  May I?

17              THE COURT:  Yes.  You may proceed.

18              MR. LEVINE:  May it please the Court, thank you so

19    much for hearing us today, your Honor.

20              In *Stein*, the Second Circuit, about 15 years ago,

21    taught us this:  An adversarial relationship does not normally

22    bespeak partnership.  KPMG faced ruin by indictment and

23    reasonably believed it must do everything in its power to avoid

24    it.  The government's threat of indictment was easily

25    sufficient, easily sufficient, to convert its adversary into

N4J8TOUA

1    its agent, and ruled that, in fact, a portion of the same

2    historic provision in the government's cooperation policies,

3    which cover attorneys' fees and joint defense activities, was

4    unconstitutional.  Same provision.  We are back 15 years later.

5    It's time for the second half, respectfully, your Honor.

6           In Sullivan & Cromwell's own words, this case is about

7    death.  Death, even corporate death, is different.  Faced with

8    such a threat, entities, even the most powerful and well-heeled

9    on this planet, just like a regular person, can be broken.  And

10   that's what happened here.

11          To survive, and when faced with such a threat,

12   artificial and natural people just want to survive, the

13   government gives a simple utilitarian choice.  Give us your

14   executives, all or nothing.  Give us people to prosecute, and

15   don't you dare allow any kind of privileged arrangements that

16   you have made before to disable you from giving us information

17   we want.  And it's all or nothing.

18          There has been no challenge in the government's papers

19   to our interpretation of these policies.  None at all.  And I

20   would respectfully suggest, your Honor, that when life is on

21   the line, corporate life for sure, the result is that people do

22   things that in other situations they would not.  Like finding

23   folks that happen to be out on disability to blame.  Like

24   breaching fundamental bedrock principles of our system relating

25   to the attorney-client relationship, which is the foundation of

1      the entire adversary system.

2            Judge, we ask you for two things today with respect to

3      the privilege motion:

4            One, based on the standards articulated in *Schwimmer*,

5      and explained to this Court, this conduct is manifestly and

6      avowedly corrupt because of what it does to our system of

7      adversary justice.  It undermines and destroys it.

8            Second, because privileged information has been used,

9      the attorney-client relationship has been abused.  There is no

10     question that *Kastigar* applies.  Not only did the Circuit hold

11     that in *Schwimmer*, but Judge Gardephe, after an exhaustive

12     review of the law in this area just two years ago, found that

13     *Kastigar* applies, and the government agreed.  So why we are

14     here debating whether *Kastigar* applies, after it has been

15     applied by the Circuit in *Landji*, in *Hoey*, and many cases, and

16     the government itself acknowledged it, I don't understand.  I

17     can only say that they are leading you into error.

18           There is no question that if this Court, in my

19     respectful opinion, does not dismiss this case now, a hearing

20     must be held both on the relationship between the government

21     and corporate partners, if the Court does not just accept our

22     view of the policy; and, two, unquestionably, as it has in

23     every case, a *Kastigar* hearing has to be held.  And I would

24     point out, in *Stein*, Judge Kaplan held a three-day evidentiary

25     hearing.

N4J8TOUA

1          THE COURT:  I just want to stop you.  You say on the

2     relationship between the government and corporate partners.  Do

3     you mean the government --

4          MR. LEVINE:  Allianz and S&C.

5          We believe that all of this conduct was directly

6     attributable to the government.  They are responsible for the

7     breaching of the relationship.  We believe the policies are the

8     encouragement of that, just as Judge McMahon found in *Connolly*,

9     that the policies encouraged the interpretation.  And,

10    therefore, if there is a contest on that issue, which the

11    government has not made in its papers, as Judge Kaplan did, we

12    have to have a hearing, respectfully.

13         Now, what is so unique about this case is that this is

14    a case that doesn't happen very much.  It's about something

15    that is really inimical to our system.  And it's the idea that

16    an attorney switches sides, goes from zealous advocate, as you

17    are required to be, for their client in the criminal justice

18    system to being their zealous opponent.  This doesn't happen

19    because it is so far out of the norm.  It is so far beyond what

20    is acceptable.

21         I don't ask your Honor today to blaze a new path.  You

22    don't need to.  What I ask you to do, though, is to enforce the

23    guardrails that protect the adversary system and people's

24    rights.  Because absent that, allowing attorneys to switch

25    sides, as the court in *Schell* noted, is really defacing our

N4J8TOUA

most sacred rights.  It is the essence of what gives us
protection.  In *Schwimmer*, the court pointed out that the
attorney-client privilege is the soil in which all of our
rights grow.  As they said, if you don't have the
attorney-client relationship, our rights are meaningless.  And
here, what the government with its policies is doing is choking
the water from that soil; and then in our other motion, the
*Brady* motion, they are also trying to obscure the light because
they don't want us to get information that lawyers can use to
effectively advocate.

THE COURT:  As you pointed out in your papers, you
believe that in order to put itself in a position to have
whatever flexibility it might need to maximize its protection
or chances under the cooperator guidelines, Allianz and
Sullivan & Cromwell structured an engagement agreement that had
provisions for what you have characterized as advance waiver,
but did lay out a system in which Mr. Tournant was made aware
that Allianz would control the privilege, and it was possible
that Allianz could waive this privilege and waive it for him
and provide the information to the government.  Mr. Tournant
had separate counsel, it seems to me from the papers, even
before he signed that engagement agreement.  And so, are you
telling me that the ethical rules preclude the validity of that
sort of an agreement even knowingly entered into?

MR. LEVINE:  What I am telling you, your Honor,

N4J8TOUA

respectfully, is one:  The agreement, which is an entirely

one-sided one, has one piece of protection for Mr. Tournant.

And that protection is that if at any time there is anything

that can be a conflict that might make it either just

inadvisable or improper for Sullivan & Cromwell to continue --

and this agreement remains under seal but I will just say it

generally -- then they must resolve that conflict before

another word is spoken.

            And in this case, as the Court knows, that conflict

absolutely ripened weeks, a week and a half, two weeks before

the relevant meeting that we are talking about.  There was no

waiveable conflict.  It was unwaiveable.  Because at that point

they knew that they had a conflict between multiple clients of

theirs.  Mr. Bond-Nelson was their client.  Mr. Taylor was

their client.  And if you look at the page 3 of the chart, they

are the three folks that are on this chart.

            It is an unwaiveable conflict.  Even if it was

waiveable, which it wasn't, that requires a waiver; and either

under 1.7 or 1.9, that waiver has to be in writing, and it has

to done with full disclosure of the entire set of information

they had.  But they didn't do that.  In fact, as we have proven

in our papers -- and the government cannot contest it, they

have no basis to -- there was deception and a lack of candor.

There was an ambush, in which information that was absolutely

material and was quickly proffered to the government was not

N4J8TOUA

1    revealed either to Mr. Tournant or to his other counsel.  And

2    there was basically, in our view, a complete undermining of his

3    rights.

4          The government argues, inconsistent with the

5    engagement letter and the long-standing law in the state of New

6    York, that somebody can sign a contract of adhesion to waive

7    something and that's all that happens.  The attorney-client

8    privilege is not a game of Three-card Monte; you can check at

9    the end to see if it had it.  Once a conflict is raised, and it

10   clearly was raised here, even if it is waiveable, which it was

11   not here, because it's obviously unwaiveable, you have to get

12   informed consent, which requires full disclosure.  Because they

13   were under such enormous pressure, they made a terrible

14   mistake.  They were trying to save the life of one client at

15   the expense of the other.  So the language of the agreement

16   itself refutes the government's point.  But if you were to

17   interpret the agreement, your Honor, in a way that gives Mr.

18   Tournant, not loyalty, not confidentiality, and not candor, it

19   is not an attorney agreement.

20         And let me tell you why this is happening, Judge.  The

21   SEC has a rule, not contested by the government.  It says you

22   can't show up at SEC testimony if, if, you're not personally

23   represented.  Ropes and Sullivan & Cromwell wanted to be in the

24   room.  So they had to represent that they were lawyers.  They

25   took on the joint representation.  And when it became

1   inconvenient, when the government was threatening Allianz's

2   life, they said, you know what, forget it, we are just going to

3   pretend that this is just an *Upjohn* situation.  That is

4   fundamentally wrong.

5         And the government absolutely encouraged it.  We

6   believe the government knew from the outset.  The SEC knew.

7   They knew that Mr. Bond-Nelson was represented by S&C and Ropes

8   as well.  And they are going to have us believe that even

9   though they won't tell us they are interacting with the SEC,

10   they are filing applications the very week that Mr. Bond-Nelson

11   walks out of the SEC, that they somehow don't know about this?

12   They gave Allianz the best cooperation credit they could get.

13   They didn't charge Allianz.  They let all their affiliates go.

14   They let them strip AGI US of all its real assets.  Based on

15   the idea that they were such good cooperators.  Is it the

16   government's position that they were fooled into knowing that

17   Mr. Tournant was not represented by Sullivan & Cromwell or did

18   they know?  It doesn't matter.  Either way, the knowledge is

19   imputed to them, and we believe they actually knew.

20         But what happens?  When my colleagues and I learned

21   about this and said, wait a second, stop the presses, you have

22   privileged material, did they change their position?  No.  They

23   had them back in.  They had them back in, where not only were

24   they presenting facts, they were actively advocating for the

25   destruction and prosecution of my client.

N4J8TOUA

1          Here it is:  "Sitting here where I am would like to

2     see you prosecute Greg Tournant.  I would like to help you do

3     that but may not have anyone to help you do that if guilty

4     plea."

5          These are his lawyers, your Honor.  They are his

6     lawyers.  And they are standing before the government and

7     saying, please don't kill my other big corporate client, go

8     after this guy.  You can't do that.  And if you can do that,

9     then every single person who has a personal counsel has to

10    worry about their privilege, has to worry, can I really talk to

11    them, can I have a free and frank exchange?  And that is the

12    end of the privilege.

13         THE COURT:  Well, every person who has a personal

14    counsel and has an engagement letter of the sort that was

15    present here.  But it seems to me that, absent this unusual

16    sort of engagement letter, you would have a much clearer

17    ethical situation, and the connection between the ethical

18    violation and the contract validity issues is still one that I

19    would either now or in rebuttal want to hear more about.  If

20    there is an ethical violation, certainly disqualification of

21    the counsel, and perhaps termination of the dual

22    representation.

23         I would like you to draw me as fine a diagram as you

24    can, by reference to specific authority as to the waiver

25    invalidity point, whether it's *ab initio*, whether it became

illegal or invalid at a point and what that point was, and what
its implications are for what could or could not have been
disclosed.

MR. LEVINE:  Your Honor, the moment that conflict
arose, and there is no question it arose no later than the 22nd
of May, when the S&C said they changed their entire approach
and started cooperating.  The agreement says that if there ever
comes a time that it may become inadvisable and improper for us
to continue to represent you, we will discuss the situation
with you with a view of arriving at a mutual agreeable
solution.  And the prior paragraph says, if we have to
withdraw, we have to withdraw.  That all happened before this
meeting.

Then in the lead up to that meeting, they did a
forensic investigation they didn't reveal.  And here is a
slide, Judge, that shows you the timing.  They initiated their
investigation on May 22.  They knew already.  Even in the
meeting with him they were saying, We understand that you're
being accused of telling Bond-Nelson to alter things.  They
knew already.  They knew exactly what was going on.  And, in
fact, they purposely withheld information on his cell phone
from him so they can surprise him.  And the entire meeting,
from a few minutes into it, was an exercise to elicit damaging
testimony, to elicit materials so they could sell it to the
government in exchange.

N4J8TOUA

1           In fact, if you put up the slide of the timeline of

2    cooperation, you will see, your Honor, that the first entry,

3    which is slide 2, the very first entry of what they claim

4    credit for is the issues about this cell phone.  If you look at

5    the bottom left.  That's what they surprised him with.

6           This was supposed to be prep for testimony.  I will

7    tell you, your Honor, when you're prepping somebody for

8    government testimony, it is one of the most complicated, most

9    important jobs you do.  And the decisions you make about

10   whether to testify and how to testify are the core of what a

11   defense lawyer's job is.  Here, they bamboozled him, they

12   ambushed him, and then they gave the government the thing they

13   would not have, which is the equivalent of an interview, a

14   proffer, or testimony that Mr. Tournant never gave.  They got

15   in the defense camp and they basically flipped his lawyer.  And

16   there is nothing in the engagement letter -- in the rules of

17   ethics say, once the circumstances change, no blanket waiver is

18   valid; you have to give specific information of what you know.

19          They walked into a room and didn't even tell his other

20   lawyer what the information was that they had.  You can't do it

21   that way.  As I said, this is not a game, a joke.  They are his

22   lawyers.  If they didn't want to be his lawyers, they didn't

23   have to.  But when you take that on, you have, as *Schell* says,

24   a sacred obligation to defend him.

25          How would it be, your Honor, if six months from now I

N4J8TOUA

walked back into the courtroom to advocate for an alleged

victim, to advocate for the government's position against Mr.

Tournant?  I ask you:  How would you react to that, if I came

to you and said I have a letter that says I can do this?  I

think it would be an unforgivable thing.  And that's the same

thing that happened here.

         I would also say to you, your Honor, very quickly,

*Schell*, which is the lead case from the Fourth Circuit on this,

in that case, no privilege information, almost no contact.  The

Fourth Circuit says, We can't live with this; we throw it out.

*Sabri*, Western district of New York, a lawyer gets intermixed

with the government.  Throw out a portion of the indictment.

The government's response is that *Schell* is out of circuit and

old.  It is.  But they don't say it's not right.  It's good

law, and it's good law because it is so rare that this happens.

This should not happen.

         And what is happening here is that the government and

their cooperation policies, which insist on all or nothing,

will not even let the little space exist for the

attorney-client relationship.  Everything else the company has

to do.  And, your Honor, it is distorting our entire system of

justice, and it is, as they said in *Schwimmer*, threatening to

destroy, destroy the underpinnings of this entire adversary

system.  And I am not being hyperbolic.  This Court,

respectfully, needs to do something similar to what Judge

N4J8TOUA

1    McMahon did and what Judge Kaplan and the Circuit did in *Stein*,

2    and say -- that was only about attorneys' fees.  This is

3    actually flipping someone's lawyer.

4            The adversary system is the heart of this system, and

5    if you can't trust your lawyer, if they are here to trick you,

6    you might as well not bother with all of this.

7            Thank you, your Honor.

8            THE COURT:  Thank you, Mr. Levine.

9            You want us to start you at 45 minutes?

10           MS. NICHOLS:  That's fine, your Honor.  Thank you.

11           Thank you, your Honor.

12           So I will start with the two questions that the Court

13   posed to guide the parties here today.  First, is this material

14   privileged?  The answer is no.  And the second question is:

15   Has a predicate been established to hold a *Kastigar* hearing or

16   a *Kastigar*-like hearing or a hearing of any kind?  And the

17   answer is also no, for the same reason, your Honor.

18           The information that Allianz, through its attorneys,

19   gave to the government, regarding information that they had

20   obtained from Mr. Tournant, was information that Mr. Tournant

21   knowingly and intelligently waived when he agreed, in writing,

22   while advised by incredibly experienced defense attorneys,

23   including one defense attorney representing only him, and loyal

24   only to him, that Allianz would control the attorney-client

25   privilege over information that was learned during their joint

N4J8TOUA

1   representation.

2          It is Tournant's burden here to demonstrate the

3   existence of a privilege and that he took steps to ensure that

4   it was not waived.  And he cannot make that showing.  He does

5   not even claim that he did not understand the written waiver

6   that he signed.  He does not claim that he was coerced into

7   signing the engagement letter that contained the applicable

8   waiver.  And he does not claim that he received misleading or

9   incorrect advice about what that waiver means, and about what

10  it didn't mean.

11         He does not claim that when he signed a document

12  saying, I understand the implications of this joint

13  representation, including the benefits and the risks involved,

14  that he didn't understand.  He doesn't claim that he didn't

15  understand the risks that were specifically enumerated in that

16  written agreement, including that if a conflict arose, Sullivan

17  & Cromwell might be required to terminate the relationship,

18  including the risk that he waived any conflict of interest that

19  would otherwise prevent Sullivan & Cromwell from continuing to

20  represent the company, and including, most applicable here, the

21  risk that confidential information that he shared with Sullivan

22  & Cromwell could be shared with the government if the company

23  determined that that were appropriate.

24         THE COURT:  Well, Mr. Levine is saying, among other

25  things, that he didn't take the risk, at a time when he

1    believed that S&C was still his lawyer, that he was sharing

2    information with them for purposes of legal advice to him, that

3    they had already decided that they would not be his lawyer,

4    that the fundamental premise of the relationship, which should

5    have been terminated, it was no longer there, so that he was,

6    if not lulled into signing the engagement agreement with its

7    waiver provisions, was lulled into disclosures of specific

8    information in this June 3rd meeting, at a time when the

9    lawyers had already turned against him.  Is that a risk that he

10   knowingly undertook under that engagement agreement?

11           MS. NICHOLS:  Your Honor, I think, first of all, we

12   have no reason to believe the premise underlying that argument.

13   I think that there is no reason, on the facts that the

14   government has access to, to believe that there was any ethical

15   breach by Sullivan & Cromwell here.  And I think it's important

16   to keep in mind the timeline and the inference that the defense

17   is asking the Court to draw to make that conclusion.

18           Mr. Bond-Nelson testified on May 20 and May 21.  He

19   ended that testimony early on the second day.  And then,

20   through only his individual counsel, he reached out to the

21   government and began cooperating.

22           According to the slide that defense counsel just put

23   up, Sullivan & Cromwell or Allianz began a forensic

24   investigation on May the 22nd.  And so, if I am understanding

25   Tournant's position correctly, he seems to think that Allianz

N4J8TOUA

should have dropped him as a client before engaging in any

investigation.  And that requirement is not what this

engagement letter contemplated.  Nor is it a one-sided

agreement, as he just said.

          Mr. Tournant, while advised by competent and

experienced counsel, chose to undertake both the risks and the

benefits of joint representation.  And that included getting

access to corporate documents, to corporate employees,

knowledge of Allianz's productions and presentations to the

SEC, and understanding and the ability to analyze how his

documents and statements would relate to other potential

witnesses and Allianz employees.

          THE COURT:  Well, I would like you to just focus on

that time period between the 22nd of May and June 3rd.  I am

hearing an argument that they not only undertook this

investigation, which included investigating the client, Mr.

Tournant, but they developed information adverse to Mr.

Tournant, elaborated on that investigation by questioning him

about the information without disclosing it to him at a time

that they were still ostensibly in an attorney-client

relationship, and then delivered that package to the

government.  Is there anything in the engagement agreement that

would have put Mr. Tournant on notice that the lawyers' access

to him, which was premised on an attorney-client relationship,

could be used in that way?

N4J8TOUA

1        MS. NICHOLS:  Again, your Honor, I think we do reject

2   the premise behind the factual narrative that Mr. Tournant is

3   pushing.  And I think what we know is that there is a very

4   short timetable between when Mr. Tournant alleges that S&C

5   should have known of the conflict, which was the second day of

6   Mr. Bond-Nelson's testimony, and the day that they actually

7   terminated his engagement, which was on June 5th, about two

8   weeks later.

9        So, again, the government doesn't have any reason to

10  believe that Sullivan & Cromwell breached its ethical

11  obligations to Mr. Tournant or the engagement letter that they

12  had signed during that two-week period.  But I think it's

13  important --

14       THE COURT:  Whose burden is it?  Frankly, in the

15  opening papers, I have a lot of exhibits which are documents

16  that were produced.  The government has made a lot of

17  representations in its papers, but not given me a single

18  declaration or affidavit.  So I don't have a factual record

19  before me.  And neither side has made clear, besides Mr.

20  Levine's blanket assertion that the burden for everything is

21  always on the government, but in this particular instance,

22  where is the burden?

23       MS. NICHOLS:  Your Honor, I think it's important here

24  to cite this argument in law, Mr. Tournant's argument.  And

25  what he is suggesting -- I am trying to answer the Court's

N4J8TOUA

1    question.  What he is suggesting is that the ethical breach by

2    Sullivan & Cromwell, which, again, we don't concede existed,

3    but supposing it did, is attributable to the government because

4    the government has policies and principles in place to

5    incentivize cooperation.

6          He must make that connection to the government's

7    action in order to obtain relief from this Court here.  He may

8    otherwise and separately have civil remedies against Sullivan &

9    Cromwell.  There may be disciplinary remedies.  But what he is

10   asking this Court to do, to be perfectly clear, is to make new

11   law.  He is asking the Court to blaze a totally new territory.

12   And he says that there is a constitutional violation here, but

13   he hasn't cited it in any particular constitutional provision,

14   and that is to obfuscate the fact that he is asking this Court

15   to make a new rule, which the government submits would be

16   ungovernable.

17         He cites to *Connolly* and *Garrity*.  But there is no

18   allegation here that he was coerced into sitting in that

19   interview with his prior attorneys on June the 3rd.  He doesn't

20   make that allegation.  He cites to a Sixth Amendment line of

21   cases, which we also cite to in our opposition brief; but, of

22   course, the Sixth Amendment doesn't apply to this situation

23   either, as the Sixth Amendment does not attach until

24   indictment.

25         And so, to answer the Court's question, there is no

N4J8TOUA

standard to suggest that an ethical breach by someone's prior counsel should be attributable to the government.  Even under the defendant's proposed *Kastigar* standard here, he has not made any showing to get further fact-finding.  In order to get a *Kastigar* hearing, he must first demonstrate a factual relationship between the allegedly privileged information and the charges in the indictment.  And I think here that's not met, for reasons that we just explained, that there is no privileged information.  It's first his obligation to demonstrate that he held the privilege and that it was not properly waived, and that he hasn't done, and he hasn't even put in a declaration on that point, and he hasn't made any of the assertions that I opened with.

THE COURT:  So do you reject as a matter of law the defense assertion that the waiver, insofar as it may or may not have been valid from the inception of the engagement agreement, was insufficient as of the time there was a conflict, and if there wasn't a knowing and informed waiver that included knowledge of the specific contact before additional information was provided, there is no effective waiver?

It's a little hard for me still to follow the precise line of the defense argument, but I gather it's either that it invalidated the waiver as of June 2nd, or whatever, or it invalidated the whole waiver, but that, nonetheless, to have a waiver that destroys any privilege built on Mr. Tournant's

N4J8TOUA

1    expectation that S&C was still acting as his lawyer on June

2    3rd, he would have had to make a waiver in writing, fully

3    informed of what had happened in terms of the forensic

4    investigation and the change of Allianz's orientation.

5           I see Mr. Levine is nodding, it looks like

6    affirmatively.  So I am going to assume that I have captured at

7    least some of the essence of his argument there.

8           MS. NICHOLS:  Let me try to say that back to you, your

9    Honor, so that I can make sure I am answering the question that

10   you're asking.

11          I understand Mr. Tournant to be arguing that the

12   waiver provision in his engagement letter was void at the point

13   in time in which Sullivan & Cromwell knew that there was a

14   conflict but secretly didn't tell him that there was a

15   conflict.  And so, I think that, to the extent that is a live

16   issue, we don't have facts to support that point of view.  But

17   it's the government's position that we don't need to engage in

18   that fact-finding in terms of Sullivan & Cromwell's process and

19   their forensic review and their development of their

20   understanding of the facts of the case and whether or not the

21   precise moment that they understood that there was a potential

22   conflict predated the moment that they conveyed that to Mr.

23   Tournant through his independent counsel.

24          THE COURT:  Because?

25          MS. NICHOLS:  Because, your Honor, if there was an

N4J8TOUA

1    ethical breach by Sullivan & Cromwell, that breach is not

2    attributable to the government.

3        THE COURT:  But the question that I am trying to ask

4    you is whether, if there was that ethical breach, it's an

5    ethical breach that, as Mr. Levine has argued, vitiated any

6    validity that the waiver and ceding to Allianz's control over

7    the privilege happened?

8        MS. NICHOLS:  Your Honor, I think that the closest

9    analogy, and again, I don't think this is apt because there is

10   no Sixth Amendment right, but I think a close analogy would be

11   the line of cases that the government cites in its brief.  And

12   the standard there is a showing that the government was

13   manifestly and avowedly corrupt.  And Mr. Tournant also has to

14   show that he was prejudiced.  And he cannot make either of

15   those showings.

16       THE COURT:  Doesn't the manifest corruption question

17   arise only if there still is a privilege?  And I thought I

18   heard you a few minutes ago saying there is not a privilege

19   because of the contract, and Mr. Levine is saying the change in

20   position in attitude of Sullivan & Cromwell vitiated the

21   contract so that there is no waiver, and furthermore, Sullivan

22   & Cromwell's conduct should be attributed to the government

23   such that the indictment should be dismissed.

24       I think that I have heard two different alleged

25   consequences of the actions of Sullivan & Cromwell in the

N4J8TOUA

1   argumentation.  And you seem to want me to continue to rely on

2   the engagement letter as something that deprived Mr. Tournant

3   of any claim of privilege in the information at all, so that we

4   don't even get to a question of taint of the government, and

5   any dismissal of the indictment or finding of improper conduct

6   would go to sort of the overall picture.

7            So, if it is privileged notwithstanding Sullivan's

8   alleged conduct, why is it that that engagement letter

9   provision still controls in the circumstances that have been

10  posited by the defense?

11           MS. NICHOLS:  I think your Honor understands that we

12  do not agree that there was any kind of breach that would

13  nullify the engagement letter.  But if we are in a world in

14  which --

15           THE COURT:  If factually the defense is right about

16  what happened, and let's just assume for purposes of this part

17  of the argument and analysis that Sullivan knew and Sullivan

18  plotted against its client in order to get something good to

19  put in that birthday present it wanted to give to the

20  government, does that conduct as a matter of law vitiate the

21  waiver provision of the engagement letter so that what was in

22  that birthday box is still privileged?

23           MS. NICHOLS:  No, your Honor.  I don't think there is

24  any reason to think that a hypothetical ethical violation by

25  Sullivan & Cromwell voids the agreement or means that Mr.

N4J8TOUA

1    Tournant's waiver was not knowing and voluntary.  I just don't

2    think there is good reason to interpret the engagement letter

3    in that way.

4          But if there were good reason to interpret it in that

5    way, I just don't think that that question is before this

6    Court, because Mr. Tournant would have some kind of civil

7    claim, or he might want to raise a claim before a disciplinary

8    committee about Sullivan & Cromwell's duties of loyalty to him.

9    But that is not before this Court because Sullivan & Cromwell's

10   actions cannot be attributable to the government, which Mr.

11   Tournant needs to make that connection and there is no

12   connection here.

13         And that is not so much a factual argument as a legal

14   argument, your Honor.  I think there is no basis for the rule

15   that he wants this Court to adopt.  And, in fact, the rule that

16   he wants this Court to adopt would require the government to

17   impermissibly wave into attorney-client relationships on a

18   massive scale.  It would require the government every time it

19   went to corporate counsel to ask for a voluntary production of

20   documents, or to serve a subpoena, to engage with corporate

21   counsel about the status of their joint representation, or lack

22   thereof, with potential other witnesses and employees of the

23   company.  The government did not do that here and the

24   government should not be doing that.

25         THE COURT:  You can continue.

N4J8TOUA

1        MS. NICHOLS:  Thank you, your Honor.

2        I want to address the Court's question about the crime

3   fraud inquiry.  I think that there is no need to resolve that

4   at this stage of the proceedings because of our position that

5   the information at issue here was not privileged, and that is

6   just a cleaner, simpler way of treating it.  But the government

7   does think that there would be good reason to believe that some

8   crime fraud exceptions would apply to information that Mr.

9   Tournant supplied to Allianz during his June 3rd interview.

10  And I think it's helpful to sort of understand that that is

11  actually how all of this percolated and came to light in the

12  first instance, is that the government raised to Allianz that

13  it was concerned about crime fraud and asked Allianz to take

14  another look at the privileged determinations that it had made,

15  and this was back in the fall of '21.  And it was after the

16  government made that request that Sullivan & Cromwell provided

17  full summaries of that interview.

18        So I think that the appropriate time and the efficient

19  way to do this would be to look at crime fraud second, but we

20  did want to flag for the Court that we think it is a live

21  issue, in the event that the Court does not find that the

22  waiver applied here.

23        THE COURT:  Thank you.

24        MS. NICHOLS:  I just want to address the government's

25  use of a filter team here, and then I think otherwise, unless

N4J8TOUA

1   the Court has other questions, I would anticipate letting Ms.

2   Graham address the rest of the motion.

3          The government does not, and has not, conceded that

4   the information here is privileged.  Nonetheless, when we

5   understood that Mr. Tournant was raising this argument, we

6   endeavored to segregate out the disputed material and to take

7   them out of the control of the case team and to put them into

8   the control of a filter team.  And that was done in an

9   abundance of caution and because all of this was raised before

10  the government brought the indictment here in this case so

11  there was no judge to whom we could really elevate this issue

12  squarely at that point in time.

13         These actions were done in an effort to be careful and

14  to be respectful of the argument that defense counsel was

15  making, notwithstanding that we did not think that it had any

16  merit.  And so I think that is important for the Court to

17  consider in looking at both the allegation that the

18  government's actions here have been manifestly and avowedly

19  corrupt, as well as the allegation that Mr. Tournant has been

20  prejudiced.

21         As the government has already explained in the papers,

22  the government did not rely on any of the allegedly privileged

23  information in presenting this case to the grand jury, and so

24  there is no way that Mr. Tournant can make a showing under

25  these circumstances that he has been prejudiced by this

N4J8TOUA

1    information.

2              THE COURT:  Let me point out once again I have that as

3    a representation in your brief.  I have no evidence as to what

4    went to the grand jury, no evidence as to what went into the

5    government's thought processes, no evidence as to the

6    relationship -- and I am anticipating Ms. Graham's part of the

7    argument here -- between the SEC investigation and the

8    prosecution.  Are you planning to rest, for purposes of my

9    determinations, on the briefs to the extent I find there are

10   material factual issues here?

11             MS. NICHOLS:  To the extent that the Court finds that

12   there are material factual issues here, I think we would like

13   the opportunity to address them through whatever mechanism the

14   Court would find helpful.

15             THE COURT:  Assume for the moment that I have no facts

16   in front of me now.  So what am I supposed to do with this

17   record?

18             MS. NICHOLS:  It's our view that on this record there

19   are no material disputed facts.

20             THE COURT:  So it's not material to my determination

21   that the government says that it didn't use any of this

22   information before the grand jury?  I can just ignore that and

23   say, if it did, it didn't, it doesn't matter.  It's not

24   material that the government represents that it did not use any

25   of the allegedly privileged information in crafting the

N4J8TOUA

1    indictment?  I can just say, one way or the other, that doesn't

2    matter as a matter of law?  Can you take me through that

3    analysis?

4         MS. NICHOLS:  It's our position that the material at

5    issue here is not privileged because Mr. Tournant waived.  And

6    we think that's a legal issue that the Court has the ability to

7    decide here.  I think the burden is on Mr. Tournant in the

8    first instance to demonstrate the validity of the privilege and

9    that he didn't waive.  He has not even put in a declaration on

10   those points.  So I think that the Court can decide this on

11   that top-line issue without further inquiry.

12        In the event that there is a factual record that the

13   Court would like to develop, I think the government and both

14   parties would benefit from some guideposts about what factual

15   record would be helpful or unhelpful.  But that's sort of the

16   reason why the government didn't in the first instance put in

17   affidavits and declarations.

18        It's our position that Mr. Tournant has not made the

19   requisite showing to get a hearing here.  I think that there is

20   law that suggests that, outside of the *Kastigar* context, when

21   there is allegations of government misconduct, the defendant

22   has to make a substantial preliminary showing in order to get

23   fact-finding, and Mr. Tournant has not made such a showing

24   here.

25        THE COURT:  And are you deferring on the question of

N4J8TOUA

1    whether facts are necessary to resolve the *Brady* issue to Ms.

2    Graham?

3              MS. NICHOLS:  Yes, your Honor.

4              THE COURT:  All right.  Thank you.

5              MS. NICHOLS:  Thank you.

6              Ms. Graham, you're up now.  You have a little over 17

7    minutes once you get to the podium.

8              MS. GRAHAM:  Thank you, your Honor.

9              Just one additional point, if I may, on the privilege

10   point that I just discussed with Ms. Nichols.

11             I think it's also helpful in understanding the

12   timeline of the case here and how it may track with the other

13   cases cited by defense, is that the relevant events took place

14   between May 20th and 21st, when Mr. Bond-Nelson had his

15   deposition, and June 3rd, when Mr. Tournant was interviewed or

16   prepped by S&C.

17             The government did not notify Allianz or S&C of its

18   investigation until June 10, after any of those events took

19   place.  And so, to find that Allianz or S&C's conduct in that

20   time, which for all the reasons Ms. Nichols noted there is not

21   an evidentiary record to show that it was improper or that it

22   in any way invalidated the clear engagement letter, to impute

23   Allianz's conduct during that time to the government, there is

24   just no basis in the record to do so.  And what Mr. Levine

25   urges that is a broad policy set by the government about

N4J8TOUA

1    corporate prosecutions means that anything a corporation does,

2    even before it has had a single communication with criminal

3    authorities, can then be imputed to the government, there is

4    just simply no basis for that in the law and that would be in

5    fact extraordinary.

6         Your Honor, moving to the motion about *Brady* and the

7    SEC.  The SEC is not part of the prosecution team for *Brady*

8    purposes here.  It is a separate and independent agency that

9    engaged in a parallel investigation.  As your Honor knows from

10   the case law, and I know you have read the briefs carefully, to

11   be part of the prosecution team, an individual or entity must

12   have been acting on the government's behalf or is an arm of the

13   prosecutor.  And that is not what happened here.  This was a

14   parallel, not a joint investigation.  And a finding that it was

15   a parallel investigation here would be consistent with the

16   finding of numerous other district courts who have examined

17   similar sets of facts, including the judges in *Middendorf*,

18   *Blaszczak*, *Collins*, *Chow*, *Velissaris*, and *Alexandre*, to cite

19   just a few recent examples.

20        So, going one by one through the factors that courts

21   in this district have considered, it's clear that the SEC was

22   not part of the prosecution team, and that the SEC and SDNY did

23   not conduct a joint investigation.

24        The first of the factors, cited in cases like

25   *Middendorf* and *Blaszczak*:  Did the SEC participate in witness

N4J8TOUA

1    interviews with the DOJ?  They did, but only after witnesses

2    were given separate warnings by the SEC and DOJ teams, told

3    that the teams were conducting separate investigations.  And,

4    to be the clear, the SEC took no notes.  The DOJ was

5    responsible for the only set of notes of those witness

6    interviews.

7           THE COURT:  Where is my evidentiary record on that?

8           MS. GRAHAM:  Yes, your Honor.  We did not submit

9    affidavits consistent with our practice.  In other courts where

10   this has come up, we have proffered those facts in the record.

11   They are undisputed, and, in fact, some of that is reflected in

12   interview notes that have already been turned over to defense.

13   But, of course, if your Honor determines that an affidavit or

14   some further showing on this is necessary, we can provide that.

15   But we did follow our customary practice when this has been

16   litigated in other cases.

17          THE COURT:  Well, Mr. Levine, when he comes back for

18   his rebuttal, can tell me whether, to what extent, and on what

19   basis the defense would dispute any of those representations.

20          MS. GRAHAM:  Thank you, your Honor.

21          I would also note that in this case, where there are

22   two independent agencies investigating the same fraud, there is

23   nothing wrong or improper or unusual about, for witness

24   convenience, interviewing a witness at the same time, so that

25   that witness does not have to sit for two separate interviews

1    and perhaps travel for those interviews.

2            Was the SEC involved in presenting the case to the

3    grand jury?  It was not.

4            Did the SEC review documents gathered by or share

5    documents with the prosecution?  It did, but it did not review

6    grand jury material and it did not participate in the execution

7    of any search warrants or in the responsiveness of the search

8    warrant returns.  And there, again, I would note that it is

9    normal and appropriate to share documents and information.  The

10   government and SEC are both tasked with protecting victims of

11   billing and dollar frauds like occurred here, as well as the

12   markets.  And so it's not remarkable, and in fact it is

13   routine, to share information.  That does not convert this into

14   a joint investigation with the SEC.

15           Did the SEC play a role in the development of

16   prosecution strategy?  It did not.

17           And did the SEC accompany the prosecution to court

18   proceedings?  It did not.

19           Your Honor, I am happy to answer any other questions.

20   Other than that, we would rest on our briefs for our argument.

21           THE COURT:  Since this is the last time you stand up

22   on this, I have reviewed your brief, I hear your explanation

23   that you're providing your predicate facts by way of proffer.

24   As I said, I will ask Mr. Levine whether there is any dispute

25   or basis for disputing them.  So if there is nothing else that

N4J8TOUA

1   you want to say to augment what is in front of mind for me,

2   that's fine, I don't have specific questions for you aside from

3   that.

4           MS. GRAHAM:  I am also happy to reserve time.  It was

5   a little bit out of order.  Generally defense would argue their

6   motion first.  Mr. Levine understandably preferred to address

7   the privilege motion.  But given that, I haven't had an

8   opportunity to respond to anything he might say orally, and so

9   should the Court find it necessary, I am happy to stand again

10  and answer any questions that arise after Mr. Levine for the

11  first time orally argues this point.

12          THE COURT:  Well, we have got ten minutes still on the

13  clock out of the government's 45 so we will see what is

14  necessary and appropriate after Mr. Levine has returned to the

15  podium.

16          MS. GRAHAM:  Thank you, your Honor.

17          THE COURT:  Thank you.

18          MR. LEVINE:  Your Honor, respectfully, the government

19  simply invites this Court into error by skipping virtually our

20  entire argument.

21          Number 12 in your package, which we can put up on the

22  screen, are the principles of prosecution that say any joint

23  defense arrangement that disables you from providing us

24  information can be held against you.

25          That policy is part of an original policy that is part

N4J8TOUA

1    of the same policy in *Stein*.  You didn't hear a word about

2    *Stein*.  In *Stein* and in *Connolly*, the test is whether or not

3    the government is encouraging this behavior.  That's the law in

4    this Circuit.  And they are encouraging this behavior because

5    they tell everyone at every conference and in every statement,

6    if you don't give us your people, and if you do anything to

7    have a structure that doesn't let you do this, you're going to

8    get in trouble with us, and in this case you're going to get

9    killed.  That's the policy.  And *Stein* and *Connolly* and its

10   progeny say it's attributable to the government if people

11   follow it.

12            Now, the question is, is it improper?  The problem

13   here is that Sullivan and Ropes, and Ropes is a different

14   engagement letter, basically decided to represent Tournant.

15   And then -- and, by the way, there is a government

16   investigation.  They know it's going on.  Things get bad.  They

17   say to the government, we immediately decided we are going to

18   cooperate.  They know what's coming.  In fact, both in *Stein*

19   and in *Connolly*, the court said, you don't have to be told by

20   the government, you look at the policy.

21            If they are contesting the policy, they won't even

22   identify it for you, let's have a hearing.  There is a factual

23   issue.

24            There is no question what happened here.

25            THE COURT:  I let you ride over me a minute ago.  Not

N4J8TOUA

1      now.

2             So, yes, they say there is this policy.  We have

3      engagement letters that you acknowledge or an engagement letter

4      that is meant to be written around that.  Are you saying that

5      because of this policy, and because the government encourages

6      corporations in general not to shield their executives, that's

7      fundamentally corrupt?

8             MR. LEVINE:  No.  What I am saying is, if you have a

9      policy that basically puts somebody in a position where their

10     corporate life is threatened, and they end up breaching their

11     obligations to their employee, it's the regular and natural

12     result of what they have done.  In the same way that KPMG --

13            THE COURT:  When you say breaching obligations, and

14     again, there is the question of what the fundamental obligation

15     is.  We have an engagement letter that says, we can decide to

16     turn the information over that we have gathered in the course

17     of the joint representation.

18            MR. LEVINE:  But that's not what it says, your Honor.

19     I am happy to take you through it.

20            THE COURT:  It says that if they find that there is a

21     conflict, that they will discuss it and seek to resolve it in a

22     mutually acceptable manner.  It doesn't say that if there is no

23     mutually acceptable manner, they will never turn the

24     information over.  And there is a question, as the government

25     has pointed out, as to whether there are appropriate and

N4J8TOUA

1    sufficient remedies on the civil side and the grievance

2    authority's side to remedy conduct that is found to have been a

3    breach of the lawyer's ethical obligation without punishing the

4    government for it.

5         MR. LEVINE:  First of all, the ethics rules don't

6    permit that.  The ethics rules do not permit an unwaiveable

7    conflict to be unaddressed.  Even if it's waiveable, you have

8    to address it.  And the letter actually says that the SEC will

9    only turn the materials over if and when it deems appropriate.

10   No lawyer can deem appropriate turning materials over when they

11   know they are laboring under an unwaiveable conflict.  And if

12   you read the agreement as you just suggested, your Honor, it's

13   basically a contract of adhesion.  Mr. Tournant has no rights

14   to protect himself.

15        THE COURT:  He had Milbank Tweed as his lawyer when he

16   decided to enter into this agreement.  Maybe he should sue them

17   for malpractice.

18        MR. LEVINE:  Your Honor, in *Schell*, in *Sabri*, the

19   abuse of the attorney-client privilege, these lawyers went and

20   advocated actively against their client.  Regardless of whether

21   even materials could have been turned over, which they can't,

22   you can't switch sides.  This is not a game of gotcha.  You

23   literally have lawyers going into the government and saying,

24   after we say this is privileged, prosecute this guy and save

25   us.  We don't have a system like that.  They didn't mention

N4J8TOUA

*Schell* to you.  *Schell* says, a guy who is on the government

side, who doesn't even do anything, it's so bad that we have to

throw it out.  *Sabri* is the same.  This conduct is so far out

of the norm.

THE COURT:  *Schell* was the one who had been a lawyer

and then literally was a prosecutor, correct?

MR. LEVINE:  So the only question there is attribution

of this to the government.  And I have shown you under *Stein*

and under the other cases that if they adopt a policy that

promotes this, that's enough.

But you know what, your Honor, if you're saying I am

not sure, you have to have a hearing, just like Judge Kaplan

did.  He had three-day hearing on this issue so he can satisfy

himself that just cutting off legal fees meets the standard,

which the circuit said it easily did.  We will offer, if

necessary -- we have offered to you, and I take great umbrage

that the prosecution has their taint team sitting here who

knows the information.  We gave you the transcript of the

meeting.  We gave you the notes.  And what they say, and what

they show unmistakably, is a conflict and an ambush.  The

government's first page of their brief says, Sullivan didn't

start cooperating until they knew there was a problem.  Right.

On the 22nd of May, when they watched their other client start

blaming Mr. Tournant, or denying blaming it, and they clearly

understood the SEC was looking at that.  And they were

N4J8TOUA

1     investigating for a year.  And, by the way, your Honor, this is

2     parallel.  I am not good at math, but I know this.  This is

3     parallel.  They don't intersect.

4          Every single aspect of this investigation is

5     intersecting.  And the United States attorney stood up and

6     said, this investigation -- and I will play it for you if you'd

7     like -- was run by the office, the SEC, and the postal

8     inspector.  I take his word for it.  And the government has

9     offered nothing on that.

10          So you have the SEC and the government talking to each

11     other.  And my other cases where we have had this, we have

12     gotten all of those communications.  What did they talk about

13     between the 22nd and the 3rd?  I will tell you what they talked

14     about.  Multiple applications that says we got our stuff from

15     the SEC.  What did the SEC tell them?

16          THE COURT:  I'm sorry.  I am getting lost as to who

17     your them's and they's are.

18          MR. LEVINE:  What did the SEC tell the government?

19     They all knew there was a joint representation here.

20          So, your Honor, what I am saying to you is --

21          THE COURT:  They all knew, as in the SEC knew, or

22     you're inferring that because you posit that the SEC knew

23     because they were serving things or --

24          MR. LEVINE:  They were sharing information, and they

25     have not provided us all of that information.  But it's clear

N4J8TOUA

the government was talking to Mr. Bond-Nelson.  They knew he

had been represented by Sullivan.  No basis to suggest they

didn't know all the people represented by Sullivan.  They are

talking to the SEC.  They know.  Sullivan & Cromwell 100

percent knew there was a problem.  They told the government

that.  And I have put in a transcript to you that on page 35,

Sullivan asks my client a question that specifically makes

clear that they know exactly what the allegation is.  And it's

part of an ambush.

          Now, your Honor, I did put in evidence.  They didn't.

These guys didn't look at it; and instead of having the taint

team argue this, they want to pretend they don't know.  Their

whole argument to is, your Honor, there is not a factual

record.  This a factual record.  They haven't looked at it and

they haven't offered any of their own.  So on this factual

record, you need to rule for me or, at minimum, you need to

have a hearing.  But the notion that we haven't -- I put in so

many exhibits in this case that prove our point.  And on the

privilege, as we have proffered, it violates the language of

the agreement.  It violates New York State, New York City

ethics opinions and ethics rules.  There is no way to provide

informed consent without revealing the facts.  And we have

proffered to you and it's in the transcript that material was

withheld.

          When I meet with Mr. Tournant, if I don't tell him the

N4J8TOUA

truth, if I am not candid with him, I have breached my

obligation.  And if I am not candid with him because I am

protecting another client, I have an unwaiveable conflict and I

have to stop.  That's the law.  They don't contest that.  But

if you want to have a hearing on that, we will put an expert on

that will say that has always been the law in the state of New

York.

          So the notion here that we don't have a record -- and

there's two standards.  The avowedly corrupt standard has

nothing to do with prejudice and it has nothing to do with

*Kastigar*.  What it has to do with is the switching of sides is

so inimical that even without any prejudice you have to throw

it out.

          THE COURT:  It was the lawyers who, as you put it,

switched sides, not the government.  You need to attribute that

behavior to the government in order to have a predicate for

your demand for a dismissal of the indictment.

          MR. LEVINE:  Yes.  The policy is the predicate.  And

they have not disputed in their papers the policy.

          Now, I understand that there are a lot of moving parts

here.  And I will tell you, and this is not the same as the

situation before Judge McMahon, but the issue was, do *Upjohn*

interviews, where you're not the lawyer, cannot be attributed

to the government?  And Judge McMahon started with the idea

that no.  At the end she said absolutely.  This was an

1  outsourced investigation.

2          Here, the question is, do these policies cause that?

3  We have cited for you a Sullivan & Cromwell legal piece that

4  specifically says, Hey, by the way, under this memo, you have

5  got to be really careful because you might end up, if you're

6  representing an individual, you might end up with an

7  unwaiveable conflict of interest and the government is going to

8  hold it against you because you can't share the information.

9  They wrote that years before this all happened.

10         So the notion that we are sort of just fantasizing

11  about this is crazy.  What has happened here is there is a

12  coordinated arrangement between the government and big

13  corporate parties that basically boxes in individuals and

14  punishes companies if they don't do that.  And that's been

15  proven before.  It was exactly what happened in *Stein* and the

16  circuit said this is unconstitutional.  It was found

17  unconstitutional in *Connolly*.  And the Court should look at

18  this.  Because this whole corporate cooperation issue, it's not

19  necessarily illegal, but it has the ability to distort our

20  adversary system, and that's what happened here.

21         Your Honor, they are arguing to prosecute their

22  client.  Is there no space that an individual has to defend

23  himself?  They don't need it.  They have every resource.  And

24  the notion that the government stands up and says, you have

25  nothing to see here, this is just how we do it, that's the

1    problem.  An individual's ability and his rights are being

2    absolutely destroyed.

3         Now, let me just talk to you very, very briefly about

4    *Kastigar* so we can get this straight.  Judge Gardephe said --

5    the circuit hasn't actually defined exactly what the standard

6    is, the burden that I have to meet to get a *Kastigar* hearing.

7    He decided there wasn't one.  He says in *Landji*, no, they get a

8    hearing.

9         Let's also step back.  They keep saying the

10   information is not privileged.  That's wrong.  The argument

11   they should make, because it's the only one that is actually

12   honest, is that there is privileged material, because it's

13   material from attorney-client communications, but the privilege

14   belongs to Sullivan & Cromwell and Allianz.  So this argument

15   that there is no privileged information, that's wrong.  It

16   doesn't help or hurt, but it is just not accurate legally.

17        There is privileged material from an attorney-client

18   communication.  The only question is, who has the right to

19   waive it?

20        Now, you do not have the right to take advantage of a

21   blanket waiver when the facts change.  New York State Bar

22   Association, that's the ethics rules.  It's also the fact that

23   in all the cases about disqualification in this circuit,

24   switching sides is considered totally inimical.  The notion

25   that a lawyer changes sides, and then when you add on top of it

N4J8TOUA

1    they change sides by using the privileged information, using

2    the information that the government could not otherwise get.

3    And we have shown in our brief how each one of the topics, the

4    cross-examinations are part of the indictment.  The burden is

5    on them, not on me, to show you it's not in there.

6          And I will suggest this to you, your Honor.  I think

7    there is no question that the privilege was not waived.  You

8    may not at this moment agree with me.  Hope springs eternal.

9          THE COURT:  I am here to listen.

10          MR. LEVINE:  What I am saying is this:  At minimum, if

11   it is privileged, then I am right, you have to have a *Kastigar*

12   hearing.  Because this indictment is absolutely tainted.  The

13   prosecution team is tainted.  In fact, the entire office is

14   tainted because these meetings went all the way up to the U.S.

15   attorney.

16          I am just saying, your Honor, think about the idea

17   that your lawyer is now sitting across the table from the

18   United States attorney demanding your prosecution.  What is a

19   person to do?  And if we want to get into the idea that Mr.

20   Tournant has no rights, this engagement letter is meaningless,

21   if you want to read it that way, then, yes, our argument is

22   it's unconscionable, and it is a coercive agreement, and a

23   coercive agreement designed for the government, those

24   statements cannot be used.

25          The agreement is very one-sided.  They could have done

N4J8TOUA

1   everything that they did here with a standard *Upjohn* warning

2   and a joint defense understanding, which is how it usually

3   happens.  They didn't.  Because they wanted to be in the room

4   with the SEC.  And if you really take them seriously, they are

5   saying, Well, for the SEC, we will say we are his lawyer, but

6   in any meaningful way, we are not.  We are not going to give

7   him loyalty.  We are not going to give him confidentiality.

8   And we are not going to give him candor.

9          But the problem you have, your Honor, is you can't do

10  it that way.  They should have stopped.  The best the

11  government says to you is these prosecutors say they don't

12  know, although some of them have seen this information before.

13  We have got transcripts.  They hammered Mr. Tournant, and they

14  asked him about something that they didn't disclose.  That fact

15  alone, that your lawyer wasn't candid with you, especially when

16  they have a motive for that, that raises a fact question, and I

17  have put it before you.

18         So I think, your Honor, you should dismiss this

19  indictment on its face and send the message that the

20  attorney-client privilege is not something that should be the

21  subject of sort of supplication to the government to prove your

22  cooperation.  I mean, we have put in for you, your Honor, a

23  statement by the lead lawyer here, essentially saying, how much

24  can I cooperate?  I am even facing potential personal

25  discipline to be able to help you here.  That's not how we

1    should be running this system.  And it's dangerous.

2           And with respect to this SEC point, the SEC and the

3    government coordinated everything.  One set of notes?  How do

4    you have one set of notes in a parallel proceeding?  I have the

5    notes here.  You're running an investigation and you don't get

6    the notes of the meetings with all the key witnesses?  There is

7    nothing parallel about any of this.  And they stand up in the

8    press conference and the U.S. attorney says, We along with the

9    SEC ran this investigation.  Are they saying he made a false

10   statement?  I don't believe that for a minute.  They shared

11   interviews.  Most of the documents came from the SEC.  The SEC

12   helped them with pen register applications.  The SEC has been

13   there with them all the time.  And everyone knows that is what

14   is happening.  The notion that these meetings with the

15   witnesses are somehow parallel meetings that are happening at

16   the same time, this is all nonsense.

17          Let me tell you why it's happening.  It's happening

18   because they are trying to prevent people from getting *Brady*.

19   You don't have to reach the constitutional issue.  You have an

20   order that you issued that says anybody who is involved in this

21   investigation provide the information.  You have three brothers

22   and sisters on this bench in this court who have a rule that

23   says you have to turn it over.  And they do.  And in many cases

24   this isn't a fight.

25          And what are we fighting about?  I am not asking the

N4J8TOUA

1    government to go to the middle of the midwest to some obscure

2    government office because some guy was in the building being

3    interviewed.  We are talking about the people who stood up at a

4    press conference and genuflected about how great their

5    cooperation was, and have been interacting in this case from

6    day one.

7         The investigation was supposedly going on a year

8    before we even got to going overt.  What happened?  They won't

9    give me any of the communications.  Why not?  If they weren't

10   coordinating, what is there to give me?  And why are they doing

11   this?  Because, Oh, my gosh, I might get some information that

12   shows what we already know about this case generally, which is

13   this is a very unfair prosecution, that witnesses will show

14   that this is an unfair prosecution.  But we can't get that

15   information.

16        What is the rule of law value here?  These people

17   worked with them.  Interviews, documents, and every other

18   aspect of this investigation.  They say they didn't go into the

19   grand jury; it's illegal for them to go in the grand jury.

20   They announced their indictment the same day as the SEC

21   announced their charges.  Mr. Bond-Nelson and Mr. Taylor, who

22   pled guilty under seal, entered into agreements with the SEC

23   before those were unsealed that referenced those agreements.

24   How did they get sealed criminal cases?  Because they are

25   talking all the time.

N4J8TOUA

1          I am not objecting to that.  I agree with Ms. Graham
2    entirely.  You are absolutely allowed to coordinate with
3    another agency.  What you're not allowed to do is coordinate
4    and then tell this fairy tale that we are acting in parallel,
5    that we are acting in a non-intersecting way.  And in many
6    cases, the court says, yeah, you can get all the intersection.
7          So, if the government is right, then turning over to
8    us all of the communications, all of the interactions, so they
9    can stand up at an evidentiary hearing and show you, see, we
10   really didn't work with them, fine.  But the notion that they
11   are just to going to proffer that its parallel, it's not
12   parallel in any sense of that word.  So that's my point on
13   that.
14         Just returning briefly, your Honor, I would like to
15   show you, if I can, just some of these slides, which I think
16   you have seen before, that show what was turned over and what
17   was used, that are basically line by line from these
18   interviews.  It's pages 7, 8, 9.
19         These are prep sessions.  These are sessions in which
20   not only did they ambush Greg, but at times -- it's in the
21   briefs -- they encouraged him on how to answer a question.
22   They coach him, not in an improper way, as you do.  They are
23   working with him to prepare.  They are, in fact, role-playing
24   some of this.  So under the guise of prep, he is actually being
25   interviewed by the government, because this is all going to the

N4J8TOUA

1   SEC and going to the government.

2           We can't have that.  There is no public policy

3   justification for that.  In fact, in *Schwimmer*, the Second

4   Circuit was so clear, in a case, by the way, about an

5   accountant who wasn't even a lawyer.  The circuit said, it's

6   fundamentally meaningless if you undermine the full and frank

7   communication relationship between an attorney and a client.

8   If we can't have candid conversations with our clients, then we

9   can't stand up in courts like this and effectively represent

10  them, because they won't trust us, and they shouldn't trust us.

11          And the notion now that the government wants to play a

12  gotcha, because there is a way to read this agreement, which is

13  so completely one-sided that no one would enter into it unless

14  they had no choice.

15          What I would suggest to you --

16          THE COURT:  Are you saying Mr. Tournant had no choice

17  but to enter into that agreement?

18          MR. LEVINE:  I think, your Honor, there is an element

19  for a corporate employee of a lack of choice because you have

20  to either choose your liberty or your job.  Here, the

21  difference was that, unusually, the lawyers for the company

22  said, No, no, we are not just going to give you an *Upjohn*

23  warning; you have got a lawyer there, whatever you say we can

24  use.  They stepped across the transom and said, we are your

25  lawyers.  And they did that for their own reasons.  And it's

N4J8TOUA

1    not a bad reason.  But what you can't do is take on a joint

2    representation and then when it becomes inconvenient, drop your

3    client like a hot potato and throw him to the wolves.  It's bad

4    enough they make disclosures.  They are actively advocating for

5    his destruction, actively saying, prosecute this guy.  Why?

6    Because we are facing the death penalty.

7            THE COURT:  So you accept that a company could have

8    reacted to the guidelines by giving *Upjohn* warnings and

9    eschewing joint defense arrangements entirely, that the

10   government doesn't preclude that.

11           MR. LEVINE:  That's right.  The question then would be

12   whether or not the government was essentially -- they were

13   really outsourcing the investigation.  That's a different

14   question, not for today.  What I am saying is what happened

15   here is they didn't do that.  They decided to become his

16   lawyer, and once they did, they had actual obligations as a

17   lawyer.

18           THE COURT:  The "they" being Allianz, Sullivan &

19   Cromwell's counsel?

20           MR. LEVINE:  Yes.  In fact, if you look at the Ropes

21   agreement, they don't even have this provision.  They say we

22   are never going to reveal your confidences.  So there is a

23   whole other issue there that we raised in the brief, which is

24   Ropes is in these meetings as well.  But just taking the

25   Sullivan & Cromwell example, they became his lawyer, and that

N4J8TOUA

1    has consequences.

2              And the reason here that I say your decision is more

3    narrow is because you're not taking on the entire question of

4    how corporate counsel needs to behave; you're taking on the

5    question of how individual counsel needs to behave.  And the

6    *sine qua non* of joint representation, according to the New York

7    State and the New York City Bar Association for years, is you

8    always have to be ready to reevaluate.  And if it turns out

9    that you have a conflict, you have got to either get out or get

10   a waiver that is legitimate.  And they didn't do that.

11             And, your Honor, I would really ask you to look at the

12   materials we have provided and the citations in the sealed

13   materials because they show you, without any question, that

14   there was a conflict here.  And once that happens, there is no

15   valid waiver.  And, really, I would also just ask you in

16   conclusion to ask yourself:  Does this seem like the way we

17   should be running this system?  That it's just a game of gotcha

18   for people who are dealing with the most significant, most

19   dangerous situation of their life, and they have all these

20   lawyers around, that basically we are going to play a game of

21   gotcha with them and people that are their lawyers are now

22   going to turn out to be their chief antagonists?  Is that

23   really who we are?  Can't we run a system that says, you know

24   what, you represented that person, that's it.

25             We have cases where people will not reveal privilege

N4J8TOUA

1    to help other people because it's improper.  And here, it's

2    just too far.  It's too far and it's inconsistent.  And all the

3    cases I cited to you -- *Schell*, *Sabri*, *Prevezon*, *Emle* -- they

4    all say, switching of sides, switching of sides is something we

5    simply can't have in the adversary system.  And that's true in

6    *Schell* even though no privileged material in *Schell* was turned

7    over, none.  In fact, the person there really had some

8    relationship to the case, but did nothing to formally himself

9    prosecute his client.

10              THE COURT:  And we deter that conduct and punish the

11   government as an enabler by dismissing an indictment?

12              MR. LEVINE:  Yes.

13              THE COURT:  Thank you.

14              MR. LEVINE:  Thank you so much, your Honor.

15              THE COURT:  Ms. Graham, Mr. Levine has said that the

16   defense draws inferences that it considers contradict all of

17   the government's proffers as to the nature of the

18   investigation, and has also made some other *Brady* arguments.

19   Do you want to respond to that at all?

20              MS. GRAHAM:  Yes, your Honor, briefly, because I think

21   I may have responded to many of the points already, and I don't

22   want to prolong what is already a long conference.  But just

23   very briefly, the one thing that I haven't addressed was his

24   arguments about the U.S. attorney's statement at the press

25   conference, that this was an investigation run by this office,

1   the SEC, and the Postal Inspection Service.

2           I just want to put that statement in context for your

3   Honor.  The video, of course, is publicly available.  But just

4   to put it in context.  That was in response to a question from

5   a reporter about whether the resolution was coordinated with

6   regulators in Germany.  And so, what the U.S. attorney was

7   doing, in his *sua sponte*, not prepared remarks, he said he

8   can't speak to the interactions with anyone in Germany, but

9   that this investigation has been run, and then he did say, by

10  this office, the SEC, and the postal service.

11          That wasn't the clearest phrasing, but it's clear

12  especially if you look at the other statements, the prepared

13  statements in the press conference, in which the investigations

14  were discussed as parallel proceedings, and it was clear that

15  the U.S. attorney was announcing the criminal case and the SEC

16  was announcing the parallel civil case.  It's clear that by

17  that, perhaps, slightly unfortunate wording, the U.S. attorney

18  was not in any way saying that this was a joint investigation.

19  As your Honor knows, it's been the long position of this office

20  and we take care when we conduct our investigations to keep

21  them parallel investigations, and there is no basis to take

22  this one statement as saying something entirely new, that the

23  SEC, a separate and independent agency, was part of the

24  prosecution team for purposes of the government's

25  constitutional obligations.

N4J8TOUA

1          So I did want to address that one statement.  For the

2    remainder, I will rest on my papers.

3          Thank you.

4          THE COURT:  And you're resting on your proffers as

5    sufficient factually and your argument as to contextualized

6    construction of the U.S. attorney's statement?

7          MS. GRAHAM:  Yes, your Honor.  As noted, we are happy

8    to supplement the record should you find it necessary.

9          THE COURT:  If there is anything else that you want me

10   to consider by way of declarations, file them by next Friday.

11         MS. GRAHAM:  Thank you, your Honor.

12         THE COURT:  Mr. Levine.

13         MR. LEVINE:  Your Honor, if the Court is going to

14   consider declarations from the government, we obviously would

15   like an opportunity to respond.

16         THE COURT:  Yes.  Any response by the Friday after

17   that.  So that's the 28th for any declarations by the

18   government.  And then the Friday after that is May 5 for

19   response by the defense.

20         MR. LEVINE:  May I say one more thing?  I apologize.

21         Your Honor, I must say, if the government is going to

22   start putting in evidence --

23         THE COURT:  Hang on.  I have to turn off this printer.

24         All right.

25         MR. LEVINE:  Respectfully, your Honor, if the

N4J8TOUA

1    government is now going to decide to put in evidence that it

2    could have put in before, and you are going to allow it, we

3    would ask for discovery.  Because the problem here is all of

4    these issues are still shrouded.  If they want to put in

5    information on the SEC's relationship with them, or they want

6    to put in whatever it is that they want to put in, then we

7    should get what we get in other hearings, which is we should

8    get discovery.  Let's have a factual record.  Because it's

9    really unfair for the government to say -- and we have asked

10   them for this information.  We have asked them for the grand

11   jury minutes.  We have asked them for the interactions between

12   SEC and S&C.  They said no.  Now I understand the Court wants

13   to potentially take a supplemental set of briefs on the factual

14   circumstances.  I think the Court should order the government

15   to give us the discovery we have asked for so we can have a

16   meaningful response.  And I also suggest we should have a

17   hearing on these issues.

18         THE COURT:  I understand that that is and has been

19   your position.  I will consider, after receiving these

20   submissions that I have just authorized, whether discovery

21   and/or a hearing is necessitated by the nature, content,

22   breadth, inconsistency with the proffers, or whatever may be

23   argued by the parties in their submissions.  And I have not yet

24   resolved the motion insofar as it seeks discovery and/or a

25   hearing.  I have yet to determine whether that's necessary.

N4J8TOUA

1          MR. LEVINE:  Thank you very much, your Honor.  I

2     appreciate it.

3          MS. GRAHAM:  Your Honor, just one more question for

4     clarity sake.  The declarations that you want are on the joint

5     and parallel motion, correct?

6          THE COURT:  Yes, the *Brady* issue.

7          MS. GRAHAM:  Thank you, your Honor.

8          THE COURT:  We are adjourned.

9          Thank you all very much.

10         (Adjourned)