UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA


   -v-

                              No.   22-CR-276-LTS

GREGOIRE TOURNANT,

        Defendant.

-------------------------------------------------------x


MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Gregoire Tournant's Motion to Compel the Government to Produce Brady Materials (docket entry no. 45 (the "Motion")), in which Mr. Tournant asserts that the Government must review and produce from the files of the Securities Exchange Commission ("SEC") potentially exculpatory materials because the two entities allegedly engaged in a joint investigation of his conduct.  The Government opposes the Motion, arguing that no joint investigation existed and that Mr. Tournant is not entitled (under Brady v. Maryland[1]) to materials in the SEC's files.  (Docket entry no. 61 ("Gov. Opp.").)  The Court has reviewed thoroughly the parties' submissions and arguments, and, for the following reasons, the Motion is denied.


BACKGROUND

The following facts are drawn from the parties' motion papers, declarations, and exhibits, and are undisputed unless otherwise noted.  Mr. Tournant has been charged in a

---

[1]    See Brady v. Maryland, 373 U.S. 83 (1963).

criminal case brought by the U.S. Attorney's Office for the Southern District of New York (the "Government"); and is also named as a defendant in an SEC civil enforcement action.  Both cases are based on allegations that Mr. Tournant engaged in a scheme to defraud investors while he was employed at Allianz Global Investors U.S. LLC ("AGI"), a company which was a subsidiary of Allianz SE ("Allianz"), one of the world's largest financial services firms.  (Indictment, docket entry no. 2 ("Indct.")) (SEC v. Tournant et al., 22-cv-4016-LLS, at docket entry no. 1.)  The Indictment alleges that, in his role as a portfolio manager at AGI, Mr. Tournant deceived investors by essentially "understating the risk to which investors' asserts were exposed, and therefore how the returns they touted were actually generated."  (Indct. ¶ 1.)  In March 2020, the investment funds that Mr. Tournant oversaw crashed and lost over $7 billion in market value; the funds were eventually shut down.  (Id. ¶ 7.)  The SEC thereafter began investigating the closure of the funds, notified Allianz of its civil inquiry in or before August 2020, and filed a civil complaint against Allianz in September 2020.[2]  (Gov. Opp. at 4; In re Allianz GI Structured Alpha Class Action Litigation, 20-cv-7154-KPF.)  The Government began a separate[3] criminal investigation into the funds around the same time, but the Government's investigation remained covert for some time and was not formally announced until June 10, 2021.  (Gov. Opp. at 4-6.)

Mr. Tournant argues that the activities of the Government and SEC's actions leading up to his indictment show that the two agencies conducted a joint investigation into his alleged misconduct, while the Government maintains that the facts show the two agencies maintained parallel but separate investigations.  For example, Mr. Tournant infers a joint

---

[2]     Allianz was also conducting its own internal investigation into the circumstances of the funds' collapse.  (Gov. Opp. at 4.)

[3]     The Government proffers that the Government and the SEC "each initiated their separate investigations independently."  (Docket entry no. 76 ("Graham Dec.") ¶ A.)

investigation from the fact that, during the course of the investigations, the Government and the

SEC conducted a total of 22 joint witness interviews.  (Mtn. at 3.)  However, at each of the

interviews, the witnesses were informed that "the agencies' investigations were separate, that the

interviews were conducted together only as a matter of convenience, and that, if there were to be

a proffer agreement, the witness would enter into a separate agreement with each agency."

(Graham Dec. ¶ F.)  SEC attorneys who were present at these interviews did not take notes, and

the SEC does not possess any notes from these joint interviews.  (Id. ¶ E.)  No SEC attorneys

were designated as special Assistant U.S. Attorneys to work on the criminal investigation.  (Id.

¶ D.)  Mr. Tournant also notes that, during the course of the investigations, Allianz and its

counsel made a number of informal presentations to the Government regarding the progress of

Allianz's internal investigation, and SEC attorneys were present for at least four of those

presentations.  (Mtn. at 3.)  The Government represents, however, that the SEC was not involved

in its presentation of the criminal case against Mr. Tournant to the grand jury, that the SEC did

not receive any transcripts of the grand jury proceedings, and that the Government did not

provide the SEC with any materials that the Government obtained pursuant to grand jury

subpoenas.  (Id. ¶¶ G, I.)  The SEC has not accompanied the Government to court for any

proceedings in the instant criminal case.  (Id. ¶ J.)

   On May 16, 2022, a grand jury returned the Indictment against Mr. Tournant in

this case, charging him with five counts: conspiracy to commit securities fraud, investment

adviser fraud, and wire fraud; securities fraud; two counts of investment adviser fraud; and

conspiracy to obstruct justice.  (See Indct.)  The Indictment was unsealed on May 17, 2022, and

the SEC filed its civil complaint against Mr. Tournant on that same day.  (See docket entry no 1;

SEC v. Tournant et al., 22cv4016-LLS.)  Also on May 17, 2022, AGI U.S. was indicted for

securities fraud and pled guilty in a criminal case, and the SEC announced its settlement with AGI U.S.  (See United States v. Allianz Global Investors US, LLC, 22cr279-CM.)  Mr. Tournant asserts that the coordination of the plea and settlement agreements between the Government and the SEC is indicative of a joint investigation.  For example, he notes that Allianz's SEC settlement agreement credits Allianz for any funds it pays pursuant to its settlement with the Government; and that the SEC consent judgements of two of Mr. Tournant's colleagues (Mr. Bond-Nelson and Mr. Taylor) incorporated by reference the defendants' guilty pleas in the criminal case, which at the time were still sealed.  (Mtn. at 3-4.)  The Government represents that the SEC "played no role in the Government's charging decision or the development of the Government's prosecutorial strategy," and that the Government likewise "played no role in the SEC's charging decision or the development of the SEC's strategy."  (Graham Dec. ¶¶ B, C.)

In announcing these developments in the civil and criminal cases, the Government and the SEC issued separate press releases thanking each other for support throughout the investigations.  (See U.S. Attorney's Office for the Southern District of New York, *Three Portfolio Managers and Allianz Global Investors U.S. Charged in Connection with Multi-Billion Dollar Fraud Scheme*, United States Department of Justice (May 17, 2022), https://tinyurl.com/3renm34a [https://perma.cc/2KYT-55UX]; U.S. Sec. and Exch. Comm'n, *SEC Charges Allianz Global Investors and Three Former Senior Portfolio Managers with Multibillion Dollar Securities Fraud* (May 17, 2022), https://www.sec.gov/news/press-release/2022-84 [https://perma.cc/KX8A-QY87]).  The agencies also held a joint press conference on May 17, 2022, during which representatives from both agencies commented on the investigations.  (United States Attorney's Office for the Southern District of New York, *U.S. Attorney Announces Charges Against Three Portfolio Managers and Allianz Global Investors*

*U.S.*, YouTube (May 17, 2022), https://youtu.be/Q9ZiLt3sOxg [https://perma.cc/5BSB-4QJT]).

SDNY U.S. Attorney Damian Williams thanked the SEC for its "extraordinary work in this

matter," and stated that "this investigation has been run by this office, the SEC, and the postal

inspection service . . . a combination that I think has been quite successful"; and SEC

Enforcement Director Gurbir Grewal thanked the Government "for their incredible partnership."

(Id. at 10:57–11:14, 20:44–21:30, 26:11–26:25.)  Mr. Tournant points to these statements as

acknowledgements of a joint investigation.

> In November 2022, in the SEC civil case against Mr. Tournant, the Government

filed a motion seeking to intervene pursuant to Federal Rule of Civil Procedure 24, requesting a

stay of all discovery in the civil action "until the conclusion of the parallel criminal case" against

Mr. Tournant.  (SEC v. Tournant et al., 22cv4016-LLS, at docket entry no. 28 (November 14,

2022).)  The motion stated that there was a "substantial overlap between the Civil Action and the

Criminal Case" against Mr. Tournant and acknowledged that the two matters "share common

questions of law and fact."  (Id. at 2-3.)  The motion to intervene was later denied by Judge

Stanton.  (Id. at docket entry no. 34.)  Mr. Tournant points to the motion as another indicator of

joint law enforcement activity.  (Mtn. at 6.)

> The defense further cites document sharing between the two agencies, noting that

the Government's document productions to the defense in this case included "millions of pages

of documents that were previously produced to the SEC."  (Mtn. at 2; docket entry no 47-1.)  Mr.

Tournant also points to two affidavits that accompanied warrant applications submitted by the

Government in the summer of 2021 which indicate that the information contained in the

affidavits was based, in part, upon "documents and information collected by the [SEC] in

connection with a parallel SEC investigation relating to Allianz GI."  (Mtn. at 3; Mtn. Exhibit B

at 2; and Mtn. Exhibit C at 3.)  The Government represents that the SEC did not participate in "the execution of [Government] search warrants or the responsiveness reviews of materials obtained pursuant to search warrants."  (Graham Dec. ¶ H.)

   In a September 12, 2022 letter to the Government (Mtn. Exhibit E), Mr. Tournant's counsel requested that the Government produce materials within the files of both the Government and the SEC, pursuant to the Court's June 3, 2022 Order Issued Pursuant to Federal Rule of Criminal Procedure 5(f) (docket entry no. 13, the "Rule 5(f) Order") which, among other things, directs the Government to produce information to the defense in a manner consistent with the duties enunciated in Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  Specifically, counsel cited a portion of the Rule 5(f) Order that recognizes that Brady and its progeny impose upon the Government "an affirmative duty to seek out and provide to the defense all material evidence that is favorable to the accused and that is known to the Government or to federal, state, and local law enforcement personnel and officers who are or have been involved in the investigation or prosecution of the case."  (Docket entry no. 13 at 1.)  The Government has not fulfilled the defense's request to search the SEC's files, contending that it is compliant with all of its Brady obligations and that it is not required to search the SEC's files.  (Mtn. at 7.)  Mr. Tournant filed the present Motion in December 2022, seeking to compel the Government to produce Brady materials, which the Government opposes.  The Court held oral argument on the Motion on April 19, 2023, and the parties thereafter submitted declarations in support of their positions.[4]

---

[4]  At oral argument, the Court authorized the Government and the defense to submit factual declarations in connection with the present motion (Tr. at 63-65), and both parties did so. (See docket entry nos. 76 and 78.)  The defense also submitted a supplemental letter (docket entry no. 77) which presents new legal arguments relating to the present Motion. As the defense did not seek permission to file a sur-reply, the Court declines to address

DISCUSSION

The Supreme Court's decision in Brady v. Maryland, 373 U.S. 83 (1963), and its progeny impose an affirmative obligation upon the Government to disclose all material exculpatory evidence to the defense in a criminal case.  See United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001).  This disclosure obligation, however, only extends to evidence that is "known to the prosecutor."  United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998); see also Fed. R. Crim. P. 16(a)(1)(E) (requiring the production of material information "within the government's possession, custody, or control").  The prosecution's duty to disclose Brady materials also extends to other governmental entities that act as an "arm of the prosecutor" in a criminal case.  United States v. Blaszczak, 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018) (quoting United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975)).  In particular, a "prosecutor's duty to review documents in the possession, custody, or control of another agency arises where the Government conducts a 'joint investigation' with another agency."  United States v. Collins, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019) (citation omitted); see also United States v. Gupta, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012) ("Where the [U.S. Attorney's Office] conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for Brady evidence.").  The Court's reference in the Rule 5(f) Order to involvement "in the investigation or prosecution of the case" refers, consistent with Brady and its progeny, to

---

these new arguments.  See Travelers Ins. Co. v. Buffalo Reinsurance Co., 735 F. Supp. 492, 495 (S.D.N.Y. 1990) ("[A] sur-reply memorandum shall not be accepted without prior leave of court."); Zirogiannis v. Seterus, Inc., 221 F. Supp. 3d 292, 298 (E.D.N.Y. 2016), aff'd, 707 F. App'x 724 (2d Cir. 2017) ("New arguments first raised in reply papers in support of a motion will not be considered.").

involvement in the investigation or prosecution of the criminal case. The resolution of Mr. Tournant's motion thus turns on whether the record supports an inference that the Government conducted its criminal investigation jointly with the SEC.

"To determine whether a joint investigation occurred, courts conduct a 'fact-specific inquiry that is best approached on a case-by-case basis' to analyze the 'degree of cooperation between agencies.'" United States v. Alexandre, No. 22-CR-326-JPC, 2023 WL 416405, at *5 (S.D.N.Y. Jan. 26, 2023) (citation omitted). In analyzing the degree of cooperation between the prosecution and another agency, courts in this district have looked to five non-exclusive factors, examining whether the agency "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." Collins, 409 F. Supp. 3d at 239 (citing United States v. Middendorf, 18-CR-36-JPO, 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) (the "Middendorf factors")).[5]

---

[5]   The defense argues that, as an alternative to the Middendorf factors, the Court should consider applying the standard used by the Second Circuit in an unpublished decision, United States v. Barcelo, 628 F. App'x 36, 38 (2d Cir. 2015) — that "[i]ndividuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." Id. at 38. It is not clear that Barcelo's inquiry is apposite to the instant motion practice, given that the issue in Barcelo was whether a specific cooperating witness should be considered "part of the prosecution team" for Brady purposes — a question which the court answered in the negative. Id. In contrast, the issue here is whether two independent governmental agencies have engaged in a joint investigation. In any event, Barcelo does not announce a standard that would be applied in a materially different way in the circumstances of the case before this Court, as both the Barcelo test and the Middendorf factors focus on evaluating the totality of the circumstances of the collaboration. See id. (concluding that witness was not "part of the prosecution team" where he "did no more than provide information to the government and testify at trial" and he "played no role in the investigation or in determining investigation or trial strategy").

The defense argues that, based on these factors and the facts summarized above, the Court should conclude that the Government and the SEC conducted a joint investigation into Mr. Tournant, relying primarily on the number of joint interviews that the two agencies conducted, the volume of documents shared between the two entities, and the statements that they made to the press.  Mr. Tournant also requests that the Court hold an evidentiary hearing to determine the extent of cooperation between the two agencies.  The Government asserts that the Court should conclude, without a further hearing, that the two agencies conducted separate investigations of Mr. Tournant because, on the record before the Court, the majority of the Middendorf factors weigh against finding a joint investigation.

Courts in this district have typically concluded that no joint investigation occurred when the majority of the five Middendorf factors weigh against such a finding.  For example, in United States v. Alexandre, the defendant was indicted by the Government for securities fraud and was also the subject of a civil fraud action brought by the Commodity Futures Trading Commission ("CFTC").  2023 WL 416405, at *1-3.  The defendant filed a motion seeking a finding that the CFTC (and the court-appointed receiver in the CFTC civil case) were "part of the prosecution team for the purposes of the prosecutors' discovery obligations," and also sought an order "compelling additional disclosures by the prosecutors pursuant to Brady and Rule 16[.]" Id. at *4.  In arguing that a joint investigation occurred, the defense noted that the CFTC and the Government "acted in lockstep by filing their complaints on the same day," the CFTC "granted the Government access to the documents obtained during its investigation," the Government expressly relied "on a CFTC-recorded video in the Complaint," CFTC attorneys "attended Defendant's criminal presentment," the two agencies "issued press releases on the same day, in

which they thanked each other," and the Government sought "a stay of the civil action" in the CFTC case.  Id. at *5.

The court concluded that these facts did not indicate that the CFTC and the Government conducted a joint investigation.  Id. at *6.  The court found it relevant that "the CFTC and the Government initiated their investigations entirely separately and without each other's knowledge," and that "any coordination" between the two agencies "was focused on avoiding any steps that might compromise or frustrate the work of the other agency[.]"  Id.  The court noted that "neither the CFTC nor the Receiver was involved in the Government's presentation of evidence to the grand jury" and that, apart from one instance, "neither the CFTC nor the Receiver has accompanied the Government to or even attended court proceedings in the criminal case."  Id. at *8.  The court also found it relevant that the Government "did not conduct any joint interviews with the CFTC or the Receiver," and that "no one working for either the Receiver or CFTC was involved in developing the prosecution strategy, played a role in the government's charging decisions, or [was] designated a special Assistant U.S. Attorney."  Id.

The Alexandre court found no joint investigation even though several facts and circumstances suggested the possibility of a joint representation — such as the "large volume of documents that the CFTC and the Receiver have shared with the Government," the agencies' joint press releases, and the Government's stay motion in the civil case.  Id. at *6. The court explained that this type of document sharing between governmental agencies was "hardly uncommon," and did not by itself "indicate . . . a joint investigation, particularly given the Government's representation that it did not direct the CFTC or the Receiver to take any investigative actions," and "the information sharing largely flowed only in one direction," meaning that "the CFTC and Receiver 'did not review documents gathered only by the

prosecution.'"  Id. at *6 (citation omitted).  Similarly, the "Government's request to stay

discovery in the CFTC's civil case" did not "evince a joint investigation" because "[s]uch stays

are common when the subject matter of a pending criminal prosecution overlaps with that of a

civil litigation."  Id. at *7.  Finally, the fact that the agencies "thanked each other in their press

releases" did not constitute a basis for finding a joint investigation.  Id.  Altogether, the court

concluded that none of the factors presented by the defense were weighty enough "tip[ ] the

scale" to alter the character of the two separate investigations, and accordingly the defendant's

discovery motion was denied.  Id. at *7-9.

        Similarly, in United States v. Blaszczak, the defendant was indicted for securities

fraud by the Government and was also the subject of a civil enforcement action brought by the

SEC.  308 F. Supp. 3d 736, 739 (S.D.N.Y. 2018).  The defendant filed a motion seeking to

"compel the USAO to review [for Brady material] the SEC's action memorandum and any

similar SEC documents addressing the merits of whether or not to charge" the defendant.  Id. at

739.  The court determined that, although "aspects of the relationship between the SEC and the

USAO with respect to this matter cut in different directions," ultimately there were not enough

facts to show a joint investigation.  Id. at 742.  Several circumstances tended to support the

defendant's argument, including the facts that "the USAO and SEC conducted 39 witness

interviews in tandem," "the SEC provided the USAO with all the documents that it obtained

during its investigation," and the agencies "informed each other of their enforcement intentions"

against the defendant.  Id. at 738, 742.  However, "other factors cut in the opposite direction" and

tended to support the Government's argument, including the facts that the SEC was "not

involved with the presentation of the case to the grand jury," the SEC was present at some (but

not all) of the USAO's witness interviews, the SEC did not help to "develop prosecutorial

strategy," SEC agents did not accompany the USAO to any court proceedings, and neither agency "recommended action to the other or had any role in the other's decision making process." Id. at 742.  Ultimately, the court concluded that no joint investigation had occurred, and "decline[d] to order that the prosecution review the SEC's [files]" as requested by the defense.  Id. at 743.

Numerous other courts in this district have reached similar conclusions, routinely denying such Brady motions when it is clear that most of the Middendorf factors weigh against finding a joint investigation.  See, e.g., United States v. Middendorf, No. 18-CR-36-JPO, 2018 WL 3956494, at *1-5 (S.D.N.Y. Aug. 17, 2018) (denying the defendant's motion to "compel the Government to search the files of the SEC . . . for Brady material" and concluding that no joint investigation occurred even though "the Government and the SEC conducted joint witness interviews," and both agencies "filed charges against the same group of defendants, on the same day," where "the SEC was not involved in [the Government's] grand jury presentation," the SEC had not "reviewed documents gathered by the Government or shared the fruits of its investigation with the Government," and the SEC "did not participate in the overall development of prosecutorial strategy"); United States v. Velissaris, No. 22-CR-105-DLC, 2022 WL 2392360, at *1-2 (S.D.N.Y. July 3, 2022) (denying the defendant's request that "the Government review all information within the SEC's possession to evaluate whether any of it constitutes Brady material" and concluding that no joint investigation occurred where the SEC and the USAO "conducted joint interviews" of witnesses, the SEC "began work on its investigation months before the USAO became involved," the SEC had "not been involved in the USAO's charging decisions, grand jury presentation, or prosecutorial strategy, and the SEC ha[d] not attended court proceedings in [the criminal] case"); United States v. Collins, 409 F. Supp. 3d 228, 238-42

(S.D.N.Y. 2019) (denying the defendant's request that "the Government [be ordered to] review the SEC Materials and disclose any <u>Brady</u> material" and concluding that no joint investigation occurred where the SEC and the Government jointly participated in some (but not all) of the witness interviews, there was no "material" sharing of documents between the two agencies, "each agency made charging decisions independently of each other," "no one from the SEC attended sessions of the grand jury," and the agencies did not share personnel); <u>United States v. Merced</u>, No. 19-CR-0832-ER, 2021 WL 5826286, at *6-7 (S.D.N.Y. Dec. 8, 2021) (concluding that there was no joint investigation between the SDNY USAO and another U.S. Attorney's office where "there [was] no indication that any other U.S. Attorney's Office participated in government witness interviews, presented the case to the grand jury, exchanged documents with the government, helped to shape government strategy, or accompanied the government to any of its court proceedings").

On the other hand, courts in this district have found a joint investigation (to the extent of requiring disclosure of specified material from other agencies) where two agencies engaged in significant joint fact gathering, and where the discovery material sought by the defense was a direct product of such joint fact gathering.  For example, in <u>United States v. Gupta</u>, the defendant was subject to "a criminal insider trading case and a parallel civil enforcement action" brought by the SEC.  <u>United States v. Gupta</u>, 848 F. Supp. 2d 491, 492-93 (S.D.N.Y. 2012).  The two entities "conducted joint interviews of 44 witnesses" during their investigations, and the SEC attorney "subsequently prepared memoranda summarizing the portions of the [joint] interview[s] he deemed relevant."  <u>Id.</u> at 493.  The defendant argued that he was "entitled to disclosure of some or all of the SEC memoranda and notes" based on the

Government's "<u>Brady</u> obligation to review the SEC's [materials] and turn over any exculpatory evidence." <u>Id.</u>

The <u>Gupta</u> court granted the defendant's request and concluded that a joint investigation had occurred, because the Government and the SEC "jointly investigated" the same alleged misconduct by the defendant, and the two entities "jointly interviewed no fewer than 44 witnesses," wherein "questions were put to the respective witnesses by both the AUSAs and the SEC attorney," and the SEC attorney "prepared memoranda that summarized what he felt were the relevant parts of the interviews" in consultation with the AUSAs. <u>Id.</u> at 493-94. The court explained that, where two agencies engage in a significant amount of joint fact-gathering and joint interviews, "there can be no doubt that exculpatory disclosures made during these joint interviews that are reflected in the notes or memoranda of either agency must be disclosed to the defense." <u>Id.</u> at 495. However, the court also explained that the question of a joint investigation "must be evaluated in light of the [specific] disclosures being requested," as "[a]n investigation may be joint for some purposes; [but] it may be independent for others." <u>Id.</u> at 494-95. The court was careful to note that its ruling "does not mean that all of the documents the SEC prepared and accumulated in its investigation of [the defendant] are part of the joint investigation" — to the contrary, the court ordered that the Government need only "review the SEC's [interview] memoranda for any additional <u>Brady</u> material." <u>Id.</u>

Similarly, in <u>United States v. Martoma</u>, the issue before the court was "whether the USAO's <u>Brady</u> and <u>Giglio</u> obligations extend[ed] to communications between the SEC" and counsel for two cooperating witnesses who were expected to testify at the defendant's trial. <u>United States v. Martoma</u>, 990 F. Supp. 2d 458, 459-60 (S.D.N.Y. 2014). The court concluded that a joint investigation had occurred, relying primarily on the joint fact-finding in which the

two agencies had engaged.  Id.  The court found it relevant that "the SEC and the USAO jointly conducted twenty interviews of twelve witnesses," and that nine of those interviews involved the two cooperating witnesses.  Id. at 461.  The court also noted that the SEC shared significant documents with the USAO, the two agencies frequently conferred with each other about their investigations, and they "coordinated their efforts in conducting depositions."  Id.  Moreover, the criminal complaint against the defendant "expressly acknowledge[d] the SEC's participation in [the joint] fact-gathering" by stating that it was based "on information received from the [SEC]."  Id. at 462.  The court accordingly ordered that the USAO produce to the defendant "any communications between the SEC and counsel for [the cooperating witnesses]" that discussed certain subject matters, and ordered that such obligation would "extend[] to communications that are in the sole possession of the SEC."  Id. at 462; see also United States v. Connolly, No. 1:16-CR-00370-CM, 2017 WL 945934, at *7 (S.D.N.Y. Mar. 2, 2017) (concluding that "the Government was involved in joint fact-gathering with the CFTC" only "to the extent of [the agencies'] thirteen jointly conducted interviews," but that the "CFTC and the Government were, however, otherwise engaged in parallel investigations").

Thus, in Gupta and Martoma, courts found a joint investigation requiring Brady disclosures of specific SEC materials where the defendants made relatively narrow discovery requests that directly pertained to the joint fact-gathering activities of the Government and the SEC.  The Gupta court granted a defendant's request for access to notes taken by the SEC at joint witness interviews, where those notes reflected the SEC's internal evaluations of the witnesses' disclosures, which may not have been contained in the government's notes, and no verbatim transcripts of the interviews were available.  See Gupta, 848 F. Supp. 2d at 494-95.  The Martoma court granted a defendant's request for access to certain pretrial communications

between the SEC and counsel for two cooperating witnesses, where those witnesses had been interviewed on multiple occasions by the SEC and the government and were expected to play a key role in the case by testifying against defendant at trial.  See Martoma, 990 F. Supp. 2d at 459-62.

In contrast, courts have treated with skepticism broad requests for orders requiring the Government to search the entire case file of another agency for Brady materials.  See, e.g., Velissaris, 2022 WL 2392360, at *3 (noting that the defense's "argument that the Government is required to search 'the entire SEC case file'" was overreaching, and that the defense "does not otherwise explain why such a search is likely to uncover exculpatory material").  As the Gupta court explained, the question of a joint investigation "must be evaluated in light of the [specific] disclosures being requested."  Gupta, 848 F. Supp. 2d at 494.

The defense here makes an exceedingly broad request — asking the court to compel the Government to search all files of the SEC for any potentially exculpatory evidence pertaining to Mr. Tournant.  The defense does not cite any case in which a court has granted a such a sweeping, untailored Brady request, compliance with which would be highly onerous for the Government, and which would involve "searching databases, reviewing terabytes of documents, and parsing through attorney work product."  (Gov. Opp. at 46-47.)  The breadth of the defense's disclosure request is simply not supported by current law, and Mr. Tournant has proffered no persuasive grounds for such an expansive duty, particularly where the record does not provide any non-speculative basis for a conclusion that there was joint investigation.

Based on the Government's sworn factual proffers as to the nature and circumstances of its investigation and the weight of the caselaw, the court concludes for the reasons detailed below that the analysis proffered by the defense is insufficient (both with respect

to particular analytical factors and as to the record as a whole) to support a finding of a joint investigation under the Middendorf factors.  Fundamentally, none of the facts and circumstances relied upon by the defense supports anything more than speculation that the SEC collaborated with the Government in the strategic or analytical formulation of the criminal case or acted at the direction of the Government in pursuing its investigation.

The defense relies on the fact that the Government and the SEC announced their actions on the same day and held a joint press conference thanking each other for their contributions.  (See Mtn. at 5 (quote from U.S. Attorney Damian Williams, stating that he has been "working shoulder to shoulder with the SEC for a very long time," that he wishes to thank the SEC "for their extraordinary work in this matter," and that "this investigation has been run by this office, the SEC and the postal inspection service").)  Given the existence of multiple investigations, the U.S. attorney's statements at the press conference are not sufficient, in light of the Government's sworn statements and the consistent references to separate or parallel investigations in contemporaneous documents such as the warrant applications, to raise an issue warranting a hearing as to whether the investigations were joint within the meaning of Brady and its progeny.  The fact of a joint press conference or press release is no more indicative of a joint investigation than it is of cooperation between parallel investigations.  See, e.g., Alexandre, 2023 WL 416405, at *6-7 (finding that "the fact that the [USAO] and the CFTC thanked each other in their press releases" and initiated their actions against the defendant "on the same day" was not a valid "basis for finding a joint investigation"); Connolly, 2017 WL 945934, at *8 (finding no joint investigation between the Government and the New York State Department of Financial Services even though the agency issued a press release "in which the agency expressed its appreciation to the Government . . . for their 'work and cooperation'" during the investigation).

Nor does the Government's motion to intervene in the SEC civil action[6] to seek a stay of the civil proceeding indicate joint investigative activity.  See Alexandre, 2023 WL 416405, at * 7 (finding that the Government's prior "request to stay discovery in the CFTC's civil case" did not "evince a joint investigation," as such stays "are common when the subject matter of a pending criminal prosecution overlaps with that of a civil litigation").  Likewise, the coordination of settlements or plea agreements between the agencies may be indicative of collaboration as to the disposition of charges, but is not by itself suggestive of joint development of investigative information or charging strategies.

---

[6]     In its post-argument declaration, the defense tendered a copy of a privilege log served by the defense in the SEC civil action, in which the SEC asserted a categorical privilege claim over communications between June 2020 and May 2022 for "[c]orrespondence between or among SEC staff and personnel from other federal agencies conducting parallel investigations regarding Allianz Global Investors U.S., LLC, related Allianz entities, and/or their employees," citing attorney-client, work product, and law enforcement privileges, and section 24(f) of the Securities Exchange Act, and representing that "[s]uch communications, made in anticipation of litigation, reflect confidential information, including scheduling of investigative and litigation events, thought processes, and mental impressions of the federal personnel involved."  (DE 78-2 at 1-2.)  In the defense's accompanying unauthorized sur-reply letter, Mr. Tournant argues that the existence of this privilege log, which shows "nearly two years' worth of communications" between the Government and the SEC, plus the fact of the SEC's assertion of work-product/law enforcement privilege over this log, show that the two agencies played a role in each other's litigation and prosecution strategy.  (DE 77 at 4-5.) The Court does not find this argument persuasive, as the mere facts that the Government and SEC communicated with each other during the course of their investigations, and the SEC later claimed privilege over those communications, do not evince a joint investigation or shared strategic decisions.  See Collins, 409 F. Supp. 3d at 242 (finding no joint investigation despite the level of "coordination and sharing of information between the SEC and the Government").  Similarly, a Government pen register application, tendered with the post-argument declaration, that expressly cites "relevant records and information provided by the SEC that the SEC collected as part of its parallel investigation" (DE 78-1 at 4) indicates receipt of information from the SEC and specifically disclaims joint investigative activity.

While the SEC and the Government did conduct a number of joint interviews in this case, the Government's declaration represents that the SEC neither took notes during the interviews nor has notes of the interviews. (Graham Dec. ¶ E.) Witnesses were, furthermore, expressly told that the agencies' investigations were separate, that the interviews were conducted together only for convenience, and that any proffer agreements would be entered into separately with the respective agencies. (Id. ¶ F.) These circumstances likewise suggest coordination of parallel activity and are insufficient to indicate joint investigative activity. See Collins, 409 F. Supp. 3d at 240-43 (concluding that where, among other circumstances, jointly interviewed witnesses "were told that the two agencies were conducting parallel but separate investigations," the SEC "did not take notes during interviews," and the SEC did not "create reports of the witness interviews," the SEC's participation in interviews "and [the] coordination and sharing of information between the SEC and the Government . . . [did] not support a finding that there was a joint investigation"); Velissaris, 2022 WL 2392360, at *2 (noting that "jointly conducted interviews, standing alone, do not support a conclusion that the SEC and USAO have conducted a joint investigation, particularly where the defendant's request is not limited to information about those interviews").

As for the document-sharing by the SEC, while it does appear that a significant number of documents was shared with the Government, this is neither unusual nor inappropriate and does not on its own support a finding of a joint investigation. See Velissaris, 2022 WL 2392360, at *3 (noting that "[t]o the extent that the USAO has relied on evidence gathered from the SEC," this factor is less weighty because "that evidence was gathered from before the USAO began its own investigation, and was not performed under its direction"); Alexandre, 2023 WL 416405, at *6 (finding no joint investigation despite the "large volume of documents" that the

CFTC shared with the Government, and noting that these types of "access grants" between governmental agencies are "hardly uncommon, [and] do not indicate by themselves a joint investigation").  Likewise, the fact that the Government relied in part on information sourced from the SEC to support warrant applications is not dispositive.  See Collins, 409 F. Supp. 3d at 240 (concluding that no joint investigation occurred although the Government relied on SEC materials "as a basis for [its] affidavit seeking historical cellphone location information" in a search warrant).

        Having reviewed the record and the circumstances of the investigation in light of the case law, the Court concludes that, on balance and in this context, the five factors enumerated in Middendorf do not weigh in favor of a finding that the Government and the SEC conducted a joint investigation into Mr. Tournant — rather, the record indicates that the agencies conducted parallel but separate investigations.  Because the record does not suggest that a joint investigation occurred, the Court denies Mr. Tournant's request for an order directing the Government to conduct a complete search of the SEC's investigative files for exculpatory information, and also denies the corresponding request for an evidentiary hearing.

*[remainder of page intentionally left blank]*

CONCLUSION

For the reasons explained above, the Motion is denied,[7] and the request for an

evidentiary hearing in connection with the Motion is also denied.  Docket entry no. 45 is

resolved.


SO ORDERED.

Dated: New York, New York
       August 4, 2023


   /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge

---

[7]    The parties are reminded that, pursuant to the Court's order at the October 27, 2022
conference (see docket entry no. 40 at 33-34), the deadline for the commencement of the
second stage of motion practice in this case is 21 days following publication of this
decision (i.e., August 25, 2023).