UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA


   -v-

GREGOIRE TOURNANT,

      Defendant.

No.    22-CR-276-LTS

-------------------------------------------------------x


OPINION AND ORDER


APPEARANCES:


DAMIAN WILLIAMS

UNITED STATES ATTORNEY FOR THE
SOUTHERN DISTRICT OF NEW YORK
By:  Nicholas Folly

      Margaret Graham

      Allison Nichols

1 Saint Andrew's Plaza

New York, NY 10007


*Attorneys for the United States of America*

LEVINE LEE LLP

By:  Allison Bonelli

      Seth L Levine

1500 Broadway, Suite 2501

New York, NY 10036

ORRICK, HERRINGTON & SUTCLIFFE
LLP
By:  Daniel R. Alonso

      Olivia A Rauh

51 West 52nd Street

New York, NY 10019


*Attorneys for Defendant*


LAURA TAYLOR SWAIN, Chief United States District Judge

Before the Court is Defendant Gregoire Tournant's Motion to Dismiss the
Indictment, or in the Alternative for a Hearing (docket entry no. 53 (the "Motion")), in which
Mr. Tournant asserts that the indictment should be dismissed because the Government allegedly
unlawfully intruded on his attorney-client privilege during the investigation of this case.  The
Government opposes the Motion, contending that Mr. Tournant has waived any privilege claims
and representing that, even if Mr. Tournant's communications were privileged, the Government
did not intrude upon his privilege.  The Court has reviewed thoroughly the parties' submissions
and arguments and, for the following reasons, the Motion is denied in its entirety.

<u>BACKGROUND</u>

The following facts are drawn from the parties' motion papers, declarations, and
exhibits, and are undisputed unless otherwise noted.  In May 2022, Mr. Tournant was indicted on
a number of charges alleging that he engaged in a scheme to defraud investors while he was
employed at Allianz Global Investors U.S. LLC ("AGI"), a company which was a subsidiary of
Allianz SE ("Allianz"), one of the world's largest financial services firms.  (Docket entry no. 61
("Gov. Opp.") at 3; docket entry no. 2 ("Indct.").)  Mr. Tournant worked as a portfolio manager
at AGI, overseeing a number of high-profile investment funds worth billions of dollars.  (<u>Id.</u>)

Most notably, Mr. Tournant oversaw the management of a group of funds known
as the Structured Alpha Funds (the "Funds"), a series of private investment funds that employed
bespoke investment strategies which were "marketed . . . as providing broad market exposure
while maintaining specific risk protections to safeguard against losses in the event of a market
crash."  (Indct. ¶¶ 10-16.)  The Indictment alleges that Mr. Tournant, as manager of this funds
group, engaged in a scheme to deceive and defraud investors by essentially "understating the risk

to which investors' asserts were exposed, and therefore how the returns they touted were actually generated." (Id. ¶ 1.)  This scheme was allegedly carried out by Mr. Tournant (and his employees) in three ways: (1) by "overstat[ing] the level of independent oversight that AGI US and its parent company Allianz were exercising over the Funds' strategy," (2) by "misrepresent[ing] the hedging and other risk-mitigation strategies they were undertaking to protect investor funds," and (3) "fraudulently alter[ing] documents" that AGI provided to investors and failing to "disclose relevant risk information" to investors.  (Id. ¶¶ 2-3.)  In March 2020, following the onset of the pandemic, the Funds lost more than $7 billion in market value, and were eventually shut down.  (Id. ¶ 7.)  The indictment alleges that Mr. Tournant personally benefited from this fraudulent scheme, earning over $60 million during the relevant time period. (Id. ¶ 7.)

The Securities and Exchange Commission ("SEC") began investigating the Funds' closure, notified Allianz of its civil inquiry in August 2020, and filed its civil complaint against Allianz in September 2020.  (Gov. Opp. at 4; see also *In re Allianz GI Structured Alpha Class Action Litigation*, 20-cv-7154-KPF.)  Allianz also initiated its own internal investigation into the circumstances surrounding the Funds' collapse.  (Gov. Opp. at 4.)  The United States Attorney's Office for the Southern District of New York (the "Government") began a separate criminal investigation into the Funds around the same time.  (Id.)  The Government's investigation, however, remained covert for some time, and was not formally announced to Allianz until June 10, 2021.  (Id. at 4-6.)

In the fall of 2020, Mr. Tournant and other Allianz employees retained counsel in connection with the SEC's investigation.  (Docket entry no. 54, Defense Motion ("Mtn.") at 6.) First, Mr. Tournant retained Milbank LLP ("Milbank") as his personal counsel to represent him

in connection with the internal investigation and the SEC investigation.  (Id.; docket entry no. 74, Oral Argument Transcript ("Tr.") at 24, 46.)  Second, two different law firms, Sullivan & Cromwell ("S&C") and Ropes & Gray (collectively, the "Firms"), began a joint representation of Allianz and Mr. Tournant, in connection with the internal investigation and the SEC civil matter. (Mtn. at 6.)  The Firms also assisted Allianz in conducting its internal investigation.  Mr. Tournant signed an engagement letter with S&C on November 17, 2020, which set out the terms and scope of the joint representation.  (Mtn., Exhibit A (the "Agreement").)  In the Agreement, Mr. Tournant acknowledged that he understood both the "benefits and the risks involved" with proceeding with a joint representation and stated that, should S&C conclude that a conflict of interest had arisen between Mr. Tournant and Allianz, S&C would "discuss the situation" with Mr. Tournant "with a view to arriving at a mutually agreeable solution."  (Id. at 1-2.)  The Agreement also provided that, if Allianz deemed it appropriate, Allianz could release Mr. Tournant's confidential information to the Government and could waive any applicable claim of privilege, which would "mean that the protections of the attorney-client privilege that [Mr. Tournant] may have for such [confidential materials] would no longer apply."  (Id. at 3.)

The investigations continued throughout the winter and spring of 2021.  On May 5, 2021, Allianz (together with S&C) presented the preliminary findings of Allianz's internal investigation to the SEC.  (Mtn. at 8; Gov. Opp. at 4.)  Allianz denied any wrongdoing and maintained that "the collapse [of the Fund] had been caused by the unforeseeable market downturns" of the early pandemic.  (Mtn. at 8; Gov. Opp. at 4.)  On May 20 and 21, 2021, Stephen Bond-Nelson, another Allianz portfolio manager who worked on the Funds alongside Mr. Tournant, testified before the SEC.  (Mtn. at 8.)  During his testimony, Mr. Bond-Nelson was represented by his individual counsel, as well as by the Firms (who appeared on behalf of

both Mr. Bond-Nelson and Allianz).  (Gov. Opp. at 4-5.)  Mr. Bond-Nelson was questioned

extensively about the Funds and certain alterations that had been made to documents sent out to

investors, and he initially maintained that "any alterations had not been fraudulent but had

instead been attempts to make investor documents more accurate."  (Gov. Opp. at 5; Mtn. at 9.)

During the second day of questioning, however, Mr. Bond-Nelson abruptly adjourned his

testimony and refused to answer further questions.  (Mtn. at 9.)  His individual counsel then

communicated to the SEC that Mr. Bond-Nelson wished to cooperate with the SEC's

investigation and with any parallel criminal investigation, and Mr. Bond-Nelson disengaged the

Firms as his counsel.  (Gov. Opp. at 5.)  Mr. Bond-Nelson thereafter began cooperating[1] with

both the SEC and the Government, implicating Mr. Tournant as the "mastermind" who had

"directed the fraud" behind the Funds collapse.[2]  (Id.)

      Mr. Tournant maintains that this event was a key "inflection point in the Firms'

strategy in representing Allianz"—namely, that Mr. Bond-Nelson's testimony and cooperation

caused the Firms to shift from their initial strategy of denying any wrongdoing by Allianz and

Mr. Tournant, to a new strategy of "shift[ing] the blame" to Mr. Tournant in order to "serve him

up as a scapegoat to avoid the worst sanctions for Allianz."  (Mtn. at 9.)[3]  As an example of this

---

[1]    The Government represents that its "understanding [is] that Bond-Nelson's counsel did not tell Allianz that Bond-Nelson was cooperating," and that "no one but the Government, Bond-Nelson, and the SEC" was aware of the cooperating interview proffers that Bond-Nelson subsequently made on June 3 and 4, 2021.  (Gov. Opp. at 5-6.)

[2]    Mr. Bond-Nelson later pled guilty to several criminal charges in connection with his role in the alleged fraudulent scheme at Allianz.  See *US v. Bond-Nelson*, 22-CR-137-PAE.

[3]    The defense further asserts that this change in strategy was "necessitated" by certain cooperation policies maintained by the Government, which applied "enormous pressure" on Allianz to implicate individual employee wrongdoers in order to avoid the "corporate death penalty" of a guilty plea by Allianz.  (Mtn. at 10-11.)  Under the Investment

shift in strategy, the defense points to presentation materials prepared by S&C which expressly state that, "[i]mmediately after Bond-Nelson's SEC testimony," Allianz "assumed control and pledged full cooperation in connection with the investigations" and "[c]ommissioned a forensic review" of the suspected fraud issues involving the Funds.  (Mtn., Exhibit H, slide 35.)[4]  The defense asserts that, at this point in May 2021, the Firms should have realized that the interests of Allianz and Mr. Tournant had diverged to such an extent that joint representation was no longer ethical, and that they should have apprised Mr. Tournant of this potential conflict before continuing the representation.

After Mr. Bond-Nelson's testimony, S&C arranged to meet with Mr. Tournant on June 3, 2021, for the dual purposes of continuing Allianz's internal investigation and helping Mr. Tournant to prepare for his anticipated SEC testimony.[5]  (Mtn. at 11-12; Gov. Filter Ltr. at 2.)[6] At the time the meeting took place, the Government's criminal investigation was still covert and had not been announced to Allianz.  (Id.)  Two days before the meeting, S&C re-sent Mr.

---

Advisers Act, a guilty plea by Allianz to a felony conviction would result in the company "los[ing] its ability to manage money within the United States."  (Gov. Opp. at 10.)

[4]    This quote is taken from written materials comprising a presentation that S&C and Allianz made to the Government on January 20, 2022, in which Allianz summarized the results of its internal investigation, discussed the extent of its cooperation, and advocated for the prosecution of Tournant and other individual employees in lieu of Allianz.  The presentation slides state that Allianz' forensic review was initiated on May 22, 2021, the day after the Bond-Nelson SEC testimony ended.  (Mtn., Exhibit H, slide 35.)

[5]    Mr. Tournant did not ultimately provide any testimony to the SEC.  (Mtn. at 13.)

[6]    The Government submitted two separate briefs in opposition to Mr. Tournant's Motion— one prepared by the main prosecution team (docket entry no. 61); and a shorter supplemental brief prepared by a "filter team" which had access to Mr. Tournant's allegedly privileged materials that were set aside by the Government.  (See infra page 9-10.)  The filter team brief was filed under seal due to its discussion of the allegedly privileged materials.

Tournant (through his individual counsel) a copy of his engagement letter with S&C, and reminded him that, "under the terms of Mr. Tournant's engagement letter with [S&C], AllianzGI could decide to disclose Mr. Tournant's statements to the Firm" to third parties if it so chose. (Mtn., Exhibit R at 2.)  During the meeting, S&C attorneys engaged in a mock cross-examination of Mr. Tournant and asked him about various topics relating to his role in overseeing the Funds, including detailed questions about the altered documents that were sent to investors, and about Mr. Tournant's communications with Mr. Bond-Nelson.  (Mtn., Exhibit F.)

Toward the end of the meeting, the S&C attorneys "ambushed" Mr. Tournant by questioning him about whether he had used a second cell phone, what the phone was used for, and why he had failed to disclose his use of a second phone during prior interviews.  (Id. at 45-48; Mtn. at 12-13.)  They confronted Mr. Tournant with previously undisclosed documents relating to the second cell phone.  (Id.)  The meeting concluded shortly after this questioning. The defense asserts that the true purpose of this June 3 meeting was to elicit incriminating information from Mr. Tournant that could be used against him in the Government's criminal proceeding, in an effort to secure cooperation credit for Allianz.  (Mtn. at 12-13.)  After this meeting, Mr. Tournant cut off direct contact with the Firms and, on June 5, 2021, the Firms informed Mr. Tournant that they would be terminating their representation of him, explaining in their termination letters that Mr. Tournant's interests had "potentially diverged from those of the Allianz Entities."  (Mtn., Exhibits L, M.)  The Firms continued to represent Allianz.

On June 10, 2021, the Government contacted Allianz and several employees directly to inform them of the criminal investigation into the collapse of the Funds, and began making document requests to Allianz.  (Gov. Opp. at 6.)  Over the next several months, the Government engaged in an intensive investigation into Allianz, an effort which involved

"reviewing thousands of documents, engaging subject-matter experts, and interviewing more than 20 individuals, including 10 AGI employees," and in the meantime Allianz continued its own internal investigation into the misconduct.  (Id. at 4-6.)  At various points during the Government's investigation, Allianz made presentations to the Government to report on the findings of its internal investigation.  (Id. Exhibit H.)

During the course of the criminal investigation, the Government began to suspect that Mr. Tournant had engaged in obstructive conduct with regard to the SEC investigation—specifically, that Mr. Tournant had directed Mr. Bond-Nelson to lie when responding to SEC inquiries about alterations to investor documents.  (Gov. Opp. at 7.)  The Government informed Allianz in October 2021 that it was "looking into efforts by Allianz employees to obstruct the SEC investigation," and asked Allianz to "provide the Government with any facts Allianz had learned during its internal interviews regarding the purported rationale for altering risk reports." (Gov. Opp. at 8.)  In November 2021, in response to this inquiry, Allianz provided the Government with "partial summaries" of several interviews conducted during the internal investigation, including the June 3 interview of Mr. Tournant.  (Gov. Opp. at 8-9; Mtn., Exhibit R at 4, Exhibit F.)  Further, in January 2022, Allianz provided the Government with a full oral summary of the June 3 interview.  (Gov. Opp. at 9; Mtn., Exhibit R at 4.)

On January 20, 2022, S&C made a presentation to the Government which expressly advocated for the prosecution of Mr. Tournant and others in lieu of charging Allianz. (Mtn. at 14-16; Mtn., Exhibit H.)  For example, S&C stated that "Tournant, Taylor, and Bond-Nelson engaged in serious misconduct intended to understate [the] risk of the SA Funds," that there was no "knowledge or involvement in the misconduct" by Allianz management, and that a

guilty plea by Allianz/AGI was "unnecessary because DOJ action against individuals will satisfy the goals of federal prosecution." (Mtn., Exhibit H, slides 17, 92.)

The parties dispute when, precisely, the Government became aware of S&C's prior joint representation of Mr. Tournant and Allianz. The defense asserts that the Government should have "understood that Mr. Tournant was personally represented by the Firms" sometime in 2021 based on several events that occurred during the investigation. (Mtn. at 20.) The defense states that the SEC was clearly aware of the Firms' joint representation, because the SEC sent legal documents directly to Ropes & Gray as Mr. Tournant's counsel in April 2021, and the Firms appeared as counsel for Mr. Bond-Nelson and Allianz during Bond-Nelson's SEC testimony in May 2021. (Mtn. at 20.) The defense also notes that, based on the notes summary of the June 3 interview that was provided to the Government in November 2021, it was "clear that the Firms were acting as Mr. Tournant's counsel" during that meeting. (Mtn. at 20-21.)

The Government asserts that it did not become aware of the joint representation until January 2022. The Government notes that, during the multiple meetings it had with Mr. Tournant during the fall of 2021 and winter of 2022, Mr. Tournant was either represented by his individual counsel (Milbank) or his present counsel.[7] (Gov. Opp. at 11-12.) The Government also notes that, when Allianz shared the June 3 interview materials with the Government, "counsel for Allianz did not disclose that the company had shared counsel with Tournant, a fact that remained unknown to the Government." (Gov. Opp. at 9.) Shortly after Mr. Tournant's new counsel entered the case (on January 28, 2022), Mr. Tournant's new counsel informed the Government that, during the June 3 interview, Mr. Tournant had been represented by the

---

[7]     Tournant's present counsel (Levine Lee LLP, and Orrick Herrington & Sutcliffe LLP) replaced Milbank sometime in January 2022. (Gov. Opp. at 12.)

Firms—which the Government asserts was "the first time the Government learned of the joint representation." (Id. at 12.) It was also during this time that Mr. Tournant's new counsel first raised the defense claims of privilege violations, informing the Government that Allianz's disclosure of Mr. Tournant's confidential information to the Government may have tainted the Government's investigation. (Gov. Opp. at 12-13.)

Upon receiving this information, the Government "promptly and carefully evaluated the issue," and concluded that, based on the engagement letters that Mr. Tournant had signed with the Firms, S&C acted "within its rights to provide information to the Government" and that "Tournant's privilege had not been breached by [S&C's] recounting of the [June 3] interview to the Government." (Gov. Opp. at 12-15.) Nevertheless, "in an abundance of caution" the Government elected to treat the disputed materials as "potentially privileged." (Id. at 14-15.) The specific categories of materials (the "disputed materials") that the Government set aside encompassed: "notes of Tournant's statements to [S&C] during the [June 3] interview; references to those statements in Allianz's presentations to the Government; and documents that were (i) produced by Allianz pursuant to the non-waiver agreement, (ii) created during the period that Tournant was jointly represented, and (iii) included Tournant." (Id. at 15.) The disputed materials were segregated by a filter team and made unavailable to the main prosecution team. (Id.) On Feb 25, 2022, the Government informed Mr. Tournant's counsel that, in bringing any criminal case against Mr. Tournant, it would not rely on any of the disputed materials. (Id. at 16.)

On March 1, 2022, S&C made a final presentation to the Government regarding Allianz's internal investigation, in which S&C strongly advocated for a resolution to the criminal case that would allow Allianz/AGI to continue doing business in the United States. (Mtn.,

Exhibit G.)  During this presentation, S&C again described the cooperation and assistance that Allianz had provided during the Government's investigation as significant (including an assertion by S&C that "we were basically the back office of the USAO"); S&C advocated for the prosecution of Tournant in lieu of Allianz; and an S&C attorney even recognized that "Tournant may file [a] disciplinary claim against us because we gave [the Government] info, even though [Tournant] was represented by [Milbank]" at the time.  (Mtn., Exhibit G at 5-8.)  The Government, however, "did not find this advocacy persuasive" and "concluded that criminal charges were appropriate" against both Mr. Tournant and AGI.  (Gov. Opp. at 10-11.)

On May 16, 2022, a grand jury returned the Indictment against Mr. Tournant, charging him with five felony counts: conspiracy to commit securities fraud, investment adviser fraud, and wire fraud; securities fraud; two counts of investment adviser fraud; and conspiracy to obstruct justice.  (See Indct.)  The indictment in this case was unsealed on May 17, 2022, and the SEC filed its civil complaint against Mr. Tournant on the same day.  (See SEC v. Tournant et al., 22-cv-4016-LLS.)  Also in May 2022, AGI U.S. was indicted for securities fraud and pled guilty, as a result of which AGI U.S. lost its ability to manage money within the United States and was forced to sell off its components.  (See United States v. Allianz Global Investors US, LLC, 22-cr-279-CM; Gov. Opp. at 10.)

Mr. Tournant filed the instant Motion in January 2023, contending that the indictment should be dismissed because the case against him was built upon privileged information that was improperly provided to the Government and is the product of manifestly corrupt Government conduct that violates his constitutional right to due process, and requesting that the Court hold an evidentiary hearing to determine the extent to which the Government's evidence was tainted by the allegedly improper disclosure.  The Government opposes the

Motion, asserting that Mr. Tournant cannot claim privilege over the disputed materials and that the Government did not, in any event, rely on any of the disputed materials in building its case or otherwise engage in conduct violative of Mr. Tournant's constitutional rights. The Court heard oral argument on the Motion on April 19, 2023.

D<small>ISCUSSION</small>

The attorney-client privilege is a fundamental aspect of our justice system. Out of respect for this privilege, constitutional principles dictate that the Government cannot obtain access to a defendant's privileged attorney-client communications and use them against him in a criminal case to his disadvantage. The attorney-client privilege, however, is not absolute—a defendant can waive his privilege in a variety of ways, including by signing an agreement with his attorney that permits others to grant access to his confidential information. In such cases, the defendant loses the right to assert unilaterally a privilege claim over his communications with his attorney, and the law does not prevent the Government from using such materials against him in a criminal case.

Waiver is precisely what occurred in this case. Although, absent a delegation of waiver authority to another entity, Mr. Tournant would ordinarily have maintained control over the privileged status of his communications with his attorneys at S&C, he signed a retainer agreement with S&C that clearly and expressly granted Allianz authority to waive the privilege. Consequently, he has not demonstrated that the Government had access to materials that were privileged at the time they were provided to the Government, and he has failed to demonstrate that the Government has violated his constitutional rights by dealing with his former counsel in any manifestly corrupt way. Because his claims of privilege and constitutional violations lack

merit, Mr. Tournant is not entitled to dismissal of the Indictment, discovery, or the requested evidentiary hearing.

The Court's analysis will proceed in three steps, addressing (1) Mr. Tournant's claim that the Government has improperly secured access to Mr. Tournant's privileged material, (2) his claim that the indictment should be dismissed because the Government has engaged in conduct violative of his constitutional rights, and (3) whether an evidentiary hearing is warranted.

Privilege Invasion Claim

The attorney-client privilege protects communications that are "(1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice."  United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011).  Here, there is no dispute that, barring waiver, Mr. Tournant's communications with his attorneys—including, most notably, his communications with S&C during the June 3, 2021 interview—would be protected by the attorney-client privilege.  These communications occurred between Mr. Tournant and his counsel, were intended to be confidential, and were designed, at least from Mr. Tournant's perspective, to provide legal advice.

The attorney client privilege can be waived, either expressly or impliedly.  See In re Grand Jury Proc., 219 F.3d 175, 182 (2d Cir. 2000).  "It is well settled that 'the burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting [the privilege].'"  Id. (citation omitted).  "The party claiming privilege also carries the burden of showing that it has not been waived."  Hollis v. O'Driscoll, No. 13-CV-

01955-AJN, 2013 WL 2896860, at *1 (S.D.N.Y. June 11, 2013).  Because "enforcement of a claim of privilege acts in derogation of the overriding goals of liberal discovery and adjudication of cases on their merits . . . privileges are disfavored and generally to be construed narrowly." Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 473 (S.D.N.Y. 1993).  The attorney-client privilege can be expressly waived by the client, including through a contract.  See Lugosch v. Congel, 219 F.R.D. 220, 235 (N.D.N.Y. 2003) (noting that a client may waive privilege when "the client's communication(s) or the legal advice given [are] shared, in some form or fashion, with a third party," and that a "waiver such as this may be done explicitly or implicitly, or conversely, intentionally or inadvertently").

Here, Mr. Tournant signed an engagement letter with S&C on November 17, 2020, that set out "the terms of S&C's joint representation of you [Tournant] and the Allianz Entities."  (Mtn., Exhibit A ("the Agreement")).  The Agreement stated, in relevant part, as follows:

> By execution of this Letter Agreement, **you acknowledge that you understand the implications of this joint representation, including the benefits and the risks involved.**  Such benefits include, but are not limited to, the efficiencies from avoiding duplicative efforts by different lawyers and the advice of counsel who has been engaged in the matter and is familiar with its facts, circumstances, and issues.  The risks or potential disadvantages of such joint representation may include, but are not limited to, the possibility that if a conflict of interest arises, you may need to proceed solely with Milbank LLP (or another counsel of your choosing) . . .
>
> The mutual interests of the Allianz Entities and you may be best served by **sharing oral or written confidential information ("Materials")**.  Some or all of the Materials may be protected from disclosure to anyone else as a result of the attorney-client privilege, the work-product doctrine, or other applicable privileges.  You agree that S&C may share such Materials (when and if S&C deems it appropriate) with the Allianz Entities, representatives of the Allianz Entities, third parties retained by S&C, and other persons.  **You agree that if management of the Allianz Entities deems it appropriate, the Allianz Entities may decide to release Materials to the government** and to other persons outside of the Allianz Entities who agree to keep such Materials confidential, to release Materials in response to legal process, and **to waive any applicable privileges to**

the disclosure of such Materials. *You understand that such disclosure may mean that the protections of the attorney-client privilege that you may have for such Material would no longer apply*.

(Mtn., Exhibit A at 2-3) (emphasis added) (the "Advance Waiver" provision).

The Government argues that this Agreement effectuated a clear and valid waiver of any claim of privilege Mr. Tournant might hold over the disputed materials, and that Mr. Tournant has not met his burden of showing a lack of waiver. The defense, however, argues that the Advance Waiver provision was invalidated by the conflict of interest that arose between Allianz and Mr. Tournant during the course of the joint representation. According to the defense, once this conflict of interest arose, S&C had an obligation to either disclose the conflict to Mr. Tournant and obtain a new written waiver; or to terminate the joint representation. The defense points to two bases for this alleged duty to disclose: (1) the provisions of the Agreement that set out S&C's obligations to Tournant; and (2) the basic ethical duties that apply to all attorneys. The Court addresses these arguments in turn.

First, the defense contends that S&C was obligated to disclose the conflict of interest to Mr. Tournant based on the provisions of the Agreement. In general, retainer agreements are interpreted according to basic principles of contract law, and courts are obligated to enforce a clear and valid retainer agreement according to its terms. See Judd Burstein, P.C. v. Long, 180 F. Supp. 3d 308, 312 (S.D.N.Y. 2016) ("A clear and unambiguous retainer agreement will be enforced according to its terms.") (citation omitted); Caceres v. Brentwood Farmers Market, Inc., No. CV-20-3476-AKT, 2021 WL 3276637, at *2 (E.D.N.Y. May 4, 2021) ("A Court is bound to observe the provisions of a retainer agreement."). In particular, the defense argues that S&C failed to abide by the following provision of the Agreement:

**In the event we [S&C] conclude**, as the facts concerning the Structured Alpha Matter and the positions of you and the Allianz Entities develop**, that the interests of the Allianz Entities and/or other individuals whom we may represent in the Structured Alpha Matters are in conflict with your interests** (including, for example, because the Allianz Entities of are the view that the joint representation imposes constraints on its ability to cooperate with any government investigation) such that it may become inadvisable or improper for us to continue to represent you, *we will discuss the situation with you* **with a view to arriving at a mutually agreeable solution**.  You agree that, if there is such a conflict that we cannot otherwise resolve to our mutual satisfaction, [S&C] may terminate its relationship with you.

(Mtn., Exhibit A at 2) (emphasis added) (the "Conflict Disclosure provision").

        The defense asserts that, during the course of S&C's joint representation of Mr. Tournant and Allianz, it became clear that the interests of Mr. Tournant were in conflict with the interests of Allianz, but S&C failed to "discuss the situation with [him]" as required by the Agreement.  The defense asserts that this conflict of interest arose "no later than" May 22, 2021—the time at which Allianz "changed their entire approach and started cooperating" with the Government.  (Tr. at 21.)  In support of this position, the defense notes that, according to S&C's own documents, "immediately after Bond-Nelson's [May 21, 2021] SEC testimony," Allianz "[a]ssumed control and pledged full cooperation in connection with the [Government and SEC] investigations."  (Mtn., Exhibit H., slide 35.)  On May 22, 2021, Allianz initiated a large-scale internal forensic review, a "primary goal of which," according to the defense, was to "build the Government's case against Mr. Tournant and serve him up as a scapegoat."  (Id., Mtn. at 9.)  Moreover, in the weeks leading up to the June 3 interview, S&C investigated and developed evidence regarding Mr. Tournant's second cell phone, without his knowledge and with the intent to "ambush" him with this evidence at the interview.  (Mtn. at 12.)

The defense argues that, after these events, it was objectively clear that a conflict had developed between the interests of Allianz and the interests of Mr. Tournant, which triggered S&C's contractual obligation to "discuss the situation with [Mr. Tournant] with a view to arriving at a mutually agreeable solution."  (Mtn., Exhibit A at 2.)  According to the defense, S&C's subsequent failure to discuss the conflict with Mr. Tournant resulted in a material breach of the Agreement.  See Barbagallo v. Marcum LLP, 925 F. Supp. 2d 275, 287 (E.D.N.Y. 2013), aff'd, 552 F. App'x 102 (2d Cir. 2014) (noting that a breach of contract is considered "material" when it is "so substantial that it defeats the object of the parties in making the contract," or when it "goes to the root of the agreement between the parties") (citations omitted). Relatedly, the defense, pointing to a portion of the Agreement in which "S&C and the Allianz Entities" confirmed that they were "not presently aware of any such conflict" of interest at the time the letter was signed (Mtn., Exhibit A at 2), argues that the Agreement "premised S&C's joint representation on the absence of a conflict between Allianz and Mr. Tournant" (Def. Rply. at 25), such that the Advance Waiver provision ceased to be effective at the time that a conflict developed.  In other words, the defense appears to argue that the Advance Waiver provision was conditioned on S&C's promise to provide Mr. Tournant with warning of conflicts of interest that could later arise, and that S&C's failure to provide such warnings when needed invalidated the Advance Waiver provision.

The Government asserts that Mr. Tournant has shown no breach because it "does not appear that [S&C] was aware of an actual conflict between Tournant and Allianz prior to June 5, 2021," when S&C terminated the representation, and thus there would have been no reason for S&C to alert Mr. Tournant about a potential conflict (or to terminate the representation) any earlier than it did, and that no events prior to the termination of the

representation undermined the disclosure and waiver rights allocated to Allianz by the
Agreement.  (Gov Opp. at 23.)

The Court concludes, based on the plain language of the Agreement, that, whether
or not the provision requiring discussion of a conflict was breached, S&C's failure to apprise Mr.
Tournant of the potential conflict did not vitiate the Agreement's Advance Waiver provision.
First, the Court notes that it is unclear whether the Agreement's Conflict Disclosure provision
was even triggered in this case—the Agreement provides that S&C will "discuss the situation"
with Tournant "*in the event [S&C] conclude[s]* . . . that the interests of the Allianz Entities . . .
are in conflict with [Tournant's] interests."  (Mtn., Exhibit A at 2) (emphasis added).  The
defense argues that the events of late May 2021 *should have* indicated to S&C that a conflict had
arisen between Allianz and Mr. Tournant.  However, the Agreement does not impose an
obligation on S&C to act when it *should have* perceived a conflict.  Rather, the Conflict
Disclosure provision sets a subjective standard, requiring action when S&C itself *actually*
*concludes* that a conflict exists.  Although the defense has presented facts that, in hindsight, may
suggest that S&C could or should have concluded earlier that there was a potential conflict, there
is no indication that S&C was truly aware of an actual conflict between Allianz and Mr.
Tournant, or had reached a conclusion that such a conflict existed, at any time prior to the day
that S&C terminated the representation.

Second, and more to the point, nothing in the Agreement indicates that the two
provisions the defense cites—the Advance Waiver provision and the Conflict Disclosure
provision—were interdependent.  The two provisions are located in different paragraphs on
different pages of the Agreement, deal with different topics, and discuss the rights and the
conduct of different actors.  The Advance Waiver provision grants *Allianz* unilateral control over

the disclosure of privileged materials should Allianz determine that such disclosure is appropriate, while the Conflict Disclosure provision deals with the status of the attorney-client relationship between Mr. Tournant and S&C. The latter provision obligated S&C to engage in discussion with Mr. Tournant in aid of seeking a mutually acceptable resolution if it concluded that there was a conflict and provides that, if no such mutually acceptable resolution were reached, S&C had no further obligations to Mr. Tournant and could "terminate its relationship" with him. (Mtn., Exhibit A. at 3.) Nothing in the Conflict Disclosure provision purports to limit Mr. Tournant's grant of disclosure authority to Allianz.

Finally, the record indicates that Mr. Tournant entered into this Agreement knowingly, intelligently, and with the benefit of the advice of his independent counsel. At the time that Mr. Tournant signed the Agreement, he was represented by his own independent counsel from Milbank, who would have been available to advise him fully of the risks, benefits, and implications of signing the joint representation Agreement. See, e.g., Callahan v. Unisource Worldwide, Inc., 451 F. Supp. 2d 428, 434 (D. Conn. 2006) (in determining whether the plaintiff had validly waived certain rights via a contract, finding it relevant that the plaintiff was "represented by counsel throughout" the negotiation of the contract and had "discussed particular aspects of the agreement" with his attorney). In fact, the Agreement expressly advised Mr. Tournant that he "may wish to consult with a lawyer prior to entering into this Agreement," and "encourage[d] [him] to consult with separate counsel" if he had "questions concerning . . . any other matters in this letter." (Mtn., Exhibit A at 4.) Mr. Tournant is a sophisticated businessman and a well-educated individual, and he does not argue that he did not understand the terms of the Agreement. See United States v. Blau, 159 F.3d 68, 74-75 (2d Cir. 1998) (concluding that a client's significant "business and professional background . . . leave us confident in our decision

that [his] decision to hire" a potentially conflicted attorney was "both knowing and intelligent"). The Agreement also made a thorough disclosure of the risks and benefits that were posed by the joint representation, and included an express acknowledgement that Mr. Tournant understood

> [t]he implications of this joint representation, including the benefits and the risks involved. Such benefits include, but are not limited to, the efficiencies from avoiding duplicative efforts by different lawyers and the advice of counsel who has been engaged in the matter and is familiar with its facts, circumstances, and issues. The risks or potential disadvantages of such joint representation may include, but are not limited to, the possibility that if a conflict of interest arises, you may need to proceed solely with Milbank LLP (or another counsel of your choosing).

(Mtn., Exhibit A at 3.)

As noted in the Agreement, Mr. Tournant's choice to proceed with S&C as his counsel was not without benefit to him—courts have recognized that "joint defense agreements present a pooling of resources, a healthy exchange of vital information, a united front against a common litigious foe, and the marshaling of legal talent and advice." See Lugosch, 219 F.R.D. at 238. Thus, there is no basis to conclude that the Agreement's Advance Waiver provision was invalid for lack of knowing and voluntary consent to the risks and benefits offered to Mr. Tournant; nor has the defense proffered any legal or factual basis for its assertion at oral argument that the Agreement was a "contract of adhesion."[8]

---

[8]    During oral argument, the defense stated in passing that the Agreement was "basically a contract of adhesion" (Tr. at 46), but failed to explain this position further or cite any legal authority in support of it. The Court declines, in any event, to engage a theory that was raised in passing for the first time at oral argument. See US Airways, Inc. v. Sabre Holdings Corp., No. 11-CV-2725-LGS, 2015 WL 997699, at *3 (S.D.N.Y. Mar. 5, 2015) (concluding that the court need not consider the plaintiff's theory raised for the first time at oral argument because it would be "unwarranted and unfair to Defendant, which had no advance notice of Plaintiff's new argument and no opportunity to brief its opposition").

The defense further argues that S&C's conduct invalidated Mr. Tournant's waiver of the attorney client privilege because S&C violated professional ethical rules.  Specifically, Mr. Tournant argues that (1) the events of late May 2021 (prior to the June 3 interview)[9] created an un-waivable conflict of interest between Allianz and Mr. Tournant; and (2) in the alternative, even if the conflict was waivable, in order to ethically continue the representation after the events of late May 2021, S&C was required to make full disclosures to Mr. Tournant and obtain his updated consent in writing.  As a consequence of this conflict of interest, the defense contends, the Advance Waiver provision "does not apply" and "was not enforceable" following S&C's failure to obtain updated informed consent from Mr. Tournant.  (Mtn. at 7; Def. Reply at 29.)

As an initial matter, this defense argument appears to be based on a conflation of two different types of advance waivers—advance confidentiality waivers, and advance conflict waivers.  In an advance *conflict* waiver, a client agrees to waive "the firm's potential future conflicting engagements" as to other clients, so that he may hire the attorney of his choosing despite those potential future conflicts.  See First NBC Bank v. Murex, LLC, 259 F. Supp. 3d 38, 65 (S.D.N.Y. 2017); see also Blau, 159 F.3d at 74 ("A defendant who is faced with the possibility that his attorney might become conflicted may waive the potential conflict of interest 'in order to retain the attorney of his choice.'") (citation omitted).  Although such conflict waivers are permitted, courts often "take a fairly critical view of blanket future conflicts waivers," and require attorneys to obtain specific and detailed informed consent from clients.  Murex, 259 F. Supp. 3d at 75 n. 18 (citation omitted); see also United States v. Hatfield, No. 06-

---

[9]     These events included: the beginning of Bond-Nelson's covert cooperation with the Government investigation; Allianz pledge of its cooperation with the Government investigation and commencement of a full forensic review; and the alleged inflection point in S&C's representation strategy, in which S&C began attempting to shift the blame to Mr. Tournant in order to protect Allianz.  (Def. Reply at 29 – 30.)

CR-0550-JS, 2009 WL 3806300, at *13 (E.D.N.Y. Nov. 13, 2009) ("[A]lthough courts appear to disfavor prospective [conflict] waivers, they are not per se invalid.").

In contrast, in an advance *confidentiality* waiver, a client agrees to waive future claims of attorney-client privilege, thus allowing his attorney to share his otherwise-confidential information with third parties.  See generally New York City Bar Association's Professional Ethics Committee, *Formal Opinion 2004-02: Representing Corporations and Their Constituents in the Context of Governmental Investigations* (Feb. 2, 2004) ("2004 NY Bar Op."), https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/formal-opinion-2004-02-representing-corporations-and-their-constituents-in-the-context-of-governmental-investigations [https://perma.cc/7H4Z-28PQ] (discussing "prospective waivers and advance permission to reveal confidential information," wherein an attorney enters into a "written understanding [with the client] with regard to confidential information learned during the representation").  Such prospective confidentiality waivers are not analyzed with a high degree of scrutiny, both because a client has a lesser expectation of privacy in confidences that the client knows could be shared with co-clients, see Tekni-Plex, Inc. v. Meyner & Landis, 89 N.Y.2d 123, 137, 674 N.E.2d 663 (1996) ("Generally, where the same lawyer jointly represents two clients with respect to the same matter, the clients have no expectation that their confidences concerning the joint matter will remain secret from each other."); and because in general the attorney-client privilege is "readily waived" and can even be waived unknowingly or inadvertently.  See Bowne, 150 F.R.D. at 479 ("Waiver [of attorney-client privilege] does not require that the privilege holder 'intentionally relinquish a known right.'") (citation omitted).  The New York City Bar Association recognizes that advance confidentiality waivers are prudent when an attorney undertakes joint representation of a

corporate client and an employee.  See 2004 NY Bar Op. (noting that an advance waiver of confidentiality "can be done in an engagement letter that sets out the understandings and agreements between the corporate client and the employee client with regard to sharing and control of confidential information").

The Agreement at issue here features an *advance confidentiality waiver*, under which Mr. Tournant agreed that Allianz would control the privilege, and that in the future Allianz might decide to release Mr. Tournant's confidential materials to third parties, including government authorities, in which case Mr. Tournant would "waive any applicable privileges to the disclosure of such Materials." (Mtn., Exhibit A at 3.)  The Agreement does not, however, contain an advance conflict waiver regarding the joint representation—Mr. Tournant never agreed to waive any future conflicts of interest by S&C that might later develop during the representation.  Instead, the Agreement simply provides that, if an unresolvable conflict of interest should later arise, S&C "may terminate its relationship" with Mr. Tournant.  (Id. at 2-3.)

The defense has made a variety of arguments concerning the actions that S&C should have taken during late May 2021 with respect to the joint representation.  For example, the defense argues that S&C was required to apprise Mr. Tournant of the potential conflict "the moment that [the] conflict arose" (i.e., the moment that Allianz shifted its strategy and decided to begin cooperating with the Government investigation), because "once the circumstances change, no blanket waiver is valid," and the attorney must make a "full disclosure of the entire set of [new] information" to the client and obtain a new waiver "in writing." (Tr. at 17-22.)  In support of these arguments, the defense relies on portions of an ethics opinion dealing with advance *conflict* waivers, which suggest that a lawyer engaging in joint representation should "revisit the issues at the time the actual or potential conflicts arise" because, even if an initial

conflict waiver is valid, in some cases it may be necessary for the lawyer to secure a "second waiver from [the] client" for a later-arising conflict.  (2004 NY Bar Op.)

The defense does not, however, explain how the existence of a conflict of interest (whether waivable or un-waivable) or a breach of state ethical rules could invalidate the wholly separate portion of the Agreement dealing with the waiver of confidentiality.  The Court has found no legal authority supporting the defense's position that an attorney's later-arising conflict of interest would undermine the terms of a preexisting, valid retainer agreement that includes a provision granting the other party to the joint representation access to and control of privileged information.  Even if this Court were to conclude that S&C violated state ethical rules in connection with the potential conflict between Allianz and Mr. Tournant (a topic on which the Court expresses no opinion), the remedies that the defense requests to cure this alleged breach—which include invalidation of the waiver, disqualification of the Government's prosecution team, and dismissal of the indictment—are novel and unsupported in law.

When a court determines that an attorney is laboring under an actual conflict of interest, the typical remedy is to disqualify the conflicted attorney from the case—however, disqualification is an extreme measure, and "[e]ven a violation of disciplinary rules 'may not warrant disqualification.'"  In re Corp. Res. Servs., Inc., 595 B.R. 434, 442 (S.D.N.Y. 2019) (citation omitted); see also In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig., 438 F. Supp. 2d 305, 307 (S.D.N.Y. 2006) ("Not every violation of a disciplinary rule will necessarily lead to disqualification."); U.S. Football League v. Nat'l Football League, 605 F. Supp. 1448, 1463 n.31 (S.D.N.Y. 1985) (noting that an attorney's "potential violation of the provisions of the [New York Code of Professional Responsibility] is not in itself a reason to disqualify" the attorney from the case).  Moreover, courts in this circuit have expressed hesitance to acting as

enforcers of the rules of professional conduct, especially when the alleged ethical violation did not directly affect the case before the court.  See U.S. Football League, 605 F. Supp. at 1463 n.31 ("Courts are not policemen of the legal profession; that is a matter for the disciplinary arm of the bar."); Tylena M. v. Heartshare Hum. Servs., No. 02-CV-8401-VM-THK, 2004 WL 1252945, at *2 (S.D.N.Y. June 7, 2004) ("Generally, courts are reluctant to resolve disputes over ethical violations that arise during the course of litigation."); W.T. Grant Co. v. Haines, 531 F.2d 671, 677 (2d Cir. 1976) ("The business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it . . . [i]f [counsel] is guilty of professional misconduct . . . the appropriate forum is the Grievance Committee of the bar association.").  Mr. Tournant's request that the Government's prosecution team in effect be disqualified, and the indictment dismissed, based on its receipt of information from Mr. Tournant's former lawyers following the termination of Mr. Tournant's relationship with those lawyers, appears to be unprecedented. Such relief is, in any event, unwarranted here because Mr. Tournant undertook the risk of disclosures advantageous to Allianz when he knowingly entered into the joint representation pursuant to the Agreement, including its Advance Waiver provision.

> Moreover, the rule that the defense asks the Court to adopt—under which the Government could be held to account for, and its ability to prosecute alleged criminal activity impeded by, an attorney's failure to apprise joint clients of every potential conflict during the course of the representation prior to the commencement of prosecution of a former client— would be unworkable and highly impractical.  As the Government commented at oral argument, such a rule "would require the Government to impermissibly wade into attorney-client relationships on a massive scale" by requiring it to "engage with corporate counsel" in detail

about "the status of their joint representation" every time the Government asked "for a voluntary production of documents."  (Tr. at 34.)

Based on all of these considerations, the Court concludes that the defense has not met its burden of demonstrating that the Advance Waiver provision was invalid and has failed to establish grounds for dismissal of the indictment or further inquiry into the Government's use of the material provided to it by Allianz's counsel on the basis of invasion of Mr. Tournant's attorney-client privilege.  When presented with "a clear and unambiguous retainer agreement" governing the relationship between a client and his attorney, a court must enforce the agreement "according to its terms."  Judd Burstein, P.C., 180 F. Supp. 3d at 312.  The terms of the Agreement here were clear, and Mr. Tournant has made no argument that its language was in any way ambiguous.  Mr. Tournant agreed at the outset of the joint representation that, "if management of the Allianz Entities deems it appropriate, the Allianz Entities may decide to release" confidential or privileged materials obtained during the course of the joint representation "to the government . . . and to waive any applicable privileges to the disclosure of such materials." (Mtn., Exhibit A at 3.)  Mr. Tournant specifically acknowledged that he "underst[ood] that such disclosure [by Allianz] may mean that the protections of the attorney-client privilege that [he] may have for such Material would no longer apply."  (Id.)  He also acknowledged that "the Allianz Entities and others may give S&C access to confidential information," but that, due to "applicable privileges or other legal or strategic considerations, S&C may determine not to disclose this information to [him]."  (Id. at 4.)

Thus, according to the clear terms of the Agreement, Allianz had unilateral control over the privileged status of information developed during the joint representation. When Allianz and S&C decided to share the disputed materials with the Government, Allianz

waived any applicable claim of privilege over the materials, including Mr. Tournant's privilege claim. Based on this valid waiver provision and Allianz's decision to disclose this information, the Court concludes that Mr. Tournant's attorney-client privilege with respect to the information that Allianz or S&C provided to the Government during the course of the investigation was waived upon such disclosure. The Court further concludes, for the reasons explained above, that Mr. Tournant's argument that S&C's alleged ethics violation impeded the Government's ability to utilize the information provided to it by S&C and Allianz is unavailing.

Constitutional Violation Claims

The Court next addresses the defense argument that the Government obtained improper access to privileged materials under circumstances that would render the continued prosecution of this case violative of Mr. Tournant's constitutional rights. This argument fails because (1), as explained above, Mr. Tournant had granted Allianz control over waiver of his claim of privilege with respect to his confidential communications from the outset of the joint representation; (2) the defense has not shown that the Government's interaction with S&C in this case was of a manifestly corrupt character; and (3) the defense has not shown that the Government's general encouragement of cooperation by corporate defendants is of so coercive a character as to be manifestly corrupt and require dismissal of the indictment.

Under the due process protections of the Fifth Amendment to the Constitution of the United States,[10] if the government "violates a protected right of the defendant, due process

---

[10]    Mr. Tournant has also asserted that the allegedly improper conduct of the Government violated his Sixth Amendment right to effective assistance of counsel. See United States v. Ginsberg, 758 F.2d 823, 833 (2d Cir. 1985) ("[G]overnment interference in the relationship between attorney and defendant may violate [the defendant's] right to

principles may bar the government from invoking the judicial process to obtain a conviction if the government's conduct 'reached a demonstrable level of outrageousness.'" United States v. Cuervelo, 949 F.2d 559, 565 (2d Cir. 1991) (citations omitted).  "[T]he existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience.'" United States v. Chin, 934 F.2d 393, 398 (2d Cir. 1991) (citation omitted).  In the case of violations of the attorney-client privilege that occur pre-indictment, a defendant must show that "the conduct of the government has been manifestly and avowedly corrupt." United States v. Schwimmer, 924 F.2d 443, 447 (2d Cir. 1991); see also United States v. Voigt, 89 F.3d 1050, 1070 (3d Cir. 1996) (noting that a defendant claiming outrageous government misconduct "bear[s] both the burden of production and persuasion").

"When the government *intentionally* intrudes into the attorney-client privilege, such conduct 'warrants careful scrutiny.' However, even in cases of intentional intrusion, the Second Circuit has 'never gone so far as to adopt' a per se rule requiring . . . dismissal of an indictment." United States v. Weissman, No. 94-CR-760-CSH, 1996 WL 751386, at *12 (S.D.N.Y. Dec. 26, 1996) (quoting Schwimmer, 924 F.2d at 447) (emphasis added).  Such an

---

effective assistance of counsel.")  However, as the Government correctly noted during oral argument (and the defense did not dispute), "the Sixth Amendment doesn't apply to this situation" because "the Sixth Amendment does not attach until indictment." (Tr. at 29); see United States v. Vasquez, 675 F.2d 16, 17 (2d Cir. 1982) ("For a Sixth Amendment right to counsel to attach, adversarial proceedings must have commenced against an individual, 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'") (citation omitted).  Here, the alleged privilege violations by the Government all occurred prior to the initiation of any criminal proceedings against Mr. Tournant—thus the Sixth Amendment is largely inapplicable.  To the extent that some cases (such as United States v. Stein, 541 F.3d 130 (2d Cir. 2008)) recognize that pre-indictment behavior can underlie a violation that can be asserted post-indictment, there are no facts that can sustain such a claim here.  (See infra pages 34-37.) Accordingly, the Court focuses primarily on Defendant's Fifth Amendment constitutional argument.

exacting degree of scrutiny is not required, however, in cases where "the government's intrusion into territory protected by [the defendant's] attorney client privilege *cannot be characterized as intentional*." Id. at *13. (emphasis added).[11]  If a defendant meets the "very heavy burden" of showing "outrageous governmental misconduct," the remedy is dismissal of the indictment. United States v. Walters, 910 F.3d 11, 27 (2d Cir. 2018).  Dismissal of an indictment is "an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted); see also United States v. Sabri, 973 F. Supp. 134, 146 (W.D.N.Y. 1996) ("Dismissal of an indictment for outrageous government conduct, although rare, is permissible . . . when 'the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'") (citation omitted).

Here, the defense argues that the Government's conduct was manifestly corrupt in two respects.  First, the defense alleges that the Government intruded on the attorney-client relationship by inducing Mr. Tournant's counsel to "switch sides" and help build the criminal case against him, and by obtaining access to Mr. Tournant's privileged communications (including, most notably, the notes from the June 3 meeting).  Second, the defense alleges that the Government's cooperation policies encouraged S&C to act unethically in its representation of Mr. Tournant, such as by including what the defense characterizes as unethical provisions in Mr.

---

[11]     In applying the "manifest corruption" standard, some courts also take into account whether the government's conduct prejudiced the defendant.  However, the Fifth Amendment standard does not expressly require a showing of prejudice—if the intrusion upon privilege rises to the level of manifestly corrupt, it is considered to be presumptively prejudicial.  See United States v. Hoey, No. 15-CR-229-PAE, 2016 WL 270871, at *6 (S.D.N.Y. Jan. 21, 2016) (noting that these types of "particularly flagrant and sweeping violations of attorney-client privilege may justify dismissal of an indictment based on an assumed but not a concrete showing of taint").

Tournant's retainer agreement.  The Government argues that Mr. Tournant cannot meet the high bar of showing that its conduct was manifestly corrupt, because there is no evidence that the government *intentionally* intruded upon his attorney client privilege, and because the mere existence of the policies that encourage cooperation does not constitute outrageous misconduct.

The Court concludes that Mr. Tournant has not demonstrated any manifest corruption or violation of his constitutional rights by the Government.  First, as explained above, there has been no disclosure of materials as to which Mr. Tournant retained the ability to assert his claim of privilege.  It is elementary that a defendant cannot sustain a claim for unconstitutional intrusion into his attorney-client privilege when he has made no showing that his communications were privileged when the government received them.  See Voigt, 89 F.3d at 1070 (finding that the defendant's claim of manifest corruption failed because the defendant "failed to demonstrate that any of the information [his attorney] provided the government . . . was in fact privileged").  Second, even if the communications had been privileged, nothing in the proffered evidence indicates that the Government improperly intruded into the attorney-client relationship, or that the Government otherwise took any corrupt or outrageous actions with regard to its relations with S&C and Allianz.

The Court first addresses Mr. Tournant's argument that the Government acted in a manifestly corrupt way when it accessed his allegedly privileged information and intruded on his relationship with S&C.  In cases which have found manifest corruption, the record showed a clear, intentional, and flagrant intrusion by the government into the realm of attorney-client privilege.  For example, in United States v. Marshank, 777 F. Supp. 1507 (N.D. Cal. 1991), an indictment was dismissed after the government had essentially used the defendant's attorney as a confidential informant—the government "investigated [the defendant] using information

received from his own attorney," it "actively collaborated with [the attorney] to build a case against the defendant," and it "facilitated" the attorney's "unethical behavior . . . by hiding it from the defendant" and the court.  Id. at 1523-24.  Likewise, in United States v. Sabri, 973 F. Supp. 134 (W.D.N.Y. 1996), an indictment was dismissed due to the government's "manipulation of the attorney-client relationship" where the government instructed the defense attorney to call her client and to then "direct[] the conversation" to incriminating topics, all while surreptitiously recording the conversation—the "attorney-client relationship was the vehicle used . . . to obtain admissions from the defendant" that were then used in the prosecution against him. Id. at 138, 147; see also People v. Joly, 336 Mich. App. 388, 405-06 (2021) (finding manifest corruption where government agent inadvertently came across a privileged email containing key incriminating evidence, but then intentionally "used the privileged information to further his investigation of defendant").

        In contrast, in cases which have concluded that the government's actions were not manifestly corrupt, the government either did not commit any intentional intrusion into the attorney-client relationship, or its actions (even if intentional) did not rise to a level of egregious misconduct that prejudiced the defendant.[12]  For example, the court in United States v. Schwimmer, 924 F.2d 443 (2d Cir. 1991), found no manifest corruption where the government expressly directed the defendant's accountant to turn over privileged workpapers because, "although the agents obviously obtained the workpapers intentionally, [defendant] suffered no

---

[12]     The Third Circuit has articulated a helpful three-factor test for such situations: "in order to raise a colorable claim of outrageousness pertaining to alleged governmental intrusion into the attorney-client relationship, the defendant's submissions must demonstrate an issue of fact as to each of the three following elements: (1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice."  Voigt, 89 F.3d at 1067.  No such circumstances are presented here.

prejudice as a result"—the government did not obtain any "preview of defense strategy" from the workpapers, and "any influence on the government's case by information obtained" from the workpapers "was wholly conjectural and insubstantial." Id. at 446-47.  Similarly, the court in United States v. Voigt, 89 F.3d 1050 (3d Cir. 1996) found no manifest corruption where the government was essentially relying on the defense attorney as an informant during the investigation, because there was no evidence that the government "was or should have been aware" of the attorney-client relationship during the relevant time period; the government "did nothing to solicit the calls" from the defense attorney; the government's "efforts to steer clear of privileged information" demonstrated "that the government was attentive to ethical constraints;" and the defendant had not "suffered any ill effects flowing from the government's allegedly improper investigative activity"—although the attorney was "violating her ethical obligation to avoid a conflict of interest," there was no basis for imputing this violation to the government.  Id. at 1069-70; see also United States v. Sanin, 113 F.3d 1230, 1997 WL 280083, *4 (2d Cir. 1997) (concluding that there was no government intrusion because "not only was the [intrusion upon attorney client privilege] unintended by the government . . . [the defendant] has been unable to point to any prejudice he has suffered"); United States v. Dunham, No. 20-2686, 2021 WL 3045372, at *3 (3d Cir. July 20, 2021) (finding no government intrusion where the government's behavior was "more akin to passive tolerance [of a conflict]" than "active encouragement of impropriety," as the government has "[no] affirmative duty . . . to inform a suspect that he has a potential conflict of interest with his attorney") (citation omitted).

Further, in determining whether the government has intruded upon privilege, courts often consider whether the prosecution took reasonable precautions to avoid exposure to privileged materials.  See, e.g., United States v. Scozzafava, 833 F. Supp. 203, 210-11

(W.D.N.Y. 1993) (finding no intrusion where the prosecution "took steps . . . to avoid invading

the zone of privilege established for attorney-client communications," and because there "was no

deliberate effort [by the prosecution] to learn defense strategy or tactics, to invade the defense

camp, or otherwise to interfere with the ability of [defendant's] retained attorney to advise and

assist him"); United States v. Sharma, No. 18-CR-340-LGS, 2019 WL 3802223, at *3-4

(S.D.N.Y. Aug. 13, 2019) (finding no privilege violation where the defendants had "not shown

that the Government intentionally intruded on the attorney-client privilege," the parties "agreed

to a protocol for segregating the potentially privileged materials" and there was "no evidence that

the Government intentionally diverged from the protocol," and "the Government took reasonable

precautions to avoid exposure to privileged materials").

Here, unlike in Marshank or Sabri, there is no indication that the Government

actively aided or encouraged S&C to disclose information in violation of any privileged

relationship with Mr. Tournant.  Each of those cases involved a narrow set of facts in which the

government affirmatively requested or encouraged the defendant's personal attorney to disclose

incriminating information about the defendant, which was gleaned during privileged

communications, leading to the attorney essentially acting as an "undercover informant" on

behalf of the government.  See United States v. Longo, 70 F. Supp. 2d 225, 270 (W.D.N.Y.

1999) (noting that, in both Sabri and Marshank, a constitutional violation occurred "based on a

finding of outrageous official conduct in the government's misuse of the defendant's attorney . . .

as an informant to gather evidence against the defendant").   Here, although S&C assisted the

Government by providing information and records, and S&C encouraged the Government to

prosecute Mr. Tournant, there is no indication in the record that any *Government agent*

improperly requested or encouraged S&C to gather information about Mr. Tournant to pass on to

the Government for use in a criminal prosecution.  In other words, any misconduct here was solely on the part of S&C, not the Government.

Moreover, unlike in <u>Joly</u>, there is no indication that the Government used Mr. Tournant's allegedly privileged information to further its investigation or to bring the case against him.  Indeed, once the Government was made aware of Mr. Tournant's claim of improper disclosure of privileged material, it took reasonable steps to segregate the disputed material pending a determination of the privilege claim.  The Government proffers that it did not use the disputed material in its presentation to the grand jury or in fashioning the Indictment, and nothing in the record indicates otherwise.  At most, some of the Government's pre-indictment actions—such as continuing to attend presentations by S&C even after being made aware of the defense's claim of privilege violations and S&C's potential conflict of interest—may have constituted "a passive tolerance" of a conflict, but none rose to the level of an unconstitutional "active encouragement of impropriety." <u>Dunham</u>, 2021 WL 3045372, at *3.  Furthermore, although prejudice is not a necessary element of the "manifestly corrupt" standard which is applicable here, the Court also concludes that has not shown that he would be able to establish that he was prejudiced by the Government's exposure to his allegedly privileged materials.[13]

The Court next addresses Mr. Tournant's argument that the Department of Justice's ("DOJ") promulgation of general guidelines encouraging corporate cooperation induced S&C to engage in unethical conduct (<u>e.g.</u>, inclusion of the unusual Advance Waiver provision in

---

[13]    To the extent the defense argues that the prosecution has been tainted simply due to the prosecution's exposure to potentially privileged information (despite the filtering efforts that were undertaken), such argument is unavailing, as such reasoning has been rejected by the Second Circuit.  <u>See</u> <u>Schwimmer</u>, 924 F.2d at 446 (explaining that a defendant cannot show an intrusion into attorney-client privilege based on "the mere tangential influence that [exposure to] privileged information may have on the prosecutor's thought processes"—rather, there must be a concrete "improper use" of privileged materials).

the retainer agreement).  Specifically, the defense argues that S&C's conduct was legally attributable to the Government because the Government's cooperation guidelines incentivize corporations to provide information regarding the misconduct of individual employees.  These arguments are insufficient to raise a material issue regarding improper government conduct.

The actions of a private entity "are attributable to the State if 'there is a sufficiently close nexus between the State and the challenged action of the entity, so that the action of the latter may be fairly treated as that of the State itself.'"  See United States v. Stein, 541 F.3d 130, 146-148 (2d Cir. 2008) (citation omitted).  For example, in Stein, the government was investigating a potential tax fraud perpetuated by a company and certain of its employees. Id. at 136-38.  The company had a longstanding policy of covering legal fees for its employees during any criminal investigation.  Id.  When the company later began cooperating with the government investigation, its fees policy came into conflict with governmental cooperation principles which stated that a prosecutor should weigh "the extent and value of a corporation's cooperation" by looking to whether the corporation is "protecting its culpable employees . . . through the advancing of attorneys fees."  Id.  Responding to specific pressure from the government, the firm informed its employees that it would cover their fees only if they cooperated fully with the government investigation.  Id.  When certain employees were later indicted, the Second Circuit affirmed the district court's determination that the government had exerted such undue influence on the company decision-making that dismissal of the indictment was required.  Id. at 145-46.  The company's action was attributable to the government because the government essentially "forced [the company] to adopt its constricted fees policy"—the government had "intervened in [the company's] decision-making" by "expressing their disappointment" with the prior fees policy; by "mak[ing] plain their strong preference as to what

[the company] should do"; and by steer[ing] [the company] toward their preferred fee advancement policy and then supervis[ing] its application."  <u>Id.</u> at 148.  In contrast, this <u>Stein</u> test is not satisfied when "the state merely approves of or acquiesces in the initiatives of the private entity, or when an entity is merely subject to governmental regulation."  <u>Id.</u> at 146 (citations omitted).

       Here, the defense argues that the Government encouraged S&C to betray its clients' confidences by the publication of the DOJ's "Principles of Federal Prosecution of Business Organizations" (the "Principles"), a set of guidelines which, according to the defense, "apply enormous pressure on corporations under investigation to meet strict and burdensome requirements to obtain cooperation credit" and avoid criminal penalties.  (Mtn. at 10.)  The specific Principle cited by the defense provides that, in order to receive cooperation credit, a corporation must "identify all individuals substantially involved in or responsible for the misconduct at issue" and "provide to the [government] all relevant facts relating to that misconduct."  (Mtn., Exhibit I at 8.)  The defense asserts that the Principles "left S&C little choice but to turn on its own client," putting S&C in a situation wherein "the only safe course . . . was for S&C to switch sides and betray Mr. Tournant"—an outcome so egregious that it allegedly violated his constitutional rights.  (Mtn. at 28-30.)  Defendant's dramatic depiction of the termination of the joint representation and S&C's proffer of information and assistance to the Government ignores Mr. Tournant's knowing and voluntary entry (while represented by individual counsel) into a retainer agreement which gave his employer control over the disposition of privileged communications.  It also disregards the inescapable logic that any target of a government investigation would find it in its own interests to be forthcoming with information in a manner that might help it to avoid indictment.

The defense has not demonstrated that the mere existence of the Principles is sufficient to render the Government responsible for any action taken by S&C during the investigation.  As noted by the Government, the Second Circuit recently addressed and rejected a similar argument in Gilman v. Marsh & McLennan Companies, Inc., 826 F.3d 69 (2d Cir. 2016).  There, a company became the subject of an investigation by the state attorney general ("AG"), and it later began cooperating.  Id. at 71-72.  The company asked two of its employees to sit for interviews with the AG, and "warned that failure to comply would result in termination"; the employees refused the interviews and were fired.  Id.  The employees argued that, because of the company's cooperation, the company's actions were attributable to the AG under the principles enunciated in Stein.  Id. at 76.  The Second Circuit rejected this argument, noting that, in Stein, the government had wielded "overwhelming influence" on the company's conduct, and had "steered [the company] to adopt a policy it otherwise would not have adopted."  Id.  In contrast, in the facts before the Gilman court, there was no evidence that the AG had "forced" the company to take any particular action, "intervened" in its decision-making, or "supervised" its interview requests, and "government compulsion" was not the "but-for reason" that the company had undertaken the interviews.  Id. at 76-77.  Instead, as the Gilman court explained, "a company is not prohibited from cooperating, and typically has supremely reasonable, independent interests for conducting an internal investigation and for cooperating with a governmental investigation, even when employees suspected of crime end up jettisoned."  Id. at 77.

Here, as in Gilman, there is no indication that a government policy forced Allianz or its counsel to take any particular action, or directly intervened in its decision-making.  The decision to include the Advance Waiver provision in the retainer agreement for joint representation was consistent with Allianz's interest in facilitating both its employees' ability to

obtain legal services and its own ability to develop its knowledge of the relevant circumstances.

Allianz' decision to invoke the Advance Waiver provision when it perceived that its interests had

diverged from Mr. Tournant's (and that it would be in a better position under the Principles if it

provided information to the Government) was consistent with Allianz' self-interest and with the

express language of the Advance Waiver provision to which Mr. Tournant had agreed.[14]

The Court accordingly concludes that Mr. Tournant has failed to provide a

plausible basis for any inference that the Government's actions in this case were manifestly

corrupt and his motion to dismiss the indictment on constitutional grounds must be denied.

Evidentiary Hearing Request

Finally, the defense asserts that Mr. Tournant is entitled to an evidentiary hearing

(preceded by discovery) so that the Court may determine the extent to which the Government

had access to and utilized his privileged materials, and the extent to which exposure to his

privileged materials tainted the prosecution team and the indictment.

Mr. Tournant asserts that he is entitled to a hearing of the type contemplated by

the U.S. Supreme Court's decision in Kastigar v. United States, 406 U.S. 441 (1972), a case that

concerned the prosecution of persons who had earlier been granted immunity.  Id. at 460.

Kastigar held that, when a witness is compelled to give incriminating testimony under a grant of

immunity and is thereafter prosecuted for a matter relating to the compelled testimony, the

Government bears "the heavy burden of proving that all of the evidence it proposes to use was

---

[14]     "You agree that if management of the Allianz Entities deems it appropriate, the Allianz
Entities may decide to release [privileged or confidential material] to the government . . .
. You understand that such disclosure may mean that the protections of the attorney-client
privilege that you may have for such Material would no longer apply."  (Mtn., Exhibit A,
at 3.)

derived from legitimate independent sources." Id. at 461-62.  Courts have subsequently

interpreted Kastigar to establish a specialized type of proceeding, called a "Kastigar hearing," in

which the Court can determine whether the Government's evidence was derived from legitimate

sources.  Holding a Kastigar hearing is appropriate when the defendant "raises a distinct, non-

speculative possibility of taint" in the Government's evidence.  See United States v. Helmsley,

726 F. Supp. 929, 933-34 (S.D.N.Y. 1989).  While some courts in this circuit have applied the

Kastigar standard to a defendant's claim of intrusion upon the attorney-client privilege by the

government, see, e.g., United States v. Sharma, No. 18-CR-340-LGS, 2019 WL 3802223, at *5

(S.D.N.Y. Aug. 13, 2019), as the Government correctly notes, there is no binding Second Circuit

authority on the question of whether a Kastigar hearing is required in all such cases.  See United

States v. Landji, No. 18-CR-601-PGG, 2021 WL 5402288, at *20 (S.D.N.Y. Nov. 18, 2021)

(noting that there is "a dearth of law in the Second Circuit" on the issue of "a Kastigar claim

premised on access to privileged materials").

       Even if the Second Circuit had firmly recognized the right to a Kastigar hearing in

such cases, Mr. Tournant would not be entitled to one here because he has not made a threshold

showing that the government's evidence is tainted.  See Sharma, 2019 WL 3802223, at *5 ("To

warrant a [Kastigar] taint hearing," a defendant has "the burden of showing a factual relationship

between the privileged information and the prosecution.") (citation omitted); United States v.

Connolly, No. 16-CR-0370, 2019 WL 2120523, at *19 (S.D.N.Y. May 2, 2019) ("'An

insubstantial and speculative possibility of taint' does not trigger Kastigar.") (citation omitted);

Hoey, 725 F. App'x at 61 (to warrant a hearing, the defendant must show a "factual connection

between" the content of "the allegedly privileged information and the charges in [the] case.").

Here, as explained above, Mr. Tournant held no enforceable privilege claim over the disputed

materials, because he had signed a valid advance confidentiality waiver providing that Allianz would control the privilege and acknowledging that any privilege claim he held would be waived upon Allianz's disclosure.  Nor has Mr. Tournant shown any specific factual relationship between his allegedly privileged information and the Government's case against him. Accordingly, Mr. Tournant is not entitled to an evidentiary hearing or to related discovery on his claims.

CONCLUSION

For the reasons explained above, the Motion is denied insofar as it seeks dismissal of the indictment, and Mr. Tournant's alternative request for an evidentiary hearing and discovery is also denied.   This Opinion resolves docket entry no. 53.

The next pretrial conference in this case is scheduled to take place on September 19, 2023, at 11:30 am.

SO ORDERED.

Dated: New York, New York
        August 3, 2023

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge