UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA


   -v-

                                  No.    22-CR-276-LTS

GREGOIRE TOURNANT,

        Defendant.

--------------------------------------------------------x


MEMORANDUM OPINION AND ORDER

        Before the Court is Defendant Gregoire Tournant's motion seeking: (1) a bill of particulars; (2) compelled production of alleged Brady material; (3) dismissal of the wire fraud object of the conspiracy charge; (4) dismissal of Count Three or Count Four of the above-captioned Indictment (docket entry no. 2 (the "Indictment")); and (5) the striking of paragraphs 7 and 69 of the Indictment as surplusage.  (See docket entry no. 98 (the "Motion").)  The Government opposes the Defendant's Motion in its entirety.  The Court has reviewed thoroughly the parties' submissions and arguments, and, for the following reasons, the Motion is granted in part and denied in part.


BACKGROUND

        The following facts are drawn from the Indictment and the parties' submissions, and are undisputed unless characterized as allegations or otherwise noted.  In May 2022, Mr. Tournant was indicted on a number of charges alleging that he engaged in a scheme to defraud investors while he was employed by Allianz Global Investors U.S. LLC ("AGI"), an indirect, wholly-owned subsidiary of Allianz SE ("Allianz").  (Indictment ¶ 1.)  Mr. Tournant worked as a

portfolio manager at AGI, overseeing a number of high-profile investment funds worth billions of dollars.  (Id.)  Most notably, Mr. Tournant oversaw the management of a group of funds known as the Structured Alpha Funds (the "Funds"), a series of private investment funds that employed bespoke investment strategies that were "marketed . . . as providing broad market exposure while maintaining specific risk protections to safeguard against losses in the event of a market crash."  (Id. ¶¶ 10-16.)  Approximately a dozen individuals (including Mr. Tournant) worked on the Structured Alpha Funds.  (Id. ¶ 10.)  The Indictment alleges that Mr. Tournant, as Chief Investment Officer and co-lead Portfolio Manager of this Funds group, engaged in a scheme to deceive and defraud investors by essentially "understating the risk to which investors' asserts were exposed, and therefore how the returns they touted were actually generated."  (Id. ¶ 1, 14.)  This scheme, which allegedly resulted in the initiation and retention of Fund investments that might not otherwise have been made or maintained, was allegedly carried out by Mr. Tournant (and other members of the group) in three ways: (1) by "overstat[ing] the level of independent oversight that AGI and its parent company Allianz were exercising over the Funds' strategy," (2) by "misrepresent[ing] the hedging and other risk-mitigation strategies they were undertaking to protect investor funds," and (3) by "fraudulently alter[ing] documents" that AGI provided to investors and failing to "disclose relevant risk information" to investors.  (Id. ¶¶ 2-3.)

In March 2020, following the onset of the COVID-19 pandemic, the Funds lost more than $7 billion in market value, and were eventually shut down.  (Indictment ¶ 7.)  The Indictment alleges that Mr. Tournant personally benefited from the fraudulent scheme, earning over $60 million during the relevant time period.  (Id.)  During the summer of 2020, the United States Securities and Exchange Commission ("SEC") began conducting an investigation into the circumstances surrounding the Funds' March 2020 losses.  (Id. ¶¶ 8, 70.)  In the weeks and

months that followed, the Indictment alleges, Mr. Tournant "took steps to obstruct the SEC investigation," repeatedly directing Stephen Bond-Nelson, a Portfolio Manager for the Funds, to lie to AGI lawyers, "knowing that such lies would be passed on to the SEC."  (Id. ¶¶ 8, 70.)

On May 16, 2022, a grand jury returned the Indictment against Mr. Tournant, charging him with five felony counts: conspiracy to commit securities fraud, investment adviser fraud, and wire fraud; securities fraud; two counts of investment adviser fraud; and conspiracy to obstruct justice.  (See generally Indictment.)  The Indictment was unsealed on May 17, 2022, and the SEC filed a civil complaint against Mr. Tournant on the same day.  See SEC v. Tournant et al., 22-CV-4016-LLS (S.D.N.Y.).  Also in May 2022, AGI was indicted for securities fraud and pleaded guilty.  See United States v. Allianz Global Investors US, LLC, 22-CR-279-CM (S.D.N.Y.)

Mr. Tournant previously filed a motion to compel the Government to review the SEC's files and provide discovery material therefrom, (docket entry nos. 45-47), and a motion to dismiss the Indictment, (docket entry nos. 53-55), both of which were denied.  (Docket entry nos. 81, 86).  Mr. Tournant filed the instant motion on September 19, 2023 (docket entry nos. 98-100), seeking a wide range of relief related to disclosure issues and to perceived defects in the Indictment.  The Court addresses each of Mr. Tournant's requests in turn.

DISCUSSION

Bill of Particulars

Federal Rule of Criminal Procedure 7(f) provides in pertinent part that: "[t]he court may direct the government to file a bill of particulars.  The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits."

FED. R. CRIM. P. 7(f).  "Rule 7(f) . . . permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted).  Importantly, "evidentiary detail is not the function of the bill of particulars." United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (citation omitted).

In determining whether a bill of particulars is warranted, the "important question is whether the information sought is necessary, not whether it is helpful."  United States v. Facciolo, 753 F. Supp. 449, 451 (S.D.N.Y. 1990) (citations omitted).  Particulars are necessary only where indictment charges are "so general that they do not advise the defendant of the specific acts of which he is accused."  United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004) (internal quotation marks and citation omitted).  "If the information the defendant seeks is provided in the indictment or in some acceptable alternate form, such as discovery or other correspondence, no bill of particulars is required."  United States v. Binday, 908 F. Supp. 2d 485, 497 (S.D.N.Y. 2012) (internal quotation marks and citation omitted).  Courts in this Circuit have, however, recognized that, in some instances, "mountains" of discovery without more will not be sufficient to render an indictment constitutionally sound.  See Bortnovsky, 820 F.2d at 574-75 (finding the lack of "crucial information" regarding events charged in the Indictment was not remedied by "mountains of documents" provided by the Government, as the effect was to impermissibly shift the burden of proof to the defense).

Although a determination regarding the need for a bill of particulars is highly fact-dependent, occasionally making case law on the issue difficult to synthesize, see, e.g.,

United States v. Bin Laden, 92 F. Supp. 2d 225, 334 (S.D.N.Y. 2000) (citations omitted) ("[T]he precedents furnish little help in disposing of requests for bills of particulars in criminal cases."), factors that have been found relevant to determining whether particulars are necessary include: the clarity of the indictment; the duration and breadth of the alleged conspiracy, i.e., the complexity of the crime charged; whether the government has provided adequate notice of the particulars; the potential danger to co-conspirators, witnesses, or victims; and the nature of the alleged criminal conduct.  See, e.g., United States v. Lino, No. 00-CR-632-WHP, 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001) (gathering cases); Bin Laden, 92 F. Supp. 2d at 233-34 (same); 1 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 130 (5th ed. 2023).

Mr. Tournant seeks four categories of additional information: (1) identification of the specific investors and consultants that are alleged victims of the charged offenses; (2) particularization of the allegedly false and fraudulent statements, representations, and omissions, including, but not limited to, identification of the specific documents that the Government alleges were altered; (3) identification of the alleged acts of obstruction with which Mr. Tournant is charged; and (4) the names of any unindicted alleged co-conspirators.  (Docket entry no. 99 ("Def. Mem.") at 12.)  Mr. Tournant argues that this case involves allegations of a "complex fraudulent scheme," "involving more than 100 sophisticated institutional investors who invested in at least 17 separate Structured Alpha funds . . . that held different securities and had different investment objectives, risk strategies, and disclosures," and that was perpetrated over a six-year period from 2014 to 2020.  (Id. at 1.)  Because of "the sheer scope of the scheme alleged in the Indictment" along with the "more than seven million pages of discovery produced to date by the

government," Mr. Tournant argues, he "would be hindered in preparing his defense" without the information sought.  (Id. at 1-2, 12).

The Government contends that a bill of particulars is not necessary because:

> [T]he Indictment, discovery produced to date, witness statements produced last year, and additional information provided by the Government are far more than sufficient to put him on notice of the nature and specifics of the crimes of which he is accused and to permit him to adequately prepare his defense.

(Docket entry no. 109 ("Gov. Opp.") at 4.)

The Court addresses the requested particulars in the order presented.


Identification of Alleged Victims

Citing the "highly individualized nature of the scheme charged," Mr. Tournant seeks the identification of the investors, prospective investors, and consultants, if applicable, that the Government intends to prove were victims of the alleged scheme charged in Count One. (Def. Mem. at 12.)  Mr. Tournant notes that the number of investors in the implicated Funds totaled to more than 100 "of the world's largest and most sophisticated institutional investors, ranging from pension funds to individuals," and that "Mr. Tournant is alleged to have made different misrepresentations to different investors who were invested in different Funds," "at different times . . . over a six-year period from 2014 to 2020."  (Id. at 4, 12; docket entry no. 110 ("Reply Mem.") at 3.)  In addition to these institutional and individual investors, Mr. Tournant also surmises from the discovery materials that the Government "contends that at least seven consultants received an additional set of alleged misrepresentations."  (Def. Mem. at 13.)  Given the "unusual complexity of this case" and the large volume of discovery so far produced, Mr.

Tournant argues that the identities of the alleged victims are therefore "critical to [his] ability to prepare for trial."  (Id. at 12-13; see also Reply Mem. at 4.)

The Government maintains that a particularized list of victims is unnecessary in this case, because the Government has already provided a list of investors in the Funds, "which number approximately 100 entities," and has "provided significant detail about the fraudulent conduct, including specific misstatements, investor presentations, and altered reports."  (Gov. Opp. at 10.)  The Government characterizes the request as an apparent "impermissible effort to suss out, nearly a year before trial, the victims that the Government expects to call at trial," and asserts that "[c]ourts routinely deny requests for particulars identifying victims"  where the defense has received sufficient information "to identify the intended targets of the fraud scheme" through discovery.  (Id. at 9 (citing several cases in the Southern and Eastern Districts of New York).)  In his Reply, Mr. Tournant seeks to distinguish the present case from the cases cited by the Government, arguing that "it was clear who the victims were" in the cases "relied on by the government."  (Reply Mem. at 3-4.)

Having examined the factors frequently cited by courts to evaluate requests for particulars, the Court is persuaded that Mr. Tournant is currently without sufficient information to adequately meet the charges levied against him, to the extent that particularization of the alleged victims of the scheme charged in Count One of the Indictment is necessary.  At forty-eight pages, the Indictment lays out a detailed overview of the scheme, grouping the alleged misrepresentations that purportedly give rise to criminal liability into "three general categories" and providing alleged examples as to each category, including dates, direct quotes, and occasionally images and figures from relevant documents.  (Indictment ¶ 2; Gov. Opp. at 4.)  The Government has also provided a considerable amount of discovery to date, including further direction to help navigate the discovery

(docket entry no. 100-3 ("Exhibit C")), and represents that it will produce yet more information closer to the scheduled trial date.  (See, e.g., Gov. Opp. at 8 (asserting Government will disclose a witness list and remaining 3500 material sufficiently in advance of trial, and that it will produce a list of conspirators at the time it produces its exhibits in advance of trial).)

However, the lengthy Indictment and voluminous discovery produced thus far also cut against the Government's position that a particularized list of victims is unnecessary. Where, as here, the Indictment alleges a scheme that spans over six years, implicating upwards of "17 separate, privately-traded funds" comprised of more than 100 institutional and individual investors, along with an undisclosed number of prospective investors, examples of allegedly fraudulent misrepresentations identified among at least seven millions of pages of discovery, without more, do not provide sufficient particularity to apprise Mr. Tournant of the parameters of the scheme with which he is charged.  It is already a considerable task to evaluate the hundreds of examples of alleged misrepresentations that have been provided by the Government, many of which involve complex financial calculations spanning a six-year period.  (See, e.g., Indictment ¶ 48-50, 52-58, 59-62, 64-66.)  Requiring Mr. Tournant to extrapolate, from that limited set of examples, the full set of investors, and an unidentified set of potential investors and consultants, in order to sufficiently identify the scope of the alleged scheme and prepare accordingly would be a daunting and potentially impossible undertaking.  Courts in this Circuit have shown an inclination to grant particulars in similarly complex cases with markedly less discovery.  See, e.g., United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987) (holding denial of bill of particulars to be abuse of discretion in RICO action where over 4,000 documents were produced and details regarding allegedly fraudulent offenses were obscure); United States v. Vaid, No. 16-CR-763-LGS, 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017) (granting request for bill of

particulars in health care conspiracy case with 41-page indictment and over 600,000 pages of discovery); United States v. Nachamie, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) (granting bill of particulars as to several categories of requested information in Medicare fraud case where Government had produced over 200,000 pages of discovery).  As to the remaining factors, the offenses charged in the Indictment are certainly serious, but they are not violent, and many of the alleged victims have presumably been identified among the broader list of investors produced. Cf., e.g., U.S. v. Gotti, No. 02-CR-743-RCC, 2004 WL 32858, at *9 (S.D.N.Y. Jan. 6, 2004).

In sum, the Court finds that particulars as to the alleged victims are necessary to allow defense counsel to conduct a reasonably focused investigation, such that Mr. Tournant will be adequately prepared for trial.  The Government is, accordingly, directed to particularize the institutional and individual investors and prospective investors of the Structured Alpha Funds, as well as any consultants, that it will or may attempt to prove were victims of the scheme alleged in Count One of the Indictment.

Particularization of Statements, Representations and Omissions

Mr. Tournant further argues that a bill of particulars specifying each of the allegedly false statements and representations, and material omissions, is warranted because of the substantial scope of the alleged fraudulent scheme, during which "Fund investors and consultants received thousands of reports and other communications . . . including, but not limited to, daily reports containing Fund performance data."  (Def. Mem. at 15.)  Complaining that the Indictment provides only "illustrative examples" of the three general categories into which it groups the alleged misrepresentations (Indictment ¶ 2; Gov. Opp. at 4), Mr. Tournant

seeks a complete list of the statements and allegedly altered documents that the Government will offer to prove the charged scheme.  (Def. Mem. at 15-16.)

        The Government counters that this level of comprehensive detail is unnecessary to provide Mr. Tournant with fair notice, pointing to the information that has so far been disclosed.  Relevant disclosures highlighted by the Government include the "numerous examples" of each category of alleged misrepresentations supplied by the Indictment.  (Gov. Opp. at 4-5 (citing Indictment ¶¶ 2, 20-21, 23, 28, 43, 70-71).)  Throughout its Opposition briefing, the Government also emphasizes that it produced the proffer statements and plea transcripts of Stephen Bond-Nelson and Trevor Taylor, two alleged co-conspirators identified in the Indictment, over a year ago (Gov. Opp. at 8), and that, in response to Mr. Tournant's April 12, 2023, letter request to the Government (docket entry no. 100-2 ("Exhibit B")) seeking greater detail as to allegations in the Indictment, the Government directed Mr. Tournant to further examples of alleged misrepresentations throughout the already-produced discovery.  (Gov. Opp. at 1-2; see also Reply Mem. at 5 (noting Government has directed Mr. Tournant to an additional 152 allegedly altered reports sent to investors, 23 allegedly altered reports sent to consultants, and 721 investor presentations sent to investors and consultants).)  As noted above, the Government has further represented that it will provide additional materials sufficiently in advance of trial.  (See Gov. Opp. at 8 (asserting Government will disclose a witness list and remaining 3500 material sufficiently in advance of trial, and that it will produce a list of conspirators at the time it produces its exhibits in advance of trial).)  Given these substantial disclosures, the Government argues that Mr. Tournant's request for particularized misrepresentations is "nothing more than an ill-disguised attempt at general pretrial discovery."

(Gov. Opp. at 5 (citing United States v. Mandell, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010) (internal quotation marks omitted)).)

   The Government's point is well taken.  At this stage, the kind of granular particularization requested by Mr. Tournant would be a detailed guide to the Government's evidence, and would also force the Government to tip its hand as to its strategy for proving the risk management misrepresentation aspect of its case.  See United States v. Henry, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (internal citations omitted) ("Nor, given that a bill of particulars confines the Government's proof to particulars furnished, should a motion for a bill of particulars be granted where the consequence would be to restrict unduly the Government's ability to present its case, or permit the defendant to tailor her testimony to explain away the Government's case.").

   Mr. Tournant's citations of several cases from this Circuit and others that have ordered bills of particulars in "factually complex" cases, such as those alleging financial crimes or fraud, do not persuade the Court that further particularization of statements and omissions is necessary at this stage of the proceedings.  (Def. Mem. at 11, 13-14 (gathering cases).)  Mr. Tournant is correct that the complexity of a charge, particularly in conspiracy cases, has moved courts in this Circuit to grant requests for particulars in some cases and, indeed, this consideration was one of the factors that motivated the Court to grant Mr. Tournant's request for a particularized list of alleged victims.  However, in light of the extensive information that has been or will be produced by the Government, including the list of victims required by this Order, Mr. Tournant has not shown a need for an exhaustive catalog of all alleged misrepresentations. The Court will not require the Government to undertake that task at this time.  The request for

particulars as to allegedly false and fraudulent statements, representations, and omissions is denied.

<u>Alleged Acts of Obstruction</u>

Mr. Tournant next seeks particulars as to each of the overt acts that allegedly occurred in furtherance of the obstruction conspiracy charged in Count Five, arguing that the Indictment provides only a single example of such acts (Def. Mem. at 16), and that, if the conspiracy extends beyond the obstructive acts highlighted by the Government, "[he] would have no notice of that." (Reply Mem. at 9.) The Government contends that there is no need to furnish this category of particulars because the Indictment identifies not one, but two overt acts allegedly committed in furtherance of this conspiracy, and the Government "has already produced the proffer notes in which [Mr. Tournant's named co-conspirator, Steven] Bond-Nelson discussed his involvement in the charged obstruction conspiracy" along with "the involvement of others in the charged crimes." (Gov. Opp. at 8.)

The Court finds that Mr. Tournant has received sufficient information to apprise him of the nature of this charge. As opposed to the conspiracy charged in Count One, the scope of the conspiracy charged in Count Five is much more compressed, allegedly occurring between July 2020 and May 2021. (Indictment ¶ 85.) The Indictment identifies two alleged overt acts taken in furtherance of this conspiracy, which are set forth in detail. (Indictment ¶ 87.) Mr. Tournant is not, as a general matter, entitled to disclosure of all overt acts that the Government will allege were committed in furtherance of the conspiracy, <u>United States v. Carroll</u>, 510 F.2d 507, 509 (2d Cir. 1975), and the Government's disclosures have provided meaningful direction as to its evidence supporting the charge. Not only has Mr. Tournant received proffer statements

from an identified co-conspirator as to this Count which, according to the Government, describe

both Bond-Nelson's conduct and "the involvement of others in the crimes charged," Mr.

Tournant will also be informed of additional conspirators, if any, and be provided with a witness

list and remaining 3500 material "sufficiently in advance of trial."  (Gov. Opp. at 8.)  Requiring

further particulars at this stage would venture into evidentiary detail that is beyond the proper

scope of a bill of particulars.  <u>Torres</u>, 901 F.2d at 234.  The request for particulars as to alleged

acts of obstruction charged in Count Five is therefore denied.


<u>Identity of Co-Conspirators</u>

Finally, Mr. Tournant requests "a complete list" of unnamed co-conspirators,

again citing the complexity and duration of the charged scheme, the large amount of discovery,

"the government's admissions," and "the minimal burden [that would be imposed] on the

government" if it were required to provide such a list. (Def. Mem. at 17; Reply Mem. at 7-8.)

The Government opposes the request, arguing that "blanket requests" for the identities of co-

conspirators are routinely denied where the information provided by the Government in the

Indictment or discovery is otherwise sufficient.  (Gov. Opp. at 7.)  As explained above, the

Government has provided significant discovery to date, including proffer statements and plea

transcripts of co-conspirators identified in the Indictment, which allegedly also detail the

involvement of others in the charged scheme.  (<u>Id.</u> at 8.)

The inquiry here, as with all requests for particulars, does not turn on the burden

created by the disclosure of alleged co-conspirators or whether that disclosure would be helpful

in the defense's pretrial preparations; rather, the question is whether such disclosure is <u>necessary</u>

to mount a defense and to prevent unfair surprise.  <u>Bortnovsky</u>, 820 F.2d 572, 574 (2d Cir.

1987).  Not only has the Government provided significant disclosures that go to the identity of the co-conspirators, it has represented that it will provide a list of alleged conspirators prior to trial.  (Gov. Opp. at 8.)  Given the extensive and targeted information already available to Mr. Tournant, his arguments are insufficient to show why disclosure of co-conspirator identities now, versus according to the timeline set out by the Government, is necessary, rather than merely helpful, to adequately apprise him of the charged offenses.  The request for particulars as to the identities of co-conspirators is therefore denied.

Production of Alleged Brady Material

As detailed at length in the Court's Order pursuant to Federal Rule of Criminal Procedure Rule 5(f) (docket entry no. 13), Brady v. Maryland, 373 U.S. 83 (1963), and the decisions that have built upon it establish that, in order to assure protection of the defendant's constitutional rights to due process and a fair trial, the prosecution (i.e., the Government) has an affirmative duty to seek out and provide to the defense all material evidence that is favorable to the accused and that is known to the Government or to federal, state, and local law enforcement personnel and officers who are or have been involved in the investigation or prosecution of the case.  Strickler v. Greene, 527 U.S. 263, 280-81 (1999); Kyles v. Whitley, 514 U.S. 419, 437 (1995).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  U.S. v. Bagley, 473 U.S. 667, 682 (1985).

Because Brady established a backward-looking standard, a "prudent prosecutor will resolve doubtful questions in favor of disclosure."  United States v. Agurs, 427 U.S. 97, 108 (1976).  This duty applies to evidence that affirmatively tends to exculpate the defendant, as well

as to information that impeaches the credibility of the Government's witnesses, <u>Bagley</u>, 473 U.S. at 676-77 (citing <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)), at both the guilt and sentencing phases.  <u>Brady</u>, 373 U.S. at 88.  Even inadmissible evidence may be material if it could lead to the discovery of admissible evidence.  <u>U.S. v. Mahaffy</u>, 693 F.3d 113, 131 (2d Cir. 2012).  The Government must disclose such evidence to the defense after its existence becomes known to the Government, in time to enable the defense to have an opportunity to make effective use of the evidence in preparing its case and at trial, including a reasonable opportunity to investigate the information.  <u>U.S. v. Coppa</u>, 267 F.3d 132, 135 (2d. Cir. 2001); <u>Grant v. Alldredge</u>, 498 F.2d 376, 382 n.7 (2d Cir. 1974).  <u>Brady</u> does not, however, establish a general right to pretrial discovery.  <u>United States v. Perez</u>, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (citing <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977) and <u>United States v. Evanchik</u>, 413 F.2d 950, 953 (2d Cir. 1969)).

Mr. Tournant seeks three broad categories of materials pursuant to <u>Brady</u>, citing "serious concerns about the government's compliance with its <u>Brady</u> obligations and the Rule 5(f) Order in this case": (1) "interview statements of investors and . . . other [Government] communications with investors and potential investors and their counsel"; (2) "[a]ny [e]vidence" showing Allianz's or AGI's independent risk management oversight of the Funds"; and (3) "any evidence showing that the severe 'market dislocations' due to COVID and the actions by AGI personnel and management . . . contributed (or caused) the investor losses."  (Def. Mem. at 17-20.)  The Government opposes these requests, pointing to the large body of evidence that the Government has already turned over in each of these three categories, and arguing that the remaining materials sought are outside the bounds of its obligations under <u>Brady</u>.  (Gov. Opp. at 12-13.)  Asserting that it "will continue in good faith to satisfy its disclosure obligations,"

"[k]eeping in mind the new theories set forth in the defendant's motion," the Government asks

that the Court deny Mr. Tournant's motion for compelled production.  (Id. at 14-15 (gathering

cases).)  In his Reply, Mr. Tournant argues that deferring to the Government's "good-faith

representation" regarding its disclosure obligations is inappropriate at this time, pointing out that

the Government turned over "witness statements and attorney proffers from two AGI risk

management employees and their counsel" that allegedly contain Brady material one day before

filing its Opposition.  (Reply Mem. at 9, 12.)

       The Court agrees that Mr. Tournant's construction of Brady as set forth in the

Motion is overly broad.  Brady and its progeny, including Giglio v. United States, 405 U.S. 150

(1972), call for disclosure of evidence in the Government's possession that is both material to

guilt or punishment and is favorable to the accused.  Brady, 373 U.S. at 87.  Brady is not meant,

however, to embrace "all evidence in the government's file which might conceivably assist [a

defendant] in preparation of his defense."  United States v. Ruggiero, 472 F.2d 599 (2d. Cir.

1973).  In other words, simply because material is helpful to the defense, it is not always

disclosable pursuant to Brady or Giglio.  The categories of information called for in Mr.

Tournant's motion, framed with such terms as "any" and "all," call for evidence beyond the

bounds of Brady.  (See Def. Mem. at 17-20.)  While disclosure of some of this information may

be helpful to Mr. Tournant's preparations or may cast doubt on the Government's theory of the

case, Mr. Tournant has not demonstrated that all of the material encompassed within the three

identified categories is exculpatory within the meaning of Brady.

       The Government's reaffirmation of its obligations under Brady and its

representation that it will produce all such material in time for its effective use by the defense are

sufficient on this record to persuade the Court that the defense has neither shown the necessity of

an order compelling immediate disclosure, nor even that the Government has undisclosed <u>Brady</u>

material in its possession at this juncture.  <u>See</u> <u>United States v. Kelly</u>, 91 F. Supp. 2d 580, 584-85

(S.D.N.Y. 2000) (gathering cases from within the Second Circuit for the proposition that courts

"have repeatedly denied pretrial requests for discovery orders pursuant to <u>Brady</u>" where the

Government has made a good-faith representation regarding its understanding and compliance

with its disclosure obligations).  The request for compelled production of alleged <u>Brady</u> material

is denied.


<u>Wire Fraud Object of the Conspiracy Charge</u>

Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, Mr. Tournant

seeks dismissal of the wire fraud object of the conspiracy charge in Count One, asserting that the

Count fails to state an offense within the terms of the wire fraud statute.  (Def. Mem. at 20-22;

Reply Mem. at 13; FED. R. CRIM. P. 12(b)(3)(B)(v).)  In seeking dismissal, "a defendant faces a

high standard . . . because an indictment need provide the defendant only a plain, concise, and

definite written statement of the essential facts constituting the offense charged." <u>United States</u>

<u>v. Post</u>, 950 F. Supp. 2d 519, 527 (S.D.N.Y. 2013) (citation and internal quotation marks

omitted) (quoting FED. R. CRIM. P. 7(c)(1)).  An indictment is facially sufficient if it "first,

contains the elements of the offense charged and fairly informs a defendant of the charge against

which he must defend, and, second, enables him to plead an acquittal or conviction in bar of

future prosecutions for the same offense." <u>United States v. Alfonso</u>, 143 F.3d 772, 776 (2d Cir.

1998) (citation omitted).  Applying this standard, the Second Circuit has "consistently upheld

indictments that do little more than to track the language of the statute charged and state the time

and place (in approximate terms) of the alleged crime." <u>United States v. Pirro</u>, 212 F.3d 86, 92

(2d Cir. 2000) (citations and internal quotation marks omitted).

The essential elements of wire fraud in violation of 18 U.S.C. section 1343 are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." United States v. Weaver, 860 F.3d 90, 94 (2d Cir. 2017) (citation omitted). The Supreme Court clarified, in its recent decision in Ciminelli v. United States, that the wire fraud statute "reaches only traditional property interests." 143 S. Ct. 1121, 1128 (2023). The decision addressed the Second Circuit's "longstanding 'right-to-control' theory," which reasoned that, because "a defining feature of most property is the right to control the asset in question," the term "property" in the wire fraud statute included "the interest of a victim in controlling his or her assets." Id. at 1124, 1127 (citing United States v. Lebedev, 932 F.3d 40, 48 (2019)). Under the "right-to-control" theory, a defendant would be "guilty of wire fraud if he scheme[d] to deprive the victim of 'potentially valuable economic information' 'necessary to make discretionary economic decisions.'" Ciminelli, 143 S. Ct. at 1124 (citing United States v. Percoco, 13 F.4th 158, 170 (2d Cir. 2021)). The Ciminelli Court rejected the notion that "mere information" could be an interest protected by the wire fraud statute, holding that the sole intangible interest covered by the federal fraud statutes is "honest services," which has been explicitly specified by Congress as a chargeable object of fraud. Ciminelli, 143 S. Ct. at 1126-28 (tracing the history of the mail and wire fraud statutes before and after the Court's decision in McNally v. United States, 483 U.S. 350 (1987)).

Pointing to allegations in the Indictment concerning the alleged deprivation of information related to risk and other matters relevant to investment decisions, Mr. Tournant argues that the Government's allegations in support of the wire fraud object fail to support a valid charge "because [the Indictment] is premised on the classic 'right-to-control' theory"

rejected in <u>Ciminelli</u>.  (Def. Mem. at 21 (citing Indictment ¶¶ 1, 4-5).)  However, as the Government notes, "the wire fraud object [allegation in the Indictment] incorporates the preceding factual allegations [set forth in the Indictment], specifies a location and time frame, and further alleges the essential elements of the offense by tracking the statutory language." (Gov. Opp. at 15.)  The Government's assertion that the charged "object" of the alleged wire fraud was money, rather than potentially valuable economic information, is also supported by the text of the Indictment.  <u>Cf.</u> <u>Ciminelli</u>, 143 S. Ct. at 1125 n.1 (noting that, although an earlier indictment alleged that the property at issue in wire fraud-related charges was valuable government contracts, "the Government relied solely on the [right-to-control] theory" in defending against the defendants' motion to dismiss, and the district court relied expressly on that theory in denying the motion).

In particular, the Indictment identifies three separate kinds of misrepresentations intended to induce and retain investments into the Funds.  The first category of alleged misrepresentations is "overstat[ement of] the level of independent oversight that AGI and Allianz were exercising over the Funds' investment strategy."  (Gov. Opp. at 16.)  For example, the Indictment recounts instances during investor meetings where Mr. Tournant allegedly asserted that his investment strategy was "very focused on risk," and was further safeguarded by "independent risk management personnel" and Allianz, which Mr. Tournant allegedly described as a "master cop."  (Indictment ¶¶ 20-23).  The second category comprises alleged misrepresentations as to the "hedging and other risk-management strategies" that Mr. Tournant and others were undertaking to protect investor funds.  (Gov. Opp. at 16.).  Examples in the Indictment include statements purportedly made by Mr. Tournant during a publicly-available interview that the Funds' use of hedging positions "would protect the portfolios in an 'extreme

crash' and were an 'integral part of the process.'"  (Indictment ¶ 27.)  Similar emphasis on the

Funds' hedging strategy was allegedly highlighted in marketing materials for the Funds.  (Id. ¶

28.).  The final category of misrepresentations constitutes allegedly fraudulent alterations of

documents that were provided by AGI to investors in the Funds.  (Gov. Opp. at 16.)  The

Indictment identifies numerous examples of these alleged alterations, including changes to

spreadsheets that detailed the Funds' hedging positions (Indictment ¶¶ 40-44); allegedly altered

risk reports originally generated by an independent subsidiary of Allianz (id. ¶¶ 45-50.); and

allegedly altered performance projections that were purportedly shown to actual and prospective

investors and were meant to "hide from investors the potential downside risk to which their

investments were exposed," (Id. ¶¶ 52-58)  The Indictment alleges that all three categories of

misrepresentations in the scheme were intended to "hide from investors the amount of risk [Mr.

Tournant and his alleged co-conspirators] caused the Funds to incur in order to generate the

Funds' positive returns, attract and retain capital, and increase [the] compensation [of portfolio

managers]."  (Id. ¶ 3.)

        Unlike cases, such as the Second Circuit's decision in Ciminelli and other

decisions resting on the "right-to-control" theory, in which the alleged harm to victims was

solely the deprivation of information that was valuable in making economic decisions, the

Indictment here does not cast this risk-related information as the property of which victims were

defrauded.  Rather, the Indictment alleges that the scheme of which the alleged

misrepresentations and omissions were part was designed to attract and retain actual investments

of assets in the Funds which, when invested in ways inconsistent with the descriptive

information given to the investors, produced high financial returns of which Mr. Tournant, other

Fund managers, and AGI obtained large shares.  The wire fraud conspiracy charged in the

Indictment thus had, as the Indictment alleges, the object of obtaining and retaining tangible property—money.  (See Indictment ¶ 3 (Tournant and co-conspirators "committed the scheme in order to hide from investors the amount of risk they caused the Funds to incur in order to . . . attract and retain capital, and increase their compensation.").)

Notwithstanding these allegations related to the goal of attracting and retaining investments in the Funds, Mr. Tournant contends in his Reply that the wire fraud object remains deficient because compensation out of investment returns, i.e., his performance fee, was the object of the alleged fraudulent scheme, not the specific money or property that Mr. Tournant allegedly induced investors and prospective investors to commit to the Funds.[1]  (Def. Reply at 15-16 (citing Indictment ¶ 18).)  He further contends that the Funds' investors "retained ownership over the money they invested in the Funds . . . and had the right to redeem their investments."  (Def. Reply at 15 (citing Indictment ¶¶ 5, 30, 69).)  On this basis, Mr. Tournant attempts to distinguishes the scheme alleged in the Indictment from cases cited by the Government where courts in this District declined to dismiss wire fraud charges.  (Reply Mem. at 16-17 (citing United States v. Bankman-Fried, 2023 WL 4194773, at *8-10 (S.D.N.Y. June 27, 2023); United States v. Barbera, 2023 WL 6066249, at *1 (S.D.N.Y. Sept. 18, 2023)).)

Mr. Tournant's argument is contrary to binding circuit precedent.  In United States v. Males, 459 F.3d 154 (2d Cir. 2006), the appellant, Stephen Males, Jr. had been

---

[1]	Mr. Tournant makes an additional cursory argument on Reply that the wire fraud object cannot properly map onto all four categories of victims detailed in paragraph 5 of the Indictment.  (Reply Mem. at 14-15.)  Paragraph 5 appears in the section of the Indictment entitled "Overview of the Scheme," and contains the factual allegations underlying all five objects alleged in the conspiracy under Count One.  (Indictment ¶ 5.)  The wire fraud object does not, however, specifically reincorporate all factual allegations (see Indictment ¶ 76), and the Government does not allege that each object gave rise to each and every category of victims.

convicted by a jury of wire fraud in violation of 18 U.S.C. section 1343.  The court summarized

the appellant's scheme as follows:

> Males . . . engineered a fraudulent scheme in order to bilk investors out of
> millions of dollars. [Males] identified himself to potential investors as the
> lawyer for a firm named the Bailey Group and promised exorbitant returns
> on their investments -- upwards of 100% per week -- if the investors
> would agree to allow him to freeze or reserve their accounts in favor of the
> Bailey Group and add two of his "traders" as signatories to the accounts . .
> . .

Males, 459 F.3d at 156.  Males, like Mr. Tournant, argued that he could only have

been convicted of wire fraud if the jury found that Males had "intended to 'obtain' his victim's

money."  Id. at 158.  "[I]f", according to Males, "the jury found that his intent was only to freeze

[an investor's] account temporarily, and not to transfer the money to himself or an accomplice or

to remove any money from [said] account permanently," he could not be found guilty of wire

fraud.  Id.

The Second Circuit rejected Males' argument, holding, based on its review of

prior decisions addressing "the meaning of 'scheme or artifice for obtaining money or property'

in the context of the mail fraud statute," that a "defendant does not need to literally 'obtain'

money or property to violate the statute."  Id. at 158 (citing Porcelli v. United States, 404 F.3d

157, 162 (2d Cir. 2005).  Temporary deprivation of a victim's "ability to use his personal

property" in connection with a scheme to defraud the victim is, under Males, sufficient to

support a wire fraud conviction.  Males, 459 F.3d at 158.  The Court therefore held that "[t]he

requirement under § 1343 that the defendant devise a scheme or artifice for obtaining money or

property is satisfied where a defendant fraudulently obtains the use of another person's money or

property for a period of time, using it for his own personal profit, and depriving the owner of the

ability to do so."  Id. at 158-59 (emphasis in original).

While Mr. Tournant did not explicitly insist that investors maintain their investments in the Funds for a specific period, as with the "non-depletion letters" executed in Males, the Indictment alleges that Mr. Tournant and his co-conspirators perpetuated the misrepresentation/omission scheme both to induce investments into the Funds, and to persuade investors to maintain their investments through allegedly false pretenses.  The alleged purpose of this deception was the use of investors' and prospective investors' money and property to generate high compensation based on performance fees.  The Indictment thus frames a charge of fraudulently obtaining the use of another's money or property, and is within the parameters of the wire fraud statute as articulated in Males.

In short, the wire fraud object of the Indictment charges the essential elements of the offense, tracking the language of 18 U.S.C. section 1343, and focusing on fraud with an object directed to obtaining and retaining investors' money for use by the Funds to generate returns from which Mr. Tournant benefited.  The wire fraud object also sets forth sufficient factual allegations to allow Mr. Tournant to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).  The Court therefore finds that the wire fraud object of the conspiracy charge, set forth in Count One of the Indictment, properly states an offense and is sufficient at this stage.

Dismissal of Count Three or Count Four of the Indictment

Mr. Tournant next argues that either Count Three or Count Four of the Indictment should be dismissed "because they both charge [him] with the same statutory violation, under the same subsection . . . based on the same conduct," rendering the Indictment multiplicitous.  (Def.

Mem. at 22.)  "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." United States v. Chacko, 169 F.3d 140, 145 (2d Cir. 1999) (citations omitted).  A multiplicitous indictment creates the potential of a violation of the Double Jeopardy Clause of the Fifth Amendment, as "the jury can convict on both counts, resulting in two punishments for the same crime."  United States v. Ansaldi, 372 F.3d 118, 124 (2d Cir. 2004) (citation omitted).

Ordinarily, a reviewing court applies the "same elements" or "Blockburger" test to determine whether "the two offenses charged separately in the indictment are really one offense charged twice."  Chacko, 169 F.3d at 146 (citing Blockburger v. United States, 284 U.S. 299 (1932)); United States v. Dixon, 509 U.S. 688, 696 (1993) (affirming application of the Blockburger test)).  However, as here, when the same statutory violation is charged more than once in the same indictment, "the question is whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution."  Ansaldi, 372 U.S. at 124 (citing Bell v. United States, 349 U.S. 81, 83-84 (1955)).  More plainly put, the inquiry is whether the relevant statute—as originally intended by Congress—allows a single transaction to give rise to multiple offenses.  See Bell, 349 U.S. at 83-84.

The Government asserts that Counts Three and Four of the Indictment are not multiplicitous because they properly charge Mr. Tournant with orchestrating a fraudulent scheme, in violation of Section 206 the Investment Advisers Act of 1940 (15 U.S.C. § 80b-6)[2] "with respect to two different sets of victims."  (Gov. Opp. at 18.)  Specifically, the Government

---

[2]    The subsections of Section 206 of the Investment Advisors Act of 1940, as amended, map onto the subsections of the codified provision at Section 80b-6 of Title 15, meaning Section 206(1) is codified at 15 U.S.C. § 80b-6(1), Section 206(2) is codified at 15 U.S.C. § 80b-6(2), and so on.

argues that Count Three charges Mr. Tournant with violating Section 206 with respect to the Funds themselves, "accurately track[ing] the statutory language for violations of Section 206 . . . as set forth in 15 U.S.C. § 80b-6(1), (2), and (4)," whereas Count Four charges Mr. Tournant with violating Section 206 solely with respect to the investors and prospective investors of the Funds, citing 15 U.S.C. § 80b-6(4)[3] and SEC Rule 206(4)-8 (17 C.F.R. § 275.206(4)-8) promulgated thereunder.  Rule 206(4)-8 prohibits certain conduct therein defined as a "fraudulent, deceptive, or manipulative act, practice, or course of business" as against investors or prospective investors in pooled investment vehicles.  17 C.F.R. § 275.206(4)-8.

Although the Government acknowledges that the question of what may constitute a unit of prosecution for violations of Section 206 does not appear to have been litigated, it argues that multiple charges under Section 206 based on the alleged victim as the unit of prosecution are proper, as: (1) "the victim provides the unit of prosecution" in other statutory contexts, (Gov. Opp. at 19 (citing cases interpreting federal murder statutes)); and, (2) for securities fraud, "the allowable unit of prosecution is each securities transaction . . . even when the transactions were part of an overall scheme to defraud investors," (id. at 19-20 (citing to cases interpreting the Securities and Exchange Act of 1934 and regulations promulgated thereunder)).

Mr. Tournant characterizes the Government's argument as "fundamentally flawed," asserting that subsection 206(4) of the Investment Advisers Act "only permits the

---

[3]     Section 206(4) provides that: "It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.  15 U.S.C.A. § 80b-6(4) (Westlaw P.L. 188-22).

charge [set forth in that subsection] when it is based on a violation of the SEC rules and regulations." (Reply Mem. at 17-18.) Because Count Three charges Section 206 as a whole, including subsection (4), and does not identify an accompanying SEC rule or regulation that has been violated by the alleged conduct, Mr. Tournant reasons that either: (1) Count Three is defective, because it is devoid of an alleged underlying SEC regulatory violation, an essential element of the offense, and it is therefore "not apparent what rule the grand jury indicted Mr. Tournant under"; or (2) "the government intended that Section 206(4) of Count Three and Count Four refer" to Rule 206(4)-8, which Mr. Tournant asserts is the only "potentially applicable" rule to this case, meaning the Counts both refer to conduct against investors and prospective investors, and are therefore multiplicitous. (Reply Mem. at 18-19.)

The Court finds that the alleged victim may serve as the appropriate unit of prosecution for charges brought under Section 206 of the Investment Advisers Act, such that separate counts under Section 206 relating, on the one hand, to hedge funds and other pooled investment vehicles—in this case, the Structured Alpha Funds—and, on the other, to the investors and prospective investors in those pooled investment vehicles, are proper. Looking to the text of Section 206, subsections (1) and (2) of the statute prohibit fraudulent or deceptive conduct by an "investment adviser" as against any "client or prospective client," whereas subsection (4) generally bars investment advisers from engaging in fraudulent, deceptive, or manipulative conduct, and delegates rulemaking authority to the SEC to "prescribe means reasonably designed to prevent" such conduct by rules and regulations. 15 U.S.C.A. § 80b-6 (Westlaw through P.L. 188-22).

The Act provides no definition of "client," but the term as used in subsections 206(1) and 206(2) has historically been interpreted to apply to pooled investment vehicles as a

whole, such as the Funds involved in this case.  See, e.g., Goldstein v. SEC, 451 F.3d 873, 881-

83 (D.C. Cir. 2006).  Following the 2006 decision in Goldstein v. SEC, wherein the D.C. Circuit

"expressed the view" that Section 206's use of the term "client" could not reasonably be

interpreted to include both investors or prospective investors and the pools themselves, the SEC

promulgated Rule 206(4)-8 to clarify the scope of Section 206's protections for such investors

and prospective investors.  See Prohibition of Fraud by Advisers to Certain Pooled Investment

Vehicles; Accredited Investors in Certain Private Investment Vehicles, 72 Fed. Reg. 400, 401

(Jan. 4, 2007) (codified at 17 C.F.R. pts. 230, 275).  This regulation accords with the well-

established understanding that subsection 206(4) "applies . . . to persons other than clients."

Goldstein, 451 F.3d at 881 n.6 (citing Abrahamson v. Fleschner, 568 F.2d 862, 877-78 (2d Cir.

1977); United States v. Elliott, 62 F.3d 1304, 1311-13 (11th Cir. 1995)).  Just as Count Three

and Count Four are structured in the Indictment, the SEC has, since the promulgation of Rule

206(4)-8, regularly brought enforcement actions against advisers for unlawful fraudulent conduct

against "clients," i.e., hedge funds and other pooled investment vehicles, under subsections (1)

and (2) of Section 206, and separately charged such conduct as against investors and prospective

investors under subsection 206(4) and SEC Rule 206(4)-8.  See, e.g., SEC v. SBB Research

Grp., LLC, No. 19-CV-6473-SJC (N.D. Ill. 2019); SEC v. Yorkville Advisors, LLC, 12-CV-

7728-GBD (S.D.N.Y. 2012); SEC v. Balboa et al., 11-CV-8731-PAC (S.D.N.Y. 2011).

Even if Mr. Tournant is correct that a violation of subsection 206(4) may only be

charged based upon a violation of the SEC rules and regulations—an issue the Court need not

decide in the context of this motion practice[4]—dismissal of Count Three in its entirety would not

---

[4]    Mr. Tournant cites no authority in support of this position, and because he has raised this
argument for the first time on Reply, the Government has had no opportunity to argue its
understanding of the proper charging practice with regard to subsection 206(4).

be warranted.  As the Government notes in its opposition, "Count Three accurately tracks the statutory language for violations of Section 206 of the Investment Advisers Act," specifically alleging fraudulent conduct as against "the Structured Alpha Funds."  (Gov. Opp. at 18.)  The statutory allegations for the charge also cite to Section 206 in its entirety, and the Count incorporates the factual allegations contained in paragraphs 1 through 71 and 77 of the Indictment.  (See Indictment ¶ 81 (citing to "Title 15, United States Code, Section[] 80b-6"); id. at ¶ 80.)  The Indictment therefore sufficiently states an offense with respect to the Structured Alpha Funds.  See FED. R. CRIM. P. 7(f); United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (holding that an indictment is facially sufficient if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense").  Count Four does not charge an offense with respect to the Structured Alpha Funds,

---

Subsection (4) was added to the Investment Advisers Act in 1960.  Pub. L. No. 86-750, 74 Stat. 885 (1960).  The legislative history indicates that the amendment was meant to address the lack of clarity as to the SEC's rulemaking authority under Section 206.  See H.R. REP. NO. 86-2179, at 7-8 (1960) ("Because of the general language of section 206 and the absence of express rulemaking power in that section, there has always been a question as to the scope of the fraudulent and deceptive activities which are prohibited and the extent to which the Commission is limited in this area by common law concepts of fraud and deceit . . . [Section 206(4)] would empower the Commission, by rules and regulations to define, and prescribe means reasonably designed to prevent, acts, practices, and courses of business which are fraudulent, deceptive, or manipulative.").  The Senate Report accompanying the 1960 amendment also suggests that the general prohibition imposed by the first sentence of subsubsection (4) was meant to operate independently from the grant of rulemaking authority found in the second sentence.  See S. REP. NO. 86-1760 (1960) (emphasis added) ("[S]ection 9 of the bill would amend Section 206 to add a prohibition against engaging in conduct which is fraudulent, deceptive, or manipulative and to authorize the Commission by rules and regulations to define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."); see also United States v. O'Hagan, 521 U.S. 642, 667 (1997) (describing an analogous provision of the Securities and Exchange Act as containing a "self-operating proscription" in the first sentence, while the "second sentence delegates definitional and prophylactic rulemaking authority" to the SEC).

and its charge with respect to investors and potential investors cites the pertinent SEC regulation.

Neither Count incorporates the unit of prosecution charged in the other.  The request to strike

Count Three or Count Four as multiplicitous is therefore denied.


Striking Paragraphs 7 and 69 of the Indictment

Finally, Mr. Tournant moves to strike paragraphs 7 and 69 of the Indictment,

arguing that the dollar amounts in those paragraphs representing the total lost market value to the

Funds ($7 billion) and the lost investor principal ($3.2 billion) (collectively, the "loss amounts")

following the onset of COVID-19 amount to surplusage.  (Def. Mem. at 23-24.)  Federal Rule of

Criminal Procedure 7(d) provides that, upon motion of the defendant, "the court may strike

surplusage from the indictment or information."  Id.  Motions to strike surplusage are, however,

subject to an "exacting standard," and will be granted only where the challenged material is "not

relevant to the crime charged and [is] inflammatory and prejudicial."  United States v. Scarpa,

913 F.2d 993, 1013 (2d Cir. 1990) (emphasis added) (citations omitted).  "If evidence of the

allegation is admissible and relevant to the charge, then regardless of how prejudicial the

language is, it may not be stricken."  Id. (citation omitted).

Mr. Tournant contends that the loss amounts meet this exacting standard because

the amounts are both "unduly prejudicial . . . to the crimes charged" and "immaterial to the

elements of the charged offenses."  (Def. Mem. at 23-25; Reply Mem. at 19.)  Mr. Tournant

claims that the unfair prejudice stems from the fact that the loss amounts fail to appropriately

account for the losses attributable to the onset of the COVID-19 pandemic, and that the figures

"represent the Funds' total losses for all investors," rather than losses suffered by the investors

whom the Government alleges are victims of the offenses charged in the Indictment.  (Reply

Mem. at 20 (emphasis in original).)  The Government disputes both positions, arguing that the language regarding the loss amounts in the Indictment clearly contextualizes the $7 billion in loss as occurring "during a period of increased market volatility and severe dislocations" and states that "investors were exposed to those losses as a result of the defendant's fraud" (Gov. Opp. at 22 (citing Indictment ¶ 69)) and, further, that evidence of actual loss is relevant and admissible at trial.  (Gov. Opp. at 23.)

Specifically, the Government appears to suggest that the loss amounts are relevant to the issue of materiality.  (Gov. Opp. at 23 (citing United States v. Forbes, 249 F. App'x 233, 236-37 (2d Cir. 2007), cert. denied, 553 U.S. 1053 (2008), for the proposition that "investor losses were probative on the issue of materiality").)  Under SEC Rule 10b-5—charged as both an object of the Count One conspiracy and as a basis of the substantive charge of securities fraud in Count Two pursuant to 15 U.S.C. § 78j(b)—it is unlawful "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]"  17 C.F.R. § 240.10b-5(b) (emphasis added).[5]  Mr. Tournant argues that the Government's citation to Forbes is inapposite, as the relevant securities in Forbes were publicly traded, "hence the market reaction . . . was

---

[5]        Count Four (Indictment ¶¶ 82-83), which repeats and realleges paragraphs 1 through 71 and 77 of the Indictment, charges Mr. Tournant with, inter alia, violation of SEC Rule 206(4)-8, which also contains a materiality standard.  See 17 C.F.R. § 206(4)-8(a)(1) ("It shall constitute a fraudulent, deceptive, or manipulative act, practice or course of business . . . for any investment adviser . . . to . . . [m]ake any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .").

found relevant to materiality," whereas the Funds at issue in this case were private.  (Reply Mem. at 21.)

While the distinction Mr. Tournant highlights is accurate as a factual matter, the Court cannot rule out at this point that evidence of the loss amounts following the "COVID crash" may nevertheless be relevant to establishing materiality of the allegedly fraudulent "promises and representations made by [Mr. Tournant] about risk management."  (Gov. Opp. at 23.)  The Indictment alleges certain of these misrepresentations specifically concerned risk protection strategies that were marketed as "safeguarding[ing] against losses in the event of a market crash."  (See, e.g., Indictment ¶ 16.)  In its Opposition, the Government suggests that the loss amounts essentially represent the losses "to which investors were exposed" as a result of the alleged misrepresentations, which could bear on the materiality of those alleged misrepresentations.  (Gov. Opp. at 23.)  In light of these contentions, Mr. Tournant has not "demonstate[d] clearly that the allegations are irrelevant to the crimes charged" at this time.  See United States v. Maxwell, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021) (citing United States v. Napolitano, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)).

The motion to strike the allegations as surplusage is therefore denied, without prejudice to renewal in connection with trial.  See, e.g., Maxwell, 534 F. Supp. 3d at 322 (citations omitted) ("Courts in this District generally delay ruling on any motion to strike until after the presentation of the Government's evidence at trial, because that evidence may affect how specific allegations relate to the overall charges.").  If, at that juncture, the Government has failed to offer the loss amounts for a purpose that is relevant and admissible with respect to the crimes charged in the Indictment, the "motion to strike may be renewed, the [allegedly prejudicial material] stricken and an appropriate instruction given to the jury."  United States v.

Castellano, 610 F. Supp. 1359, 1428-29 (S.D.N.Y. 1985) (quoting United States v. Clark, 541

F.2d 1016, 1018 (4th Cir. 1976)).


CONCLUSION

For the reasons explained above, the Motion is granted to the extent that the

Government must provide a bill of particulars identifying the institutional and individual

investors and prospective investors, as well as any consultants, that the Government will or may

attempt to prove were victims of the scheme alleged in Count One of the Indictment.  The bill of

particulars must be provided by December 20, 2023.  The Motion is denied in all other respects.

The parties are directed to meet and confer on a proposed pretrial schedule—

including expert disclosures, Daubert motions, if any, motions in limine, and motions pursuant to

Federal Rule of Evidence 404(b)—and to set forth the proposed schedule in a joint letter, to be

filed by 12:00 p.m. noon on January 5, 2024.

Docket entry no. 98 is resolved.


SO ORDERED.

Dated: New York, New York
          Dec. 13, 2023


/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge