**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-CR-276 (LTS) |
| v. | |
| GREGOIRE TOURNANT, | |
| Defendant. | |

**DEFENDANT GREGOIRE TOURNANT'S SENTENCING MEMORANDUM**

### TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

GREG'S BACKGROUND ..................................................................................................... 4

   I.   Greg's Significant Health Challenges ....................................................................... 4

       *1.*   *Greg's Diagnosed Conditions* .......................................................................... 5

       *2.*   *Greg's Family History of Neurological Issues* ................................................ 9

       *3.*   *The Impact of Greg's Conditions on His Ability to Function* ........................ 10

       *4.*   *Greg's Therapies and Medications* ................................................................. 11

       *5.*   *The Deterioration of Greg's Health* ............................................................... 12

       *6.*   *Greg's Prognosis and Planning for the Future* .............................................. 13

       *7.*   *The Government and Probation Agree that Greg is Facing Serious Health Issues* ....... 15

   II.   Greg's Life and Contributions to His Family and Community ................................... 15

       *1.*   *Greg's Upbringing and Childhood* ................................................................. 15

       *2.*   *Greg at University* ........................................................................................... 16

       *3.*   *Greg as a Professional* .................................................................................... 16

       *4.*   *Greg's Family Life* .......................................................................................... 18

       *5.*   *Greg's Commitment to his Friends* ................................................................. 23

       *6.*   *Greg's Commitment to the Community* ............................................................ 26

RELEVANT SENTENCING CONSIDERATIONS .............................................................. 29

   1.   GREG'S SEVERE MEDICAL CONDITIONS SUPPORT A VARIANCE TO A NON-CUSTODIAL SENTENCE .......................................................................................... 31

       *A.*   *Greg is Suffering from Complex Health Issues* ............................................. 32

       *B.*   *Greg's Medical Needs Favor a Non-Custodial Sentence* ............................... 34

       *C.*   *The Bureau of Prisons' Ability to Provide Adequate Medical Care to Greg is Uncertain at Best* ..................................................................................................... 36

   2.   GREG'S PERSONAL HISTORY AND CHARACTERISTICS SUPPORT A NON-CUSTODIAL SENTENCE .......................................................................................... 41

       *A.*   *Greg's Personal Characteristics and History of Good Works Support a Downward Variance to a Non-Custodial Sentence* ..................................................... 41

       *B.*   *Greg's Status as a Zero Point Offender Supports a Downward Variance to a Non-Custodial Sentence* ..................................................................................... 46

3.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT A
     DOWNWARD VARIANCE ................................................................................. 48

     A.   *The Facts and Circumstances of Greg's Offense Support a Downward Variance* ......... 48

     B.   *A Non-Custodial Sentence is Sufficient Given that Actual Loss is Zero* ........................ 50

     C.   *Regardless of the Court's Findings, Loss is a Poor Metric for Sentencing Greg* .......... 50

4.   IMPRISONMENT IS NOT NECESSARY TO PROVIDE JUST PUNISHMENT ......... 52

5.   IMPRISONMENT IS NOT NECESSARY TO ACHIEVE THE GOALS OF
     DETERRENCE AND PROTECTION OF THE PUBLIC ................................................ 56

CONCLUSION .......................................................................................................................... 58

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Dean v. United States*,
  581 U.S. 62 (2017) ................................................................................................ 29

*Nelson v. United States*,
  555 U.S. 350 (2009) .............................................................................................. 29

*Pepper v. United States*,
  562 U.S. 476 (2011) .............................................................................................. 41

*Prelaj v. United States*,
  No. 18-cv-4864, 2020 WL 3884443 (S.D.N.Y. Jul. 9, 2020) ................................. 42

*United States v. Bailin*,
  No. 05-cr-48-01, 2008 WL 4279521 (S.D.N.Y. Sept. 18, 2008) ............................ 53

*United States v. Balboa*,
  622 F. App'x 31 (2d Cir. 2015) .......................................................................... 2, 48

*United States v. Bankman-Fried*,
  No. 22-cr-673 (S.D.N.Y. Mar. 28, 2024) .............................................................. 29

*United States v. Beck*,
  425 F. Supp. 3d 573 (M.D.N.C. 2019) .................................................................. 37

*United States v. Belin*,
  No. 10-cr-2213, 2023 WL 3867751 (D.N.M. June 7,2023) .................................. 37

*United States v. Blumberg*,
  No. 14-cr-458 (D.N.J. Dec. 10, 2018) ................................................................... 31

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008) .................................................................................. 29

*United States v. Ciaccio*,
  No. 19-cr-833 (S.D.N.Y. Nov. 18, 2021) ............................................................... 31

*United States v. Cohen*,
  No. 1:19-cr-00741 (June 9, 2020 S.D.N.Y) ........................................................... 55

*United States v. Contorinis*,
  692 F.3d 136 (2d Cir. 2012) .................................................................................. 54

*United States v. Corsey*,
  723 F.3d 366 (2d Cir. 2013) ............................................................................ 29, 50

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004)......................................................... 51, 56

*United States v. English*,
   No. 19-cr-20164, 2022 WL 17853361 (E.D. Mich. Dec. 22, 2022) ....................................... 37

*United States v. Faibish*,
   No. 12-cr-265, 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) ................................. 52

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012)......................................................... 30, 51

*United States v. Kessler*,
   734 F. App'x 760 (2d Cir. 2018) ......................................................... 42

*United States v. Klein*,
   No. 11-cr-255, 2011 WL 6779309 (E.D.N.Y. Dec. 27, 2011) ................................. 58

*United States v. Leitch*,
   No. 11-cr-00609, 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013) ................................. 53

*United States v. Lumiere*,
   No. 16-cr-483 (S.D.N.Y. June 14, 2017) ......................................................... 51

*United States v. Luna-Jasso*,
   No. 14-cr-3523, 2015 WL 1006390 (D.N.M. Feb. 19, 2015) ................................. 57

*United States v. Mateo*,
   299 F. Supp. 2d 201 (S.D.N.Y. 2004)......................................................... 57

*United States v. McCarthy*,
   No. 22-cr-00491, 2023 WL 37641996 (E.D.N.Y. May 30, 2023)........................................... 57

*United States v. Neiman*,
   828 F. Supp. 254 (S.D.N.Y. 1993)......................................................... 53

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ......................................................... 51

*United States v. Pena*,
   No. 15-cr-551 (S.D.N.Y. Apr. 17, 2017) ......................................................... 42

*United States v. Peters*,
   732 F.3d 93 (2d Cir. 2013) ......................................................... 54

*United States v. Phillips*,

256 F. App'x 415 (2d Cir. 2007) .......................................................................... 41

*United States v. Rosario,*
No. 17-cr-27, 2023 WL 7305260 (S.D.N.Y. Nov. 6, 2023) ..................................... 41

*United States v. Rutkoske,*
506 F.3d 170 (2d Cir. 2007) ................................................................................. 50

*United States v. Scott,*
No. 06-cr-988, 2021 WL 5989797 (S.D.N.Y. Dec. 17, 2021) ................................. 42

*United States v. Servider,*
No. 17-cr-60 (S.D.N.Y. July 27, 2017) ................................................................. 51

*United States v. Shapiro,*
No. 14-cr-399, 2022 WL 2758129 (E.D.N.Y. July 14, 2022) ................................. 51

*United States v. Sobol,*
No. 08-cr-76, 2008 WL 4427908 (E.D.N.Y. Sept. 12, 2008) ................................. 32

*United States v. Stewart,*
590 F.3d 93  (2d Cir. 2009) ................................................................................... 54

*United States v. Stewart,*
No. 15-cr-287 (S.D.N.Y. May 4, 2016) ................................................................. 44

*United States v. Tomko,*
562 F.3d 558 (3d Cir. 2009) ................................................................................. 45

*United States v. Vigil,*
476 F. Supp. 2d 1231 (D.N.M. 2007) .................................................................. 55

*United States v. Voudaris,*
No. 18-cr-217 (S.D.N.Y. Mar. 2, 2020), Dkt. No. 292 .......................................... 31

**Statutes**

18 U.S.C. § 3561 .................................................................................................. 30

**Other Authorities**

U.S.S.G §2B1.1 ............................................................................................... 33, 43

U.S.S.G §4C1.1 .................................................................................................... 39

U.S.S.G §5C1.1 ........................................................................................... 38, 39, 41

Defendant Gregoire "Greg" Tournant, by and through his counsel, respectfully submits this memorandum and accompanying exhibits to assist the Court in sentencing.

## PRELIMINARY STATEMENT

Greg Tournant stands before the Court remorseful for and ashamed of his conduct for which he fully accepts responsibility. He respectfully requests that the Court impose a non-custodial sentence that may include a period of home confinement. Greg submits that his proposed sentence is "sufficient, but not greater than necessary," to achieve the aims of sentencing, especially given his debilitating health conditions and the other factors that the Court is required to consider pursuant to 18 U.S.C. § 3553(a) ("Section 3553(a)"). As discussed extensively in the accompanying Memorandum Regarding the Applicable Sentencing Guidelines (the "Guidelines Submission"), Greg submits that when properly calculated, Greg's Guidelines offense level is reduced from 41 to 11 and a non-custodial sentence is therefore appropriate. U.S.S.G. § 5C1.1 cmt. n.10(B). Notwithstanding the applicable Guidelines range, Greg further submits that a non-custodial sentence is also the most reasonable sentence, in light of the unique circumstances present in this case.

As both the Government and Probation agree, Greg is sick. 

1

███  He therefore submits that a "sufficient, but not greater than necessary" sentence in this case does not include a term of imprisonment, ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████  Under these circumstances, and as elaborated in detail below and in Dr. Maghidman's declaration and the expert report of neurologist R. Ryan Darby, M.D. ("Darby Report"), a sentence involving incarceration would be unwarranted and dangerous for Greg.

In addition to the Section 3553(a) factors relating to health issues, the other Section 3553(a) factors support a non-custodial sentence.  As is demonstrated by this submission and the accompanying letters from his loved ones, Greg has lived his life with integrity, generosity, and care for his community, providing valuable and critical support to his family and friends.  Greg is a modest man who cares deeply about others; he has agonized over his involvement in this case and has already suffered the consequences of his actions.  Greg is also a first-time, non-violent offender with a low risk of recidivism.  Greg's history and personal characteristics thus weigh in favor of a sentence that does not include imprisonment.

The nature and circumstances of the offense also support a substantial downward variance. Greg is remorseful and takes full responsibility for the offense conduct of altering reports sent to investors in the Structured Alpha Funds (the "Funds") without their knowledge.  However, when putting Greg's misrepresentations into context, his conduct is less serious than the typical investment advisor fraud scheme, including the cases on which the Government and Probation rely on in which investors "receive[d] nothing of value in return."  *See* PSR ¶ 40(a) (citing to *United States v. Balboa*, 622 F. App'x 31, 32 (2d Cir. 2015)).  Unlike many such schemes, investors' money (including Greg's) was in fact invested in the Funds, and not simply used to pay earlier

investors to create an illusion of legitimacy and profit.  In addition, with Greg at the helm of the Funds for over 15 years, the Funds were highly profitable, with investors receiving substantial value for their investments.  Moreover, as reflected in his separately filed Guidelines Submission, if the Court agrees with Greg's expert that the loss is zero, the Guidelines explicitly provide that a non-incarceratory sentence "is generally appropriate."  U.S.S.G. § 5C1.1 cmt. n.10(B).  Even if the Court disagrees with the defense regarding the loss amount, a downward variance is still reasonable in light of the outsized impact of the loss enhancement on Greg's Guideline sentencing range.

Moreover, a non-custodial sentence with home confinement provides substantial punishment as Greg would be confined and have his liberty severely restricted.  Greg is also subject to a very substantial forfeiture order of more than $17 million dollars, including forfeiture of more than $14 million of deferred compensation, in addition to a $3 million future payment.  *See* Consent Preliminary Order of Forfeiture/Money Judgment, ECF No. 138 at 1-2.  Further, Greg faces serious collateral consequences: he will forever be branded a felon and will never work in the financial markets again, which is, itself, punishment with life-altering consequences.  The notoriety and shame that accompany a high-profile criminal prosecution exact another heavy toll.

His proposed sentence also furthers the sentencing goals of deterrence, protection of the public, and rehabilitation.  There is no risk of recidivism here.  The conduct at issue is an aberration for Greg, a first-time, non-violent offender.  Also, there is no evidence that imposing incarceration would have a general deterrent effect, as research demonstrates that even incarceration can be an ineffective general deterrent.

Accordingly, we respectfully submit, consistent with the Section 3553(a) factors, that a non-custodial sentence that may include home confinement, the $17,577,908 forfeiture obligation,

*see* Consent Preliminary Order of Forfeiture/Money Judgment, ECF No. 138 at 1, and the mandatory $200 special assessment, is "sufficient, but not greater than necessary" to achieve the aims of sentencing.

### GREG'S BACKGROUND

Since 2020, Greg has suffered from a complex series of severe neurological symptoms, 

Despite these unfortunate health challenges, those who know Greg well consistently describe him as a modest, generous, genuine and caring man who prides himself on working hard and helping others.  His generosity and genuine nature are echoed in letter after letter submitted to the Court by his family, friends, and colleagues.  In light of both his serious health issues and contributions to his family, friends, and community, it follows that neither Greg nor society is served by his incarceration.

### I.   Greg's Significant Health Challenges

---

[1] Dr. Maghidman is a board-certified internal medicine specialist with 24 years of experience.  He is affiliated with Mount Sinai Hospital in Miami Beach, Florida.  He obtained his medical degree from Cayetano Heredia University in Peru in 1999 and completed his residency and fellowship at the University of Texas at Houston in 2005.  Levine Decl. Ex. B (Maghidman Decl.) ¶ 1.

[2] Dr. Darby is a board-certified neurologist and currently an assistant professor in the Department of Neurology at Vanderbilt University.  He has extensive training and experience in behavioral neurology and neuropsychiatry, as well as in neuroimaging and cognitive neuroscience.  He received his undergraduate



*1. Greg's Diagnosed Conditions*



degree from Princeton University and his medical degree from Vanderbilt University.  Levine Decl. Ex. C
(Darby Report) ¶ 1.









\*      \*      \*



### 2. Greg's Family History of Neurological Issues

Greg's conditions are also particularly concerning in light of his family history of neurological disorders. As discussed more fully below, in March 2015, Greg's daughter Christina passed away at 17 years old after tragically taking her own life, an action directly attributable to her worsening neurological symptoms associated with her diagnosis of Dysautonomia (Dysfunction of the Autonomic Nervous System). Additionally, in 2017, Greg's father passed away from a neurological condition, amyotrophic lateral sclerosis ("ALS"). *See* Levine Decl. Ex. A at 1 (A. Schuelke Letter).

9



3. *The Impact of Greg's Conditions on His Ability to Function*



*4. Greg's Therapies and Medications*





5. *The Deterioration of Greg's Health*





6.  *Greg's Prognosis and Planning for the Future*



    7.   *The Government and Probation Agree that Greg is Facing Serious Health Issues*

Acknowledging the serious health issues Greg is facing, the Government has agreed, following interviews with Dr. Maghidman, as well as Greg's physical therapist, "not [to] contest or otherwise oppose a non-Guidelines sentence based on the defendant's health conditions." *See* Plea Agreement at 4. In addition to questioning Greg's caregivers, the Government conducted its own independent medical review and engaged its own medical expert to examine Greg physically. That expert, Dr. Inna Kleyman, a board-certified doctor specializing in general neurology at Columbia University, concluded that Greg was "experiencing real symptoms" and has a real impairment. PSR ¶ 90. Finally, Probation has unequivocally concluded that Greg's health was a "significant mitigating factor" supporting Probation's recommended sentence, and that "[h]is complicated medical situation would complicate [his] incarceration." PSR at 49.

## II.   <u>Greg's Life and Contributions to His Family and Community</u>

    1.   *Greg's Upbringing and Childhood*

Greg grew up in France, just outside of Paris. PSR ¶¶ 73, 75. Greg is the oldest of four children—he has three younger sisters, Céline, Amélie, and Lucile. *Id.* ¶ 74. From an early age, Greg took on a leadership role in his family, serving as a mentor to his younger sisters. Levine Decl. Ex. A at 14 (L. Faurel Letter) ("Being 13 years older than me, Greg often served as a mentor in my life."), 11 (A. Fourel Letter); PSR ¶ 74. Amélie described Greg as having "always been engaged in [her] life as well as in the lives of all of [their] family members," remembering fondly how Greg would drive her to and coach her through her golf tournaments throughout her adolescence. Levine Decl. Ex. A at 11 (A. Fourel Letter).

His father Phillipe, a sports medicine doctor, instilled in Greg a love for sports at an early age. *See* PSR ¶ 73. Greg tried on his first pair of skis at the age of two and later became a ski-

racer. From very early on, it was clear that Greg was a hard worker. He participated in several ski-racing pre-professional competitions. Greg actively pursued professional tennis on a parallel track. His childhood friend describes him as a leader who "displayed a willingness to unite [his tennis] team and to play collectively." Levine Decl. Ex. A at 42 (X. Fournet Letter). Between the ages of 16 and 21, Greg played professional tennis and participated in the ITF World Tennis Juniors and ITF Men's World Tennis Tour, playing in iconic events such as the French Open and U.S. Open Tennis Championships. *See* PSR ¶ 111.

As a result of universal mandatory service, Greg also served in the French military from October 1985 to April 1986. PSR ¶¶ 76, 104.

### 2. Greg at University

As a result of injuries, Greg retired from professional tennis and instead elected to play tennis at the university level. Having received a full scholarship, Greg moved to San Antonio, Texas in 1987 to attend Trinity University. PSR ¶¶ 77, 100. Greg excelled at university—he majored in finance and economics, while continuing to play Division 1 tennis through graduation in 1991. *See id.* ¶ 100. Greg then pursued a master's degree in business administration from Northwestern University, graduating in 1995. *Id.* ¶ 101.

### 3. Greg as a Professional

Following completion of his master's degree, Greg began his career in finance consulting at McKinsey & Company in Houston, Texas from 1995 to 1998. PSR ¶ 109. From 1998 to 2001, Greg worked as a financial analyst at Raymond James and Eagle Asset Management in St. Petersburg, Florida. PSR ¶ 108. As his former colleague and supervisor at Raymond James attests, "Greg was one of the most notable and impressive candidates that I ever met in my capacity as a

senior executive. . . .  He performed admirably and was always regarded as a creative, driven and high potential employee."  Levine Decl. Ex. A at 22 (K. Corba Letter).

While working to establish himself as a young professional, Greg remained devoted to his family.  At a time when most would solely be focused on their careers, Greg took on the role of primary caretaker for his grandmother.  As his sister writes, "between 1996 and 2001, [Greg] is the one who took care of [our] grandmother in her old age and up to her final days.  He managed all necessary logistics and medical decisions for her, making sure she was taken care of by the best possible doctors and staff, making sure she could enter the most appropriate facilities as she slowly lost her autonomy.  And finally[, he] managed all the end-of-life difficult decisions, bringing her his unconditional affection and support through all this time."  Levine Decl. Ex. A at 11 (A. Fourel Letter); *see also* Levine Decl. Ex. A at 13-14 (L. Faurel Letter) ("Greg was an extremely busy working professional with a young family.  Yet, he managed our grandmother's life on a daily basis with great devotion and benevolence."), 3 (T. Wilson Letter), 33 (R. Schlatter Letter).

In 2001, Greg joined Allianz Global Investors ("AGI"), rising through the ranks until he was promoted to Managing Director and Head of Structured Products, and where he remained until June 2021.  PSR ¶ 106.  Greg continued to exhibit the laudable qualities apparent in his character since childhood:  generosity, reliability, and integrity.  His colleague at AGI stated:

> Greg is one of the hardest workers I have ever encountered in my long career in financial markets.  He was always laser-focused on generating the best performance for all our clients.  His commitment to excellence was second to none.  While sometimes tough, Greg always invested a lot of time in training and coaching the newer and younger members of his team.  He was deeply involved in their career development.  Greg was also very generous and rewarded everyone well, something I had not always observed throughout my career with different financial firms.

Levine Decl. Ex. A at 44 (P. Pilavachi Letter).  Another colleague at AGI, Dean Papas, attributes his success to Greg, describing him as a "mentor" and noting that Greg gave him and numerous

other young professionals "many opportunities," and that "[w]hen you ask Greg for help, he prepares in advance, he listens, and he delivers thoughtful opinions and actionable guidance that you know has your best interest in mind. . . .  These are the actions of an unusually generous and caring person."  Levine Decl. Ex. A at 17 (D. Papas Letter).  As discussed more fully below, Greg has taken his role as a mentor seriously and a number of his friends and colleagues attest to the impact his coaching and mentoring have had on their lives, including his colleague at AGI Dean Papas.  (*See infra* at 17-18, 23-26.)  "Greg . . . goes way above and beyond . . . in his capacity as a friend and mentor not just to me, but to my friends, my family, and everyone else I've ever seen him interact with."  Levine Decl. Ex. A at 17 (D. Papas Letter).

### 4.  *Greg's Family Life*

Being a successful investment advisor was never defining for Greg.  Rather, it is "his dedication to his family" and caring for the ones that he loves that bring him purpose.  Levine Decl. Ex. A at 1 (A. Schuelke Letter).  As described by his family, Greg is a loving father, stepfather, partner, and brother who is "more interested in creating memories with the people in his life, than in having 'things,' such as flashy homes and cars."  Levine Decl. Ex. A at 4 (T. Wilson Letter).

### i.  <u>Greg as a Father</u>

Greg met his ex-wife Tava Wilson Tournant in 1990, and they were married from 1993 to 2002.  Greg and Tava had two beautiful children together, Nico and Christina.  Despite their divorce in 2002, Greg made significant efforts to keep his children at the center of his life.  Although Greg worked in New York, he "maintained a home in Florida" and "made trips back to Florida twice monthly" throughout Nico and Christina's childhood.  Levine Decl. Ex. A at 3-4 (T. Wilson Letter).  Greg attended Nico and Christina's activities and events on the weekends "without

18

fail" and made it a point to get to know their friends. *Id.* Greg also made it a point to spend the holidays with Tava, Nico, and Christina. *Id.*

Christina, like her father, was both a very gifted athlete and an exceptional scholar. She was a state champion in gymnastics at ages 7, 8, and 9, qualified for the state championships in swimming in high school, was captain of the track team and qualified for state championships in hurdles in high school, and was also valedictorian of her high school. Levine Decl. Ex. A at 4 (T. Wilson Letter). Christina was a superstar with an incredible work ethic—she was accepted and attended the Massachusetts Institute of Technology ("MIT") where she continued her swimming career. Levine Decl. Ex. A at 4 (T. Wilson Letter). Unfortunately, beginning in adolescence, Christina developed symptoms of a neurological disorder, and she would eventually be diagnosed with dysautonomia.[3] Levine Decl. Ex. B (Maghidman Decl.) ¶ 11; PSR ¶¶ 84, 92.

Some of Christina's symptoms included chronic joint pain, dizziness, eye tremors, and numbness of the extremities. Despite her symptoms, Christina pushed herself to enjoy her life, and she moved to Boston to attend MIT in the fall of 2014 with hopes of continuing her athletic career and studying biomedical engineering. Her symptoms worsened, however, and in February 2015, she experienced a physical and emotional breakdown. Despite her academic success and athletic victories at MIT, Christina was forced to take medical leave.[4]

---

[3] According to the advocacy group Dysautonomia International, "Dysautonomia is an umbrella term used to describe several different medical conditions that cause a malfunction of the Autonomic Nervous System. The Autonomic Nervous System controls the 'automatic' functions of the body that we do not consciously think about, such as heart rate, blood pressure, digestion, dilation and constriction of the pupils of the eye, kidney function, and temperature control. People living with various forms of dysautonomia have trouble regulating these systems, which can result in lightheadedness, fainting, unstable blood pressure, abnormal heart rates, malnutrition, and in severe cases, death." *See* Dysautonomia International, "What is dysautonomia?" www.dysautonomiainternational.org/page.php?ID=34 (last visited September 16, 2024).

[4] *See* Josh Solomon, "2014 Osceola Fundamental High valedictorian home from MIT found dead at TIA," *Tampa Bay Times* (Mar. 9, 2015). https://www.tampabay.com/news/publicsafety/2014-osceola-high-school-valedictorian-dies-while-home-from-mit/2220461/.

In March 2015, Christina passed away at 17 years old after tragically taking her own life, an action directly attributable to her worsening neurological symptoms that she believed had little hope of improving. Levine Decl. Ex. A at 4 (T. Wilson Letter). As Tava explained, "it was the physical pain that definitely led to emotional pain." Solomon, "2014 Osceola Fundamental High valedictorian home from MIT found dead at TIA." Christina told Tava that she would spend the night at Greg's house, but instead drove to the airport in Tampa, where she heartbreakingly jumped from the airport's garage. *Id.* Greg was "devastated by Christina's death" and "the pain of her passing was profound and left an indelible mark" on his and his family's life. Levine Decl. Ex. A at 4 (T. Wilson Letter), 8 (M. Hanania Letter). Both his son Nico and Tava believe that Greg "still grapples with the enormity of this loss," and "has not even begun to process it, much less beg[u]n healing." Levine Decl. Ex. A at 6 (N. Tournant Letter), 4 (T. Wilson Letter).

Although divorced since 2002, Tava and Greg have maintained a good and consistent relationship. Tava describes Greg as "compassion[ate]," showing great commitment when he stepped up to take care of his aging grandmother, supported her younger brother through his mental illness, and mentored her youngest brother, "welcom[ing] him into [their home] where . . . [he] lived with us throughout college." Levine Decl. Ex. A at 3 (T. Wilson Letter).

Greg has equally maintained a strong presence in his son's Nico's life, showing an "unwavering commitment to [his] well-being." Levine Decl. Ex. A at 6 (N. Tournant Letter). Nico describes his father as having a "kind heart and a strong sense of family values," and maintains that "[h]is dedication to our family and community has been unwavering, and his love and support have been a constant source of strength for me and my loved ones." Levine Decl. Ex. A at 7 (N. Tournant Letter). Tava states that "[d]espite his poor and deteriorating health over the past few years, Greg has consistently worked with Nico and shown patience and dedication to this in a way

20

many parents would not. Greg has been instrumental in guiding Nico through the beginning of his professional career. He also continued to plan time together with Nico even when he was too weak to participate in some of their preferred athletic activities."  Levine Decl. Ex. A at 4 (T. Wilson Letter).

ii.  <u>Greg as a Husband and Stepfather</u>

In June 2016, Greg married his current wife, Alexandra Schuelke, who describes him as "loving and supportive."  Levine Decl. Ex. A at 1 (A. Schuelke Letter).  The same qualities that come through in the letters of Greg's ex-wife, son, and colleagues are echoed in Alexandra's words as well.  Alexandra describes Greg's commitment to his family and friends, including his generosity and passion for mentorship, writing:

> Greg is an extremely committed individual, particularly in his dedication to his family and friends.  He is always motivated to share his knowledge and expertise, demonstrating a genuine passion for helping others succeed.  As a stepfather to my children, Greg has not only taken on the financial responsibility for their education but has also devoted countless hours to coaching them through their high school and university studies.  His involvement has been instrumental in their academic progress and personal development.

*Id.*  Both of his stepchildren, Charlene Hanania and Mathis Hanania, describe Greg as a generous "second father" and role model who "dedicated countless hours to coaching and mentoring" them. Levine Decl. Ex. A at 8 (M. Hanania Letter), 9 (C. Hanania Letter) ("From the beginning, I always saw Greg as a second father because he was attentive to us and made us feel like his own children.").  His stepson Mathis writes, "[b]eyond being a father figure, Greg has been a role model, sometimes even overshadowing my own father," describing Greg as having a "good heart and genuine interest in others."  Levine Decl. Ex. A at 8 (M. Hanania Letter).  His stepdaughter Charlene fondly remembers how Greg supported her dreams, stating:

> Having Greg by my side as I transitioned into adulthood has shaped me into the adult I am today. . . .  Saying that Greg has been generous is an understatement.  He has given me the wings to fly and become the accomplished woman I am today.  A

meaningful memory I cherish is when he gifted me my first camera and always encouraged me to take pictures while traveling, share them with him, and print them.  He was the first to recognize that I had an eye for photography and celebrated it.  A few years later, it meant a lot to me to gift him my first and only printed photography book of Costa Rica.

Levine Decl. Ex. A at 9 (C. Hanania Letter).

> iii.    <u>Greg as a Brother and Son</u>

Greg's immediate family similarly describes him as generous, caring, and committed to family.  His sister Amélie explains how Greg supported her when her husband was having health issues:

Greg is the one member of my family who supported me the most during these awful times, travelling from the US to be with us, visiting and being of great psychological help to both Christophe and me.  Times are much happier for us now, but I will never forget what my brother did for us during these years.  He has played a vital role in my husband's survival and my family's foundation.

Levine Decl. Ex. A at 12 (A. Fourel Letter).  Greg's sister Lucile describes how Greg welcomed her into his home in New York City where she lived with him when she was in graduate school, writing "I can attest that Greg is one of the most selfless and generous people.  He is deeply devoted to his family and friends."  Levine Decl. Ex. A at 13 (L. Faurel Letter).

Just as he cared for his grandmother until she passed away in 2001, Greg similarly cares for his aging mother from afar since he cannot travel to France to see her.  As his sister Amélie explains, Greg is responsible for managing his mother's care:

Currently, Greg is closely involved in helping our mother, 80 years old, a widow since 2017 and living on her own in France.  Despite being abroad and unable to travel to see her, he overlooks her financials, the organization of her house-aid, and is involved in all important decisions we need to take regarding her living conditions. It has been very difficult for him emotionally not being able to visit her for the past 4 years, but he manages to keep in very close contact with her, which is not easy given her advanced age and deteriorating cognitive state.

Levine Decl. Ex. A at 12 (A. Fourel Letter); *see also* Levine Decl. Ex. A at 45 (P. Pilavachi Letter); PSR ¶ 73.  His stepson Mathis further elaborates on Greg's role as a caregiver writing, "Greg is

deeply concerned about his aging mother and his inability to travel to France for [] several years has been very difficult. . . .  One of my biggest fears is that he may not be able to see her before she passes away."  Levine Decl. Ex. A at 8 (M. Hanania Letter).

### 5. *Greg's Commitment to his Friends*

Greg equally goes the extra mile for his friends.  Greg's character is best illustrated by the words of his family and friends, from all phases of his life.  For example, his friend and mentee Robert Feliciano describes how he met Greg at a pivotal point in his life while living in Paris.  Levine Decl. Ex. A at 24 (R. Feliciano Letter).  Robert was transitioning into his role as a primary caretaker of his grandparents, and Greg provided Robert with the mentorship and guidance he felt he needed to thrive in what was a very difficult time.  *Id.*  Robert poignantly describes Greg as more than just a friend but a "surrogate father figure" whose friendship he deeply cherishes:

> I was grappling with considerable personal responsibilities due to my biological parents' struggles with addiction.  This led me to assume a significant caregiving role for my grandparents, who lived in Brooklyn, New York. . . .  [Greg's] own experiences caring for his grandmother provided a poignant parallel to my own situation, and he offered guidance and empathy that were invaluable during those difficult times. . . .  [Greg] exemplifies integrity, compassion, and a deep-seated commitment to supporting those around him.  His role as a surrogate father figure in my life has been transformative, providing me with a sense of stability, encouragement, and belonging that I deeply cherish."

Levine Decl. Ex. A at 24-25 (R. Feliciano Letter).  Dean Papas shares a similar sentiment, explaining how Greg has gone above and beyond to provide Dean and others with guidance.  Levine Decl. Ex. A at 17 (D. Papas Letter).  Dean recounts how generous Greg is with his time and how Greg makes it a point to make others feel included:

> Today Greg is one of my closest friends and without a doubt the person outside of my family who has had the greatest impact on my life by a considerable margin. . . .  When you ask Greg for help, he prepares in advance, he listens, and he delivers thoughtful opinions and actionable guidance that you know has your best interest in mind.  When you spend recreational or leisure time with Greg, he takes time out of his routine to join you in activities that he doesn't need to do himself.  If you have friends or family with you, he will support and instruct them to the level that

he knows they will feel safe and enjoy an experience that they might otherwise feel insecure about.  These are the actions of an unusually generous and caring person.  As they say, giving someone money is considered charitable in our society, but giving someone your time and effort is truly an act of selflessness.  Greg does this all the time.

*Id*.

Friend after friend describes Greg as "generous," "kind," "caring," "thoughtful," and "honest."  Levine Decl. Ex. A at 19, (P. Bongrand Letter), 28 (J. Herrera Letter), 23 (C. Demakes Letter), 35 (F. Tomasino Letter), 30 (M. Destang Letter).  Greg is also the kind of person that his friends trust—in fact, he has been chosen as godfather to many of his friends' children.  His friend Wade Hansen, whom he met while attending graduate school, writes, "I asked Greg to be my first daughter's Godfather, and the trustee of my estate.  He has always been a thoughtful, intelligent, caring and fun father, husband and friend."  Levine Decl. Ex. A at 27 (W. Hansen Letter).  His childhood friend Patrick Boulier explains, "I have witnessed first-hand Greg's relentless selflessness and genuine concern for others.  Despite his work schedule and other demands on his time, Greg always found the time to be available for me and my family.  He always inquires about them.  He is the godfather to my son Luc. . . ."  Levine Decl. Ex. A at 21 (P. Boulier Letter).  Patrick Destang similarly states, "[Greg] is [] very trustworthy:  my wife and I had written him down to be on the council of advisers to manage our children's future if we were to die from an accident."  Levine Decl. Ex. A at 31 (P. Destang Letter).  Daniel Bontems describes Greg as a pillar in his life and one of two people in the world that he can count on.  Levine Decl. Ex. A at 36, 38 (D. Bontems Letter).

A common refrain amongst his friends is that Greg has served as a mentor who consistently extended a helping hand and went above and beyond to help them navigate their careers.  For example, Robert Feliciano writes:  "From the moment we met, Greg welcomed me into his home with open arms, treating me not just as a friend but as an extended member of his family.  [Greg's]

warmth and generosity were immediately evident, and I soon came to view him not only as a mentor but as a paternal figure in my life." Levine Decl. Ex. A at 24 (R. Feliciano Letter), *see also* Levine Decl. Ex. A at 23 (C. Demakes Letter) (describing Greg as a mentor for her son), 38 (D. Bontems Letter) (describing Greg as a "substitute father" and mentor). Robert adds that Greg opened his home to him. Robert stayed with Greg and his family during the COVID-19 pandemic and writes that the "experience . . . further underscored [Greg's] impact on my life. During this time, and despite his medical issues, [Greg] dedicated himself to coaching and mentoring me, helping me refine my skills and overcome personal challenges." Levine Decl. Ex. A at 25 (R. Feliciano Letter).

Patrick Boulier, whom Greg befriended during their mandatory military service in France in 1984, added, "Greg's open heartedness extended beyond borders. . . . His coaching and recommendations have been invaluable in both my personal and professional life." Levine Decl. Ex. A at 20 (P. Boulier Letter). Jose Herrera had a similar experience, writing "[w]hen my family was facing financial hardship during Covid in 2020, Greg helped me financially . . . he also offered for us to spend a few days at his mother's house in Tampa, Florida." Levine Decl. Ex. A at 28 (J. Herrera Letter). In fact, Greg met Jose Herrera when Jose was working as a private driver in Miami. *Id.* Jose soon started driving Greg and his family to and from the airport, and they quickly developed a friendship. *Id.* Jose and Greg would meet weekly, and Greg always insisted on paying for the meals. *Id.* Greg's generosity continued over the years: he invited and paid for Jose and his family to visit him in Colorado on numerous occasions; he offered and paid for Jose and his family to go on vacation in Costa Rica; and he's offered Jose numerous gifts. *Id.* at 28-29. Not only did Greg open his home to Jose and his family during the COVID-19 pandemic, but he also

hired Jose's wife as a housekeeper when Jose was facing financial hardship as a result of the pandemic. *Id.* at 28.

### 6. *Greg's Commitment to the Community*

Greg's generosity is not limited to his family and close friends but also extends to his community more generally. Despite enduring what was and continues to be the gut-wrenching loss of his daughter, Greg never wavered in his commitment to others. As his friend Wade Hansen put it, "He had been going through an extraordinary personal tragedy, and I asked him 'why do you keep working?' He already had security for a lifetime, but his concerns were for the team he had built, and that if he left the group at Allianz, it would cause the fund to be dismantled and the team's future livelihoods would be deeply impacted." Levine Decl. Ex. A at 27 (W. Hansen Letter); *see also* Levine Decl. Ex. A at 45 (P. Pilavachi Letter) ("Despite the loss of his daughter and the loss of his father within a two-year time frame, Greg kept moving forward and fulfilling all his responsibilities.").

Moreover, even though he was struggling with his own health during the COVID-19 crisis in early 2020, when many business owners prioritized their profits, Greg paid the salaries of the over 100 employees of the hotel in Costa Rica he partially owned for over a year. Nico, Greg's son who was living in Costa Rica at the time, described:

> During the COVID-19 pandemic in 2020, I had the privilege of witnessing my father's extraordinary kindness and leadership firsthand. . . . He demonstrated remarkable generosity by paying the salaries of over 100 employees for over a year despite the operations being shut down, providing financial stability and support to the local community in need. His philanthropy extended beyond his business, as he donated numerous acres of land to the Costa Rican Wildlife Refuge, preserving the country's precious biodiversity.

Levine Decl. Ex. A at 6 (N. Tournant Letter). This sentiment was echoed by Greg's wife, Alexandra, who explained that Greg's decision to keep the hotel open and continue to pay all of

the employees' salaries during the COVID-19 pandemic is "[a]nother illustration of Greg's generosity and dedication to help others":

> [D]espite the Costa Rican borders being closed for over nine months, Greg made the remarkable decision to keep the hotel open and continue paying all employees' salaries. This hotel was one of only three in Costa Rica to remain operational during the pandemic. Without any governmental assistance, Greg invested over a million dollars to support the employees and their families. Greg's incredibly generous decision came at a time where he was facing significant health and professional challenges himself.

Levine Decl. Ex. A at 2 (A. Schuelke Letter); *see also* Levine Decl. Ex. A at 19 (P. Bongrand Letter) ("How [Greg] behaved with his staff in Costa Rica during COVID illustrates his financial generosity.").

Greg has a pattern of helping his community and those who may not have come from the same social background as him. As Robert Feliciano writes:

> [Greg's] network of contacts and his genuine advocacy on my behalf were instrumental in helping me navigate the competitive job market, ultimately allowing me to establish a stable career path despite the initial obstacles. . . . Greg's presence in my life has been transformative, empowering me to surpass expectations and achieve levels of success I once thought unattainable—given my background and upbringing in Bushwick, Brooklyn, New York.

Levine Decl. Ex. A at 24 (R. Feliciano Letter). This pattern is echoed throughout the letters from his friends and family. Greg's childhood friend Patrick Boulier writes, "I come from a very modest family and socio-economic background, I grew up in the south of France. . . . Greg's open heartedness extended beyond borders. Despite important social gaps, he welcomed me into his family, offering guidance and support that allowed me to build a successful career and create a family of my own in Chile." Levine Decl. Ex. A at 20 (P. Boulier Letter). Jose Herrera echoes a similar sentiment, writing "Greg and I started to build a good friendship, and I was surprised because I'm not an individual of his financial status by any means, not even close." Levine Decl. Ex. A at 28 (J. Herrera Letter).

It should come as no surprise given Greg's generosity, his willingness to help others succeed, and his ability to connect with individuals who may not have come from the same social background as him, that Greg is also the type of individual that is "more interested in creating memories with the people in his life, than in having 'things,' such as flashy homes and cars." Levine Decl. Ex. A at 4 (T. Wilson Letter).  His best friend Phillipe Bongrand, who has known Greg for decades, describes Greg's lifestyle as "frugal," explaining that he prioritizes time spent with others over material things:

> [Greg] drives a modest car, wears inexpensive clothes, does not care about impressing others with material things or spending money.  When educating his children, he only cared about the importance of spending time with them, not 'buying them stuff.'

Levine Decl. Ex. A at 19 (P. Bongrand Letter).  His friend Wade Hansen, whom Greg met during graduate school, similarly describes Greg as a "modest" individual who prioritizes time with his family and shared experiences over material possessions.  Levine Decl. Ex. A at 26 (W. Hansen Letter).  Wade writes, "[f]or someone who started his post-Kellogg career at McKinsey and only went up from there, Greg's primary indulgence was time to spend with friends and family. . . .  His haircuts, his clothing, his car and his home never revealed the success he was having in his career.  No Ferrari's, no private jets or fancy dinners." *Id.*  Ken Corba, Greg's former supervisor at Eagle Asset management and now friend, adds that "[Greg] never seemed particularly driven by money and even after his financial success, Greg lived a relatively frugal lifestyle."  Levine Decl. Ex. A at 22 (K. Corba Letter).

In short, as echoed above, Greg is a modest, generous, genuine, and caring person.  The letters from Greg's family and friends reflect just "how committed Greg is to the people in his life, and how ready he is to help with anything, at any time."  Levine Decl. Ex. A at 3 (T. Wilson Letter).  The conduct at issue in this case is a departure from an otherwise honest and charitable life.  Greg

has selflessly given so much of his time to his family, friends, and community and continues to do so, despite the deterioration of his health.

## RELEVANT SENTENCING CONSIDERATIONS

Under Section 3553(a), the fundamental principle of federal sentencing is that the Court should impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of federal sentencing.  18 U.S.C. § 3553(a); *see Dean v. United States*, 581 U.S. 62, 67 (2017) (referring to this "broad command" as the "parsimony principle").  Specifically, the Court should consider, among other factors:  (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (iii) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (iv) the need for the sentence imposed to protect the public from further crimes of the defendant; and (v) the need for the sentence imposed to provide the defendant with needed medical care in the most effective manner. *See* 18 U.S.C. § 3553(a).  The Court must "conduct its own independent review of the [Section 3553(a)] factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).

While the advisory Guidelines are the starting point for the calculation of a sufficient sentence, the Court is "not allow[ed] . . . to presume that a sentence within the applicable Guidelines range is reasonable."  *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable" (citations omitted)).  This is particularly true in cases where the advisory Guidelines range is disproportionately dependent on the Section 2B1.1's loss table which, as judges within this circuit have repeatedly found, *inter alia*, lacks "empirical basis," Transcript from Sentencing

Hearing, *United States v. Bankman-Fried*, No. 22-cr-673 (S.D.N.Y. Mar. 28, 2024), ECF No. 426 at 6:19-23, "is fundamentally flawed," *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (J. Underhill concurring), and produces sentencing ranges that are "irrational on their face," *United States v. Gupta*, 904 F. Supp. 349, 351 (S.D.N.Y. 2012).

      Here, Probation recommends a sentence of 24 months.  PSR at 50.  In doing so, Probation recommends a downward variance from the Government's advisory Guidelines range.  While Greg is appreciative of Probation's recognition that a substantial downward variance is warranted, Greg submits that a sentence below this recommendation is "sufficient, but not greater than necessary" to achieve the aims of sentencing for multiple reasons, discussed in further detail below. Specifically, we do not believe that Probation adequately accounts for Greg's myriad health issues and the Bureau of Prisons'("BOP"), at best, questionable ability to provide him with the care he needs to treat his condition, especially given its poor track record in caring for inmates with complex medical conditions.  In addition, we believe that multiple other Section 3553(a) factors support a downward variance, including, but not limited to, Greg's status as a first-time, non-violent offender; his long history of good works as reflected in the letters from his family and friends; the nature and circumstances of the offense, especially given the disproportionate impact that the loss determination will have on Greg's advisory Guidelines range; and the serious collateral consequences that have already been visited on Greg based on the loss of his career as well as the significant forfeiture judgment to which he agreed.  We therefore respectfully submit that the combination of a non-custodial sentence, which may include home confinement, the $17,577,908 forfeiture obligation, *see* Consent Preliminary Order of Forfeiture/Money Judgment, Dkt. No. 138 at 1, and the mandatory $200 special assessment, is the appropriate sentence in this case.

1. <u>**GREG'S SEVERE MEDICAL CONDITIONS SUPPORT A VARIANCE TO A NON-CUSTODIAL SENTENCE**</u>

That Greg suffers from severe medical conditions requiring constant, unpredictable, and advanced care strongly weighs in favor of a non-custodial sentence particularly given, at the very least, the uncertainty that he will receive proper care if incarcerated. Sections 3553(a)(1) and 3553(a)(2)(d) require the Courts to consider a defendant's health and medical needs in determining an appropriate sentence. *See, e.g.*, 18 U.S.C. § 3553(a)(1) (mandating consideration of the "history and characteristics of the defendant"); § 3553(a)(2)(D) (requiring sentencing court to consider defendant's "need for the sentence imposed . . . to provide the defendant with needed . . . medical care . . . in the most effective manner.").

Courts have often found that a defendant's health and infirmities justify below Guidelines sentences, even granting substantial variances below the advisory Guidelines range to defendants with complex or serious medical conditions. *See, e.g.*, Transcript from Sentencing Hearing, United *States v. Lewis,* No. 23-cr-370 (S.D.N.Y. Apr. 4, 2024), ECF No. 76 at 29-30 (considering defendant's significant health challenges, varying downward, and sentencing defendant who pled guilty to conspiracy to commit securities fraud to three years' probation); Transcript from Sentencing Hearing, *United States v. Ciaccio*, No. 19-cr-833 (S.D.N.Y. Nov. 18, 2021), ECF No. 419 at 18:1-3, 19:21-20:1 (granting departure from Guidelines range of 78 to 97 months down to time served, since imprisonment of paralyzed defendant would "simply be shifting the costs of his medical care from Medicare or Medicaid to the Bureau of Prisons"); Transcript from Sentencing Hearing, *United States v. Blumberg*, No. 14-cr-458 (D.N.J. Dec. 10, 2018), ECF No. 275 at 26:21-23, 29:11-14 (sentencing the defendant to a term of imprisonment of one day, and three years' supervised release in part because of the "defendant's medical issues and the breadth of those issues"); Transcript from Sentencing Hearing, *United States v. Voudouris*, No. 18-cr-217 (S.D.N.Y.

Mar. 2, 2020), ECF No. 292 at 33:22-23, 35:25-36:1 (varying down to time served, in part because the defendant suffered from multiple sclerosis); *United States v. Sobol*, No. 08-cr-76, 2008 WL 4427908, at *1 (E.D.N.Y. Sept. 12, 2008) (considering defendant's "several significant health issues" in evaluating the defendant's history and characteristics, varying downward and sentencing him to three years' probation).

Here, Greg's health concerns and his need for access to cutting-edge and advanced care and treatment demonstrate that the most effective (in fact, the only) means of treating Greg are in a non-custodial setting where he has access to regular medical care and physical therapy to both manage his condition and prevent further deterioration. This conclusion is supported by the uncertainty, at the very least, that the BOP will be able to effectively care for Greg, especially given its well-reported staffing issues and long track record of providing substandard care to inmates with serious or complex medical needs. Accordingly, Greg's health and medical issues weigh strongly in favor of a variance to a non-custodial sentence.

A.  Greg is Suffering from Complex Health Issues

Acknowledging the serious health issues Greg is facing, the Government has agreed, following its own independent medical evaluation and interviews with Greg's primary care physician, Dr. Maghidman, as well as his physical therapist, "not [to] contest or otherwise oppose a non-Guidelines sentence based on the defendant's health conditions." *See* Plea Agreement at 4. And, after examining Greg herself, the Government's own medical expert, a Columbia University board-certified neurologist, concluded that Greg was

"experiencing real symptoms" and has a real impairment.  PSR ¶ 90.   Moreover, Probation has unequivocally stated that Greg's health was a "significant mitigating factor" supporting their recommended sentence, and that "[h]is complicated medical situation would complicate [his] incarceration."  PSR at 49; (*supra* at 14-15).





His family is similarly concerned.  (*Supra* at 12-13); Levine Decl. Ex. A at 2 (A. Schuelke Letter) (noting that "there have been many times over the last 4 years that I have been fearful for his life"); Levine Decl. Ex. A at 7 (N. Tournant Letter) ("Over the past three to four years, I have witnessed a noticeable decline in his overall health despite countless treatment sessions[.]").

### B.  Greg's Medical Needs Favor a Non-Custodial Sentence

Greg's severe and complex health problems support a variance to a non-custodial sentence because he is in need of constant and unpredictable medical care, which he cannot receive should he be imprisoned.







Accordingly, any incarceratory sentence risks serious negative effects on Greg's health with the prospect of substantially increasing his pain and suffering from his debilitating conditions due to the potential that he cannot or will not receive proper care. Greg's severe medical conditions therefore weigh strongly in favor of a variance to a non-custodial sentence.

C. The Bureau of Prisons' Ability to Provide Adequate Medical Care to Greg is Uncertain at Best

The concerns that a custodial sentence will detrimentally affect Greg's health conditions are exacerbated by the BOP's poor track record in treating inmates with serious health problems. For example, in a February 2024 report evaluating issues surrounding inmate deaths, the Department of Justice, Office of Inspector General ("DOJ-OIG") commented that "our prior OIG reports and recent unannounced inspections of BOP facilities have identified significant operational concerns in the BOP's delivery of medical care, including both physical and mental

healthcare, to inmates." *See* Levine Decl. Ex. D[5]; *see also, e.g.*, Levine Decl. Ex. E[6] (auditing provision of medical services under the BOP's clinical practice guidelines and finding "that the institutions either did not usually provide or were inconsistent in providing 18 of the 30 medical services we tested"). There are also numerous recent cases granting motions for compassionate release based on BOP's failure to provide adequate medical care. *See, e.g., United States v. Beck*, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019) (granting defendant's motion for compassionate release in part because she "received grossly inadequate treatment for her condition while serving her sentence in BoP custody"); *United States v. Belin*, No. 10-cr-2213, 2023 WL 3867751, at *4 (D.N.M. June 7, 2023) ("BOP's inadequate response to [defendant's] medical conditions—namely its striking delays and lack of follow up—constitutes an 'extraordinary and compelling' reason warranting his release under § 3582(c)(1)(A)(i)."); *United States v. English*, No. 19-cr-20164, 2022 WL 17853361, at *7 (E.D. Mich. Dec. 22, 2022) ("BOP's gross mismanagement of [defendant's] serious health conditions, even if they are not yet life-threatening, presents an extraordinary and compelling reason for release.").

In making its sentencing recommendation, the Probation Department opined that "it is important to note that the Bureau of Prisons has 'Medical Referral Centers' that care for patients with chronic severe impairments that require 24-hour skilled nursing care or nursing assistance." PSR at 49. However, the Medical Referral Centers, also known as Federal Medical Centers ("FMC"), similarly have a long and documented history of providing inadequate and substandard medical services to inmates under their care. For example, a 1994 Government Accounting Office

---

[5] U.S. Dep't of Just., Off. of Inspector Gen., *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, at 99 (Feb. 2024), https://oig.justice.gov/sites/default/files/reports/24-041.pdf.

[6] U.S. Dep't of Just., Off. of Inspector Gen., Audit Div., *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care*, at ix (Feb. 2008), https://oig.justice.gov/reports/BOP/a0808/final.pdf.

report ("GAO Report"), entitled "Inmates Access to Health Care Is Limited by Lack of Clinical Staff," focused on three of the BOP's Medical Referral Centers and found that:

> [i]nmates with special needs, including women, psychiatric patients, and patients with chronic illnesses, were not receiving all of the health care they needed at the three medical referral centers we visited.  This situation was occurring because there were insufficient numbers of physician and nursing staff to perform required clinical and other related tasks."

Levine Decl. Ex. F.[7]

Regrettably, the Federal Medical Center staffing issues underlying the findings in the GAO Report more than thirty years ago persist to this day.  In a study to assess BOP's medical staffing challenges in 2016 specifically commissioned by the DOJ-OIG, in evaluating the cause of BOP's "struggles to fill its medical staffing needs," DOJ-OIG found that, as of September 2014, "the BOP's total medical staff was approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be 'ideal' care." Levine Decl. Ex. G[8].  Similarly, in 2022, it was reported that one of the Federal Medical Centers, FMC Rochester in Minnesota, was facing an "all-time low staffing shortage."[9]  In connection with that report, the President of the Federal Medical Center Union was quoted as stating: "[y]ou can't run a prison safely, not for the staff that is there, not for the inmates that are there without the correct amount of staff." *Id.*

There is substantial additional evidence showing that the Federal Medical Centers continue to be plagued with issues relating to their inability to properly care for inmates with chronic or serious illnesses.  For example, a 2023 investigation conducted by NPR found that a quarter of

---

[7] U.S. Gen. Acc. Off., *Bureau of Prisons Health Care: Inmates' Access to Health Care is Limited by Lack of Clinical Staff*, at 9 (Feb. 1994), https://www.gao.gov/assets/hehs-94-36.pdf.

[8] U.S. Dep't of Just., Off. of Inspector Gen., *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, at 1, 4 (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf.

[9] Mackenzie Davis, "Federal Medical Center in Rochester facing all-time low staffing shortage," ABC 6 News (Aug. 1, 2022), https://www.kaaltv.com/archive/federal-medical-center-in-rochester-facing-all-time-low-staffing-shortage/.

inmate deaths occurred at the Federal Medical Center located at Butner, North Carolina.[10]  While NPR commented that "[m]ore deaths at Butner are to be expected" given that it is an FMC, in "looking closer at the experiences of individual people, NPR found numerous accounts of inmates nationwide going without needed medical care." *Id.* ("More than a dozen waited months or even years for treatment, including inmates with obviously concerning symptoms: unexplained bleeding, a suspicious lump, intense pain.  Many suffered serious consequences.").  In addition to conducting its own investigation, NPR cited a 2022 DOJ-OIG audit of BOP's contracts awarded to the University of Massachusetts Medical School, which provides medical services to two FMCs—FMC Butner and FMC Devens—that concluded, *inter alia*, that "the BOP did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare."  *Id.*

The problematic NPR findings prompted a bipartisan response from Senators Durbin and Grassley in which they urged the BOP to fix its medical care system.[11]  The NPR investigation quotes Senator Grassley who stated, "I'm deeply alarmed by reports that the Bureau of Prisons has demonstrated foot dragging when it comes to providing medical care to those in its custody."  *Id.*  In Senator Durbin's remarks, he further commented on the interrelationship between the staffing issues and BOP's inability to provide adequate care:  "Simply transferring incarcerated adults to new facilities in the hope that they will receive care, without adequately addressing the dire staffing issues or fortifying facility medical units, is not a solution."  *Id.*

---

[10] Meg Anderson, "1 in 4 inmate deaths happens in the same federal prison. Why?" NPR Investigations (Sept. 23, 2023), https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates.

[11] Meg Anderson, "Lawmakers push for federal prison oversight after reports of inadequate medical care," NPR Investigations (Dec. 12, 2023), https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-#:~:text=In%20the%20course%20of%20its,correctional%20complex%20in%20Butner%2C%20N.C.

Given the uniqueness and seriousness of Greg's condition, an incarceratory sentence of any duration would be unnecessarily harsh and would exacerbate Greg's symptoms even under the best of circumstances.  For the reasons set forth above, however, the Court should not assume that Greg would be incarcerated under ideal conditions due to the BOP staffing issues and other long term, persistent problems in the BOP's ability to deliver necessary medical care to inmates.  As such, the Court should have no confidence that the BOP will be able to provide the constant and, at times, unpredictable care that is required to adequately address Greg's complex medical needs.  Rather, the most likely scenario is that Greg would not receive anywhere close to the level of care that he receives now. ███████████████████████████████████████████ ████████████████████████████████████████████ Greg needs access to cutting-edge clinical care, which BOP cannot provide.  As a result, any period of incarceration would be extremely painful and traumatic to Greg ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████

*       *       *

Accordingly, Greg's medical condition strongly supports a non-custodial sentence, which may include home confinement, because a custodial sentence would severely and negatively impact Greg's health.  We respectfully submit that the Court should not undertake the risk of accelerating the deterioration of Greg's health by imposing a carceral sentence, especially given Probation's recommendation of a substantial downward variance to a sentence of 24 months.  PSR at 50.

## 2. GREG'S PERSONAL HISTORY AND CHARACTERISTICS SUPPORT A NON-CUSTODIAL SENTENCE

Section 3553(a) directs that the Court consider "the history and characteristics of the defendant" in considering an appropriate sentence. *See* 18 U.S.C. § 3553(a)(1) and (5). Here, Greg's personal history and characteristics, as well as his status as a first-time, non-violent offender, strongly support a variance to a non-custodial sentence.

### A. Greg's Personal Characteristics and History of Good Works Support a Downward Variance to a Non-Custodial Sentence

As the Supreme Court has stated: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (citation omitted). Underlying this federal judicial tradition, "is the principle that the punishment should fit the offender and *not merely the crime*." *Pepper v. United States,* 562 U.S. 476, 487-88 (2011) (emphasis added) (citation and internal quotation marks omitted).

Courts have regularly granted downward variances based on character traits possessed by Greg, as evidenced by the letters from his friends and family, including, but not limited to: (i) his history of strong family values and supporting his family and friends, *see, e.g., United States v. Phillips*, 256 F. App'x 415, 417 (2d Cir. 2007) (noting that district court adequately considered the section 3553(a) factors by considering defendant's "devotion to his family"); (ii) his charitable works, *see, e.g., United States v. Rosario*, No. 17-cr-27, 2023 WL 7305260, at *3 (S.D.N.Y. Nov. 6, 2023) (denying motion for early termination of supervised released but noting that, in imposing sentence, the court had considered, *inter alia*, the fact that defendant "had undertaken charitable work that positively impacted many people" as a mitigating factor); (iii) his actions as a well-regarded member of the community, *see, e.g., Prelaj v. United States*, No. 18-cv-4864, 2020 WL

3884443, at *3 (S.D.N.Y. Jul. 9, 2020) (noting that court appropriately considered defendant's "family and communities ties" in determining sentence); and (iv) his history of living an honorable and otherwise lawful life, *see, e.g.*, *United States v. Kessler*, 734 F. App'x 760, 763 (2d Cir. 2018) (noting that the district court "carefully considered the various mitigating factors . . . including . . . [defendant's] law-abiding history"); *United States v. Scott*, No. 06-cr-988, 2021 WL 5989797, at *4 (S.D.N.Y. Dec. 17, 2021) (granting a motion for compassionate release and noting that evidence before the court indicated that the defendant would be likely to live his "life as a responsible, law-abiding individual who contributes positively to society").

First, Greg has long been a devoted son, sibling, father, stepfather, and husband. (*See generally supra* at 18-25); *see, e.g.,* Transcript from Sentencing Hearing, *United States v. Pena*, No. 15-cr-551 (S.D.N.Y. Apr. 17, 2017), ECF No. 273 at 42:15-19 (granting substantial downward variance, in part, due to defendant's "substantial ties and devotion to his family [which] . . . all speak to his character"). As his son wrote, Greg's "dedication to [his] family and community has been unwavering, and his love and support have been a constant source of strength for . . . [his] loved ones." Levine Decl. Ex. A at 7 (N. Tournant Letter). Greg has always been generous with both his time and his home, supporting his children, stepchildren and siblings' careers and mentoring them at every turn. His son Nico described how his father offered him the opportunity to establish himself in the hotel industry and empowered him with the necessary skills to manage a successful business himself. Nico credits his father for helping him secure his financial future and legacy. *Id.* at 6-7 (N. Tournant Letter).

Similarly, Greg's sister Lucile, now an Associate Professor at Arizona State University, also credits Greg for her success, describing how he mentored her and welcomed her into his home in New York while she was in graduate school. Levine Decl. Ex. A at 13-14 (L. Faurel Letter).

Lucile does not believe she could have achieved academic success without her brother's help. *Id.* Greg's wife Alexandra explains how Greg not only took financial responsibility for his stepchildren Mathis and Charlene, but also devoted "countless hours" to coaching and mentoring them. Levine Decl. Ex. A at 1 (A. Schuelke Letter). Both Mathis and Charlene themselves describe Greg as a second father who was generous with both his time and money. Charlene and Greg worked closely together at his hotel in Costa Rica, where she describes how Greg "always found the time and energy to coach [her]." Levine Decl. Ex. A at 9 (C. Hanania Letter). Mathis echoes the same, describing Greg's guidance and support as "invaluable." Levine Decl. Ex. A at 8 (M. Hanania Letter).

Greg also has a long history of supporting his family through their health issues, including caring for his brother-in-law, grandmother, and now his mother. (*See generally supra* at 17-22.) His sister Amélie described how her husband suffered from a severe heart condition which required a strict diet and a restful environment to rehabilitate. Greg welcomed Amélie and her family into his home many times, and when her husband suffered two heart attacks, Greg was with her every step of the way. Amélie outright says that Greg "played a vital role in [her] husband's survival." Levine Decl. Ex. A at 11-12 (A. Fourel Letter).

Moreover, despite having three other siblings, Greg was responsible for managing all of the logistics and medical decisions for his grandmother from 1996 to 2001 "as she slowly lost her autonomy." *Id.* at 11. Greg is also currently the primary caretaker for his infirm mother. *Id.* at 12; *see also* PSR ¶ 73. Greg has been responsible for managing his mother's care since 2017. Even though she resides in France, and he cannot currently travel to see her, "he overlooks her financials, the organization of her house-aid, and is involved in all important decisions [the family] need[s] to take regarding her living conditions." Levine Decl. Ex. A at 12 (A. Fourel Letter). Greg's

absence would have detrimental effects on his family, which further supports a variance to a non-custodial sentence. *See, e.g.,* Transcript from Sentencing Hearing, *United States v. Stewart*, No. 15-cr-287 (S.D.N.Y. May 4, 2016), ECF No. 95 at 29:13-16, 32:9 (sentencing defendant to probation, in part, because he "plays a very central role in his family . . . [and] has become the primary caregiver . . . for his wife").

In addition to being an anchor to his family, Greg serves as a father figure, godfather and mentor to numerous members of his community, who rely on him for support. (*See generally supra* at 23-26.) His friends Wade Hansen and Patrick Boulier have named him as godfather to their children, and his friend Patrick Destang named Greg as manager of his estate should anything happen to him or his wife. Levine Decl. Ex. A at 27 (W. Hansen Letter), 31 (P. Destang Letter), 21 (P. Boulier Letter). His friend Daniel Bontems describes Greg as a substitute father, a pillar in his life, and one of two people in the world that he can count on for help. Levine Decl. Ex. A at 36, 38 (D. Bontems Letter). His former colleague and now close friend Dean Papas explains how Greg has gone "above and beyond" to mentor him and describes Greg as "without a doubt the person outside of [his] family who has had the greatest impact on [his] life." Levine Decl. Ex. A at 17 (D. Papas Letter). His mentee Robert Feliciano describes Greg as a "surrogate father figure" whom he relied on when he was grappling with the responsibility of caring for his grandparents while his biological parents struggled with addiction. Levine Decl. Ex. A at 24-25 (R. Feliciano Letter). Robert explains how Greg offered his unwavering support during those difficult times, including by helping him find a job in New York. *Id.*

Second, Greg has a history of giving back to his community. (*See generally supra* at 26-29.) Notably, even though Greg was struggling with his own health during the COVID-19 crisis in early 2020, when many business owners prioritized their profits, Greg paid the salaries of more

than 100 employees of the hotel in Costa Rica he partially owned for more than a year—totaling

more than one million dollars out of his own pocket—because of his care and concern for the hotel

employees. Levine Decl. Ex. A at 2 (A. Schuelke Letter). As his son, Nico, wrote, "despite the

operations being shut down, [Greg] provid[ed] financial stability and support to the local

community in need. His philanthropy extended beyond his business, as he donated numerous acres

of land to the Costa Rican Wildlife Refuge, preserving the country's precious biodiversity." Levine

Decl. Ex. A at 6-7 (N. Tournant Letter). Greg's decision to keep the hotel open and to continue to

pay all of the employees' salaries, at a time when markets were in complete upheaval (including

the stability of his own fund), is a remarkable one. As a result of Greg's decision to invest over a

million dollars to support and pay employee salaries, the hotel was one of only three in Costa Rica

to remain operational during the pandemic. Levine Decl. Ex. A at 2 (A. Schuelke Letter). All of

those employees were therefore able to continue to support their families during this incredibly

difficult time.

Indeed, Greg's history of good works is not limited to his contributions to the hotel in Costa

Rica. His former driver, Jose Herrera, passionately explains how Greg showed him and his family

great care, going as far as offering him and his family a place to stay and hiring his wife as a

housekeeper when he was facing financial hardship during the COVID-19 pandemic. Levine Decl.

Ex. A at 28 (J. Herrera Letter). Greg welcomed a number of his friends into his home during the

COVID-19 pandemic, including Robert Feliciano, who described his time spent with Greg as a

"privilege" and an "experience that . . . impact[ed] [his] life." Levine Decl. Ex. A at 25 (R.

Feliciano Letter). Courts have routinely considered such actions as appropriate to consider in

making a decision to grant downward variance pursuant to the factors set forth in section 3553(a).

*See, e.g., United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (finding that district court's

reliance on the fact that the defendant "went out of his way to accommodate his employees" to be "'logical and consistent with the factors set forth in section 3553(a).'") (internal citation omitted).

Third, Greg is a modest individual who prioritizes time spent with his family and friends over material things. (*See generally supra* at 28-29.) He has never been the type of individual who is "driven by money and even after his financial success, Greg lived a relatively frugal lifestyle." Levine Decl. Ex. A at 22 (K. Corba Letter). This is evidenced by the fact that he drives a modest car, wears inexpensive clothing, and is not wasteful in spending money or accumulating material possessions. Levine Decl. Ex. A at 19 (P. Bongrand Letter).

B. <u>Greg's Status as a Zero Point Offender Supports a Downward Variance to a Non-Custodial Sentence</u>

The Court should also consider that Greg is a first-time, non-violent offender. In November 2023, the United States Sentencing Commission (the "Commission") unanimously adopted an amendment to the Guidelines to account for defendants with no criminal history. As a first-time, non-violent offender, Greg meets the criteria for this new amendment, which provides that non-custodial sentences are appropriate for certain classes of "Zero-Point" offenders. *See* PSR ¶ 63. Recidivism data analyzed by the Commission suggests that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including lower recidivism rates than offenders in Criminal History Category I with one criminal history point.[12] *See* Levine Decl. Ex. H. Accordingly, the Commission amended the Guidelines in November 2023 to reflect its view that non-incarceratory alternatives are appropriate for a broader class of offenders and adopted the "Zero Point Offender" guidelines. *See* U.S.S.G. §5C1.1 cmt. n.10. The Chair of the

---

[12] *See* U.S. Sentencing Comm'n, Recidivism of Federal Offenders Released in 2010 at 26-27 (Sept. 30, 2021),                    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf.

Sentencing Commission explained the rationale for the changes at a public meeting of the Commission as follows:

> The second "criminal history" proposal we issued sought to fulfill a core directive Congress gave the Commission at its inception. That directive says that, in general, "a first offender who has not been convicted of a crime of violence or an otherwise serious offense" should not be incarcerated. The Commission's proposal sought to define who met this standard and what the consequences for meeting this standard should be.

> Ultimately, we decided to answer both questions broadly. Our final policy provides a larger reduction in sentence for a larger category of people than the status quo. While we agreed to limit this reduction in a limited set of circumstances, we also agreed to give judges discretion to expand non-carceral options to more people. We hope that this policy will, as one commenter put it, achieve Congress's goal of not "subjecting . . . largely productive and benign citizens to lengthy periods of incarceration, which impact not only their lives but those of their families, businesses, and communities.

Levine Decl. Ex. I.[13] Greg undoubtedly falls into the class of "largely productive and benign citizens" who need not be subjected to incarceration because of the impact that such incarceration has on "their lives but [also] on those of their families . . . and communities." *Id.*

\*      \*      \*

Greg's positive and life-long commitments to his family and his community and his charitable impact on a significant number of people support a substantial downward variance from the applicable Guidelines range. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("[S]urely, if a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

---

[13] Remarks as Prepared for Delivery by Chair Carlton W. Reeves Public Meeting of the U.S. Sentencing Comm'n at 17-18 (April 5, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20230405/20230405_remarks.pdf.

**3.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT A DOWNWARD VARIANCE**

In evaluating an appropriate sentence under Section 3553(a), several factors concerning the "nature and circumstances" of Greg's offense support a downward variance regardless of the Court's findings on the applicable advisory Guidelines range.  First, Greg is remorseful, acknowledges his wrongdoing, and takes full responsibility for the offense conduct.  He altered reports sent to investors in the Funds without telling those investors that the reports were altered, which was wrong.  Greg's offense conduct nevertheless is less serious than the typical investment advisor fraud scheme, which, as evidenced by the cases on which the Government relied in its loss calculation, often involve investors who "receive[d] nothing of value in return" for their investments, unlike that which happened in this case.  PSR ¶ 40(a) (citing to *Balboa*, 622 F. App'x at 32).  Second, the evidence and expert analyses suggest that actual loss in this case is zero.  If the loss is zero, the Guidelines explicitly provide for sentences other than imprisonment.  Greg maintains that the Court should accept the defense's Guidelines calculation and view on loss, and the offense level should be reduced to 11.  (*See generally* Guidelines Submission.)  Nevertheless, even if the Court disagrees with Greg regarding the loss amount, a downward variance is still reasonable in light of the outsized impact of the loss enhancement on Greg's Guideline sentencing range.

A.  The Facts and Circumstances of Greg's Offense Support a Downward Variance

While Greg fully accepts responsibility for his misrepresentations, the facts and circumstances surrounding these misrepresentations in the context of the Funds and its strategy amply support a downward variance.  This is nothing like a Ponzi-scheme fraud concerning fake or fraudulent investments.  Rather, the Funds were a flagship product of AGI US, with a 15-year track record of profitability, and the strategy of the Funds was sophisticated and real.  Investors'

48

money was in fact invested in the Funds, and not simply used to pay earlier investors to create an illusion of legitimacy and profit. There are no allegations of commingled funds, and each investor's account was scrupulously maintained and accurately accounted for by an independent, third-party administrator.

Significantly, investors received substantial value for their investments until March 2020. In exchange for their money, investors received legitimate interests in legitimate securities and derivatives, which were never misrepresented. *Investors redeemed almost $1 billion in early 2020 alone* and earned billions in profit over the years. There is similarly no dispute that the actual performance of the Funds was accurately represented and verified by third parties. Moreover, Greg invested side-by-side with investors in Structured Alpha 1000 LLC, strongly demonstrating his confidence in the Fund and its strategy. Nor did Greg receive any performance fees unless the Funds exceeded the relevant benchmark. (*See* Guidelines Submission at 6-7.)

In the context of the Funds and the strategy as a whole, Greg's misrepresentations were limited. The altered reports themselves were sent only to a handful of the over 100 investors in the Funds, and many were sent years before the COVID-19 market crash in 2020. None of these altered reports related to the valuation of any of the Funds' positions, which was done by a third party, or the amount of money in each investor's account. Moreover, none of these reports reflected the Funds' actual trading strategy or concerned the structure of the Funds. (*See* Guidelines Submission at 11-12, 18.) Ultimately, this case is about a legitimate investment product in which a fraud relating to limited aspects of certain risk management metrics concerning the Funds occurred. While such conduct is illegal and unacceptable, it is very different from a far-reaching fraudulent scheme involving the structure and value of the Funds.

B.  <u>A Non-Custodial Sentence is Sufficient Given that Actual Loss is Zero</u>

As discussed in detail in the accompanying Guidelines Submission and as explained by Dr. Israel Nelken in his expert report, the Government's use of $3.2 billion in lost principal as the actual loss caused by the conduct in this case is inappropriate as a matter of law and unfairly seeks to punish Greg by failing to consider that, as a factual matter, Greg's misrepresentations did not cause the losses.  As Dr. Nelken opined, the Funds' risk-mitigation strategy (including hedging for short-term market decline and restructuring for longer periods of market dislocation), was not responsible for the losses.  Rather, it was "market or other forces" that caused the losses, *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007), including the extreme multi-week market downturn as a result of COVID-19, related margin and liquidity issues, and trading decisions by others at AGI US in Greg's absence, none of which are attributable to Greg's misrepresentations.  *See generally* Guidelines Submission; PSR ¶¶ 2, 14, 21, 40(b); ECF No. 141 at 35:13-24.

Accordingly, if the Court accepts the defense's Guidelines calculation and view on loss, the offense level is reduced to 11, and a non-custodial sentence is appropriate as Greg's offense level would now fall under Zone B of the Guidelines Sentencing Table.  *See* U.S.S.G § 5C1.1 cmt. n.10(A) ("If the defendant received an adjustment under §4C1.1 . . . and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate.").

C.  <u>Regardless of the Court's Findings, Loss is a Poor Metric for Sentencing Greg</u>

As referenced above, courts in this Circuit have repeatedly recognized that strict application of the loss guidelines can produce unjustified and exaggerated sentences.  *See Corsey*, 723 F.3d 36 at 380 (J. Underhill concurring) ("[T]he loss guideline is fundamentally flawed, especially as loss amounts climb."); Transcript from Sentencing Hearing, *United States v. Lumiere*,

No. 16-cr-483 (S.D.N.Y. June 14, 2017), ECF No. 115 at 3:4, 27:25-28:24 (describing the Guidelines loss enhancement as "draconian," "irrational," "ridiculous, absurd, barbaric in some respects," and sharply varying downward from the Guidelines range); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (stating that the Guidelines "place undue weight on the amount of loss involved in the fraud" and noting that loss is a "relatively weak indicator of the moral seriousness of the offense"); Transcript from Sentencing Hearing, *United States v. Servider*, No. 17-cr-60 (S.D.N.Y. July 27, 2017), ECF No. 27 at 9:11-16 (stating that "while loss is clearly relevant, the notion that a guideline calculation . . . should be determined to a level of 80 percent by the loss calculation is . . .  irrational on its face, totally contrary to the thrust of Section 3553(a), and not to be seriously taken by any serious court."); *Adelson*, 441 F. Supp. 2d at 509 (describing the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss"); *Gupta*, 904 F. Supp. 2d at 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." (citation omitted)); *United States v. Shapiro*, No. 14-cr-399, 2022 WL 2758129, at *1 (E.D.N.Y. July 14, 2022) (describing the sentencing guidelines' economic loss figures as "unhinged"); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (holding that the "[sentencing] guidelines in [] securities-fraud prosecution[s] have so run amok that they are patently absurd on their face . . . due to the 'kind of 'piling-on' of points for which the guidelines have frequently been criticized" and describing the loss table as a "black stain on common sense") (citations and internal quotation marks omitted).

Here, the outsized impact that the loss amount could have on Greg's sentence is apparent:

under the Guidelines, were Greg to receive a Guidelines sentence, it would be almost entirely dependent on whether or not the loss enhancement applies. Should the Court agree with the defense to disregard the loss enhancement, Greg's Guidelines offense level is reduced from 41 to 11, which underscores the absurdity of the use of the loss guidelines and loss table in cases such as these. (*See generally* Guidelines Submission.); *see also United States v. Faibish*, No. 12-cr-265, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) ("[S]trict application" of the Sentencing Guidelines derived from the loss table can "unfairly balloon [the] sentencing range beyond any reasonable proportion to [the defendant's] crimes.").

Notably, Probation agrees that the "$3 billion in lost principal is somewhat overstated, or at least comingled, with losses caused by the COVID-19 pandemic . . . . These aspects . . . point to an advisory Guidelines range that overstates the defendant's relative culpability." PSR at 49. Partially as a result of this incongruity, Probation has recommended a sentence of 24 months, which is far below the Guidelines recommended sentence of 120 months. PSR ¶ 6(c)(i); PSR at 50. This reflects Probation's recommendation that the Court grant a significant downward variance in light of the inherent flaws associated with strict application of the loss enhancement.

Accordingly, regardless of the Court's findings on loss, the Guidelines pertaining to loss are a poor metric for determining Greg's sentence. The Court should consider a downward variance irrespective of its view on the applicable Guidelines range, as other courts in this Circuit have done.

### 4. IMPRISONMENT IS NOT NECESSARY TO PROVIDE JUST PUNISHMENT

A non-custodial sentence is "sufficient, but not greater than necessary," to achieve the aim of just punishment in this case, especially given Greg's debilitating health conditions. 18 U.S.C. § 3553(a)(2)(B)–(C). A non-custodial sentence is more than adequate in this case to appropriately punish Greg. "[A]s the Supreme Court has recognized, probation is *significant* punishment."

*United States v. Leitch*, No. 11-cr-00609, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013); *see also United States v. Neiman*, 828 F. Supp. 254, 255 (S.D.N.Y. 1993) (sentencing defendant to probation and noting that "[h]ome confinement may be rehabilitational as well as punitive if the person involved must modify a lifestyle and become aware of the consequences of committing illegal acts, while at the same time avoiding the sometimes negative atmosphere in places of imprisonment"). As the Supreme Court further acknowledged in *Gall*, probation is not an act of leniency, but rather a "substantial restriction of freedom,":

> Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

552 U.S at 44, 48 (citations omitted); *United States v. Bailin*, No. 05-cr-48-01, 2008 WL 4279521, at *2 (S.D.N.Y. Sept. 18, 2008) (denying defendant's motion for early termination of probation but noting that the two years' probation sentence defendant received "promote[d] the sentencing objectives of punishment and deterrence" even where the defendant "committed several grave offenses"). Home confinement would constitute a substantial punishment and a significant deprivation of liberty, particularly for Greg who has no criminal history. Research suggests that home confinement is an effective and appropriate alternative to imprisonment for offenders with low risks of recidivism, such as Greg. Levine Decl. Ex. J;[14] (*see infra* at 57).

---

[14] In March 2024, the BOP's Office of Research and Evaluation released results of a comprehensive study on the impact of the March 2020 CARES Act on home confinement, wherein a number of vulnerable individuals in federal prison were transferred to home confinement to serve the remainder of their sentences. The BOP's Office of Research and Evaluation found that home confinement did not negatively impact recidivism rates and that home confinement "offer[s] a promising direction for justice-involved stakeholders seeking effective strategies to reduce incarceration and its associated costs, while also

Moreover, Greg has been ordered to forfeit more than $17 million dollars as a result of his guilty plea. *See* Consent Preliminary Order of Forfeiture/Money Judgment, Dkt. No. 138 at 1. In partial satisfaction of his forfeiture obligation, Greg has agreed to forfeit $14,577,908, which includes all claims to his deferred compensation as an Allianz employee. Greg has also agreed to an additional $3 million future payment. Consent Preliminary Order of Forfeiture/Money Judgment, Dkt. No. 138 at 2. This forfeiture amounts to an extraordinary punishment. Criminal forfeiture "is designed to punish the offender." *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012) (citation omitted); *see also United States v. Peters*, 732 F.3d 93, 101 (2d Cir. 2013) ("Criminal forfeiture is a form of punishment."). A non-custodial sentence which may include home confinement, together with the very substantial $17 million forfeiture order to which Greg is subject, and which includes claims to his deferred compensation, therefore provides substantial and just punishment in this case.

Additionally, Greg has already suffered numerous negative collateral consequences as a result of the Government's investigation and prosecution of this case. As the Second Circuit has observed, "[i]t is difficult to see how a court can properly calibrate a 'just punishment' [under Section 3553(a)] if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009). The collateral consequences for Greg include the loss of his job at Allianz, which he held for 20 years, severely diminished career prospects, the inability to work as an investment advisor, and a tarnished reputation.[15] Based on his indictment

---

promoting public safety." BOP Office of Research and Evaluation, U.S. Dep't of Justice, "CARES Act Shows Promise in Reducing Recidivism, Reinforcing the Benefits of Reduced Incarceration," (Mar. 29 2024), https://www.bop.gov/resources/news/pdfs/20240329-press-release-cares-act.pdf.

[15] The Securities and Exchange Commission ("SEC") has a parallel pending civil action against Greg in the Southern District of New York, which is another collateral consequence that the Court should consider in determining an appropriate sentence. *Securities and Exchange Commission v. Tournant*, No. 22-cv-4016 (S.D.N.Y.).

and guilty plea, Greg is not able to work for a bank, financial firm, or any other regulated entity ever again. *See id.* at 141 (finding that the district court properly considered the defendant's likely loss of career under Section 3553(a)).

Greg has also had to endure the stigma, shame, and humiliation of pleading guilty in a well-publicized criminal prosecution. Courts have recognized that such stigma, loss of reputation, professional opportunities, and financial opportunities, especially in high-profile cases, can properly be considered by a sentencing court. *See, e.g.*, *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (considering the "incalculable damage to [the defendant's] personal and professional reputation as a result of tremendous media coverage of his case," including his "unflattering[] portray[al] as the face of public corruption"), *aff'd*, 523 F.3d 1258 (10th Cir. 2008); Transcript from Sentencing Hearing, *United States v. Cohen*, No. 1:19-cr-00741 (S.D.N.Y. June 9, 2020), ECF No. 48 at 41:7-44:22 (finding that the defendant "has already suffered significant consequences" because, among other things, he was barred from the financial services industry and sentencing him to home confinement, in part, due to his medical conditions). This case has drawn significant media attention, and there have been numerous articles reporting on Greg's indictment and guilty plea (and the indictments and guilty pleas of his co-defendants, including Allianz Global Investors US itself). This media attention has impacted the relationships with those whom Greg holds dear.

What is more, a custodial sentence would have punishing consequences for Greg's family, including his family living abroad and his elderly and infirm mother, also living abroad—none of whom would have the ability to readily visit Greg. As explained by his stepdaughter, the last four years "have been very challenging for our family with most of us based in Europe. Greg's inability to travel has been logistically very difficult." Levine Decl. Ex. A at 10 (C. Hanania Letter). His

aging and ailing mother would not only have no way of seeing him, as she is too frail to travel, but she would also lose a vital pillar of support on which she relies.

Accordingly, the significant collateral consequences to Greg and his family resulting from his indictment and guilty plea support the conclusion that imprisonment is not necessary for a just punishment.

### 5.  IMPRISONMENT IS NOT NECESSARY TO ACHIEVE THE GOALS OF DETERRENCE AND PROTECTION OF THE PUBLIC

A non-custodial sentence is also sufficient to "afford adequate deterrence to criminal conduct," and to "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(B)–(C).  As for specific deterrence, Greg poses no risk of recidivism.  The crime at issue was "particularly adapted to his chosen career" and "[t]hat career is over."  *Emmenegger*, 329 F. Supp. 2d at 428 (finding no chance of recidivism because the defendant had lost his livelihood and his career was over as a result of his conviction).  As a result of his conviction, Greg will never work in the finance industry again. ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████ Greg poses no risk of recidivism and a custodial sentence is not necessary to achieve the aim of specific deterrence.  Apart from the conduct charged in this case, Greg has lived a law-abiding life and has been a productive and

valued member of his community. Indeed, Greg has been supervised for more than two years without incident.

A non-custodial sentence is also sufficient to further the goal of general deterrence. Notably, scholars and courts generally agree that it is the certainty of punishment, not the severity of punishment, that most effectively deters crime. *See, e.g., United States v. McCarthy*, No. 22-cr-00491, 2023 WL 3741996, at *3 n.1 (E.D.N.Y. May 30, 2023) (noting that the "research shows the data on effect of harsh sentences . . . as a general deterrent is mixed at best" and citing secondary source approvingly which found that "[t]he deterrent effect of . . . the certainty of punishment is far more convincing and consistent [than the deterrent effect of] severity of punishment." (some alteration in original) (citation and internal quotation marks omitted)); *United States v. Mateo*, 299 F. Supp. 2d 201, 209 (S.D.N.Y. 2004) ("[T]here is more to the concept of just punishment and deterrence of the particular individual than the temporal and physical hardships imposed by a sentence as measured by the length of time in prison pre-specified by a guidelines range."); *United States v. Luna-Jasso*, No. 14-cr-3523, 2015 WL 1006390, at *17 (D.N.M. Feb. 19, 2015) (collecting sources and finding that "[s]tudies universally find that certainty of punishment has a far greater deterrent effect than severity of punishment"). Accordingly, imprisoning Greg will have no greater general deterrent effect than imposing a non-custodial sentence.

Furthermore, as discussed previously, Greg has been ordered to forfeit more than $17 million dollars as a result of his guilty plea. Not only does Greg have to contend with the consequences of this case on his reputation and ability to ever work as a financier, but he also feels the impact of his actions financially. The substantial forfeiture amount also serves as both a general and specific deterrent. *See United States v. Klein*, No. 11-cr-255, 2011 WL 6779309, at *3

(E.D.N.Y. Dec. 27, 2011) (holding that general and specific deterrence were achieved, in part, through the order of "sizable . . . forfeiture payments").

Finally, any further goal of general deterrence has been accomplished through the highly publicized nature of this case.  To anyone reading the news, the message that the Government is seeking to send has been sent, loud and clear, without regard to whether Greg is sentenced to a term of imprisonment.

## **CONCLUSION**

For the foregoing reasons, Greg respectfully submits that a non-custodial sentence that may include a period of home confinement, the $17,577,908 forfeiture obligation, and the mandatory $200 special assessment, is "sufficient, but not greater than necessary" to achieve the aims of sentencing.

Dated:  New York, New York
      November 1, 2024

<div style="margin-left:50%">

By:    /s/ Seth L. Levine
       Seth L. Levine
       Alison M. Bonelli
       Julie-Irene A. Nkodo
       **LEVINE LEE LLP**
       400 Madison Ave
       New York, New York 10017
       Telephone: (212) 223-4400

       Daniel R. Alonso
       Olivia A. Rauh
       **ORRICK, HERRINGTON &**
       **SUTCLIFFE LLP**
       51 West 52nd Street
       New York, New York 10019
       Telephone: (212) 506-5000

       *Attorneys for Defendant Gregoire*
       *Tournant*

</div>