**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.                                                    Case No. 22-CR-276 (LTS)

GREGOIRE TOURNANT,

                    Defendant.

## DEFENDANT GREGOIRE TOURNANT'S MEMORANDUM REGARDING THE APPLICABLE SENTENCING GUIDELINES

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT................................................................................ 1

FACTUAL BACKGROUND ................................................................................ 5

    A.   The Structured Alpha Funds ................................................................. 5

    B.   The Funds' General Strategy................................................................. 7

    C.   The Funds' Governing Documents Disclosed Inherent Risks of Investing.................. 9

    D.   The Offense Conduct ..........................................................................11

    E.   The Funds Suffered Losses Unrelated to the False Statements During the COVID-19 Market Crisis ...................................................................... 15

DISCUSSION .................................................................................................. 25

THE COURT SHOULD CONCLUDE THAT GREG HAS A TOTAL OFFENSE LEVEL OF 11 AND AN ADVISORY GUIDELINES RANGE OF 8-14 MONTHS ......................................... 25

    I.    IT IS THE GOVERNMENT'S BURDEN TO ESTABLISH BOTH THE EXISTENCE AND AMOUNT OF ANY LOSS.......................................................... 26

    II.   THE COURT SHOULD REJECT THE GOVERNMENT'S FLAWED LOSS CALCULATION ...................................................................................... 28

    III.  THE LOSSES WERE CAUSED BY "MARKET OR OTHER FORCES," NOT GREG'S MISREPRESENTATIONS ................................................... 30

    IV.  THERE IS NO REASONABLY FORESEEABLE PECUNIARY HARM PURSUANT TO GUIDELINE SECTION 2B1.1(B)(1) .................................. 34

THE DEFENSE'S PSR OBJECTIONS ................................................................. 35

CONCLUSION.................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................... 27

*United States v. Balboa*,
   622 F. App'x 31 (2d Cir. 2015) ............................................. 1, 25, 28, 29

*United States v. Bankman-Fried*,
   22 Cr. 673, 2024 WL 1342470 (Mar. 15, 2024) ............................... 26, 27

*United States v. Coppola*,
   671 F.3d 220 (2d Cir. 2012) .................................................................. 27

*United States v. Cuti*,
   2011 WL 3585988 (S.D.N.Y. July 29, 2011) ................................... 26, 28

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006) .................................................................. 27

*United States v. Hsu*,
   669 F.3d 112 (2d Cir. 2012) ....................................................... 1, 28, 29

*United States v. Lumiere*,
   2017 WL 4385835 (May 16, 2017) ........................................................ 29

*United States v. Mosely*,
   980 F.3d 9 (2d Cir. 2020) ..................................................................... 26

*United States v. Olis*,
   429 F.3d 540 (5th Cir. 2005) ................................................................ 26

*United States v. Pina*,
   2019 WL 1904920 (S.D.N.Y. Apr. 11, 2019) ........................................ 27

*United States v. Rutkoske*,
   506 F.3d 170 (2d Cir. 2007) ............................................................Passim

## Rules

U.S.S.G. Section 2B1.1 ...............................................................................Passim

Defendant Gregoire Tournant ("Greg" or "Mr. Tournant"), by and through his counsel, respectfully submits this memorandum regarding the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").

### PRELIMINARY STATEMENT

The primary driver of Greg's offense level under Section 2B1.1 of the Guidelines is the loss amount. *See* Presentence Investigation Report ("PSR") ¶ 53. When properly calculated, the Guidelines result in an offense level of 11 in Zone B. This is because the loss amount here is zero. In order for the loss enhancement to apply, the Government must prove by a preponderance of the evidence that the loss in the Structured Alpha funds (the "Funds" and each, a "Fund") in the wake of the COVID-19 pandemic and associated extreme market turmoil—and while Greg was ill and out of the office—was proximately caused by Greg's misrepresentations and not by "market or other forces." *See United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007). The Government cannot make this showing, nor does it attempt to.

Instead, the Government takes an all-or-nothing approach to loss, relying on inapposite Ponzi-scheme-style cases in which investors "ultimately receive[d] nothing of value in return" for their investments to argue that Greg is responsible for the Funds' entire lost principal—$3.2 billion dollars—incurred in March 2020. *See United States v. Balboa*, 622 F. App'x 31, 32 (2d Cir. 2015) (quoting *United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012)). But this case is nothing like a Ponzi scheme, or any other case in which investors "receive[d] nothing of value in return" for their investments. Here, the Funds were real and authentic. The Funds were a flagship product of Allianz Global Investors U.S. LLC ("AGI US") and, with Greg at the helm, had a 15-year track record of successful performance for investors. Investors' money was, in fact, invested in the Funds, and not simply used to pay earlier investors to create an illusion of legitimacy and profit or

1

comingled with Greg's personal funds or the funds of other investors, as is typical in Ponzi schemes. Investors received substantial value for their investments until the COVID-19 market losses and volatility in March 2020. Far from receiving "nothing of value in return" for their investments, investors redeemed almost $1 billion in early 2020 alone. Crucially, Greg was also one of the investors: through his deferred compensation, he invested side-by-side with investors in the riskiest fund, Structured Alpha 1000 LLC, demonstrating his confidence in the Fund and its strategy.

When considering loss under the appropriate framework, and as the accompanying expert report of Dr. Israel Nelken (the "Nelken Report") makes clear, the Funds' lost principal was not due to Greg's misrepresentations, but was instead due to "market or other forces," *Rutkoske*, 506 F.3d at 179:

***Greg's misrepresentations did not cause the losses***. The Government cannot meet its burden to prove that Greg's misrepresentations to a handful of investors in individualized reports proximately caused the losses. These reports were sent to eleven out of 114 investors, in many cases years before the losses in March 2020. Moreover, these reports were sent to investors who specifically requested them, varied by investor and type, and many were designed to anticipate market conditions and evaluate risks at a specific moment in time (*i.e.*, over a one-day period). As Dr. Nelken opines, these reports did not reflect the Funds' actual trading strategy or concern the structure of the Funds in 2020, and said nothing about the risks associated with market events that unfold over time, like what happened during the multi-week COVID-19 market dislocation in March 2020. There is simply no proximate causal link between Greg's misrepresentations and the losses, or the types of losses, that occurred here.

***The Funds' risk-mitigation strategy was not the cause of the losses***. The Funds' strategy had two risk-mitigation components: (1) hedges for overnight or short-term market crashes; and (2) restructuring (*i.e.*, actively trading the options portfolio, so that losses on certain types of options are capped) in periods of longer market decline like the COVID-19 market dislocation. With respect to the hedges, the Government contends that Greg misrepresented the strike distances of those hedges in various marketing materials sent to investors throughout the life of the Funds, telling investors that the hedges were in the -10% to -25% strike distance range, when in fact they were further out of the money. The defense does not dispute that some hedges were purchased outside the -10% to -25% range, or that most, if not all, of the marketing pitch books contained the strike distances of the hedges as set forth by the Government. However, these statements regarding hedging positions were, as stated in the marketing materials, "Position examples" and not promises or representations as to whether the Funds would employ other hedges in building actual or future positions. Even accepting the Government's argument that Greg misrepresented the strike distances of the hedges, Dr. Nelken's expert analysis shows that the actual return of the Funds tracks—and even slightly outperforms—the hypothetical "but-for" return of the Funds had all the hedges been placed in the -10% to -25% range. In other words, the placement of the hedges did not contribute to losses.

With respect to restructuring, as Dr. Nelken opines, AGI US did restructure many options positions in late February 2020 and at the beginning of March 2020 while Greg was still at the helm, but thereafter abandoned the restructuring strategy and failed to restructure the portfolio consistent with prior downturns. Had AGI US implemented restructuring in Greg's absence— consistent with the Funds' restructuring strategy in prior market stress environments—the Funds

could have experienced no losses.  In fact, restructuring could have resulted in the total reversal of all $3.2 billion in lost principal by as early as the end of March 2020.

*"Market or other forces" caused the losses*.  Dr. Nelken's expert analyses further show that "market or other forces" unrelated to the offenses of conviction and relating instead to the unfortunate impact of the COVID-19 market turmoil and trading decisions made by AGI US to address disclosed risks—all while Greg was out of the office—caused the Funds' losses.  Much of the losses sustained by the Funds were a direct result of the COVID-19 pandemic.  The impact of the pandemic on equity markets in the United States and worldwide was extreme and unusual, marked by a weeks-long series of stock market plunges and volatility spikes, including four separate circuit-breakers which halted trading on the New York Stock Exchange.  From late February to March 23, 2020, the S&P 500 dropped in value by $3 trillion, or 30% of its total value.  As Dr. Nelken opines, the COVID-19 market dislocation undoubtedly contributed to losses, with other, unrelated funds losing a substantial amount and some collapsing completely.  Additionally, certain of the Funds may have experienced margin and liquidity constraints as a result of the COVID-19 market volatility.  Such risks, to the extent they impacted the Funds, were disclosed to investors and contributed to losses.  None of these losses due to the COVID-19 market disruption are reasonably attributable to Greg's misrepresentations.

Moreover, while the Funds' governing documents made clear that investing in the Funds involved substantial risks and gave AGI US trading discretion to liquidate options positions and convert to cash, certain trading decisions made by AGI US in Greg's absence also contributed to losses.  For instance, AGI US made the decision to unwind a significant amount of option positions held by the Funds between March 16 and 18, 2020.  Dr. Nelken's analysis shows that had those options positions not been sold at that time, the Funds could have avoided more than $2.6 billion

in losses. Additionally, between March 9 and March 31, 2020, AGI US made the decision to trade out of the Funds' "beta benchmark" positions, *i.e.*, certain S&P 500 index funds. As Dr. Nelken concludes, the impact of this beta benchmark removal had a profound effect on the Fund's losses, in excess of $900 million. Thus, the Funds' losses in March 2020 are attributable to "market or other forces," not Greg's misrepresentations.

Finally, as is evident from the above, these losses were not a "reasonably foreseeable" result of Greg's offense pursuant to Guideline Section 2B1.1(b)(1). For Greg to be held accountable for the $3.2 billion dollars in actual lost principal under the Guidelines, Greg must have known, or "reasonably should have known," *see* U.S.S.G. § 2B1.1, Application Note 3(A)(iv), that these losses were a potential result of his misrepresentations. This the Government cannot show. Simply put, the $3.2 billion in actual losses incurred were the unforeseeable consequence of COVID-19 market losses and volatility, as well as AGI US's abandonment of the Fund strategy and trading decisions in Greg's absence. The losses, therefore, are not the "reasonably foreseeable pecuniary harm" resulting from Greg's actions under the Guidelines.

*      *      *

Accordingly, as discussed in more detail below, the Government cannot prove that the actual loss attributable to Greg's misrepresentations is greater than zero, making application of the loss enhancement inappropriate.

## FACTUAL BACKGROUND

### A.  The Structured Alpha Funds

The Funds were a series of private investment funds managed by AGI US. Greg was the Chief Investment Officer and Portfolio Manager of the Funds. PSR ¶¶ 17, 49. At its inception in

2005, the strategy only offered two investment vehicles.  Levine Decl. Ex. B at 4.[1]  In response to growing client demand, the investment platform rapidly expanded over the years, both in terms of assets under management and the number of investment vehicles.  At its height in December 2019, there were 17 private funds with approximately $11 billion in assets under management.  *Id.* at 10; PSR ¶¶ 13, 14.  Overall, the Funds were some of the most profitable funds managed by AGI US and contributed to more than a quarter of AGI US's profits in recent years.  Dkt. No. 2 ("Indictment")  ¶ 10.

Investors in the Funds included 114 of the world's largest and most sophisticated institutional investors, some of whom had been invested in the Funds since inception.  Levine Decl. Ex. C at 8; PSR ¶ 14.  These investors could choose among the Funds based on the degree of risk with which they were comfortable, or they could invest in an entirely bespoke Fund designed to suit their objectives.  The structure of each Fund varied to suit the institutional investors preferences, resulting in a series of unique and individualized Funds:  some of the Funds had multiple investors (*i.e.*, so-called "pooled investment vehicles"), while others were "funds of one," with a single investor, or private funds specifically created for an investor.  Indictment ¶ 12. Each Fund held different securities, had different investment objectives, risk strategies, reporting and marketing materials, and generated different returns.  *See id.* ¶ 25.  Through his deferred compensation, Greg himself was also an investor in Structured Alpha 1000 LLC, the riskiest of the Funds.

Investors were not charged a management fee, even though such fees are typical in the hedge fund industry.  Instead, investors were charged a 0% management fee and a performance

---

[1] The defense refers herein to certain presentations made by counsel for AGI US to the Government in the course of the Government's investigation and which the Government has referred the defense to in this case.

fee of 30% of each Fund's quarterly returns in excess of the relevant benchmark index.  PSR ¶ 22.

In other words, the Funds charged a performance fee if and when the Funds beat the relevant

benchmark index.  Thus, the Structured Alpha team's compensation was primarily based on the

Funds' performance.

### B.  The Funds' General Strategy

The average duration of the Structured Alpha portfolio was six to eight weeks, and the

objective was to hold 100% of the options positions until expiration.  *See* Levine Decl. Ex. D at

20.  In other words, every six to eight weeks the Funds' strategy was re-evaluated and essentially

fully replaced.  *Id.*

Although the Funds had bespoke investment strategies tailored to a specific institutional

investor's needs, the Funds all generally followed a similar complex, options-based strategy.  PSR

¶ 14.  This strategy had two main components:  the "beta benchmark" component, which delivered

a return to investors equivalent to a specified benchmark index that varied by Fund (for example,

a Treasuries fund or an S&P 500 index fund); and the "alpha" component, which involved an

options strategy that also varied by Fund, and was designed to deliver additional returns regardless

of the benchmark index's performance.  *Id.*  The higher the Fund's "alpha" target, the higher the

risk of investing in that Fund.

The "alpha" portion of the strategy had four main interworking components: (1) Range-

Bound spreads; (2) Directional spreads; (3) hedging positions; and (4) restructuring.  PSR ¶¶ 14,

24; Levine Decl. Ex. B at 14.  The first two of these components were designed to generate profits

for the Funds above the "beta benchmark."  Specifically, the Range-Bound spreads were options

positions designed to profit during typical market movements.  PSR ¶ 14.  Conversely, the

Directional spreads were options positions designed to profit when equity indexes rise or fall more

than usual.  *Id.*

The last two components were risk mitigation strategies—one prong was designed to mitigate short-term risks (hedging positions) and the other prong was designed to mitigate risk in periods of sustained market dislocation (restructuring).  Specifically, the hedging positions were options positions designed to hedge against overnight or short-term market crashes (generally defined as less than 5 days), such as the October 1987 market crash.  Levine Decl. Ex. B at 17; PSR ¶ 24.  Significantly, as disclosed to investors, the hedging positions were not designed to mitigate the risks of a longer-term market downturn such as that which occurred as a result of the COVID-19 crisis.

While the hedges were designed to serve as a circuit breaker to address short-term market crashes, restructuring was the vital long-term mechanism through which the Funds managed risk. As illustrated in the below slide, the portfolio management team, led by Greg, would restructure their positions by closing out of and then re-establishing options at new strike prices as the S&P 500 and other indices changed, in order to recapture premium and reduce risk.  Levine Decl. Ex. B at 18.



### C.  The Funds' Governing Documents Disclosed Inherent Risks of Investing

Before subscribing to a given Fund, each investor received a confidential private placement memorandum ("PPM") for the Fund, an operating agreement, and a subscription agreement for the Fund, which was executed by both the investor and AGI US.  These various governing documents for the Funds included disclosures about the inherent risks of the Structured Alpha strategy including, among other things, derivative risk, general investment risks, market risk, liquidity risk, and leverage and margin risk.  Investors were aware that investing in the Funds was risky—a return on the investment was not a guarantee, and the Funds' ability to successfully implement the Structured Alpha strategy was very much dependent on a number of factors, including market performance and volatility as well as margin and liquidity constraints.  *See, e.g.*, Levine Decl. Ex. E at 2-3 ("The Fund's investment program is speculative and entails substantial risks.  There can be no assurance that the investment objective of the Fund will be achieved . . . .  ***[T]he Fund's activities could result in substantial losses***. . . .  Investment in the Fund is suitable only for persons who can bear the economic risk of the loss of their investment. . . ." (emphasis adjusted)).

Key disclosures in the Funds' PPMs included:

> *AllianzGI Structured Alpha 1000 PPM*[2]
>
> - **Fund Investment Objectives**: "The Fund may, from time to time, temporarily invest all or substantially all of its available monies in certificates of deposit, money market funds, United States government obligations or other cash equivalent investments[.]"  Levine Decl. Ex. E at 2.
> - **General Investment Risk:** "The Fund will engage in speculative investment strategies." *Id.* at 20.
> - **Change in Investment Strategies:** "The Fund may change any of its investment strategies without prior consent of, or notice to, the Members. . . . The Managing Member may . . . formulate new approaches to carry out the Fund's investment objective." *Id.* at 2.

---

[2] The SA 1000 LLC PPM is representative of the PPMs for the Structured Alpha Funds generally—the PPMs typically contain the same representations across Funds.

> • **Volatility Risk:** "Unexpected volatility or liquidity in the markets in which the Fund directly or indirectly holds positions could impair the Fund's ability to carry out its business or cause it to incur losses." *Id.* at 29.
> • **Liquidity Risk:** "There can be no assurance that a liquid market will exist when the Fund seeks to close out an option position by buying or selling the option." *Id.* at 24.
> • **Market Risk:** "Investments in the Fund are dependent on the smooth functioning of the option exchanges trading the particular options utilized in the strategy." *Id.* at 20.
> • **Leverage and Margin Risk:** "A sudden, precipitous drop in value of the Fund's assets accompanied by corresponding margin calls could force the Fund to liquidate assets quickly, and not for fair value, in order to meet its margin requirements. Leverage magnifies both the favorable and unfavorable effects of price movements in the investments made by the Fund, which may subject the Fund and the Members to a substantial risk of loss." *Id.*

Investors also made certain representations in their Fund subscription agreements, "acknowledg[ing] that [they] made an independent decision to invest in the Fund[s] and . . . relied solely upon the [PPM], Operating Agreement and independent investigations" and that they did "*not* rely[] on the Fund or the Managing Member, or any other person with respect to the . . . economic considerations involved in this investment" other than their own advisors. *See* Levine Decl. Ex. F at 9 (emphasis added).

Moreover, the AGI Structured Alpha 1000 LLC PPM gave the Fund vast discretion regarding how and whether to hedge, and how to otherwise manage the Funds. For instance, it specifically provided that, "[t]he Managing Member may employ certain hedging techniques. . . but is not required to do so. . . . In addition to possible losses on the position sought to be hedged notwithstanding the attempted hedge, the Fund could incur losses on the hedging position itself." Levine Decl. Ex. E at 26.

### D. The Offense Conduct

On June 7, 2024, Greg pled guilty pursuant to a superseding information charging him with two counts of investment adviser fraud based on false statements made to certain investors regarding the level of risk associated with the Funds' investments. *See* PSR ¶¶ 2, 3 (reflecting that the charges were based on "making false statements to investors and prospective investors and failing to disclose to investors and prospective investors the true risks being taken with respect to the Funds' investments, in some cases in violation of their fiduciary duties."). As Greg admitted in his plea allocution, "[a]t times between 2014 and 2020, certain investors requested reports or information. [Greg] provided or caused to be provided altered reports and information to these investors that deceptively failed to disclose that alterations had been made." Dkt. No. 141 at 35:17-20; PSR ¶ 18. As discussed below, the "altered reports and information" were limited to altered information and data contained in one-day reports sent to eleven of the more than 100 investors in the Funds. Levine Decl. Ex. C at 43.

The PSR also attributes other misrepresentations relating to the details of the hedging positions and made within AGI US marketing materials to Greg. *See* PSR ¶¶ 21, 24. The defense does not dispute that some hedges were placed outside of the range referenced in the marketing materials. However, these statements regarding hedging positions were, as stated in the marketing materials, "Position examples" and not promises or representations as to whether the Funds would employ other hedges in building actual or future positions, nor were they required to hedge in any particular manner by the relevant Fund documents.

### 1.    The Altered Reports

As Greg has admitted, he sent altered reports to several investors who requested those reports over a six-year period. PSR ¶¶ 24-32. None of these altered reports related to the valuation of any of the Funds' positions, which was done by a third party, or the amount of money in each

investor's account. These reports did not reflect the Funds' actual trading strategy or concern the structure of the Funds in 2020 when the losses occurred. As the PSR provides, some of the alterations were improper, while others were done to "correct for errors" in the data. PSR ¶¶ 27, 28, 30.

Six investors received altered risk reports, which included "stress tests" that "modeled the impact of various one-day changes in the market on the [Fund]." PSR ¶ 27 (describing risk reports as "daily reports"). These reports were created by the portfolio management team, based on data from reports created by an affiliate of AGI US, Investment Data Services GmbH – Analysis and Reporting Services ("IDS"). *Id.* The reports said nothing about the actual realized profits or losses of the Funds. Rather, they were designed to predict market conditions at a specific moment in time (overnight) and how the Funds were expected to respond, and thus had no relation to market events that unfold over time, like what happened during the COVID-19 market dislocation. As reflected in the footnotes of these stress test reports, "results are based off of *an overnight market move* and no portfolio intervention[.]" *See* Levine Decl. Ex. A (Nelken Report) ¶ 29 (emphasis added).

In addition, nine investors also received altered "greeks" data, which are metrics that provide measures of risk associated with options positions. *See* PSR ¶ 28. Like the other altered data, the greeks were designed to evaluate risk over a one-day period and, as Greg informed investors, were not a useful measure to evaluate risks over a *multi-week* time period. PSR ¶ 28; Levine Decl. Ex. A (Nelken Report) ¶ 30.

Similarly, as the PSR makes clear, the remainder of the reports containing altered data have no application to the losses. Levine Decl. Ex. A (Nelken Report) ¶ 31. Open positions worksheets were shown at certain investor meetings and, in some cases, the data was altered to bring the "strike distances of the hedges closer to the money." PSR ¶ 25. Altered attribution data was sent to one

investor, and "[i]n some cases, the changes were made to correct errors in the data, in other cases the changes made it appear as though the portfolio had more significant hedging positions than were in fact in place."  PSR ¶ 30.  And altered positions data, in which some of a Fund's open options positions were changed from "short positions to long positions," was sent to one potential investor in 2018.  PSR ¶ 26; Indictment ¶ 44.  As explained by Dr. Nelken and set forth below, the actual hedging positions in place did not contribute to losses.  Levine Decl. Ex. A (Nelken Report) ¶¶ 34-42.  Altered "daily" performance data was sent to three investors as early as July 2016, reflected Fund performance on a daily basis, not over a multi-week period, and was reflective of past performance.  PSR ¶ 29.  Modified expected value sheets "were shown to certain investors who requested them during [on-site] client meetings, as an example of one of the many tools used by the portfolio managers to monitor the portfolio and associated risk."  PSR ¶ 31.  The variable alpha target misrepresentations applied to one investor in "certain years" between 2016 and 2020. PSR ¶ 32.

### 2.    Hedging-Related Representations

As noted, the PSR also seeks to hold Greg responsible for misrepresentations relating to how far "out of the money" (by percentage) certain hedges purchased to protect the strategy from a short-term dislocation were.  According to the PSR, "[b]eginning in October 2015, AGI US consistently represented to investors on a slide entitled 'Position examples' in marketing materials that it would purchase hedges for the Funds that ranged -10 to -25% 'out of the money' to protect the portfolio against an overnight crash, as well as a short-term equity-market crash" but instead purchased hedges closer to -10 to -45%, (averaging between -30 to -50% beginning in February 2018) and "repeatedly failed to purchase the hedging positions that some investors were promised."  PSR ¶¶ 21, 24.

The defense does not dispute that some hedges were purchased outside the -10% to -25% range.  The defense also does not dispute that most, if not all, of the marketing pitch books contained the strike distances of the hedges as set forth in the PSR.  However, the strike distances were communicated to investors in marketing pitch books, which were different depending on the investor and the Fund, on a slide entitled "Position **examples**."  As shown below, some of the "Position examples" slides, in addition to using the word "examples," even expressly noted that "strike distances [were] *typically* from -10% to -25%."  PSR ¶ 24 (emphasis added); *see also* Levine Decl. Ex. H at 12.  These marketing materials were reviewed and approved by the AGI US Legal and Compliance departments.  PSR ¶ 34.



AGI US also did not make representations in its agreements with investors as to how hedging would be accomplished, or whether the Funds would employ hedges in the -10% to -25% range in building actual or future positions.  AGI US had discretion to change its strategy.  Levine

Decl. Ex. E at 26; *see supra* at 9-10.  Regardless, as explained by Dr. Nelken and set forth below, the placement of the hedges did not contribute to losses.

### E. The Funds Suffered Losses Unrelated to the False Statements During the COVID-19 Market Crisis

With Greg at the helm of the Structured Alpha strategy, the Funds were successful prior to the sustained market downturn that resulted from the COVID-19 pandemic.  The market downturn during COVID-19 was extreme and unusual, marked by a weeks-long series of stock market plunges and volatility spikes in the US equity and options markets beginning in February 2020 and extending through March 2020.  The COVID-19 market disruption also coincided with Greg's absence from work due to severe neurological issues that plague him to this day.  As a result of the COVID-19 market disruption, Greg's absence, and other factors unrelated to Greg's misrepresentations as explained below, the Funds experienced substantial losses.

1.    Prior to the COVID-19 Pandemic, the Funds Consistently Outperformed the Market

For the 15 years in which they were in existence prior to 2020, the Funds outperformed the market and earned strong returns for investors, while navigating through periods of market volatility and multiple market dislocation events such as the financial crisis in 2008.  *See* PSR ¶ 16 (noting that the "Funds performed well for 15 years, including through market disruptions, until the Covid-related volatility in March 2020").  In addition to earning strong and consistent returns, investors also redeemed a substantial amount of money from the Funds over the years.  In early 2020 alone—prior to the COVID-19 pandemic—investors redeemed a total of $869,976,040 from the Funds.  *See* Levine Decl. Ex. G at 6-7.

2.    COVID-19 Led to Extreme Market Volatility in February and March 2020

The COVID-19 global pandemic, which began in late February 2020, profoundly impacted all aspects of society worldwide.  It caused unprecedented changes in lifestyle, work, and social

interactions, and countless studies have reported on both the dramatic psychological and emotional effects, as well as the exacerbation of economic disparities created by the pandemic. Naturally, US financial markets were also severely impacted.

The COVID-19 pandemic caused fear among investors, leading to an extreme, weeks-long series of stock market plunges and volatility spikes in the US equity and options markets beginning in February 2020. The historic impact of the COVID-19 pandemic on the market is evident from the performance of the S&P, which lost ***30% of its value*** between February 20 and March 23, 2020. Levine Decl. Ex. A (Nelken Report) ¶ 24. During this time, among other things, four market-wide circuit-breakers were triggered as a result of the rapid decline in the markets, halting trading on the New York Stock Exchange. *Id.* Since it was first implemented in 1987, a circuit-breaker had been triggered only once prior to March 2020.[3]

3. <u>Greg Was Incapacitated During the COVID-19 Market Dislocation</u>

As reflected in Mr. Tournant's accompanying sentencing submission, dated November 1, 2024 (the "Sentencing Submission"), in early March 2020, at the same time the market began to experience the extreme volatility sparked by the COVID-19 pandemic, Greg became incapacitated with severe neurological issues that affected (and continue to affect) his vestibular system. PSR ¶ 88. As a result of his health issues, Greg was out of the office and was unavailable between March 9 and March 24, 2020—during the height of the COVID-19 market volatility—unable to

---

[3] *See* Minami Funakoshi and Travis Hartman, "March madness," Reuters Graphics (Mar. 18, 2020), https://www.reuters.com/graphics/USA-MARKETS/0100B5L144C/# (last visited November 7, 2024).

maintain his role as portfolio manager and leader of the Funds' strategy. *See generally* Sentencing Submission; PSR ¶ 40, p. 48.

While Greg was out of the office, the Funds—particularly those that were managed to higher alpha targets like Structured Alpha 1000 and 1000 Plus (*i.e.*, the Funds with the highest alpha target, and therefore the most risky)—realized substantial total losses through the end of March 2020. PSR ¶ 16. Ultimately, AGI US made the decision to liquidate most of the Funds, beginning with Structured Alpha 1000 and Structured Alpha 1000 Plus, locking in the losses incurred during an extremely volatile time in the United States and around the world. As a result, the Funds lost more than $3.2 billion in principal. PSR ¶ 16.

4.    The Losses Incurred During the COVID-19 Pandemic Were Unrelated to the False Statements

Greg retained Dr. Israel Nelken to determine whether there was any relationship between the losses to the Funds' and the false statements underlying Greg's conviction. Dr. Nelken is the President and Founder of Super Computer Consulting, Inc., a former lecturer at the University of Chicago, a testifying expert in areas relating to financial mathematics, financial markets, and risk management, and a former public director on the board of the CFE (Chicago Futures Exchange). Dr. Nelken prepared an expert report, submitted concurrently, setting forth his analysis and conclusions. As set forth in his report, Dr. Nelken concluded that there is no causal relationship between Greg's misrepresentations in the altered reports and the Funds' losses. Dr. Nelken also concluded that the Funds' hedging protection did not contribute to losses; and had the restructuring strategy been implemented consistently with how it had been implemented in previous downturns with Greg at the helm, the Funds would not have sustained any losses at all. Rather, losses sustained by the Funds were the unfortunate result of the COVID market downturn and related disclosed margin and liquidity risks, and AGI US's trading decisions made in Greg's absence.

17

i.      **Dr. Nelken Concluded that Altered Reports Did Not Cause Losses**

With respect to Greg's misrepresentations in individualized reports sent to institutional investors in the Funds, *see* PSR ¶ 14, Dr. Nelken opined that these altered reports, "which were sent to several institutional investors over a six-year period, do not reflect the Funds' actual trading strategy or concern the structure of the Funds in 2020, and thus have no direct relationship to the losses." Levine Decl. Ex. A (Nelken Report) ¶ 27.

Many of the reports, including the altered risk reports and greeks, "were for one-day scenarios, and do not provide information about the risks associated with a multi-week market movement like the unique events in February and March 2020 caused by COVID-19." Levine Decl. Ex. A (Nelken Report) ¶ 27. In particular, the risk reports sent to investors "'modeled the impact of various one-day changes in the market on the Structured Alpha Fund[s],'" and "pertained to one-day risks." *Id.* ¶ 29; PSR ¶ 27. Greeks data, according to Dr. Nelken, "can only provide a measure of risk for, at most, a one-day period and are not a reliable metric to measure risk over a multi-week time period." Levine Decl. Ex. A (Nelken Report) ¶ 30.

Similarly, the remainder of the reports containing altered data, many of which, set forth above, were sent years before 2020, were for one-day scenarios, concerned the placement of hedges, or were demonstratives used during meetings, did not affect total losses in March 2020. Levine Decl. Ex. A (Nelken Report) ¶ 31; (*supra* at 12-13).

ii.      **Dr. Nelken Concluded that the Fund's Risk-Mitigation Strategy Was Not the Cause of the Losses**

As Dr. Nelken opined, the Funds' hedging strategy that was in place at the beginning of the COVID-19 market disruption did not contribute to losses. He further concluded that, had the Funds' restructuring strategy been implemented in Greg's absence as it had been in prior market downturns, the Funds would not have suffered losses.

***Hedging***.  The hedging portion of the Funds' risk mitigation strategy was designed to protect the strategy in the event of an overnight or short-term crash.  Levine Decl. Ex. A (Nelken Report) ¶ 35.  Accepting the Government's contention that Greg misrepresented the strike distances of hedges by telling investors that they were in the -10% to -25% range when in fact a portion of the hedges were further out of the money, Dr. Nelken conducted an analysis showing that "the results of the Funds would have been comparable regardless of the strike distance of the hedges that were used." *Id.* ¶ 42.

To reach this conclusion, Dr. Nelken plotted the hedge positions *actually* purchased (the "Cumulative Actual Return") and compared them to hypothetical -10% to -25% hedge positions (the "Cumulative But-For Return") from the beginning of the COVID-19 market downturn on February 20, 2020 to Greg's last day in the office on March 6, 2020.[4]  He concluded that the Cumulative Actual Return of each Fund "tracks—and even slightly outperforms" the Cumulative But-For Return of each Fund from February 20 to March 6, 2020.  Levine Decl. Ex. A (Nelken Report) ¶ 41.  The charts on pages 13 through 17 of the Nelken Report plot the results for the Funds.  For example, the chart for the Structured Alpha 1000 Fund below shows the Cumulative Actual Return (yellow line) slightly outperforming the Cumulative But-For Return (blue line):

---

[4] As Dr. Nelken explains, *see* Levine Decl. Ex. A (Nelken Report) ¶ 39, "[t]he hedging positions were only designed to protect the Funds' strategy from short-term market crashes of less than five days.  However, this longer period was used to analyze the hedges for the entire period prior to Mr. Tournant's incapacitation."



Similarly, on a "weighted average basis" across all Funds, "the 'misplaced' hedges performed effectively the same as—and even slightly outperformed [by 1.32%]—the 'but-for' -10 to -25% hedges." Levine Decl. Ex. A (Nelken Report) ¶ 41. Thus, no losses are attributable to the "misplaced" hedges as of March 6, 2020.

***Restructuring***. With respect to the restructuring strategy, which was utilized in periods of longer market dislocation, Dr. Nelken concluded that AGI US's "failure to restructure the portfolios consistently with the way they were restructured during previous market downturns while Mr. Tournant was at the helm, contributed to losses." Levine Decl. Ex. A (Nelken Report) ¶ 43. In reaching this conclusion, Dr. Nelken performed a two-part restructuring analysis to assess the impact of AGI US's failure to restructure on the Funds' losses. First, Dr. Nelken analyzed "[h]ow the portfolio management team of AGI US . . . navigated certain [prior] periods of multi-day market declines[.]" *Id.* ¶ 47. Second, Dr. Nelken analyzed the "But-For simulated performance of the Funds had the 'Restructuring Model' . . . been applied over March 9, 2020 up until various month end dates (i.e., March 31, 2020, April 31, 2020, and May 29, 2020)." *Id.* In other words, Dr. Nelken analyzed what, if any, restructuring AGI US did in Greg's absence and how AGI US's failure to restructure may have contributed to investor losses.

20

With respect to the first part, Dr. Nelken analyzed the trade patterns of the options in the portfolio "over specific dates in December 2018, February 20, 2020 to March 6, 2020, and March 9 to March 31, 2020."  Levine Decl. Ex. A (Nelken Report) ¶ 49.  The results of the trade pattern analysis show: (1) new Equity Index Tail Risk Hedge Long Puts were not opened when prior hedging positions expired at the same level of frequency from March 9, 2020 to March 31, 2020 when compared to other periods; (2) Volatility Index Rangebound Short Calls were not restructured over March 9, 2020 to March 31, 2020, while they were restructured in other periods; (3) Equity Index Rangebound Short Puts were not restructured over March 9, 2020 to March 31, 2020, while they were restructured in other periods; and (4) the statistical distance at which Volatility Index Rangebound Short Calls and Equity Index Rangebound Short Puts were closed over March 9, 2020 to March 31, 2020 was far beyond that which was typical when Greg was managing the funds.  *Id.* ¶ 51.  In sum, AGI US deviated from the typical restructuring strategy in Greg's absence.

With respect to the second part, Dr. Nelken's Restructuring Model showed what would have occurred had the Funds been restructured beginning on March 9, 2020 consistent with prior periods.  In conducting his analysis, he applied two methods of restructuring:  "L1 Restructuring," which means "that upon active closure of an option, purchase a new option immediately on the same trading day that the original was closed"; and "L2 Restructuring," which means "that instead of opening a new replacement option immediately,  wait three trading days to open the position instead."  Levine Decl. Ex. A (Nelken Report) ¶ 53.  Ensuring that "potential margin issues are dynamically remediated through the model," the results of the Restructuring Model show that "investors would have recovered any lost principal had restructuring been followed as in past periods."  *Id.* ¶¶ 55, 56.

This is set forth in the chart below from Dr. Nelken's analysis. Under "L1 Restructuring," investors could have recovered all $3.2 billion in lost principal by the end of May 2020, even generating capital gains in the amount of $73,387,724 by May 29, 2020. Under "L2 Restructuring," investors could have recovered all lost principal by the end of March 2020, even generating capital gains in the amount of $284,407,600 by March 31, 2020. Capital gains by the end of May could have amounted to $1,550,967,255 under "L2 Restructuring." Levine Decl. Ex. A (Nelken Report) ¶ 56.

| | | (Lost Principal) / Capital Gains | | |
| --- | --- | --- | --- | --- |
| | Actual Performance | Restructured Performance | | |
| End of Performance Period | | L1 Restructuring | | L2 Restructuring |
| 3/31/2020 | $      (3,238,748,200) | $      (1,006,256,309) | $ | 284,407,600 |
| 4/30/2020 | | $      (190,978,106) | $ | 1,234,952,773 |
| 5/29/2020 | | $      73,387,724 | $ | 1,550,967,255 |

In sum, as Dr. Nelken concluded, had AGI US "implemented restructuring from March 9, 2020 to May 31, 2020 consistent with how they had done so in prior market stress environments, under [his] analysis, the principal losses would have been more than recovered by May 31, 2020." Levine Decl. Ex. A (Nelken Report) ¶ 59.

### iii.    Dr. Nelken Concluded that the Funds' Losses Were Caused by Other Factors Unrelated to the Misrepresentations

In his expert opinion, Dr. Nelken found that the Funds' losses were the unfortunate result of the following factors unrelated to actual or alleged misrepresentations at issue in this case: (1) the COVID-19 market disruption and related margin and liquidity issues; and (2) trading decisions made by AGI US in Greg's absence.

First, Dr. Nelken concluded that, combined with other factors, the COVID-19 market disruption contributed substantially to losses in the Funds. Levine Decl. Ex. A (Nelken Report)

¶ 60.  The COVID-19 pandemic led to a multi-week series of stock market plunges and volatility spikes in the US equity and options markets, and the S&P lost 30% of its value between February 20 and March 23, 2020.  *Id.* ¶ 24.  In reaching his conclusion, Dr. Nelken compared the Funds' actual performance to that of other investment vehicles with comparable option strategies during the Spring of 2020.  *Id.* ¶ 61.  Dr. Nelken found that the comparable funds experienced losses of approximately 26% to 28% during the relevant period.  *Id.*  Moreover, certain short volatility funds—including Malachite Capital Management, Parplus Capital Partners, and Alberta Investment Management Corp.—shut down as a result of the COVID-19 market disruption.  *Id.* ¶ 62.

Additionally, "to the extent that the Funds were impacted by margin and liquidity issues caused by the COVID-19 market disruption, those issues also may have contributed to losses in the Funds."  Levine Decl. Ex. A (Nelken Report) ¶ 63.  For instance, on March 10, 2020, AGI US received approximately 20 margin calls from its prime brokers.  This issue was due to an error by State Street, AGI US's asset manager.  AGI US was unable to meet the prime brokers' margin calls because State Street did not deliver the money to the prime brokers, which put the Funds affected at risk for account closure.  *See id.* ¶ 63.  Parallel to margin concerns, AGI US represented to investors that the Funds experienced liquidity constraints limiting their ability to unwind hedging positions and de-risk the portfolio.  *Id.*  While it is unclear "whether liquidity constraints were due to market conditions, or due to AGI US's failure to implement the Funds' strategy, AGI US represented to investors that such liquidity constraints contributed to losses."  *Id.*  These risks, to the extent they impacted the Funds, were disclosed to investors and are not attributable to Greg. *Id.*; (*supra* at 9-10).

Second, the Funds' governing documents gave AGI US wide trading discretion, warning investors that the Funds may be forced to "liquidate assets quickly, and not for fair value" and that the Funds may, "from time to time, temporarily invest all or substantially all of its available monies in certificates of deposit, money market funds, United States government obligations or other cash equivalent investments[,]" *see* Levine Decl. Ex. E at 20.  Consistent with these representations, Dr. Nelken found "certain trading decisions made by AGI US management in [Greg's] absence . . . also contributed to losses," Levine Decl. Ex. A (Nelken Report) ¶ 64.

For instance, AGI US made the decision to liquidate a significant amount of option positions held by the Funds between March 16 and 18, 2020.  Levine Decl. Ex. A (Nelken Report) ¶ 65.  Dr. Nelken analyzed the impact the liquidation of these positions had on the Funds' losses and concluded that had those options positions remained open and not been sold at that time, $2,684,295,547 in losses could have been avoided.  *Id.* ¶ 67.

Additionally, as Dr. Nelken explained, the Funds were "managed to a certain beta benchmark with the intention of outperforming it through the alpha."  Levine Decl. Ex. A (Nelken Report) ¶ 69.  As described in the Nelken Report, between March 9 and March 31, 2020, in Greg's absence, AGI US made the decision to trade out of "beta benchmark" positions in certain of the Funds.  *Id.* ¶ 68.  To measure the loss associated with AGI US's decision, Dr. Nelken conducted an "Impact of Beta Removal" analysis, which quantified "the amount of avoidable loss had executive management of AGI US (absent [Greg]) not traded out of the beta benchmark."  *Id.* ¶ 75.  The results show that as much as $908,742,546 in losses could have been avoided had the "beta benchmark" not been sold.  *Id.* ¶ 76.  Thus, in total, if AGI US had chosen not to liquidate

the options and sell the beta benchmark when it did, the entire amount of the lost principal—more than $3.2 billion—could have been avoided.  *Id.* ¶ 78.[5]

## DISCUSSION

## THE COURT SHOULD CONCLUDE THAT GREG HAS A TOTAL OFFENSE LEVEL OF 11 AND AN ADVISORY GUIDELINES RANGE OF 8-14 MONTHS

The Court should conclude that, under the Guidelines, Greg has a total offense level of 11 and a corresponding advisory Guidelines range of 8-14 months.[6]  Adopting the Government's Guidelines calculation, the PSR calculated Greg's total offense level at 41, which included a 30-level enhancement under U.S.S.G. § 2B1.1(b)(1)(P).  *See* PSR ¶¶ 52-64.  However, the Government did not and cannot establish that any actual loss occurred as defined in Section 2B1.1, and the Court therefore should not apply a loss enhancement.[7]

Contrary to the Government's assertion, this is not a case in which an "investor puts money into a fraudster's hands, and ultimately receives nothing of value in return," such that Greg is responsible for the entire $3.2 billion in lost principal.  *Balboa*, 622 F. App'x 32 (citation and internal quotation marks omitted); PSR ¶ 40(a).  As a result, for a loss enhancement to apply, the Government bears the burden to prove that "the misrepresentation proximately caused the economic loss," and losses caused by "market or other forces" must be excluded from the calculation.  *See Rutkoske*, 506 F.3d at 179.  The Government has made no effort to meet this burden, and, in fact, as Dr. Nelken concluded, none of the losses to the Funds were proximately

---

[5] AGI US management made these trading decisions in an extraordinarily difficult environment and had the right to make these decisions.  Whether these decisions to abandon the strategy were good or bad, they contributed to losses and were made without Greg's involvement.  Levine Decl. Ex. A (Nelken Report) n.70.

[6] Probation has recommended a sentence of 24 months.  *See* PSR p. 47.

[7] The parties did not stipulate in the Plea Agreement as to how loss is counted under the Guidelines and left that issue open for sentencing.  *See* Plea Agreement at 2; PSR ¶ 6(a)(iii); U.S.S.G. § 2B1.1(b)(1)(P).

caused by Greg's misrepresentations, but instead were the result of "market or other forces." Accordingly, the Court should not apply any loss enhancement in this case.

I.  **IT IS THE GOVERNMENT'S BURDEN TO ESTABLISH BOTH THE EXISTENCE AND AMOUNT OF ANY LOSS**

Guidelines Section 2B1.1(b)(1) permits the Court to enhance a defendant's base offense level based on the amount of "loss" attributable to the offense.  U.S.S.G. § 2B1.1(b)(1).  For a loss enhancement to apply, the Government must prove by a preponderance of the evidence both the existence of and the amount of loss attributable to the offense conduct.  *See United States v. Mosely*, 980 F.3d 9, 29 (2d Cir. 2020); *United States v. Cuti*, 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011).  Where, as here, the Government seeks a loss enhancement based on "actual loss," it must establish "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1 Application Note 3(A)(i).  Section 2B1.1's requirement that the loss "resulted from the offense" imposes a loss causation requirement pursuant to which the Government must prove that "the misrepresentation proximately caused the economic loss."  *Rutkoske*, 506 F.3d at 179.  Proof that a defendant's actions were "cause-in-fact," in the sense that "but for" a defendant's actions no loss would have occurred, is insufficient.  *United States v. Olis*, 429 F.3d 540, 545-46 (5th Cir. 2005).

As the Government recently acknowledged in another recent sentencing before this Court, the Second Circuit's decision in *Rutkoske* sets forth the standards applicable to the loss causation analysis required by Section 2B1.1.  *See* The Government's Sentencing Memorandum at 17, *United States v. Bankman-Fried*, No. S6 22 Cr. 673, 2024 WL 1342470 (S.D.N.Y. Mar. 15, 2024) ("Bankman-Fried Sent. Memo") ("In a securities fraud case, the loss amount is calculated as the decline in value of the securities purchased by investors, insofar as that decline is a 'result of the fraud.'" (quoting *Rutkoske*, 506 F.3d at 179)).  In *Rutkoske*, the Second Circuit held that the loss

causation standards applicable to civil fraud cases pursuant to the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), applied to the determination of actual loss in criminal cases, under the predecessor to Section 2B1.1. *Rutkoske*, 506 F.3d at 179 ("[W]e see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence."). Under these standards, the Court must make a "reasonable estimate" of "the extent to which a defendant's fraud, as distinguished from market or other forces" caused the loss. *Rutkoske*, 506 F.3d at 179 (reversing and remanding for sentencing because the district court had not considered whether market or other outside forces contributed to the decline in value of the security at issue). In other words, as the Government recently stated, "[i]n cases where the securities decline in value over time for multiple reasons in addition to a defendant's fraud, the "portion of a price decline caused by other factors must be excluded from the loss calculation." *See* Bankman-Fried Sent. Memo at 47 (quoting *Rutkoske*, 506 F.3d at 179); *see also Rutkoske*, 506 F.3d at 179 ("In [securities fraud] cases, '[l]osses from causes other than the fraud must be excluded from the loss calculation.'") (alteration in original) (quoting *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006)).

While it need not establish loss with absolute precision, the Government must present sufficient evidence to enable the court to make a reasonable estimate of the actual loss so as not to engage in "mere speculation." *See, e.g.*, *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("[A] district court's findings must be grounded in the evidence and not derive from mere speculation."). Where the Government fails to present sufficient evidence to allow the Court to make a non-speculative, reasonable loss estimate, no loss enhancement should be applied. *See United States v. Pina*, 2019 WL 1904920, at *3 (S.D.N.Y. Apr. 11, 2019) (rejecting the

27

Government's proposed loss amount as "entirely speculative" and insufficient for the court to "make a principled assessment" of the amount "properly attributable" to the defendants' scheme); *Cuti*, 2011 WL 3585988, at *4 (holding that the Government failed to meet its burden to establish loss under Section 2B1.1 for multiple reasons, including the Government's failure to adequately explain the impact of "other factors" on the loss calculation).

As shown below, the Government did not and cannot meet its burden to establish that any of the actual or alleged misrepresentations in this case were the proximate cause of the losses.

## II.    THE COURT SHOULD REJECT THE GOVERNMENT'S FLAWED LOSS CALCULATION

The Government makes no effort to establish which portion of the loss, if any, was proximately caused by Greg's misrepresentations. The Government instead asserts that the Court should calculate the loss as the entire amount of the principal invested by the more than 100 investors in the Funds, amounting to more than $3.2 billion. PSR ¶¶ 40-41. In making this argument, the Government relies on cases that, by their terms, only apply when an investor is fraudulently induced to invest in a worthless investment. *Id.* The PSR summarizes the Government's argument as follows:

> According to the Government, as determined in *United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012) and *United States v. Balboa,* 622 F. App'x 31, 32 (2d Cir. 2015), the loss attributable to the defendant is the amount the investors provided to the defendant. In *Hsu*, the Second Circuit stated that "when an investor puts money into a fraudster's hands, and ultimately received nothing of value in return, his loss is measured by the amount of principal invested." While *Hsu* was a case about a Ponzi scheme, in *Balboa*, the Second Circuit extended the rule from *Hsu* to a case where the loss was "the total sum of money that victims of [the] scheme were fraudulently induced to invest in the hedge fund." There, like here, the defendant argued that "the global economic downturn, rather than his fraudulent scheme, was the ultimate cause of the victims' loss and therefore, the actual loss attributable to the fraud was $0." *Id.* The Circuit rejected that argument, stating that it "is foreclosed by *United States v. Hsu*," and affirmed the lost principal as the measure of loss. *Id.*

PSR ¶ 40(a).

As the PSR accurately states, however, these cases apply only "when an investor puts money into a fraudster's hands, and ***ultimately received nothing of value in return***." *Balboa*, 622 F. App'x at 32 (emphasis added) (quoting *Hsu*, 669 F.3d at 121). They do not, however, apply when "what [the investors] got was not worthless." Transcript from Sentencing Hearing, *United States v. Lumiere*, No. 16-CR-00483 (S.D.N.Y. June 13, 2017), ECF No. 105 at 3:14–20 (rejecting the Government's loss calculation pursuant to *Balboa* and *Hsu* because it "doesn't seem to have taken account of the fact that although investors may not have invested but for the fraudulent elevation of the net asset value in which the defendant, in the Court's view, played a very prominent role, nevertheless, what they got was not worthless."); *see also* Government's Sentencing Memorandum at 7, *United States v. Lumiere*, No. 16-CR-00483, 2017 WL 4385835 (May 16, 2017) (relying on *Balboa* and *Hsu*).

The Court should reject the Government's argument that it is not required to exclude losses that were not proximately caused by the fraud, because there should be no dispute that the Funds not only were not worthless, but the investors received substantial returns prior to the COVID-19 crash. Indeed, the Funds were very real:

- The Funds were a flagship product of AGI US, with a 15-year track record of profitability. The strategy of the Funds was sophisticated and real (*supra* at 5-6);

- Investors received substantial value for their investments until March 2020. In exchange for their money, investors received legitimate interests in legitimate securities and derivatives, which were never misrepresented. ***Investors redeemed almost $1 billion in early 2020 alone*** and earned substantial returns over the years. (*supra* at 15);

- Investors' money was in fact invested in the Funds, and not simply used to pay earlier investors to create an illusion of legitimacy and profit. There are no allegations of commingled funds, and each investor's account was scrupulously maintained and accounted for by an independent, third-party administrator;

- There is no dispute that the actual performance of the Funds was accurately represented and verified by third parties;

- Greg invested side-by-side with investors in Structured Alpha 1000 LLC, strongly demonstrating his confidence in the Fund and its strategy; and

- Greg did not receive any performance fees unless the Funds exceeded the relevant benchmark (*supra* at 6-7).

Accordingly, the Court should reject the Government's flawed calculation and conclude that the Government bears the burden to establish the portion of the loss, if any, that was proximately caused by the fraud.

## III. THE LOSSES WERE CAUSED BY "MARKET OR OTHER FORCES," NOT GREG'S MISREPRESENTATIONS

As Dr. Nelken's conclusions illustrate, the Government cannot meet its burden on loss causation. Greg's misrepresentations did not cause the losses. With respect to the two prongs of the Funds' risk-mitigation strategy: (1) the results of the Funds would have been comparable regardless of the placement of the hedges; and (2) had the restructuring strategy been implemented consistently with previous market downturns, the Funds would not have sustained any losses. Instead, the investor losses were caused by the COVID market downturn, related disclosed margin and liquidity risks, and AGI US's trading decisions made in Greg's absence.

***Losses were not caused by Greg's misrepresentations.*** Greg's misrepresentations to investors in altered reports did not "proximate[ly] cause the economic loss." *Rutkoske*, 506 F.3d at 179. These altered reports, "which were sent to several institutional investors over a six-year period, do not reflect the Funds' actual trading strategy or concern the structure of the Funds in 2020, and thus have no direct relationship to the losses." Levine Decl. Ex. A (Nelken Report) ¶ 27; (*see supra* at 18.)

Moreover, as Dr. Nelken opined, many of the reports, including the altered risk reports and greeks, "were for one-day scenarios, and do not provide information about the risks associated

with a multi-week market movement like the unique events in February and March 2020 caused by COVID-19." Levine Decl. Ex. A (Nelken Report) ¶ 27; *id.* ¶ 29 (the risk reports sent to investors "'model[ed] the impact of various one-day changes in the market on the Structured Alpha Fund[s],'" and "pertained to one-day risks"); *id.* ¶ 30 (greeks data "can only provide a measure of risk for, at most, a one-day period and are not a reliable metric to measure risk over a multi-week time period."). Greg also made investors aware of the limitations of using greeks to evaluate risks over periods longer than one day, telling them that greeks "were not a useful measure to evaluate risk over a one-day period." *Id.* ¶ 30; PSR ¶ 28. Similarly, the remainder of the reports containing altered data, many of which were sent years before 2020, were for one-day scenarios, concerned the placement of hedges, or were simply demonstratives used during meetings, did not affect total losses in March 2020. Levine Decl. Ex. A (Nelken Report) ¶ 31; (*supra* at 18.)

***The Funds' risk mitigation strategies were not the cause of the losses.*** The first prong of the Funds' risk-mitigation strategy is hedging for short-term market crashes. The Government contends that Greg misrepresented the strike distances of the hedges by telling investors in marketing materials that hedges were in the -10% to -25% range when, in fact, they were further out of the money. Accepting the Government's argument for purposes of his analysis, Dr. Nelken showed that "the results of the Funds would have been comparable regardless of the strike distance of the hedges that were used." Levine Decl. Ex. A (Nelken Report) ¶ 42. Dr. Nelken found that between the beginning of the COVID-19 market downturn on February 20, 2020 and Greg's last day in the office on March 6, 2020, for each Fund, the Cumulative Actual Return "tracks—and even slightly outperforms" the Cumulative But-For Return. Nelken Report ¶ 41. On a "weighted average basis," the same result applies: "the 'misplaced' hedges performed effectively the same

as—and even slightly outperformed [by 1.32%]—the 'but-for' -10 to -25% hedges." *Id.*  Thus, the "misplaced" hedges did not cause the losses.  (*See supra* at 19-20.)

The second prong of the Funds' risk-mitigation strategy is restructuring for longer periods of market decline.  As Dr. Nelken opined, AGI US, absent Greg, "did not implement restructuring in a manner consistent with what was done in prior periods of market stress[.]"  Levine Decl. Ex. A (Nelken Report) ¶ 59 (emphasis omitted).  As Dr. Nelken's analysis showed, "[h]ad the AGI US portfolio management team implemented restructuring from March 9, 2020 to May 31, 2020 consistent with how they had done so in prior market stress environments . . . the principal losses would have been more than recovered by May 31, 2020." *Id.* ¶ 59.  In fact, under Dr. Nelken's analysis, investors could have recovered all $3.2 billion in lost principal by as early as the end of March 2020. *Id.* ¶ 56; (*see supra* at 20-22).

***Losses were caused by the COVID-19 market dislocation.***  When combined with other forces, the losses sustained by the Funds can be explained by COVID-19 market turmoil. *See* Levine Decl. Ex. A (Nelken Report) ¶ 24 (noting that S&P lost 30% of its value between February 20 and March 23, 2020); (*see supra* at 22-23).  Comparing the Funds' performance to other option strategies, Dr. Nelken found that multiple other funds experienced substantial losses in the relevant period. *Id.* ¶¶ 61–62.  Certain hedge funds completely collapsed, losing billions. *Id.* ¶ 62.  Probation also recognized that the losses are "somewhat overstated, or at least comingled, with losses caused by the COVID-19 pandemic." PSR ¶ 48.  None of the losses due to the COVID-19 market disruption are attributable to Greg's misrepresentations, as those losses would have occurred regardless of whether any misrepresentations were made.  To the extent that the Funds were impacted by margin and liquidity issues caused by the COVID-19 market disruption and

those issues contributed to losses in the Funds, those losses are similarly not attributable to Greg.[8] Levine Decl. Ex. A (Nelken Report) ¶¶ 60, 63; (*see supra* at 23).

>    ***Losses were caused by AGI US's decisions to liquidate the options and trade and ultimately remove the beta benchmark.***  Fourth, while the Funds' governing documents gave AGI US enormous trading discretion, as Dr. Nelken found, "certain trading decisions made by AGI US management in [Greg's] absence contributed to losses."  Levine Decl. Ex. A (Nelken Report) ¶ 64; *see, e.g.* Levine Decl. Ex. E, at 2-3 ("The Fund may, from time to time, temporarily invest all or substantially all of its available monies in certificates of deposit, money market funds, United States government obligations or other cash equivalent investments[.]").

>    Specifically, AGI US's decision to unwind a significant amount of option positions held by the Funds between March 16 and 18, 2020, which as Dr. Nelken opined, resulted in a loss of more than $2.6 billion.  Levine Decl. Ex. A (Nelken Report) ¶¶ 66–67.  Similarly, AGI US made the decision to trade out of "beta benchmark" positions in certain of the Funds.  In total, Dr. Nelken's analysis shows more than $900 million in avoidable lost principal by the end of May 2020 had the "beta benchmark" not been sold.  *Id.* ¶ 76.  In total, AGI US's decisions were responsible for more than the entire lost principal—$3.2 billion.  *Id.* ¶ 78; (*see supra* at 24).[9]

*    *    *

>    In sum, the Government's use of $3.2 billion in lost principal as the actual loss caused by the conduct in this case is inappropriate as a matter of law and unfairly seeks to punish Greg by failing to consider that, as a factual matter, Greg's misrepresentations did not cause the losses.  As

---

[8] The Restructuring Model accounts for margin issues and actively trades around those issues.  *See, e.g.*, Levine Decl. Ex. A (Nelken Report) n.54.

[9] As Dr. Nelken notes, to the extent AGI US may have liquidated the options positions and/or sold the beta benchmark in order to meet margin calls from prime brokers or address liquidity concerns, "any losses incurred as a result of margin calls or liquidity issues during the COVID-19 market dislocation are unrelated to any misrepresentations" by Greg.  Levine Decl. Ex. A (Nelken Report) ¶ 77.

Dr. Nelken opined, the Funds' risk-mitigation strategy, had it been implemented as in past downturns, was not responsible for the losses. Rather, it was "market or other forces" that caused the losses, *Rutkoske*, 506 F.3d at 179, including the extreme multi-week market downturn as a result of COVID-19, related margin and liquidity issues, and trading decisions by others in Greg's absence, none of which are attributable to Greg's misrepresentations. In light of the above, the Government cannot prove that the actual loss attributable to Greg's misrepresentations is greater than zero. Accordingly, application of the Section 2B1.1 loss enhancement is not supported.

## IV.    THERE IS NO REASONABLY FORESEEABLE PECUNIARY HARM PURSUANT TO GUIDELINE SECTION 2B1.1(B)(1)

Further confirming that application of the loss enhancement is inappropriate here, the actual losses were not a reasonably foreseeable potential result of Greg's offenses. Under the Guidelines, "actual loss means the *reasonably foreseeable* pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 Application Note 3(A)(i) (emphasis added). In turn, "reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant *knew or*, under the circumstances, *reasonably should have known*, was a potential result of the offense." U.S.S.G. § 2B1.1 Application Note 3(A) (iv) (emphasis added).

Thus, for Greg to be held accountable for the $3.2 billion dollars in actual lost principal under the Guidelines, the Government must prove that Greg must have known, or reasonably should have known, that future losses stemming from the COVID-19 market downturn would have been a potential result of periodic misrepresentations to a handful of investors in one-day reports. This the Government cannot do, and nothing in the PSR suggests otherwise. Plainly, neither Greg nor anyone else could have foreseen future trading losses and the total collapse of the Funds from the content of the misrepresentations made to certain clients, especially considering the unique and unprecedented impact of COVID-19. Therefore, no loss is attributable to him. Again, the $3.2

billion in actual losses incurred were the unforeseeable consequence of COVID market volatility, Greg's health issues, and, as explained above, AGI US's decision-making and abandonment of the Structured Alpha restructuring strategy in Greg's absence. Those losses are not the "reasonably foreseeable pecuniary harm" resulting from Greg's actions and do not qualify as loss under the Guidelines.

## THE DEFENSE'S PSR OBJECTIONS

The defense stands on its objections that Probation did not accept in the final PSR. In particular, the defense stands on its objections to the PSR's recitation of the facts concerning the obstruction conduct (*see* PSR ¶¶ 39, 47, 59) and AGI US's risk management issues (*see* PSR ¶¶ 33-36; 38).

## CONCLUSION

For the foregoing reasons, Mr. Tournant respectfully submits that the loss enhancement is inappropriate in this case, and that the Sentencing Guidelines call for a total offense level of 11 in Zone B.

Dated:  New York, New York
        November 1, 2024

By:    /s/ Seth L. Levine
       Seth L. Levine
       Alison M. Bonelli
       Julie-Irene A. Nkodo
       **LEVINE LEE LLP**
       400 Madison Ave
       New York, New York 10017
       Telephone: (212) 223-4400

       Daniel R. Alonso
       Olivia A. Rauh
       **ORRICK, HERRINGTON &**
       **SUTCLIFFE LLP**
       51 West 52nd Street
       New York, New York 10019
       Telephone: (212) 506-5000

       *Attorneys for Defendant Gregoire*
       *Tournant*