**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Case No. 22-CR-276 (LTS)

       v.

GREGOIRE TOURNANT,

           Defendant.

## DEFENDANT GREGOIRE TOURNANT'S REPLY MEMORANDUM IN SUPPORT OF HIS SENTENCING SUBMISSIONS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

   I.   A NON-CUSTODIAL SENTENCE IS WARRANTED AND JUST IN LIGHT OF
GREG'S HEALTH ........................................................................................................... 3

   II.   A NON-CUSTODIAL SENTENCE IS WARRANTED BECAUSE OF GREG'S
PERSONAL CHARACTERISTICS AND THE SUBSTANTIAL MONETARY
PENALTIES ................................................................................................................... 7

   III.  ACTUAL LOSS IN THIS CASE IS ZERO ................................................................ 8

   IV.  THE COURT SHOULD REJECT THE GOVERNMENT'S FLAWED LOSS
CALCULATION .............................................................................................................. 8

      A.   The Loss Causation Requirement Applies Even in Fraudulent Inducement Cases ...... 10

      B.   The Government's Description of the Offense Conduct Relies on Generalizations
and Inaccuracies ................................................................................................. 15

CONCLUSION................................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

*Koon v. United States*,
    518 U.S. 81 (1996) ........................................................................................................... 1

*Paroline v. United States*,
    572 U.S. 434 (2014) ..........................................................................................................11

*Pepper v. United States*,
    562 U.S. 476 (2011) ......................................................................................................... 1

*United States v. Ahuja*,
    No. 18-cr-328 (S.D.N.Y.) ................................................................................................ 6

*United States v. Balboa*,
    622 F. App'x 31 (2d Cir. 2015) .......................................................................................11

*United States v. Bankman-Fried*,
    No. S6 22-cr-673, 2024 WL 1342470 (S.D.N.Y. Mar. 15, 2024)................................10, 11, 13

*United States v. Barbera*,
    2023 WL 6095026 (S.D.N.Y Sept. 18, 2023) .................................................................11

*United States v. Bryson*,
    101 F. Supp. 3d 147 (D. Conn. 2015) ....................................................................... 12, 13

*United States v. Byors*,
    586 F.3d 222 (2d Cir. 2009) .......................................................................................... 12

*United States v. Gushlak*,
    2011 WL 3159170 (E.D.N.Y. Jul. 26, 2011) .............................................................. 14

*United States v. Gushlak*,
    728 F.3d 184 (2d Cir. 2013) ..................................................................................... 13, 14

*United States v. Hu*,
    No. 20-cr-360 (S.D.N.Y.) ................................................................................................ 6

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) ............................................................................................ 13

*United States v. Lumiere*,
    No. 16-cr-483 (S.D.N.Y.) ............................................................................... 6, 9

*United States v. Niebuhr*,
    456 F. App'x 36 (2d Cir. 2012) ......................................................................... 9

*United States v. Olis*,
    429 F.3d 540 (5th Cir. 2005) ........................................................................... 12

*United States v. Paul*,
    634 F.3d 668 (2d Cir. 2011)............................................................................. 12

*United States v. Rutkoske*,
    506 F.3d 170 (2d Cir. 2007) .................................................................... *passim*

*United States v. Shor*,
    No. 18-cr-328 (S.D.N.Y.) ................................................................................. 5

*United States v. Stitsky*,
    536 F. App'x 98 (2d Cir. 2013) .......................................................................11

*United States v. Tagliaferri*,
    No. 13-cr-115 (S.D.N.Y.) ................................................................................. 6

*United States v. Turk*,
    626 F.3d 743, 745 (2d Cir. 2010) .................................................................... 12

*United States v. Velissaris*,
    No. 22-cr-105 (S.D.N.Y.) ................................................................................. 5

*Williams v. New York*,
    337 U.S. 241 (1949) ......................................................................................... 1

**Statutes**

18 U.S.C. § 3553(a) ................................................................................... 2, 3, 7

Defendant Gregoire "Greg" Tournant, by and through his counsel, respectfully submits this reply memorandum in support of his Sentencing Submission (ECF No. 156) and Guidelines Submission (ECF No. 158).[1]

## PRELIMINARY STATEMENT

It has long been the "federal judicial tradition" for a sentencing judge to consider each defendant who appears before her as "an individual" and impose a sentence that abides the "principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (first quoting *Koon v. United States*, 518 U.S. 81, 113 (1996), then quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). While Greg unreservedly accepts responsibility for what he actually did, which, as explained below, is far more limited than the Government describes, he respectfully submits that the Court's sentence should account for the fact that he is a very sick man and that, as the Government does not dispute, the BOP's ability to provide him with adequate medical care is uncertain at best. Regardless of the Court's Guidelines calculation, Greg's severe health issues and his need for constant, complex, and cutting-edge medical care, coupled with his zero-point offender status and the fact that he has otherwise lived a decent and law-abiding life, demonstrate that a sentence that imposes a period of institutional incarceration would be overly punitive and life threatening. As such, any such sentence would be greater than necessary to comply with the purposes of federal sentencing.

The Government's November 15, 2024 sentencing submission (ECF No. 163, "Gov. Br."), while acknowledging that a variance from its Guidelines range is appropriate in this case, does not address or properly account for the serious negative effects and risks to Greg's health that would

---

[1] Terms not defined herein have the meaning ascribed to them in Greg's opening sentencing submissions.

1

result from an incarceratory sentence.  While notably acknowledging that Greg's health issues "merit serious consideration," Gov. Br. at 21, and that a variance is appropriate, such consideration is lacking in the Government's sentencing submission.  In fact, the Government's submission contains no discussion as to how Greg's health issues should impact the Court's sentencing determination, apart from arguing that a non-incarceratory sentence would create disparities with the sentencings of other individuals who either did not have any reported physical health issues or had health issues far less serious than those that afflict Greg.  The Government's dismissiveness of Greg's serious health issues in its submission does not conform to the analysis required under Section 3553(a) or provide the Court with any meaningful guidance as to the punishment that "fits" in this case.

The Government's sentencing submission also overstates Greg's offense as it relates to both the loss calculation under the Guidelines and Greg's actual conduct in this case.  The Government's assertion that Greg is responsible under the Guidelines even for losses that he did not cause is not only contrary to settled law, but it also conflicts with the Guidelines' stated purpose for using loss as a proxy for a defendant's culpability, as imperfect as that analysis has been found to be.  In addition, the Government's sentencing submission contains clear overstatements concerning Greg's offense conduct in this case.  The Government has not shown and cannot show any misstatements concerning the placement of hedges or risk management oversight, which are the only two misstatements generally applicable to all investors.  Instead, the Government resorts to vague references to broader misconduct that do not relate to any of the actual conduct in this case.  Similarly, the Government fails to grapple with the fact that the individualized altered reports were sent to only a handful of actual investors in the Funds, and, in certain circumstances, alterations were made to correct errors in the data or to reduce positive hypothetical returns.

2

Accordingly, Greg respectfully requests that the Court impose a non-custodial sentence that may include a period of home confinement because it is "sufficient, but not greater than necessary," to achieve the aims of sentencing.  18 U.S.C. § 3553(a).

## ARGUMENT

### I.    A NON-CUSTODIAL SENTENCE IS WARRANTED AND JUST IN LIGHT OF GREG'S HEALTH

The Government "does not contest that a downward variance is warranted in light of [Greg]'s health problems," Gov. Br. at 21, and acknowledges that "because of his health issues, [Greg]'s time in prison may be more difficult than it is for others," *id.* at 22.[2]  The Government conducted its own independent evaluation of Greg's health, including an examination by a distinguished Columbia University neurologist retained by the Government, interviews with Greg's physician and physical therapist, and a review of Greg's medical records, for the purpose of determining the extent of Greg's condition and the magnitude of the risks Greg faces if incarcerated.  *See* PSR ¶ 90.



---

[2] Should the Court accept Greg's proposed Guidelines calculation, a variance is not needed.  *See, e.g.*, Sentencing Submission at 3.



These expert views are echoed by those closest to Greg, who have observed the brutal consequences of his illness and described their concern for Greg's health and his life.  Sentencing Submission at 12-13; Sentencing Submission Levine Decl. Ex. A at 2 (A. Schuelke Letter) ("There have been many times over the last 4 years that I have been fearful for his life.").

It is similarly undisputed that, as shown in his opening submission, Greg's severe health conditions require constant, highly sophisticated, and unpredictable medical care and therapy, which he cannot receive should he be imprisoned.  Without this medical care and therapy, Greg faces a substantial risk of deterioration.  *See* Sentencing Submission at 13-14, 34-36;

███████████████████████████████████   The Government does not dispute that the BOP's ability to provide adequate medical care to Greg is uncertain at best, and the Government notably makes no effort to defend the BOP's troubling track record in treating inmates with serious health problems, including those inmates incarcerated in Federal Medical Centers.  *See* Gov. Br. at 21-23; Sentencing Submission at 36-40.[3]  Further, given the complexity of Greg's conditions, there is no serious argument that he can receive adequate care outside of the most sophisticated neurological treatment centers which, plainly, the BOP is not.

While acknowledging that Greg's health issues "merit serious consideration," Gov. Br. at 21, and acknowledging that a variance is appropriate, the Government's sentencing submission does not contain any discussion of, or take into account, the serious negative effects to Greg's health that would result from an incarceratory sentence.[4]  Rather, the Government's argument as to why Greg's health issues do not warrant a non-incarceratory sentence is limited to its assertion that such a sentence would not be consistent with "similar" cases.  *See id*. at 21-23.  But none of the Government's "similar" examples involve defendants, like Greg, with serious health issues that require complex, unpredictable, and cutting-edge care.  *See id.* 21-22; *United States v. Velissaris*, No. 22-cr-105 (S.D.N.Y. Mar. 24, 2023), ECF Nos. 92 (Sentencing Memorandum), 118 (Transcript of Sentencing Hearing) (defendant suffered from mental health and alcohol abuse issues, but not physical health conditions); *United States v. Shor*, No. 18-cr-328 (S.D.N.Y. Nov. 6, 2019), ECF

---

[3] If incarcerated, in light of Greg's health issues, it is likely that he will not be designated to a minimum-security institution and, instead, will be sent to a higher-security facility, resulting in far harsher conditions than a non-violent offender would otherwise face.

[4] The Government agreed "not [to] contest or otherwise oppose a non-Guidelines sentence based on the defendant's health conditions."  Plea Agreement at 4.  The Government's failure to provide any basis for limiting the downward variance it is now proposing is both inconsistent with the spirit of the Plea Agreement and fails to take Greg's humanity into account.

No. 299 (Sentencing Memorandum) (defendant was on the neurodiversity spectrum, but had no reported physical health conditions); *United States v. Ahuja*, No. 18-cr-328 (S.D.N.Y. Nov. 13, 2019), ECF No. 312 (Letter Regarding Sentencing) at 17  (describing how the stress of the case has affected defendant's health and including redacted references to doctors, but no suggestion of complex health issues such as Greg's neurological conditions); *United States v. Lumiere*, No. 16-cr-483 (S.D.N.Y. June 14, 2017), ECF No. 115 (Transcript of Sentencing Hearing) at 29:1-11 (defendant suffered from "certain psychological vulnerabilities that would . . . raise certain possible dangers or hardships associated with prison time" but does not discuss physical health conditions); *United States v. Hu*, No. 20-cr-360 (S.D.N.Y.  Apr. 4, 2022), ECF No. 72 (Sentencing Memorandum) at 7-9 (defendant suffered from obesity and a type of cardiac arrhythmia which required daily medication, but his conditions are not comparable to Greg's neurological conditions); *United States v. Tagliaferri*, No. 13-cr-115 (S.D.N.Y. Feb. 13, 2015), ECF No. 140 (Transcript of Sentencing Hearing) at 81:13-21, ECF No. 128 (Government Sentencing Memorandum) at 13-14 (defendant was 75 years old and as a result of his age suffered from "a host of ailments," but the Government did not support a variance on account of his health, as it does here).  As such, none of the examples that the Government provides are comparable to Greg's condition, and they therefore do not support its sentencing disparity argument.  Moreover, the Government makes no effort to address or distinguish the examples cited in Greg's opening submission in which Judges in this Circuit (and elsewhere) granted substantial downward variances below the advisory Guidelines range to defendants with complex or serious medical conditions.  *See, e.g.*, Sentencing Submission at 31-32 (citing to five federal cases in which courts have varied or departed downward on account of defendant's serious health challenges).

Accordingly, given Greg's severe medical conditions, which require constant, highly complex, unpredictable, and cutting-edge care, and the negative impact that imprisonment would have on his health, an institutional incarceratory sentence is overly punitive and "greater than necessary" in this case.  18 U.S.C. § 3553(a).  Greg therefore respectfully submits that the Court should not risk his safety or the deterioration of his health by imposing a sentence which includes a term of institutional imprisonment.  Instead, the Court should impose a sentence that can include home confinement along with the other penalties that will be imposed.  Simply put, a sufficient punishment in this matter can be crafted without unnecessarily putting Greg's life at risk.

## II.    A NON-CUSTODIAL SENTENCE IS WARRANTED BECAUSE OF GREG'S PERSONAL CHARACTERISTICS AND THE SUBSTANTIAL MONETARY PENALTIES

Aside from the conduct at issue, for which Greg is truly remorseful and accepts responsibility, Greg has lived a decent, honorable, and law-abiding life.  As detailed in the Sentencing Submission and as the letters from Greg's loved ones reflect, Greg's commitment to caring for his friends and family, his role as a caretaker for his grandmother and mother, his history of charitable works including his decision to pay over $1 million of his own money towards the salaries of hotel workers during the COVID-19 pandemic, and his role as a father, stepfather, godfather, and mentor to countless friends and other members of his community, strongly support a non-custodial sentence.  *See* Sentencing Submission at 41-47; Sentencing Submission Levine Decl. Ex. A (compendium of letters of support).  The Government fails to acknowledge these facts in its submission.

In light of his personal characteristics, his status as a zero-point offender, and his debilitating health conditions, a non-custodial sentence that may include home confinement, coupled with the substantial forfeiture of more than $17 million dollars that includes a $3 million dollar payment, serve as severe and substantial punishment.  *See* Sentencing Submission at 46-47,

52-56.  Indeed, the monetary penalties Greg is already facing, in addition to the numerous collateral consequences, including the loss of his career and the shame attendant to this highly-publicized matter, are devastating.  *See id.* at 54-55.  Accordingly, a non-incarceratory sentence is warranted.

## III.    ACTUAL LOSS IN THIS CASE IS ZERO

The Government incorrectly characterizes the defense's position on loss, suggesting that the defense's position is that loss "cannot be computed."  Gov. Br. at 11.  To the contrary, as discussed in detail in Greg's Guidelines Submission and as explained by Dr. Nelken in his expert report, for purposes of Greg's sentencing, the loss amount here is properly calculated as zero.  *See generally* Guidelines Submission; Guidelines Submission Levine Decl. Ex. A (Nelken Report) ¶¶ 12-16, 27-42.  This is because, as a factual matter, the evidence fails to establish that Greg's misrepresentations caused the losses.  As Dr. Nelken opined, the Funds' risk-mitigation strategy (including hedging for short-term market decline and restructuring for longer periods of market dislocation), was not responsible for the losses.  Rather, it was "market or other forces" that caused the losses, *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007), including the extreme multi-week market downturn as a result of COVID-19, related margin and liquidity issues, and trading decisions by others at AGI US in Greg's absence, none of which are attributable to Greg's misrepresentations.  *See generally* Guidelines Submission; PSR ¶ 40(b).

## IV.    THE COURT SHOULD REJECT THE GOVERNMENT'S FLAWED LOSS CALCULATION

The Government does not address or attempt to take on the defense's loss causation arguments or Dr. Nelken's analyses showing that the losses were caused by "market or other forces," *Rutkoske*, 506 F.3d at 179, not by any misrepresentations.  Instead, the Government asks the Court to find that Greg is responsible for all $3.2 billion in lost principal largely as an *ipse dixit*: everyone agrees that investors ultimately lost $3.2 billion in principal, therefore that is the

loss amount. If adopted, the Government's flawed loss calculation would undermine the very purpose of the Guidelines' use of "actual loss" as a proxy for a defendant's culpability—as "draconian" and "absurd" as that is, *see, e.g.*, Transcript of Sentencing Hearing, *United States v. Lumiere*, No. 16-cr-483 (S.D.N.Y. June 14, 2017), ECF No. 115 at 27:25-28:24.[5] As expressly reflected in the "Background" commentary to Section 2B1.1, the "sentencing enhancements for loss amount under the Guidelines are predicated on the notion that fraudsters who ***cause*** more monetary harm are more culpable and should therefore generally be given longer terms of imprisonment." *United States v. Niebuhr*, 456 F. App'x 36, 39 (2d Cir. 2012) (emphasis added); *see* U.S.S.G. § 2B1.1 cmt. Background ("The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss ***caused or intended*** by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline." (emphasis added)).

Despite asserting at the outset of its sentencing submission that loss causation matters, *see* Gov. Br. at 1-2 ("[w]hen the risks that [Greg] had lied about materialized, investors lost billions of dollars"), the Government devotes the entirety of its loss argument to explaining why it need not prove that any of the misrepresented risks actually materialized, *id.* at 11-16. The Government even goes so far as to argue that "the question of whether AGI's losses were caused by COVID-19 is legally irrelevant." *Id.* at 14-15.[6] Rather, by applying the label of "fraudulent inducement" to

---

[5] Even Probation agrees that the Government's loss amount is "somewhat overstated, or at least comingled [sic], with losses caused by the COVID-19 pandemic." PSR at 48.

[6] The Government does not address, let alone dispute, Dr. Nelken's conclusion that comparable funds experienced significant losses during the COVID-19 market downturn. *See* Gov. Br. at 14-

Greg's conduct, the Government contends that it is relieved of any obligation to prove loss causation, and that the appropriate measure of loss is the total amount of principal lost by investors regardless of whether there was any relationship between the fraudulent conduct and the amount lost.

The Court should reject the Government's baseless position.  First, the Government is required to prove loss causation even in fraudulent inducement cases.  Second, the Government's position is based on a flawed and, at times, misleading description of the offense conduct, which simply cannot be generalized to all investors.  The Government makes no attempt to offer individualized investor-by-investor proof of fraudulent inducement, nor could it.  Indeed, the Government has not shown any misstatements concerning the placement of hedges or risk management oversight, which are the only two misstatements generally applicable to all investors.

### A.  <u>The Loss Causation Requirement Applies Even in Fraudulent Inducement Cases</u>

As Greg demonstrated in his opening submission, the Second Circuit held in *Rutkoske* that U.S.S.G. § 2B1.1 requires the Government to prove loss causation, including demonstrating that "the misrepresentation proximately caused the economic loss."  506 F.3d at 179.  In arguing that the *Rutkoske* loss causation requirement does not apply in fraudulent inducement cases, the Government ignores the fact that this argument contradicts the position that it took earlier this year in *United States v. Bankman-Fried*, No. S6 22-cr-67 (S.D.N.Y.).  As reflected in the Government's sentencing memorandum in that case, the Government argued that *Rutkoske*'s loss causation standard applied to a scheme in which the defendant had fraudulently induced more than a billion

---

15.  Moreover, certain short volatility funds—including Malachite Capital Management, Parplus Capital Partners, and Alberta Investment Management Corp.—shut down as a result of the COVID-19 market disruption.  Guidelines Submission Levine Decl. Ex. A (Nelken Report) ¶¶ 61-62.

dollars of investments in FTX.com.  The Government's Sentencing Memorandum at 47, *United States v. Bankman-Fried*, No. S6 22-cr-673, 2024 WL 1342470 (S.D.N.Y. Mar. 15, 2024).

The Government likewise ignores the fact that its argument is contradicted by the very cases it cites in its submission.  For example, in *United States v. Barbera*, 2023 WL 6095026 (S.D.N.Y Sept. 18, 2023)—a fraudulent inducement case cited repeatedly in the Government's brief, *see* Gov. Br. at 12, 13, 15—the Court's holding that the "appropriate measure of loss [is] the amount that the defendant induced the victims to invest, less anything the victims received in return," *Barbera*, 2023 WL 6095026, at *2, was premised on its conclusion that the Government had satisfied the proximate cause standard set forth in the Supreme Court's decision in *Paroline v. United States*, 572 U.S. 434 (2014).  Rejecting the defendant's argument that there were intervening causes that "broke the chain of proximate cause," the Court found that there was "a clear '**direct relation**' between the 'injury asserted' by investors who suffered losses and the defendant's 'injurious conduct.'"  *Barbera*, 2023 WL 6095026, at *3 (emphasis added) (quoting *Paroline*, 572 U.S. at 444).

Unlike here, the "direct relation" standard was met in each of the cases on which the Government relies as to the entirety of the amount invested.  As discussed in Greg's opening brief, the Government cites a number of cases—including those cited in the PSR—involving a Ponzi scheme or a stock that was worthless at the time of the alleged misrepresentations.  *See, e.g.*, *United States v. Stitsky*, 536 F. App'x 98, 111 (2d Cir. 2013) (finding that the defendants failed to demonstrate that the district court's factual finding that "the Units [*i.e.*, the investment] 'conferred no value at all on the investors'" was clearly erroneous); *United States v. Balboa*, 622 F. App'x 31, 32 (2d Cir. 2015) ("[I]nvestor put[] money into a fraudster's hands, and ultimately received nothing of value in return." (quoting *United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012))); *Hsu*, 669

F.3d at 120-21 (addressing loss in a Ponzi scheme).  As the Fifth Circuit stated in *United States v. Olis*, 429 F.3d 540 (5th Cir. 2005), in a quote on which the Second Circuit relied in *Rutkoske*, "[i]n cases where defendants promoted worthless stock in worthless companies, measuring the loss as the entire amount raised by the schemes is neither surprising nor complex, and is fully consistent with civil loss causation." *Id.* at 546; *see also Rutkoske*, 506 F.3d at 180 n.4 (citing *Olis* and stating that "promot[ing] worthless stock in worthless companies . . .  would justify attributing the entire loss amount to [a defendant's] fraud").

Several of the other cases on which the Government relies involved fraudulently obtained loans.  *See, e.g.*, *United States v. Byors*, 586 F.3d 222, 224, 226 (2d Cir. 2009) (determining loss in a case in which the defendant's false statements related to the assets securing the victims' loans); *United States v. Paul*, 634 F.3d 668, 677-78 (2d Cir. 2011) (same); *United States v. Turk*, 626 F.3d 743, 745, 751 (2d Cir. 2010) (same).  In *Turk*, the Second Circuit made clear that *Rutkoske's* loss causation principle applied to schemes involving fraudulently inducing lenders to make loans. *Turk*, 626 F.3d at 751 (a sentencing court must determine "'the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses'" and finding that "the Government is *not* trying to limit the application of the causation requirement to securities cases" (quoting *Rutkoske,* 506 F.3d at 179)).  In holding that the amount of loss was the unpaid principal on the loans, the court found that the requisite direct relation between the fraudulent conduct and the unpaid loan balances existed because the fraud concealed the risk that materialized.  *Id.* at 748-51.

Moreover, in its zeal to avoid its obligation to prove loss causation, the Government mischaracterizes the District of Connecticut's decision in *United States v. Bryson*, 101 F. Supp. 3d 147 (D. Conn. 2015), as a scheme involving "false statements to investors about a fund's

12

investment strategy."  Gov. Br. at 13.  To the contrary, the defendants in *Bryson* fraudulently led one group of victims to believe that "they were investing in a structure where all investors were *pari passu,* when in reality, they were investing in a position junior to over $300 million of senior debt."  *Bryson*, 101 F. Supp. 3d at 155.  In addition, unlike here, there was a direct relation in *Bryson* between these false statements and the losses incurred by these investors when the fund went into bankruptcy.  *Id.* at 156 ("Inherent in this junior status was the risk that they would suffer a loss of their entire investment in a liquidation scenario in which priority was given to the senior investment.").  Thus, *Bryson* offers no support for the Government's position that it need not prove proximate cause in this matter.

In addition, there is no support for the Government's argument that *Rutkoske*'s loss causation requirement applies only to publicly traded stocks.  Gov. Br. at 14.  For example, the stock at issue in *Bankman-Fried* was not publicly traded and yet the Government contended that the *Rutkoske* standard applied in that case.  The Government's Sentencing Memorandum at 47, *United States v. Bankman-Fried*, 2024 WL 1342470; *see also United States v. Leonard*, 529 F.3d 83, 93 & n.11 (2d Cir. 2008) (applying *Rutkoske* to non-publicly traded securities).

The Court should also reject the Government's assertion that it need not even attempt a loss causation analysis based on its claim that the calculation would be difficult.  *See* Gov. Br. at 14 (asserting that *Rutkoske* does not apply because its loss calculation methodology would not work in this case).  As the Second Circuit has made clear, the Government may not avoid its obligation to present evidence on loss causation in situations in which the loss is "extremely difficult to value."  *Leonard*, 529 F.3d at 93 (vacating the sentences and remanding for resentencing based on the district court's error in computing the loss amount as equal to the entire cost of the securities without deducting the value of the securities received); *see also United States v. Gushlak*, 728 F.3d

13

184, 197 (2d Cir. 2013) ("Although performing the task may be a challenge in any particular case, as a general matter, it is necessary to a determination whether particular losses were 'directly and proximately' caused by fraud, or instead by the materialization of some non-fraud risk, against which investors are not protected by the securities laws." (citing, among other cases, *Rutkoske*, 506 F.3d at 178-79)).

For similar reasons, the Court should reject the Government's argument that the Court should alternatively use gain as a proxy for loss in the event that the Court rejects its loss calculation. Gov. Br. at 15-16. The Guidelines permit the Court to use "the gain that resulted from the offense as an alternative measure of loss ***only if there is a loss but it reasonably cannot be determined***." U.S.S.G. § 2B1.1 cmt. n.3(B) (emphasis added). Given that the Government does not claim to have retained an expert or made any effort to calculate the actual loss to investors in the Funds, there is no support for its assertion that the loss cannot be determined. To the contrary, as shown in Greg's Guidelines Submission and the Nelken Report, the loss is calculable, and in fact, there was no loss to investors that was proximately caused by the fraudulent scheme, or any "direct relation" between the fraudulent scheme and the Funds' losses. *See* Guidelines Submission Levine Decl. Ex. A (Nelken Report) ¶¶ 12, 27-79; Guidelines Submission at 18-25, 30-35. Indeed, the Government's acknowledgement that "the fraud had not yet been revealed when the losses occurred," Gov. Br. at 14, constitutes an admission as to the lack of a direct relation between the fraud and the losses. *See, e.g.*, *United States v. Gushlak*, 2011 WL 3159170, at *5 (E.D.N.Y. Jul. 26, 2011) ("There is no causal link between the revelation of fraud and the decline in the price of GlobalNet stock because the revelation of fraud occurred long *after* the price declined. The court cannot infer that any part of the decline in GlobalNet's market price was attributable to a fraud of which the market remained entirely unaware." (citing *Rutkoske*, 506 F.3d at 179)).

Accordingly, the Court should reject the Government's argument that it is not required to prove loss causation or, alternatively, that it can rely on gain.

**B.  The Government's Description of the Offense Conduct Relies on Generalizations and Inaccuracies**

Greg fully accepts responsibility for the actual offense conduct in this matter.  He altered reports sent to investors in the Funds without telling those investors that the reports were altered, which was wrong.  In arguing that losses should include all lost principal in the Funds, the Government uses generalizations to paint a false picture of the offense conduct in which Greg "systematically" provided the Funds' investors with misleading information about the riskiness of his investment practice such that "[w]hen the risks that [Greg] had lied about materialized, investors lost billions of dollars."  Gov. Br. at 1-2; 16.  The facts simply do not support the far-reaching scheme described by the Government, or that the Government's generalized description of the misrepresentations fraudulently induced all investors to invest.  There are only two alleged misrepresentations applicable to all investors.

First, the Government contends that Greg misrepresented the strike distances of hedges in various marketing materials, telling investors that the hedges were in the -10% to -25% strike distance range, when in fact they were further out of the money.[7]  Gov. Br. at 4-5.  The Government tells the Court that these further-out-of-the-money hedges were "less protective in the event of a

---

[7] The Government contends that "beginning in February 2018, tail risk hedges were purchased at strike prices that averaged between -30 to -50% out of the money."  Gov. Br. at 5.  As Dr. Nelken opines, a review of the hedging placements indicates that the cost-weighted average statistical distance for the hedging positions stayed within the -10% to -25% range nearly 75% of the time during the period from February 2018 forward.  Reply Levine Decl. Ex. A (Nelken Supplemental Report) ¶ 10.  This is consistent with what Dr. Nelken would expect to see in a dynamically managed fund like the Structured Alpha Funds, which had a strategy of replacing positions every six to eight weeks during which time positions could generally fluctuate around the range due to market moves.  *Id.*

market downturn." *Id*. at 5. But the defense has conclusively shown that, in the scenario that actually transpired in this matter, the hedges were not "less protective in the event of a market downturn." Rather, the hedges that were in place at the beginning of the COVID-19 market disruption, which were designed to protect against an overnight or short-term crash scenario, performed just as well—and provided slightly *more* protection against a market downturn—than if all the hedges had been placed in the -10% to -25% range. Guidelines Submission at 19-20, 31-32; Guidelines Submission Levine Decl. Ex. A (Nelken Report) ¶ 41. The Government has failed to offer any evidence to dispute this point.

Further, given that the hedging representations were made in marketing materials on a slide entitled "Position examples," the Government's generalized contention that all investors were therefore deceived is unreasonable.[8] The Government does not dispute that the representation about hedging placements was in one bullet on a slide in the Funds' marketing decks called "Position examples." Gov. Br. at 4. The Government also does not dispute that some of these "Position examples" slides even expressly noted that "the hedges were '*typically*' within the -10 to -25 range." *Id.* (emphasis added). Nor was AGI US required to hedge in any particular manner by the relevant Fund documents, which gave the Funds wide discretion concerning what securities to purchase. *See* Guidelines Submission at 10, 14-15.

Second, the Government contends that Greg misrepresented the level of AGI US's oversight to investors. Gov. Br. at 3. The Government has not offered and cannot offer any specifics about these alleged risk management misrepresentations beyond the general contention

---

[8] That these were "examples" is supported by the fact that certain investors who asked for the data were given unaltered holdings data from which those investors could have discerned the actual placement of the hedges and easily seen particular positions that were outside of the -10% to -25% range. Reply Levine Decl. Ex. A (Nelken Supplemental Report) ¶ 11.

that "AGI US repeatedly represented to investors in marketing materials" for the Funds that risk was managed and monitored by virtue of "three lines of defense": (i) the business, including portfolio management and sales; (ii) Enterprise Risk Management ("ERM"), Compliance, and Legal departments; and (iii) an Internal Audit function. *Id.* But these statements regarding AGI US oversight were true, and nothing in the PSR demonstrates otherwise. ERM was a real department at AGI US with dedicated employees whose function was to independently oversee the "operational and portfolio risks for AllianzGI's business." *See* Reply Levine Decl. Ex. B (May 5, 2021 Presentation to the SEC) at 8, 38. Investment Data Services GmbH – Analysis and Reporting Services ("IDS"), an affiliate of AGI US, was responsible "for generat[ing] daily risk reporting and stress tests based on parameters set by the ERM." *See id.* at 39. To the extent a parameter was exceeded on a daily risk report, ERM was notified and addressed the issue. Moreover, the marketing materials containing these representations about the "three lines of defense" were approved by AGI US Legal and Compliance departments. PSR ¶ 34.[9]

As set forth in the AGI US Statement of Facts in connection with its plea agreement, and as noted in the PSR, AGI US admitted that there were "gaps and weaknesses" in its controls, as those controls related to the Funds.[10] But those were isolated issues relating to AGI US's failure to identify the altered reports sent to a handful of investors by members of the Structured Alpha Team, including Greg, and the Government does not point to any evidence that these risk

---

[9] The Government points to only one specific statement made by Greg to a single investor pertaining to risk management: a 2014 statement by Greg during a presentation in which Greg told "one investor that the Funds had 'very strict controls' and described AGI US's parent company, Allianz, as a 'master cop.'" Gov. Br. at 3. Setting aside whether this statement even rises to the level of a misrepresentation, this 2014 statement made to a single investor is a far cry from a "systematic" misrepresentation of AGI US's risk management oversight.

[10] *See* AGI US Statement of Facts ¶ 15, available at https://www.justice.gov/usao-sdny/press-release/file/1506871/dl; PSR ¶ 34.

management "weaknesses" are generalizable to all investors or, indeed, were the responsibility of Greg and his small portfolio management team to manage properly.  Indeed, the Government does not dispute that the Funds were a flagship product of AGI US, with a 15-year track record of profitability; the strategy of the Funds was sophisticated and real; in exchange for their money, investors received legitimate interests in legitimate securities and derivatives; investors' money was in fact invested in the Funds, and not simply used to pay earlier investors to create an illusion of legitimacy and profit; there are no allegations of commingled funds; each investor's account was scrupulously maintained and accounted for by an independent, third-party administrator; there is no dispute that the actual performance of the Funds was accurately represented and verified by third parties; and Greg invested side-by-side with investors in the riskiest Fund, strongly demonstrating his confidence in the Fund and its strategy.  Guidelines Submission at 15, 29-30.

Lastly, the altered data in reports sent to a handful of investors is more limited than the Government describes.  As discussed in the Guidelines Submission, the individualized altered reports were sent to only a few investors over a period of six years along with unaltered data, were for one-day metrics, and had no bearing on the losses suffered in March 2020 or the risks associated with a multi-week market downturn.  Guidelines Submission at 11-13, 17-18.  Moreover, in certain instances, alterations were made to correct errors in the data, *see* Gov. Br. at 6-7, or to reduce positive hypothetical returns.

Indeed, many of the Government's representations about the altered data overstate the nature and circumstances of Greg's offense.  For instance, to support its argument that Greg "fraudulently altered the data that was provided to investors in a way that consistently understated the magnitude of the risk to which the investors were exposed," the Government contends that Greg "altered open position[s] worksheets, which showed each position in the portfolio, before

certain investor meetings." Gov. Br. at 5. As the Government conceded in its responses to the defense's PSR objections, the meeting the Government identified in which Greg altered open positions worksheets pertains to a meeting with a *prospective* investor, who never actually invested in the Funds and is not on the Government's list of victims. *See* PSR at 37-38 (Objections); PSR ¶ 25.

The Government also contends that Greg's "scheme is most starkly apparent" in his "lies" concerning the "variable alpha" targets. Gov. Br. at 17. These purported lies pertain to a single investor that was in a unique position with a unique agreement with AGI US in which the aggressiveness of its investments (*i.e.*, the alpha targets) changed based on the volatility of the markets. The Government suggests that this investor was exposed to "greater financial risk," Gov. Br. at 7, because its investments were managed at a riskier-than-agreed-to level (*i.e.*, a higher alpha target). However, as Dr. Nelken opines, Greg had the discretion under the agreement with this investor to substantially increase the alpha target in light of the increasing market volatility during the COVID-19 market dislocation. During the critical time when the losses occurred between February 24, 2020 and March 6, 2020 (Greg's last day in the office before his health issues), Greg did not increase the alpha target to the maximum alpha target within the agreed-upon range, and in fact, stayed below the maximum agreed-upon alpha target. Thus, during the COVID-19 market dislocation and while Greg was at the helm, this investor's money was not managed to a higher-than-agreed-upon level of risk. Reply Levine Decl. Ex. A (Nelken Supplemental Report) ¶¶ 6-7. Dr. Nelken further concludes that this investor lost less money through mid-March 2020 than it otherwise would have, had its investments been managed to the maximum agreed-upon alpha target, as opposed to the actual alpha target. *Id*. at ¶ 8.

Lastly, the Government calls Greg's alterations to "daily" risk reports the "most pervasive[]" alteration. *See* Gov. Br. at 18. The Government mentions, but glosses over, the fact that as noted in the PSR, certain changes to the daily risk reports were made to correct errors in the IDS data. Gov. Br. at 6; PSR ¶ 27. Similarly, these risk reports sent to investors were for one-day risks and were generated to model "the impact of various one-day changes in the market on the Structured Alpha Fund[s]." PSR ¶ 27. As a result, like many of the other altered reports sent to investors, these reports regarding risk pertained to one-day risk analytics and could not predict or assess how the Funds would behave during a long-term market event such as the COVID-19 market dislocation. Guidelines Submission Levine Decl. Ex. A (Nelken Report) ¶¶ 13, 27.

Accordingly, the Government's loss argument is based on generalizations and inaccuracies in the offense conduct, which do not support the Government's far-reaching fraudulent scheme or support the Government's theory that Greg's misrepresentations fraudulently induced all investors to invest.

\*     \*     \*

In sum, in determining the appropriate Guidelines calculation for Greg, the Court should reject the Government's flawed theory of loss, which seeks to hold Greg responsible for the total amount of principal lost by all investors, regardless of whether there was any relationship between the fraudulent conduct and the loss. The Government's theory is contrary to the law and the defense's undisputed expert analyses, and is belied by the actual offense conduct in this case, which is narrower than the Government portrays. Therefore, Greg's proposed Guidelines calculation is correct and should be adopted. Regardless of the Court's Guidelines calculation, however, Greg's severe health issues and his need for constant, complex, and cutting-edge medical care, in addition to his zero-point offender status and the fact that he has otherwise lived a law-abiding life,

demonstrate that an incarceratory sentence is overly punitive, life threatening, and greater than necessary to comply with the purposes of federal sentencing.

## **CONCLUSION**

For the foregoing reasons and those set forth in Sentencing Submission and Guidelines Submission, Greg respectfully submits that a non-custodial sentence that may include a period of home confinement, the $17,577,908 forfeiture obligation, and the mandatory $200 special assessment, is "sufficient, but not greater than necessary" to achieve the aims of sentencing.

Dated: New York, New York
November 27, 2024

By:     /s/ Seth L. Levine
Seth L. Levine
Alison M. Bonelli
Julie-Irene A. Nkodo
**LEVINE LEE LLP**
400 Madison Ave
New York, New York 10017
Telephone: (212) 223-4400

Daniel R. Alonso
Olivia A. Rauh
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000

*Attorneys for Defendant Gregoire Tournant*